UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| PAULA M. LELIGDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT A. McDONALD, | ) | |
| SECRETARY, | ) | Case No. 1:14-cv-02810-DCN |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF VETERANS' AFFAIRS | ) | |
| Louis Stokes Cleveland VA Medical Center | ) | |
| 10701 East Boulevard, | ) | |
| Cleveland, Ohio 44106 | ) | |
| | ) | |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

### Nature of Action

1.     After Paula M. Leligdon ("Plaintiff" or "Leligdon") disclosed the destruction of

evidence and filed her own discrimination complaint, VA management in Cleveland denied her

promotion, disciplined her for what she said, and subjected her to harassment, surveillance, close

supervision and a hostile work environment. She brings this action against Defendant, the Secretary, Robert A. McDonald, of the United States Department of Veterans Affairs ("Defendant" or "VA"), under Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and the Age Discrimination in Employment Act ("ADEA").

2.      Leligdon began working for the VA in 2004 in the Social Work department. Over the past ten years, Leligdon ascended the ranks at the VA, and is currently a GS-12 Supervisor, Psychiatry Social Work. Leligdon supervises and manages a staff of eleven social workers and one assistant, and covers eight different psychiatric service areas. Among her myriad of duties, Leligdon works closely with each of her Program Managers and Team Leaders to ensure that veterans' social work needs are met; she assists her staff to ensure compliance with all VA polices and training requirements; makes personnel decisions regarding leave requests and discipline; provides hiring recommendations for open social work positions; participates in 24/7 social work supervisory coverage for the VA Medical Center; and is an active participant in the Ethics Committee and Psychiatry Managers' Meetings. While performing each of these duties, Leligdon has strived to ensure exceptional service to veterans. In so doing, Leligdon has placed primary importance on the overall mission of the VA to deliver exceptional mental health services to Veterans. Her focus on the VA's mission—rather than her personal interests—has put Leligdon at odds with VA management at the Louis Stokes Medical Center, who, since 2010, have subjected Leligdon to unlawful discrimination, outright hostility, maltreatment, humiliation, isolation and retaliation. They have denied her promotion, downgraded her performance rating and subjected her to harassment, surveillance, close supervision and a hostile work environment.

**Jurisdiction and Venue**

3.      This civil action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"). Also, the defendant is an official of the United States Government sued in his official capacity. Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346.

4.      Since 2011, Leligdon has timely filed complaints of discrimination with the VA's Office of Resolution Management ("ORM"), complaining of the unlawful acts alleged herein.

5.      Leligdon satisfied all administrative and jurisdictional requirements for bringing the instant action to this Court.

6.      At all times relevant to this action, the VA committed all of the actions which comprise the unlawful employment practices alleged herein within the jurisdiction of the United States District Court for the Northern District of Ohio. Thus, venue properly lies before this Court pursuant to 28 U.S.C. § 1391(b) (2). Venue in this district is also proper under 42 U.S.C. § 2000e-5(f)(3).

**Parties**

7.      Leligdon is a resident of the State of Ohio, and she has been an employee of the VA's Louis Stokes Cleveland, Ohio, Medical Center since 2004. In 2005, Leligdon became a member of the Psychiatry Grand Rounds Committee of the Medical Center.

8.      Robert A. McDonald is the Secretary of the United States Department of Veterans Affairs. He is sued here in his official capacity.

## Facts

*In 2010, when Leligdon disclosed information about the death of a client in an altercation at a VA Medical Center, and thereafter the destruction of evidence, the VA began subjecting Leligdon to unlawful discrimination. Leligdon's filing two EEO complaints, that, in turn, resulted in the VA retaliating against her by downgrading her performance and encouraging her staff to file complaints against her.*

9.      In April 2010, a veteran was involved in an altercation with another veteran at the Brecksville VA Outpatient Mental Health Clinic, which resulted in the first veteran's death.

10.     Following the directions of her then-supervisor, Dale Goldstein (Assistant Chief of Social Work), Leligdon completed and submitted a Report of Contact (ROC) concerning the altercation and the veteran's ensuing death. Goldstein told Leligdon that she should just copy the CPRS note in her ROC, but Leligdon made additional disclosures. Her additional disclosures included information about how upset the veteran was, how the veteran's presenting conditions would support a conclusion that medical staff could have done more to prevent the veteran's death, or both. In or around 2010 after the veteran's death, Leligdon's colleagues, including Goldstein and Joe Aquilina, the Chief of Social Work, ceased their regular communications and interactions with her. Goldstein, however, repeatedly told Leligdon, "You should have listened, if only you would have listened to me."

11.     Following the April 2010 incident, the VA started to unlawfully target Leligdon, and subjected her to surveillance at her home, in her community and elsewhere. The surveillance involved the participation of other law enforcement agencies including but not limited to Medina County and Medina City law enforcement agencies.

12.     During or around 2010 and 2011 and continuing thereafter, some VA staff avoided Leligdon, closed their doors, and refrained from working with Leligdon.

13.     During or around 2011, Stephanie Martin and another provider told Leligdon that Dr. David Blank, the Assistant Chief of Psychiatry, encouraged the staff to target a medical provider whom the Psychiatry Service/Medical Center wanted dismissed.  In 2013, a VA psychiatrist told Leligdon that the psychiatrist was leaving the current practice area because Dr. Blank had targeted the psychiatrist. From 2011 to the present, the Cleveland VA Medical Center maintained a culture in which certain managers could target other staff members for hostile treatment that could be damaging to the careers of those targeted. This cultural attribute is part of a broader culture of suppressing criticism by engaging in reprisals against those who engage in criticism or otherwise associated with such critics.

14.     Shortly after receiving the January 2011 disclosure about being targeted, Leligdon informed Goldstein that she was being maltreated and targeted. Leligdon disclosed that staff were avoiding Leligdon, closing their doors, and refraining from working with Leligdon,

15.     During or around January 2011, Joe Picklo, the VA Privacy Officer, issued a memorandum to VA staff.

16.     At a February 4, 2011, VA Ethics Committee meeting (which Leligdon attended via conference call, while Aquilina was in the same room as Leligdon), an unidentified female caller indicated that she discovered an employee was about to reveal information via social media sites. The female caller said that if the information had been disseminated to the media and public, it would have destroyed the VA Medical Center. Upon discovering the imminent disclosure, the female caller said that she contacted Joe Picklo, the VA Privacy Officer, and asked him to have the evidence destroyed. According to the female caller, Picklo did, indeed, destroy the evidence. On January 18, 2011, the Privacy Officer (Picklo) sent an email to all Cleveland VA staff reminding them to be "cognizant of discussing patient and employee issues in areas that

5

are not conducive in maintaining auditory privacy." The email added, "Remember, an inappropriate verbal disclosure is no different than a physical privacy breach." On February 3, 2011, the Privacy Officer's department sent an email prohibiting the dissemination of information pertaining to "personal activities occurring within the medical center" to social media sites.

17.    As soon as it became known that Leligdon was present in the room with the other persons attending the February 4, 2011 meeting via conference call, her presence was announced on the call, which immediately terminated the female caller's continued comments.

18.    In April 2011, Leligdon and other VA personnel were subpoenaed to testify in a hearing regarding the veteran's death. The case settled before the hearing.

19.    The VA's unauthorized surveillance of Leligdon escalated in 2011.

20.    During or about March 2011, Leligdon interviewed for a position as a Caregiver Support Coordinator. VA management did not select her for this position even though Leligdon had the superior qualifications.

21.    In April 2011, Leligdon initiated contact with an EEO counselor, and filed a formal EEO complaint in June 2011, alleging age and gender discrimination (EEOC Case No. 532-2012-00027X). In 2010, Aquilina and Goldstein had told Leligdon that they are notified immediately whenever an EEO complaint is filed which involves their service, and that the Director of Social Work Services is first notified by the EEO manager of EEO complaints. Leligdon's June 2011 EEO complaint was ultimately dismissed.

22.    In April 2012, one of Leligdon's employees told Leligdon he was aware that she was being bad-mouthed by other VA employees at the Louis Stokes Medical Center, and he was confused about what he had been hearing about her.

23.     In the Spring of 2012, Leligdon overheard two of her staff members (Copen and Lipkin) speaking derogatorily about her while in an employee parking garage. VA management failed to take any actions to address the bullying behavior against Leligdon.

24.     On or around May 18, 2012, Leligdon applied for the position of Assistant Chief of Social Work. Leligdon was deemed qualified, and she was one of three persons who interviewed for the position. Despite Leligdon's being highly qualified for the position, the VA Medical Center selected Felix Christopher Esmurdoc, who was considerably younger and less qualified than Leligdon.

25.     On June 20, 2012, Dr. Blank informed Leligdon that she had been removed from the Psychiatry Grand Rounds Committee, a committee Leligdon had been involved in since 2005. No other Committee members were removed at this time. Dr. Blank initially told Leligdon the reason for her removal from the committee was a restructuring of the committee. Subsequently, however, Dr. Blank admitted to Leligdon that he headed up the committee, and he simply decided to remove her from it.

26.     Also in June 2012, Leligdon was removed from the Mental Health Monitor Committee. Leligdon's repeated requests to Dr. Linda Bond (Manager, Psychiatry WP) and Dr. Konicki (Chief of Psychiatry) for an explanation of her removal went unanswered. Dr. Bond stated that Joe Aquilina would represent Social Work, but Aquilina denied this to Leligdon.

27.     On July 23, 2012, Leligdon filed another formal EEO Complaint (EEOC Case No.: 200H-0541-201203512), claiming that Aquilina, Dr. Blank, and Dr. Bond, had engaged in unlawful reprisals against her, when they removed her from the Psychiatry Grand Rounds Committee and the Mental Health Monitor Committee. Leligdon further claimed unlawful age and gender discrimination and reprisal concerning her non-selection for the Assistant Chief of

Social Work position, a position which the VA granted in June 2012 to Christopher Esmurdoc, a younger, less-qualified candidate. Leligdon also claimed the VA was engaging in unlawful harassment against her.

28.     In August 2012, Esmurdoc (who became Leligdon's first-line supervisor in June 2012), acknowledged to Leligdon that he was aware of the rumors and gossip being spread around the Louis Stokes VA Medical Center about Leligdon. Esmurdoc encouraged Leligdon to speak with Employment and Labor Relations Specialist Denise Calabrese about the staff members who were speaking derogatorily about her, and to speak directly with these staff members about their conduct. Other than making these statements, Esmurdoc did nothing to stop the bullying behavior.

29.     Leligdon spoke with Calabrese in September 2012. Leligdon reiterated to Calabrese that she was being treated inappropriately, and how that mistreatment was negatively impacting her and her staff. Calabrese also advised Leligdon to speak with the two staff members who had spoken derogatorily about her in the parking garage, and to remind them that further incidents of such conduct may be cause for disciplinary action.

30.     Sharon Ezekiel informed Leligdon in or around October or November 2012 that Jason Gatliff, Head of the VA's Ethics Committee, and other Ethics Committee members, had been meeting privately about the Mental Health Advance Directive, excluding both Ezekiel and Leligdon (who were the co-facilitators) from the meetings.

31.     Following the advice of Esmurdoc and Calabrese, Leligdon spoke with Copen and Lipkin in November 2012. Copen admitted to Leligdon that he had spoken derogatorily about her, and stated he was not the only person who had done so. Leligdon reminded Copen that such

behavior was not appropriate, especially given that Jason Gatliff (Head of the VA's Ethics Committee) had just appointed Copen as the Ethics Consult Coordinator for the Medical Center.

32.     Leligdon also spoke with her other staff members in November 2012, who acknowledged they had heard the rumors being spread about her. One of these staff members told Leligdon that she would not want to even consider going into VA management, given the rumors and gossip that were being spread about Leligdon, and the bullying treatment she was receiving.

33.     During a conversation with another staff member in November 2012, Leligdon became emotionally upset as they discussed the maltreatment Leligdon was receiving by the VA Medical Center. The staff member informed Leligdon that the staff had been told she was dangerous, and they were warned to watch out for her. The staff member told Leligdon that this staff member was never concerned about Leligdon.

34.     In November 2012, Gatliff stated to Leligdon that he had difficulty working with her due to the rumors, gossip, and derogatory talk about her in the VA Medical Center. Gatliff also admitted he had personally participated in the gossip and rumors about Leligdon, and that he was aware of her 2012 EEO complaint. Gatliff nevertheless did nothing to address or stop the bullying behavior.

35.     During the November 2012 meeting with Gatliff, he also told Leligdon that he had told other Ethics Committee members about the rumors he had heard about Leligdon. Gatliff admitted that he should have handled the rumors differently, and that he should have handled the Mental Health AD committee issue differently. Though Gatliff promised Leligdon that he would include her in future Mental Health AD committee meetings, VA management prevented Leligdon from participating.

36.     In November 2012, Leligdon met with a VA pyschiatrist. They discussed the VA's maltreatment of Leligdon. Leligdon became emotionally upset during the meeting. The psychiatrist suggested that Leligdon perhaps find another job outside of the VA.

37.     Esmurdoc rated Leligdon as "Fully Successful" in her 2011-2012 Performance Appraisal. Leligdon had received "Outstanding" evaluations since 2007. During a meeting with Leligdon in November 2012, Esmurdoc acknowledged that he failed to consider Leligdon's self-assessment, which, according to Esmurdoc, did in fact show that she had worked above the Fully Successful level.

38.     Leligdon filed a grievance in November 2012 regarding her lowered performance evaluation.

39.     When Leligdon met with Picklo in December 2012, he told her that the current Director, Sue Fuehrer, was unwilling to address or reprimand upper management who violated the VA's policies and procedures or participated in misconduct or misbehavior – despite his urging her to do so. Picklo told Leligdon that as a result of Fuehrer's inaction, upper management's misconduct and misbehavior escalated, which was negatively impacting the Medical Center, its staff, and the veterans' care. Picklo advised Leligdon to pursue a civil law suit against the VA.

*After Leligdon filed her performance appraisal grievance, the VA escalated its hostilities toward her, with hostilities now coming from Calabrese, Fuehrer, the EEO Manager, and the Chief of Staff.*

40.     In January 2013, Leligdon went to Calabrese's office to hand-deliver a document regarding her grievance (as Calabrese was involved in handling the grievance). Calabrese's staff told Leligdon that Calabrese would be out after a meeting; Leligdon waited thirty minutes, then

was told that Calabrese had left. Calabrese participated in Leligdon's EEO claims on behalf of the VA Medical Center. Leligdon informed Calabrese's supervisor of the incident.

41.     On February 12, 2013, Leligdon sent a letter to the then-VA Secretary Shinseki, stating that she had been the target of unlawful actions by the VA, since she disclosed information about the death of her client in an altercation in April 2010. She sent copies of her letter to Attorney General Eric Holder and Ohio Attorney General Michael Dewine. She disclosed her involvement in Islamabad She provided copies of journal article showing that this involvement consisted of professional association with homeopathic practitioners there through her position as Executive Secretary of the Ohio State Homeopathic Medical Society. She informed Secretary Shinseki that she had been under surveillance, harassed, and was deemed a serious criminal. She informed Secretary Shinseki that her life had been threatened. Leligdon also told Shinseki about the cover-up of unlawful activity by the VA (the incident with Picklo destroying evidence about unlawful acts at the Medical Center), as well as her unwarranted removal from two committees and her not being selected for two positions for which she was the most qualified.

42.     Leligdon met with Dr. Murray Altose, the Chief of Staff, and Calabrese in March 2013 regarding the grievance of her performance appraisal. During the meeting, Leligdon openly questioned Calabrese's involvement in Leligdon's grievance as being a potential conflict of interest, given Calabrese's involvement in Leligdon's 2012 EEO case.

43.     On March 15, 2013, Fuehrer and Dr. Altose acknowledged receipt of her grievance, which included statements regarding the VA Medical Center's mistreatment of her, and Gatliff's admissions that he had difficulty working with Leligdon due to the rumors he had heard, and his participation spreading those rumors.

44.     Despite knowing about Gatliff's admissions, Fuehrer and Altose failed to take any action.

45.     On March 18, 2013, Dr. Altose issued a memorandum, upholding Esmurdoc's performance rating of Leligdon as "Fully Successful," and denying her grievance based on a finding of no violations on the part of the VA Medical Center.

46.     In the Spring of 2013, the VA Medical Center's EEO Manager, Andrea Freeman, sent Leligdon insulting, vituperous emails. In June 2012, Freeman had sent an email to the VA Medical Center's Service Chiefs, Supervisors, and Secretaries of the Service Chiefs, regarding the proliferation of harassment complaints against the VA Medical Center, and how the VA could avoid liability by taking immediate and appropriate corrective action. In her email, Freeman discussed in detail a case against the VA, in which a former VA employee had been the subject of continuous, denigrating rumors, and the VA was found liable because it did not take sufficient action to stop the rumors. Despite her knowledge of the potentially damaging nature of rumors being spread about VA employees, Freeman did nothing to stop the tide of rumors being spread about Leligdon. Rather, Freeman personally participated in such harassment of Leligdon and through her example fomented the tide.

47.     In March 2013, Leligdon spoke with the VA's ORM about possibly filing a complaint against Freeman. The ORM encouraged Leligdon to speak with Darlene Mathes, the EEO Lead Coordinator. On April 1, 2013, Leligdon spoke with Mathes about Freeman, who told Leligdon she had spoken with Freeman regarding her inappropriate communications with Leligdon. Mathes referred Leligdon to speak with Fuehrer for appropriate management of the situation. Leligdon did as Mathes recommended, sending supporting documentation to Fuehrer regarding her complaint about Freeman. Fuehrer, however, did nothing to correct Freeman's

behavior toward Leligdon and did not even reply for two months, and only after Leligdon's insistence for a reply.

48.     Before meeting with Leligdon on May 20, 2013, Esmurdoc initiated a discussion with Freeman about conducting an investigation into Leligdon.

49.     On May 20, 2013, Esmurdoc met with Leligdon to discuss complaints which Leligdon's staff had made against her. Esmurdoc told Leligdon that Lipkin and others had made these complaints, and, in an attempt to intimidate Leligdon, told her that Lipkin had been documenting her interactions with her. Esmurdoc further chastised Leligdon because she had asked for "more specifics" regarding his May 17, 2013 request to meet with him on May 20, 2013. Esmurdoc told Leligdon that requesting "more specifics" regarding meetings he requested was "not appropriate and will be viewed as insubordination."

50.     Esmurdoc revealed on May 21, 2013, that he was offended by what he perceived as Leligdon's blatant disregard and lack of respect for him. Esmurdoc prejudged the "complaints" against Leligdon, assuming them to be true without the benefit of a fair investigation reasonably designed to discover the true facts.

51.     On June 3, 2013, Aquilina and Esmurdoc met with Leligdon, and issued to her four ROCs from Lipkin, Copen, Kasidonis, and Dr. Blank, dated May 14, May 20, May 21, and May 29, 2013. Aquilina told Leligdon that he had personally encouraged completion of the ROCs by the staff, two of which he wrote himself on their behalf.  Aquilina and Esmurdoc also advised Leligdon that they intended to provide to the EEO investigator the names of the providers with whom Leligdon worked. Leligdon reminded Aquilina and Esmurdoc of the issues she previously had with Lipkin and Copen, she had a retaliation claim against Dr. Blank, Kasidonis worked under Dr. Blank.

52.     Esmurdoc met with Leligdon on June 12, 2013, and informed her that he had concerns about the amount of annual and sick leave she was using, and that he wanted her to increase her workload. Leligdon communicated to Esmurdoc that her increased use of annual and sick leave was due to the stress she was experiencing as a result of the VA Medical Center's retaliation against her. Leligdon also informed Esmurdoc that her workload was already higher than any other supervisor who had held her position.

53.     On July 22, 2013, Esmurdoc met with Leligdon, and threatened her that if she did not comply with his request to increase her clinical hours, he would withdraw his approval of her as continuing on as a Professional Standards Review Board member. Since the inception of the Supervisor of Social Work position, clinic time had been excluded from the Supervisor's duties. Esmurdoc was attempting to unilaterally impose this additional duty on Leligdon.

54.     On July 31, 2013, Esmurdoc issued to Leligdon a "Notification of unacceptable conduct/opportunity to improve." In his Notification, Esmurdoc stated that he had provided Leligdon with feedback regarding "your lack of respect and argumentative approach and your lack of cooperation and collegiality," and that she had responded with "aggressive and blatant attempts to disrespect me as your supervisor." He further stated that Leligdon's violations of the code of conduct "are consistent with feedback provided by some of your employees and provided to you in reports of contact on June 3, 2013." During his meeting with Leligdon on July 31, 2013, Esmurdoc snickered, laughed at Leligdon, and mocked her as he issued the Letter of Counseling.

55.     Also on July 31, 2013, Esmurdoc presented Leligdon with a reminder of policy regarding her requests for annual leave. Deviating from the VA Medical Center's annual leave policy, Esmurdoc required Leligdon to provide him with 72-hours advance notice of her intent to

14

take annual leave. The VA Medical Center's policy merely required that requests for annual leave "will be made in advance except in unusual situations." He also required her to speak directly with him or Aquilina, and stated that email requests or voicemail messages would no longer suffice. Esmurdoc further informed Leligdon that she would not be in an authorized leave status until she had received at least verbal approval from himself or Aquilina. No other subordinates are subjected to such requirements.

56.     Leligdon sent a letter to Fuehrer on August 4, 2013, regarding the July 31, 2013 Letter of Counseling Esmurdoc issued to her. In her letter, Leligdon explained that since 2004, her manner of requesting annual leave using emails, voicemails, and direct communications had always been approved; she had never been denied use of annual or sick leave; she had never been mandated to provide advance notice within a specified time frame (per Esmurdoc's requested 72-hour advance notice); that at the two meetings with Esmurdoc in which he expressed concern about the amount of annual and sick leave she was using, Leligdon had explained to him that her increased usage was due to the VA Medical Center's retaliation against her; that both Esmurdoc and Aquilina were directly involved in her 2012 EEO claim and her grievance; and that Esmurdoc and Aquilina had encouraged her staff to submit ROCs against her.

57.     In August 2013, Esmurdoc denied Leligdon's request to remain on the Professional Standards Review Board. Leligdon was the only Board member who had ever been denied permission to continue as a Board member.

*After Leligdon filed her third EEO complaint in August 2013, and after she was cleared of all the allegations against her, the retaliation and harassment against her intensified yet again, with Esmurdoc issuing another Letter of Counseling regarding her leave usage, Dr. Bond interfering with Leligdon's attempt to meet with a staff member concerning a family complaint, and Esmurdoc giving Leligdon another "Fully Successful" performance rating despite her Outstanding performance.*

58.     On August 30, 2013, Leligdon filed her third EEO complaint against the VA Medical Center, alleging discrimination, reprisal, harassment, and hostile work environment.

59.     On September 4, 2013, the EEO Manager issued a report, exonerating Leligdon of the hostile work environment allegations against her. Aquilina met with Leligdon to deliver the results of the report to her. All throughout the meeting, Aquilina avoided eye contact with Leligdon and did not offer any words of congratulations regarding her exoneration.

60.     On October 23, 2013, Esmurdoc issued a third Letter of Counseling to Leligdon, asserting she violated leave policy when she requested six hours of sick leave for October 8, 2013, yet failed to make an advanced request for annual leave for the remaining two hours on October 8, 2013, and when she failed to request 15 minutes of annual leave in advance on October 16, 2013, to cover the 15 minutes she was running late to the office. Esmurdoc charged Leligdon with AWOL for two hours on October 8, 2013, and AWOL for 15 minutes on October 16, 2013. Esmurdoc met with Leligdon on October 24, 2013, to present the Letter of Counseling to her. Aquilina was also present at this meeting, and he supported Esmurdoc's accusations and decision to charge Leligdon with AWOL. Esmurdoc was aware that the AWOL charge would lower Leligdon's wages. The decision to charge Leligdon with AWOL is a deviation from normal Center policy and practices that permit the use of annual leave to cover unexpected absences due to traffic, medical appointments or other circumstances beyond the employee's control.

61.     In response to Esmurdoc's October 23, 2013 Letter of Counseling, Leligdon wrote a letter to Fuehrer (and provided a copy to Altose, Aquilina, and Esmurdoc) on November 2, 2013. Leligdon explained that when she told Esmurdoc about her need to take sick leave on October 8, 2013, she also advised him that she might need to use both sick leave and annual leave to cover the eight hours, due to her low sick leave balances. She entered her request for two

hours of annual leave the very next day she returned – October 9, 2013. Leligdon explained in her letter that during her meeting with Esmurdoc on October 24, 2013, she stated the foregoing to him. Esmurdoc responded that his recollection of their conversation was different than Leligdon's, and that he had sent himself a text regarding their conversation. Regarding the October 16, 2013 AWOL charge, Leligdon explained in her letter that she arrived to work approximately 15 minutes late due to unavoidable traffic delays, and that rather than operating a telephone in the middle of rush-hour traffic to call Esmurdoc and request annual leave in advance, she entered her request for 15 minutes of annual leave when she arrived at the office. Leligdon also stated that all of her previous requests for annual leave to cover her late arrivals – up until October 16, 2013 – had been approved by every one of her previous supervisors, including Esmurdoc, and that she had used the same procedure since 2009 without any complaints. Prior to issuing Leligdon the Letter of Counseling on October 23, 2013, neither Esmurdoc nor any other supervisors or management had advised Leligdon that she needed to handle her requests for annual leave to cover late arrivals in a manner other than which she had been doing since 2009.

62.     In October 2013, one of the social workers supervised by Leligdon and assigned to work with Dr. Bond, John McKinney, refused to attend a meeting requested by Leligdon to discuss a complaint asserted against him by a veteran's family member. McKinney told Leligdon he was not able to attend the meeting because Dr. Bond told him his other staff duties took precedence over attending the meeting with Leligdon. The meeting was necessary for Leligdon to respond to a family complaint about McKinney's conduct with a veteran's family.

17

63.     When Leligdon subsequently requested Dr. Bond's assistance in managing the issue with McKinney, Dr. Bond accused Leligdon of harassing her. Dr. Bond also refused Leligdon's repeated requests to issue a ROC.

64.     In a meeting later in October 2013, Esmurdoc presented Leligdon with a ROC completed by Esmurdoc on McKinney's behalf. In the ROC, McKinney accused Leligdon of bullying him, and he mentioned the three previous ROCs against Leligdon which other staff members on his team had submitted. In July 2013, however, McKinney had denied any issues of harassment or hostile work environment by Leligdon during the EEO investigation of such claims against Leligdon.

65.     On December 2, 2013, Esmurdoc issued Leligdon another "Fully Successful" performance rating, despite her self-assessment which showed an outstanding performance in all elements, and which was comparable to previous years in which she had received an "Outstanding" performance rating. Aquilina approved the Fully Successful performance rating. Aquilina and Dr. Altose had denied Leligdon's grievance regarding her 2011-2012 performance appraisal. VA policy and practices provide for bonuses to those who get "outstanding" ratings, and support such individuals in future career advancement.

66.     On January 2, 2014, Esmurdoc and Aquilina met with Leligdon, and presented her with a memorandum from Dr. Altose. Dr. Altose ordered Leligdon to increase her clinic time, though Leligdon had provided documentation showing that her staff was being underutilized and had a low workload, and thus they could handle any increased need for clinic time. Dr. Altose also ordered Leligdon to meet in person with Esmurdoc and Aquilina, although he was quite aware of her discomfort in their physical presence due to their reprisals against her, and despite the fact that Leligdon had EEO claims against both Esmurdoc and Aquilina. Further, Dr. Altose

prohibited Leligdon from copying her attorney on emails, even though the emails were directly related to Leligdon's claims of harassment and retaliation. Dr. Altose threatened Leligdon with formal administrative action and potential disciplinary action.

67.     Also on January 2, 2014, Freeman informed Leligdon that her request for official time to prepare for her EEO claim would be limited to 16 hours, a decision that Freeman admitted to making.  This limitation was in contradiction to established VA protocol, policy, and the EEOC regulation, 29 C.F.R. § 1614.606(b).

68.     On January 2, 2014, Freeman responded to Leligdon's email requesting clarification of the VA policy allowing Freeman to limit her official time to 16 hours, stating that Freeman was updating VA policy. Freeman also told Leligdon that, "you are starting to harass and 'bully' me as usual so I will no longer respond to your email on this subject." Fuehrer was copied on the emails exchanged between Leligdon and Freeman. Fuehrer is Freeman's supervisor, and had been made aware by Leligdon of Freeman's other acts of disrespect toward Leligdon. Freeman was involved in all of Leligdon's EEO complaints. Fuehrer's failure to take corrective action against Freeman allowed Freeman to continue her bullying, retaliatory and disrespectful behavior toward Leligdon.

*Beginning in March 2014, the VA Medical Center stepped up its attacks on Leligdon, issuing one disciplinary action after another, denying her essential training, and escalating its unlawful surveillance of Leligdon.*

69.     On March 10, 2014, Esmurdoc issued Leligdon another Letter of Counseling for calling an employee, McKinney, at home after he had left a voicemail message for her and Dr. Bond requesting sick leave on February 4, 2014. Leligdon was calling McKinney pursuant to the VA's policy and practice of addressing patient care concerns. Esmurdoc cited to a provision in the 2011 Master Agreement between the VA and the American Federation of Government

19

Employees, Article 35, which provides that an employee may use voicemail to notify a supervisor of the type of leave requested, in the event the supervisor is not available. In contrast, as discussed in Paragraph 55 above, Esmurdoc told Leligdon that it was not sufficient for her to leave a voicemail message for him; rather, she had to verbally speak with him or Aquilina.

70.     Esmurdoc met with Leligdon on March 26, 2014, to deliver the March 10, 2014 Letter of Counseling. During the meeting, Esmurdoc snickered at Leligdon when she told Esmurdoc she would not have adequate time to respond to the Letter of Counseling within the short 3-day period he had given to her.

71.     Just five days later, on or about March 31, 2014, Esmurdoc and Aquilina issued a ROC against Leligdon, claiming she violated Dr. Altose's order not to include her attorney on emails, and that she was inappropriately using the restricted option in her Outlook webmail.

72.     On April 1, 2014, Esmurdoc and Aquilina prohibited Leligdon from using the restricted option in Outlook for all her email communications, even though this option is available for all VA employees' use. Esmurdoc denied Leligdon's request for an explanation of this prohibition.

73.     On April 4, 2014, Esmurdoc and Aquilina each issued Leligdon a ROC regarding the situation referred to in the March 10, 2014 Letter of Counseling. The ROC also noted that Leligdon told Esmurdoc and Aquilina that she would not have time to respond to the March 10, 2014 Letter of Counseling within three days.

74.     On April 4 and April 7, 2014, Esmurdoc denied Leligdon's requests for an authorized absence so she could attend training that would enable her to maintain her State licensure and Medical Center training requirements. Esmurdoc provided no rational basis for his denial.

75.     Leligdon requested assistance from Dr. Altose on April 9, 2014, regarding Esmurdoc's denial of her request for an authorized absence so she could attend the essential training. Dr. Altose denied her request for assistance on April 11, 2014, upholding Esmurdoc's denial and without providing any basis for his decision. During the ten-year period of time Leligdon worked at the VA Medical Center, this was the first time any of her requests for an authorized absence to attend training were denied.

76.     On May 12, 2014, Aquilina issued Leligdon a Notice of Proposed Suspension dated May 9, 2014. The Notice of Proposed Suspension charged Leligdon with (1) "Conduct Unbecoming of a Supervisor," (2) "Failure to Follow Instructions", and (3) "Inappropriate Use of Email." Regarding the first charge, Aquilina stated that Leligdon had sent an email on April 23, 2014 to her entire Cleveland VA Medical Center chain of command, complaining of six items that were, *inter alia,* accusations tailored to infer illegal practices, poor judgment, and unlawful and biased decisions. Aquilina also noted that Leligdon had sent emails to her chain of command on April 4, April 9, and April 11, 2014, regarding Esmurdoc's denials of her requests for authorized absences to attend training. Aquilina said that Leligdon's April 4 email was not based on any protected activity that she needed to disclose. He said Leligdon's behavior was "absolutely disrespectful and shocks the conscience and any basic good manners and business standards." Aquilina further cited to an email that Leligdon sent to Freeman on March 12, 2014, on which she copied her chain of command, responding to an email Freeman sent to her, telling Freeman, "I'm sorry that you feel the need to be so rude, defense [sic] and accusatory…." Commenting on Leligdon's email to Freeman, Aquilina wrote that, "[y]ou obviously did not like her response." Lastly, Aquilina referred to an email which Leligdon sent to her subordinates, Fuehrer, and Dr. Altose on April 9, 2014, asking them to review the VA's EEO, Diversity,

21

Inclusion, and No Fear policies. Aquilina quoted Leligdon's sentence in her email stating that, "I have learned a great deal about civil rights and liberty's [sic] the past several years." Aquilina wrote that, "[t]his sarcasm is extremely inappropriate, especially when the highest chain of command in our Medical Center is included."

77.     Regarding charge 2 in the May 9, 2014 Notice of Proposed Suspension, Aquilina stated that Leligdon's continued use of the restricted option in her Outlook emails "creates hostility."

78.     Regarding charge 3 in the May 9, 2014 Notice of Proposed Suspension, Aquilina referred to the emails which Leligdon sent on April 9 and April 11. Summing up his charges against Leligdon, Aquilina wrote that "[y]our actions are disturbing, unwarranted and abusive. You are prompt to 'bully' and exaggerate responses to minor day to day disagreements."

79.     On May 23, 2014, Esmurdoc and Aquilina issued Leligdon a Letter of Reprimand dated May 22, 2014. In the May 22, 2014, Letter of Reprimand, Aquilina charged Leligdon with "Failure to Follow Instructions" regarding her copying a non-VA attorney (her undersigned counsel who was her counsel of record for her EEO complaints) on emails she sent on May 21, 2014, to Kevin Broussard from ORM, Mr. Paul Depompei, and Mr. Antonio Suarez from Human Resources. Leligdon's May 21, 2014, emails referenced the May 9, 2014 Notice of Proposed Suspension. The proposed suspension acknowledged that Leligdon's April 23, 2014 email alleged "illegal practices" and "unlawful and biased decisions" on the part of the VA. Aquilina also charged Leligdon for "Inappropriate Use of Email" and "Conduct Unbecoming of a Supervisor" related to her skipping the chain of command by not including Esmurdoc and Aquilina in her May 21, 2014, emails, and copying Fuerher instead.

80.     On June 6, 2014, Esmurdoc and Aquilina issued Leligdon a Notice of Reprimand dated June 3, 2014, and a Notice of 3-day Suspension dated June 4, 2014. In the Notice of Reprimand, Aquilina claimed that Leligdon inappropriately discussed during a performance mid-term appraisal meeting with McKinney his participation in an Administrative Investigatory Board (AIB), where he was a witness. According to Aquilina, McKinney claimed Leligdon's discussion of his participation in an AIB was "threatening." Leligdon had no such discussion with McKinney and had no such knowledge of his AIB involvement.

81.     In the June 4, 2014, Decision letter suspending Leligdon for 3 days, Aquilina stated that he sustained charges 1, 2, and 3 in the May 9, 2014, Letter of Proposed Suspension. Aquilina stated that he considered Leligdon's written reply to the proposed suspension, and noted that "you neither expressed remorse over the incidents nor apologized for your behavior. You also mention your years of service to this medical center. Although I appreciate your years of service to this medical center and recognize that your actions were perhaps not with malice, your conduct is inexcusable."

82.     On June 13, 2014, Acting Secretary of Veterans Affairs Sloan D. Gibson issued a memorandum to all staff stating, "The Department of Veterans Affairs (VA) is strongly and unequivocally committed to equal employment opportunity, diversity and inclusion, and the protection of employee rights in the workplace." He expressed his, "unwavering commitment to the rights and protections enshrined in the Civil Rights Act of 1964, the Notification and Federal Employee Antidiscrimination and Retaliation Act, the Whistleblower Protection Act and all Federal laws that protect our employees." His memo continues:

> As we face challenges in our work environment, it is more important than
> ever that each of us recommits ourselves to these principles and redoubles
> our efforts to cultivate a safe, fair, and inclusive culture at VA.  Our
> collective ability to deliver the best services and care to our Nation's

Veterans is inextricably linked to sustaining an organizational culture that protects and empowers the voices of all employees and leverages the diverse talent of all of our human resources.  This includes creating a climate that embraces constructive dissent, welcomes critical feedback, and ensures compliance with legal requirements.

An essential component to this is the clear demonstration of VA's Core Values:  Integrity, Commitment, Advocacy, Respect, and Excellence. These enduring values create the foundation for an environment that fosters diversity and inclusion.  We must be vigilant in ensuring that our words and behaviors congruently promote a culture that facilitates employee engagement and hears all voices.

Executives, managers, and supervisors bear a special responsibility for enforcing the policies summarized below and promoting the imperatives of equity, diversity, and inclusion in the workplace.  It is my expectation that supervisors share this Policy Statement with their workforce to ensure full understanding of its content.  The Whistleblower Protection Policy Statement can be found at the following link: http://vaww.va.gov/opa/publications/No_FEAR_Attachments.pdf

83.     On June 17, 2014, Freeman contacted the assigned EEO investigator and reviewed Leligdon's EEO claims, thereby violating Leligdon's confidentiality rights and privacy, and interfering with Leligdon's protected activity of participating in the EEO process. In so doing, Freeman overstepped her role as the EEO Director and detracted from the independence required for the federal EEO program.

84.     On June 20, 2014, Leligdon delivered a letter to Fuehrer, Dr. Altose, and Picklo, asking them to step forward and take responsibility for the wrongdoing being perpetrated by the VA Medical Center against Leligdon and for the cover-up of the VA's unlawful destruction of evidence, which she had communicated to VA Secretary Shinseki in February 2013. Leligdon also delivered copies of this letter to Esmurdoc and Aquilina.

85.     On July 3, 2014, Esmurdoc and Aquilina issued a Letter of Counseling to Leligdon, claiming that she inappropriately sent an email to Lisa Clark, the Regional Counsel Staff Attorney, in which she requested Clark's legal assistance concerning her subordinate

employee McKinney. McKinney had requested that the ROC and other documents filed against him concerning the complaints from a veteran's family members be destroyed. Because these documents also pertained to Leligdon's EEO claims and thus could not lawfully be destroyed, Leligdon sought the advice of Clark on how to respond to McKinney's request. Further, because McKinney had been coordinating efforts with the VA Medical Center's upper management to target Leligdon, and because he had already filed several ROCs against her, Leligdon felt the need to protect herself and her decision-making with regard to McKinney by seeking the advice of legal counsel. Nevertheless, Leligdon's request for legal advice from Clark went unanswered.

86.     Prior to receiving the July 3, 2014 Letter of Counseling, Leligdon had never been advised, warned, or prohibited from requesting legal advice from Clark or anyone else in the Office of Regional Counsel. Indeed, Leligdon had worked independently and amicably with the Office of Regional Counsel on various matters without incident or the need for approval for the previous ten years.

87.     On July 22, 2014, Leligdon sent Esmurdoc an email, requesting that he endorse her as a candidate for the VISN 10, Social Work Professional Standards Review Board. In her email, Leligdon emphasized her qualifications to serve on the board, including her current position as a mental health clinician, Supervisor, and Manager for Social Work psychiatry, as well as her previous involvement as a board member for the VA's local Social Work Professional Standards Review Board.

88.     On July 23, 2014, Esmurdoc denied Leligdon's request for an endorsement to serve on the VISN 10 Social Work Professional Standards Review Board, stating, "[i]n light of recent conduct issues that we are working to correct, I cannot support your request to apply for this opportunity."

25

89.     The so-called conduct issues which Esmurdoc used as a rationale for denying

Leligdon's request for an endorsement had been included as events in Leligdon's EEO claims.

By July 23, 2014, Leligdon had submitted 30 events as part of her EEO complaint, all of which

had been accepted for investigation. *See* the VA ORM's Acceptance of Leligdon's Eleventh

Amendment of EEO Complaint, dated August 21, 2014.[1]

90.     On July 31, 2014, Esmurdoc and Aquilina issued Leligdon another Notice of

Proposed Suspension, this time for an email which Leligdon sent to Fuerher on July 3, 2014, in

response to the Letter of Counseling she received the same date. In the July 31, 2014, Notice of

Proposed Suspension, Aquilina criticized Leligdon's characterization in her email to Fuerher of

the Letters of Counseling and expectation she had received as being adverse actions. According

to Aquilina, "[t]hree day suspensions and reprimands are discipline and not adverse actions," and

Leligdon, who had taken "VA-provided classes from Employment and Labor Relations on

Disciplinary & Grievance Process…should understand these terms and use them correctly."

91.     In the July 31, 2014, Notice of Proposed Suspension, Aquilina also cited to

Leligdon's July 11, 2014 email to Esmurdoc, in which she copied Fuerher and Dr. Altose,

regarding the July 3, 2014 Letter of Counseling. Aquilina opposed Leligdon's going up the chain

of command and including Fuerher and Dr. Altose on the email, since "Mr. Esmurdoc was the

only appropriate recipient during this first interaction between you and Mr. Esmurdoc." Aquilina

added that, "[y]our email is based on your opinion and not on any protected activity you needed

to disclose or elevate to the entire Medical Center chain of command."

92.     Aquilina further claimed in the July 31, 2014, Notice of Proposed Suspension that

Leligdon should not have insisted on speaking to a VA Regional Counsel attorney about a

---

[1] Per the August 21, 2014, Notice, the VA's ORM accepted a total of 33 events for investigation.
Event 30 occurred on July 3, 2014; Event 31, July 23, 2014; Event 32, July 31, 2014; and Event
33: continuous surveillance from 2010 through August 9, 2014.

subpoena issue; rather, according to Aquilina, she should have gone directly and solely to her supervisor, Esmurdoc. Aquilina found that Leligdon's telling the VA attorney that she followed the procedures he had communicated to her regarding subpoenas was "angry, irrational, judgmental and accusative, and berating to your senior management. Your behavior is disrespectful, and lacks the deference owed to senior management."

93.     In the July 31, 2014, Notice of Proposed Suspension, Aquilina told Leligdon that she is expected to abide by the VA's Medical Center Policy regarding Employee Responsibility and Conduct, which provides that, "Employees are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy, and ethical behavior towards patients, visitors, and coworkers." Aquilina further admonished Leligdon, stating, "[i]n spite of a previous disciplinary action[2] issued to you, you continue to demonstrate a pattern of irresponsibility and disregard, thereby serving as the basis for your suspension. It is sad that you have not taken the many opportunities I have given you to deter an adverse action."

94.     On a continuous basis from 2010 through August 9, 2014, Agency officials had harassed Leligdon and deprived her of privacy through the unauthorized and unlawful surveillance of her home and elsewhere, as well as her private communications. Leligdon personally witnessed and documented this surveillance.

95.     On August 22, 2014, Aquilina issued to Leligdon a Notice of Suspension regarding the July 31, 2014 Notice of Proposed Suspension, sustaining the two charges contained

---

[2] Aquilina listed the previous disciplinary actions issued to Leligdon since March 2014, specifically the March 26, 2014 Letter of Counseling concerning Leligdon's failure to receive prior verbal approval for her leave request; the three-day suspension which Leligdon served in June 2014 regarding emails she had sent; the May 23, 2014 reprimand regarding emails she had sent; the June 6, 2014 reprimand for discussing an AIB during a performance feedback session with McKinney; and the July 3, 2014 Letter of Counseling regarding Leligdon's requesting legal advice from VA Regional Counsel Clark.

therein.[3] In sustaining the two charges, Aquilina wrote that he found Leligdon's conduct to be "inexcusable."

96.     Defendant continues to subject plaintiff to a hostile work environment, and has imposed additional adverse actions on plaintiff.

> 1)  From September 5 to 8, 2014, defendant suspended plaintiff from employment without pay.
>
> 2)  From October 6, 2014, and continuing thereafter, defendant, through Program Specialist Jason Gatliff and Chief of Staff Dr. Murray Altose, excluded the plaintiff from participating in the Mental Health area Ethics Team.

## FIRST CAUSE OF ACTION

### DISCRIMINATION

97.     All other allegations of this pleading are incorporated here by reference.

98.     On July 23, 2012, Leligdon filed a formal EEO complaint, alleging discrimination and retaliation for her prior May 2011 EEO complaint when the VA removed her from the Mental Health Monitor Committee and the Psychiatry Grand Rounds Committee. In her July 23, 2012 EEO complaint, Leligdon also alleged that the VA engaged in unlawful age and gender discrimination and retaliation when the VA selected Esmurdoc for the Assistant Chief of Social

---

[3] Although Aquilina stated in the August 22, 2014 Notice that the suspension pertained to the Notice of Proposed Suspension presented to Leligdon on May 12, 2014, he stated that he was sustaining the two charges in the Notice of Proposed Suspension. The May 9, 2014 Notice of Proposed Suspension contained three charges. On June 6, 2014, Aquilina issued to Leligdon the Notice of Suspension pertaining to the May 9, 2014 Notice. The July 31, 2014 Notice of Proposed Suspension contains two charges. Thus, because the July 31, 2014 Notice of Proposed Suspension contains two charges, rather than three, and because Leligdon had already served her suspension time for the May 9, 2014 Notice of Proposed Suspension, it is assumed that Aquilina erred and should have referred to the July 31, 2014 Notice of Proposed Suspension as the basis for the August 22, 2014 Notice of Suspension. It is apparent that even Aquilina had some difficulty keeping up with all the disciplinary actions he and Esmurdoc were issuing against Leligdon.

Work position, who was younger and less qualified than Leligdon. Leligdon further claimed that the VA had engaged in unlawful harassment against her. Leligdon specifically named Aquilina, Dr. Blank, and Dr. Bond as the responsible management officials.

99.     On August 30, 2013, Leligdon filed her third formal EEO complaint, alleging reprisal and hostile work environment. Fuehrer, Aquilina, Esmurdoc, Altose, Freeman and Gatliff were the responsible management officials.

100.     On October 8, 2013, the VA charged Leligdon with AWOL for two hours when she did not make an advanced verbal request for two hours of annual leave to supplement the six hours of sick leave she had requested. Leligdon had, however, informed Esmurdoc in advance of her possible need to take annual leave to supplement her sick leave.

101.     On October 16, 2013, the VA charged Leligdon with AWOL for fifteen minutes when she did not make a verbal advanced request for annual leave to cover the fifteen minutes she was late in arriving to her office due to unavoidable traffic problems. Even though it would not have been safe for Leligdon, who was in heavy vehicular traffic, to place a call to her supervisor to obtain his prior verbal approval of her request for 15 minutes of annual leave, and though Leligdon immediately requested 15 minutes of annual leave upon her arrival at the office, the VA charged her with AWOL. Since 2009, and up until October 16, 2013, Leligdon had relied upon and used the same manner of requesting annual leave for the times she was running late to the office, all without complaint.

102.     On October 23, 2013, the VA issued a Letter of Counseling to Leligdon, claiming that she violated the VA's annual and sick leave policy regarding the incidents on October 8, 2013 and October 16, 2013. However, the VA's annual and sick leave policy did not require that

advance notice be requested verbally within a specified period of time prior to the taking of leave.

103.    On December 2, 2013, the VA issued to Leligdon an adverse performance evaluation, rating her at "Fully Successful," though her self-assessment demonstrated an "Outstanding" performance, and her performance was comparable to previous years in which she had received an "Outstanding" performance rating.

104.    On April 4 and April 7, 2014, Esmurdoc denied Leligdon's request for an authorized absence on April 9 and April 11, 2014, so she could attend essential training pertaining to her state licensing requirements and the VA's medical center. Both Esmurdoc and Dr. Altose provided no rational basis for denying Leligdon's request for an authorized absence so she could attend this training. This was the first time Leligdon's request for an authorized absence to attend training had been denied in the ten-year period of time Leligdon worked for the VA Medical Center.

105.    On May 23, 2014, Esmurdoc and Aquilina issued a Letter of Reprimand to Leligdon, claiming she violated Dr. Altose's specific instructions for her not to copy her non-VA attorney in emails she sends, and that she inappropriately disregarded the chain of command by including Fuehrer on her emails to Broussard from ORM, Mr. Depompei, and Suarez from HR, but not including Aquilina or Esmurdoc.

106.    On June 6, 2014, Esmurdoc and Aquilina issued Leligdon a 3-day suspension in a letter dated June 4, 2014, upholding the charges in a May 9, 2014 Notice of Proposed Suspension which charged Leligdon with (1) Conduct Unbecoming of a Supervisor, (2) Failure to Follow Instructions, and (3) Inappropriate Use of Email. In the May 9, 2014 Notice, Aquilina claimed that Leligdon sent an inappropriate email to her entire chain of command on April 23, 2014, in

which she detailed six items that accused the VA Medical center of illegal practices and unlawful and biased decisions. Aquilina's May 9, 2014 Notice stated that Leligdon had also sent inappropriate emails to her chain of command on April 4, April 9, and April 11, 2014 regarding Esmurdoc's denial of her request for training, and on March 12, 2014, regarding Freeman's response to Leligdon's email of that same day, in which Leligdon stated that, "I'm sorry that you feel the need to be so rude, defense [sic] and accusatory…." Aquilina also took issue with an email that Leligdon sent to her subordinates, Fuehrer, and Dr. Altose on April 9, 2014, in which Leligdon stated she had learned a lot about civil rights in the past several years. Aquilina stated that Leligdon's "sarcasm if extremely inappropriate, especially when the highest chain of command in our Medical Center is included." Charges two and three in the May 9, 2014 Notice of Proposed Suspension referred to the same emails discussed in the first charge.

107.    On June 6, 2014, Aquilina issued Leligdon a Letter of Reprimand dated June 3, 2014, claiming that she inappropriately discussed her subordinate employee McKinney's participation in an AIB during a mid-term performance evaluation meeting, which McKinney viewed to be threatening. Aquilina's claim is false. Also, at the encouragement of the VA Medical Center's management, McKinney had previously submitted several ROCs against Leligdon.

108.    On July 3, 2014, Esmurdoc and Aquilina issued Leligdon a Letter of Counseling for requesting legal advice from the VA Medical Center's Office of Regional Counsel Clark. Leligdon's subordinate employee McKinney had requested that a ROC and other documents filed about him regarding a complaint from a veteran's family member be destroyed. Because McKinney had filed several ROCs against Leligdon at the behest of VA management, and because his request would have impacted documents under consideration in Leligdon's EEO

31

complaint, Leligdon properly felt it appropriate to seek legal advice concerning her response to McKinney's request, which advice was never received.

109.    On July 23, 2014, Esmurdoc denied Leligdon's request for an endorsement as a candidate on the VISN 10 Social Work Professional Standards Review Board.

110.    The events set forth in Paragraphs 98-109 were accepted by the VA's EEO Office for investigation as independent claims of discrimination. *See* the August 21, 2014, Notice of Eleventh Amendment of the EEO Complaint of Paula Leligdon, page 5.

111.    In the Notice of Eleventh Amendment, the EEO stated that the following events were accepted for investigation as Leligdon's overall hostile work environment claim based on reprisal for prior EEO activity:

1)    In August 2012, Christopher Esmurdoc (CE), Assistant Chief of Social Work and immediate supervisor acknowledged that he was aware of the rumors and gossip going around the Medical Center about the complainant [Leligdon] and he failed to act after the complainant advised him that she was being harassed by her subordinates.

2)    In November 2012, Jason Gatliff (JG), Head of Ethics Committee, stated he had difficulty working with the complainant due to the rumors, gossip and negative talk about her that was going around the Medical Center, admitted he participated in said gossip and rumors, and that he was aware of her EEO complaint.

3)    In June 2012 and November 2012, management failed to act when the complainant advised them of the bullying, rumors and gossip being spread about her throughout the VA Medical Center.

4)    On March 15, 2013, Susan Fuehrer, Director, failed to act after the complainant advised her about JG's admission that he had difficulty working with her and his participation in spreading rumors, gossip and negative talk about her.

5)    In May 2013, just prior to the May 20th meeting, Joseph Aquilina (JA), Chief of Social Work Services, and CE initiated a 'witch-hunt' on the complainant by soliciting reports of contact (ROCs) from her subordinates, and contacting HR and EEO regarding an inquiry/investigation against her.

6)      On May 20, 2013, during a meeting, CE threatened to discipline the complainant for alleged insubordination.

7)      On June 3, 2013, CE and JA issued the complainant four different ROCs, which were dated May 14, 2013, May 20, 2013, May 21, 2013, and May 29, 2013, respectively.

8)      On July 22, 2013, CE threatened to remove the complainant from the Professional Standards Review Board (PSRB) if she refused to assume increased duties.
        35.
9)      On July 31, 2013, CE issued the complainant two Counseling Plans.

10)     From July 2012 to October 16, 2013, JA and CE failed to support and/or have undermined the complainant's supervisory position and responsibilities.

15)[4]   On January 2, 2014, Andrea Freeman (AF), Director of EEO, provided advice and recommendations which caused the complainant's official time to be limited to 16 hours.

16)     On January 2, 2014, AF demeaned and disrespected the complainant by accusing her of harassment and bullying, and refused to communicate with the complainant about official business, including her pending EEO complaint.

17)     During a period from October 2013 thru January 29, 2014, Dr. Linda Bond (LB), Manager, Acute Inpatient Psychiatry Unit, undermined the complainant's supervisory duties by interfering with her investigation of a complaint from a Veteran's family member about the treatment received, influenced the complainant's subordinate to not meet with the complainant, and refused to act regarding the complainant's complaint about her (LB) interference.

18)     On January 2, 2014, Dr. Murray Altose (MA), Chief of Staff, issued the complainant a memorandum, Subj: Letter of Expectations.

19)     On March 26, 2014, CE and JA issued the complainant a Counseling Plan.

20)     On or about March 31, 2014, CE and JA issued the complainant a report of contact (ROC).

21)     On April 1, 2014, CE and JA prohibited the complainant from ever using the restriction option in Outlook for all email communications.

---

[4] For ease of reference, the numbering herein corresponds to the numbering in the Notice of Eleventh Amendment of the events which were included as part of Leligdon's overall claim of hostile work environment. In the Notice of Eleventh Amendment, the remaining events numbered 11 through 14, 23, 26 through 28, 30, and 31 were accepted for investigation as discrete acts. *See* Paragraphs 98-110 herein.

22)     On April 4, 2014, CE and JA issued the complainant two additional ROCs.

24)     On April 11, 2014, MA failed to act and supported CE's decision to deny the complainant's request for authorized absence to attend training and has not provided any viable rationale.

25)     On May 12, 2014, CE and JA issued the complainant a notice of proposed suspension.

29)     On June 17, 2014, AF violated the complainant's confidentiality rights and privacy when she interfered with the complainant's EEO protected activity by contacting the assigned EEO investigator and reviewing her EEO claims.

32)     On July 31, 2014, CE and JA issued the complainant a notice of proposed suspension.

112.     In the Notice of Eleventh Amendment, the following event was accepted as an amendment: "Whether the complainant was subjected to a hostile work environment based on sex (female) and reprisal for prior EEO activity when on a continuous basis beginning in 2010 through August 9, 2014, agency officials and agents have harassed the complainant and deprived her privacy through the surveillance of her home, elsewhere, and private communications."

113.     From August 2012 through July 2014, Leligdon made disclosures to the management at the VA Medical Center about the harassment and retaliation she was experiencing.

114.     Leligdon filed three formal EEO complaints against the VA Medical Center, the first in June 2011; the second complaint, on July 23, 2012; and the third complaint, on August 30, 2013. In these complaints, Leligdon alleged age discrimination, reprisal, hostile work environment, and gender discrimination.

115.     Title VII prohibits an employer from discriminating against any of its employees because the employee has opposed an unlawful discriminatory practice, or because the employee

has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

116.    Making disclosures to management about harassment and retaliation is protected opposition activity under Title VII. *Crawford v. Metropolitan Gov't of Nashville and Davidson County,* 555 U.S. 271 (2009). Title VII's prohibition against retaliation extends to forbid discrimination against employees who attempt to protest or correct allegedly discriminatory conditions of employment. *Hearn v. R.R. Donnelly & Sons Co.,* 460 F. Supp. 546, 548 (N.D. Ill. 1978) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 796, 93 S. Ct. 1817 (1973)).

117.    The VA Medical Center engaged in unlawful age and gender discrimination and reprisal when it selected Esmurdoc as the Assistant Chief of Social Work. Esmurdoc was significantly younger than Leligdon, and was less qualified for the position. The non-selection occurred in June 2012, just a few months after Leligdon brought to the attention of the VA Medical Center's management the bullying to which she was being subjected, and less than one year after she filed her first formal EEO complaint in June 2011.

118.    The VA Medical Center engaged in unlawful reprisal discrimination when it subjected Leligdon to multiple, unwarranted disciplinary actions, most of which were based on Leligdon's emails to her superiors disclosing the unlawful cover-up and destruction of evidence by VA management in February 2011; Leligdon's emails to her superiors opposing the bullying and unlawful harassment to which she was being subjected; Leligdon's failure to follow the chain-of-command by including Dr. Altose and Fuerher in her emails opposing the VA Medical Center's discriminatory practices; Leligdon's insistence on copying her non-VA attorney on emails pertaining to the wrongful discipline she was receiving; and Leligdon's insistence on seeking the legal advice of VA attorneys pertaining to matters concerning her subordinate

employee who was being encouraged by VA management to file multiple, unwarranted ROCs against Leligdon.

119.    The VA Medical Center engaged in unlawful reprisal and gender discrimination when it subjected Leligdon to invasive surveillance of her home, her community and elsewhere, and her private communications. The unlawful surveillance began in 2010 after the death of a veteran at the VA Medical Center, and escalated, and after she discovered and disclosed the VA's cover-up of its unlawfully destroying evidence. The unlawful surveillance further increased in intensity and frequency after she filed a second, formal EEO complaint in July 2012, and the third formal EEO complaint in August 2013. The VA's targeting Leligdon for surveillance was based not only on reprisal for Leligdon's EEO activity, but also on her whistleblowing and deviation from the stereotype of women being submissive.

120.    Leligdon has met all jurisdictional prerequisites for filing this action, and this action is authorized to be filed here pursuant to 42 U.S. Code § 2000e–16(c).

## DEMAND FOR RELIEF

121.    Leligdon seeks the following relief:

A.    Declaratory relief that the acts and practices described in this complaint are unlawful in violation of the Civil Rights Act.

B.    Preliminary and permanent injunctive relief to restore her as nearly as possible, in the position she would have been in had the prohibited personnel practices not occurred.

C.    Instatement into the position of Assistant Chief of Social Work that was wrongfully denied to her.

D.      Preliminary and permanent corrective action to abate the defendant's violations, to prevent future violations and directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment and advancement opportunities.

E.      Back pay and related benefits, medical costs incurred, travel expenses, any other reasonable and foreseeable consequential damages.

F.      Compensatory damages (including interest, reasonable expert witness fees, and costs).

G.      Costs of this action, including reasonable attorneys' fees.

H.      Such other and further relief this Court finds just and proper.


Respectfully submitted by:


/s/ Richard R. Renner
_____
Richard R. Renner, #0029381
Attorney for Plaintiff
Kalijarvi, Chuzi, Newman & Fitch, P.C.
1901 L St. NW, Suite 610
Washington, DC  20036
(202) 466-8696 direct
(202) 331-9260 office
1-877-527-0446 fax
rrenner@kcnlaw.com


## CERTIFICATE OF SERVICE

I certify that I filed the foregoing through the Court's CM/ECF system which will cause notice of this filing to be issued to all counsel of record.

/s/Richard R. Renner
_____
Richard R. Renner
Counsel for Plaintiff