UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


PAULA M. LELIGDON,                    )    CASE NO.: 1:14CV2810
                                      )
                                      )
                                      )
                  Plaintiff,          )    JUDGE DONALD C. NUGENT
                                      )
         v.                           )
                                      )
ROBERT McDONALD,                      )
                                      )
                  Defendant.          )


MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PAGES

TABLE OF AUTHORITIES ......................................................... iv

STATEMENT OF THE ISSUES.................................................... viii

SUMMARY OF THE ARGUMENT ............................................. viii

BACKGROUND ............................................................................1

    I.     LELIGDON'S EEO COMPLAINTS ...................................1

    II.    EVENTS AT ISSUE ....................................................2

          A.    LELIGDON'S SUPERVISORS ISSUED VERBAL AND WRITTEN COUNSELING TO CORRECT HER UNPROFESSIONAL BEHAVIOR ...........................6

          B.    THE VAMC INVESTIGATED LELIGDON'S CLAIMS .........................7

          C.    LELIGDON WAS ISSUED A FULLY SUCCESSFUL PERFORMANCE RATING ........................8

          D.    LELIGDON INSTIGATED CONFLICTS WITH OTHER VAMC EMPLOYEES ...................9

          E.    THE VAMC CHIEF OF STAFF ATTEMPTED TO ADDRESS LELIGDON'S BEHAVIOR WITHOUT FORMAL DISCIPLINE ........................9

          F.    LELIGDON'S CONTINUED UNPROFESSIONAL BEHAVIOR REQUIRED FORMAL DISCIPLINARY MEASURES ........................11

          G.    LELIGDON ERRONEOUSLY CLAIMS SHE WAS REMOVED FROM THE MENTAL HEALTH AREA ETHICS TEAM ........................14

          H.    LELIGDON'S CLAIMS THAT THE VA HAS HER UNDER SURVEILLANCE ARE UNSUPPORTED ...............15

LAW AND ARGUMENT ...............................................................16

    I.     SUMMARY JUDGMENT STANDARDS ...........................16

II.      TITLE VII STANDARDS ................................................................................17

III.     LELIGDON HAS FAILED TO EXHAUST HER ADMINISTRATIVE
REMEDIES REGARDING HER GENDER
DISCRIMINATION CLAIM ................................................................................18

IV.     LELIGDON HAS NOT ESTABLISHED A PRIMA FACIE CASE OF
DISCRIMINATION OR RETALIATION FOR THE MAJORITY OF
HER CLAIMS ................................................................................19

      A.     LELIGDON HAS NOT PROVEN A PRIMA FACIE CASE OF
GENDER DISCRIMINATION ................................................................................19

      B.     LELIGDON HAS NOT PROVEN A PRIMA FACIE CASE OF
RETALIATION FOR THE MAJORITY OF HER CLAIMS ..................21

            1.     PROTECTED ACTIVITY ................................................................................22

            2.     MATERIALLY ADVERSE ACTIONS ........................................23

            3.     CAUSATION ................................................................................25

      C.     LELIGDON HAS NOT PROVEN A PRIMA FACIE CASE ON HER
HOSTILE WORK ENVIRONMENT CLAIM ........................................26

V.      THE VA HAD LEGITIMATE, NONDISCRIMINATORY REASONS FOR
ITS ACTIONS ................................................................................30

      A.     2013 "FULLY SUCCESSFUL" PERFORMANCE RATING..................30

      B.     JUNE 2014  THREE-DAY SUSPENSION ................................................31

      C.     THE SEPTEMBER 2014 SUSPENSION ................................................33

VI.     LELIGDON HAS NOT SHOWN THAT DEFENDANT'S LEGITIMATE,
NONDISCRIMINATORY REASONS WERE PRETEXTUAL..........................34

      A.     LELIGDON CANNOT SHOW THAT THE "FULLY SUCCESSFUL"
PERFORMANCE RATING WAS PRETEXTUAL ................................35

      B.     LELIGDON CANNOT SHOW THAT THE LEGITIMATE, NON-
DISCRIMINATORY REASONS FOR HER SUSPENSIONS WERE
PRETEXTUAL................................................................................36

TABLE OF AUTHORITIES

CASES                                                                                    PAGES

Abbott v. Crown Motor Co., 348 F.3d 537 (6th Cir. 2003)........................................................ 22

Akers v. Alvey, 338 F.3d 491 (6th Cir.2003) ........................................................................... 26

Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974) ............................................................ 19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)............................................................. 17

Ang v. Procter & Gamble Co., 932 F.2d 540 (6th Cir. 1991)...................................................... 18

Armstrong v. Index Journal Co., 647 F.2d 441 (4th Cir. 1981) .................................................. 33

Austion v. City of Clarksville, 244 F. App'x 639 (6th Cir. 2007).............................................. 29

Barnett v. Dep't of Veterans Affairs, 153 F.3d 338 (6th Cir. 1998) ........................................... 30

Barrett v. Whirlpool Corp., 556 F.3d 502 (6th Cir. 2009)......................................................... 22

Black v. Zaring Homes, Inc., 104 F.3d 822 (6th Cir. 1997)....................................................... 27

Blackburn v. Shelby Cty., 770 F. Supp. 2d 896 (W.D. Tenn. 2011)..................................... 24, 25

Blake v. Potter, Nos. 1:04CV2112, 1:05CV649, 2006 WL 355321
  (N.D. Ohio Feb. 15, 2006) .................................................................................................... 28

Broska v. Henderson, 70 F. App'x 262 (6th Cir. 2003) ............................................................. 26

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)............................................................. 21

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) ......................................... 21, 23

Carreno v. DOJI, Inc., 668 F. Supp. 2d 1053 (M.D. Tenn. 2009) ............................................. 33

Cleveland v. S. Disposal Waste Connections, 491 F. App'x 698 (6th Cir. 2012)....................... 28

Tipler v. E. I. DuPont deNemours & Co., 443 F.2d 125 (6th Cir. 1971) .................................... 18

Combs v. Int'l Ins. Co., 354 F.3d 568 (6th Cir. 2004)............................................................... 17

Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460 (6th Cir. 1998).......................... 19

Dixon v. Ashcroft, 392 F.3d 212 (6th Cir. 2004) ...................................................................... 19

Douglas-Slade v. LaHood, 793 F. Supp. 2d 82 (D.D.C. 2011) .................................................. 24

iv

EEOC v. Avery Dennison Corp., 104 F.3d 858 (6th Cir. 1997)...................................................... 26

EEOC v. Bailey Co., 563 F.2d 439 (6th Cir. 1977)...................................................................... 18

EEOC v. Ford Motor Co., 782 F.3d 753 (6th Cir. 2015)............................................................... 25

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344 (6th Cir. 1998) ............................... 21

Faragher v. City of Boca Raton, 524 U.S. 775 (1998)................................................................. 27

Fullen v. City of Columbus, 514 F. App'x 601 (6th Cir. 2013) ................................................... 34

Grace v. USCAR, 521 F.3d 655 (6th Cir. 2008)........................................................................... 26

Halfacre v. Home Depot, U.S.A., Inc., 221 F. App'x 424 (6th Cir. 2007)................................... 23

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)................................................................... 26, 27

Henderson v. Walled Lake Consol. Sch., 469 F.3d 479 (6th Cir. 2006) ..................................... 17

Jones v. Potter, 488 F.3d 397 (6th Cir. 2007) ............................................................................. 17

Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876 (6th Cir. 1996)................................................... 23

Mason v. Geithner, 811 F. Supp. 2d 128 (D.D.C. 2011) ............................................................. 33

McDonald v. Union Camp Corp., 898 F.2d 1155 (6th Cir. 1990)................................................ 36

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) .................................................... 17, 18

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57  (1986) ............................................................. 26

Mitchell v. Toledo Hosp., 964 F.2d 577 (6th Cir. 1992) ............................................................. 36

Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497 (6th Cir. 2014) ................................. 25

Morris v. Oldham Cty. Fiscal Court, 201 F.3d 784 (6th Cir. 2000) ...................................... 26, 29

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)...................................................... 27

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998) ................................................. 29

Parikh v. Cleveland Hardware & Forging Co., No. 1:04CV2363,
  2006 WL 1515667 (N.D. Ohio May 26, 2006)........................................................................ 34

Primes v. Reno, 190 F.3d 765 (6th Cir. 1999)............................................................................. 20

Rattigan v. Holder, 604 F. Supp. 2d 33 (D.D.C. 2009) .............................................................. 32

Russell v. Univ. of Toledo, 537 F.3d 596 (6th Cir. 2008) ........................................................... 34

Seay v. Tennessee Valley Auth., 339 F.3d 454 (6th Cir. 2003) ................................................... 35

Siegner v. Township of Salem, No. 15-2063, 2016 WL 3426092
  (6th Cir. June 22, 2016) ........................................................................................................ 36

Smith v. City of Salem, Ohio, 378 F.3d 566 (6th Cir. 2004) ...................................................... 21

Spees v. James Marine, Inc., 617 F.3d 380 (6th Cir. 2010) ...................................................... 20

Stoyanov v. Mabus, 126 F. Supp. 3d. 531 (D. Md. 2015) .......................................................... 25

Sutherland v. Michigan Dep't of Treasury, 344 F.3d 603 (6th Cir. 2003) ................................... 35

Taylor v. Geithner, 703 F.3d 328 (6th Cir. 2013) ...................................................................... 24

Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556 (2d Cir. 2011) ......................... 24

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) ................................................... 18

Thorn v. Sebelius, 766 F. Supp. 2d 585 (D. Md. 2011) ............................................................. 29

Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013) ............................................. 22, 25

Upshaw v. Ford Motor Co., 576 F.3d 576 (6th Cir. 2009) ......................................................... 17

Vincent v. Brewer Co., 514 F.3d 489 (6th Cir. 2007) ................................................................ 20

Walz v. Potter, 3:06-cv-614, 2008 WL 4737493 (W.D. Ky. Oct. 27, 2008) ................................ 25

Weaver v. Ohio State Univ., 71 F. Supp. 2d 789 (S.D. Ohio 1998) ............................................ 22

White v. Baxter Healthcare Corp., 533 F.3d 381 (6th Cir. 2008) ............................................... 20

White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789 (6th Cir. 2004) ............................. 21, 23

Willey v. Slater, 20 F. App'x 404 (6th Cir. 2001) ...................................................................... 28

Williams v. Gen. Motors Corp., 187 F.3d 553 (6th Cir. 1999) .................................................... 28

Young v. Oakland Cty., 351 F. Supp. 2d 653 (E.D. Mich. 2004) ............................................... 35

Younis v. Pinnacle Airlines, Inc., 610 F.3d 359 (6th Cir. 2010) ................................................. 21

Zhu v. Vanderbilt Univ., No. 3:06-0460, 2007 WL 2963980 (M.D. Tenn. Oct. 5, 2007) .......... 36

STATUTES

28 U.S.C. § 1746 ................................................................................................................ 38

42 U.S.C. § 2000e ........................................................................................................ 2, 17

42 U.S.C. § 2000e-3(a) .................................................................................................... 22

RULES

Fed. R. Civ. P. 56(a) ....................................................................................................... 16

## STATEMENT OF THE ISSUES

1. Whether Leligdon exhausted her administrative remedies with regard to her claim of gender discrimination.

2. Whether Leligdon has established a prima facie case of discrimination, retaliation or hostile work environment retaliation.

3. Whether Leligdon can show that the VA's legitimate, non-discriminatory reasons for its actions were pretextual.

## SUMMARY OF THE ARGUMENT

Defendant, Robert McDonald, Secretary, United States Department of Veterans' Affairs ("VA"), has moved for summary judgment in its favor because Leligdon's claims are workplace conflicts that are unrelated to discrimination prohibited by Title VII.  During the course of her time at the VA, Leligdon has repeatedly escalated standard workplace disputes due to personality conflicts and her unfounded belief that she has been placed under surveillance by drones and law enforcement teams, coordinated by the VA and/or the federal government.  This Court should grant summary judgment in favor of the VA because Leligdon failed to exhaust her administrative remedies with regard to her claim of gender discrimination, has failed to establish a prima facie case with regard to the majority of her claims, and cannot show that Defendant's legitimate, non-discriminatory reasons for its actions were pretextual.

## BACKGROUND

Leligdon is employed as a Supervisory Social Worker at the Wade Park facility of the Veteran's Administration Medical Center ("VAMC") in Cleveland, Ohio.  (Declaration of Joseph Aquilina ("Aquilina Decl."), ¶ 5.)[1]

She has been a supervisory social worker since April 2009, and has worked at the VAMC since 2004.  (Aquilina Decl., ¶¶ 4, 5.)   As a supervisory social worker, Leligdon is one of 24 first-line social work supervisors within the VAMC and is responsible for overseeing 11 social workers and one program assistant.  (Aquilina Decl., ¶ 5.)  Leligdon, like other first-line social work supervisors, also maintains clinical direct patient care hours in the Outpatient Mental Health Department.  (Id.)

At the time of the allegations in the Complaint, Leligdon reported to Felix Christopher Esmurdoc, ("Esmurdoc") Assistant Chief of Social Work.  (Aquilina Decl., ¶ 4.)   Leligdon's second-line supervisor is Joseph Aquilina, ("Aquilina") the Chief of Social Work. (Id.) Aquilina reports to Dr. Murray Altose, the Chief of Staff of the VAMC.  (Aquilina Decl., ¶ 3.) Dr. Altose, in turn, reports to Susan Fuehrer, Director of the VAMC.   (Aquilina Decl., ¶ 3.)  As the Director, Ms. Fuehrer is responsible for 5,500 employees who provide patient care to more than 100,000 veterans at 18 locations throughout northeast Ohio.  (Aquilina Decl., ¶3.)

## I.    Leligdon's EEO Complaints

From 2011 to present, Leligdon has brought five EEO complaints against the VA. (Decl. of James D. Jindra, ECF No. 11-2, PageID # 98 at ¶ 2; Second Declaration of James D. Jindra ("Second Jindra Decl., ¶ 4.)[2]  She filed her first claim on June 23, 2011, alleging that she was

---

[1] A copy of Mr. Aquilina's declaration is attached as Exhibit A.

[2] Mr. Jindra's first declaration was filed as an attachment to Defendant's Partial Motion to

discriminated against due to her age when she was not selected for the position of Caregiver Support Coordinator on March 31, 2011, a position outside of the Social Work Service. (First Jindra Decl., ECF No. 11-2, ¶ 2(a)).  Leligdon withdrew her complaint, and her case was dismissed on March 28, 2013.  (Id.)  Leligdon filed her second EEO complaint on July 23, 2012, alleging discrimination based on age and reprisal for EEO activity regarding her claimed "exclusion" from several committees and her non-selection for the position of Assistant Chief of Social Work.  (Id., ¶ 2(b).)  The VA issued a Final Agency Decision dismissing the complaint, and Leligdon did not appeal.  (Id.)

The claims at issue in the current case arise from her third EEO complaint. (Second Am. Compl., ECF No. 23, PageID # 288); (Mem. Opinion & Order, ECF No. 28, PageID # 359). They begin in June 2012 and end in September 2014.  (First Jindra Decl., ECF No. 11-2, ¶ 2(c)). Leligdon's third EEO complaint, which she amended eleven times, contains 32 alleged claims. (Id.)  Leligdon contends that all of these alleged incidents constitute gender discrimination and retaliation based on a hostile work environment and individual adverse actions, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.[3]

## II.   Events at Issue

Leligdon's unprofessional and disruptive behavior escalated, after Mr. Esmurdoc was selected as the Assistant Chief of Social Work in the summer of 2012.  Leligdon applied for this position, but was not selected.  (ECF No. 23, PageID # 294-295, ¶ 27).  Leligdon's behavior deteriorated from disrespectful to insubordinate, and she began to have conflict with many employees with whom she interacted, both inside and outside of her supervisory chain.

_____

Dismiss, ECF No. 11.  A copy of Mr. Jindra's Second Declaration is attached as Exhibit B.

[3] Leligdon filed two subsequent EEO complaints that are not at issue in this litigation and are proceeding through the administrative process.

On March 15, 2013, Leligdon sent a letter to Susan Fuehrer, Director of the VAMC, and Dr. Altose in support of her grievance of her 2011-2012 Performance Appraisal.  (EEO Statement of Susan Fuehrer ("Fuehrer Stmt."), ¶ 10.)[4]  In the letter, Leligdon accused Aquilina, Dale Goldstein (her former supervisor), and Esmurdoc of retaliation for prior EEO activity by rating her Fully Successful for the 2011-2012 fiscal year.  (Id.)  Leligdon also stated that there were "rumors/gossip/negative talk going around the Medical Center about me."  (Id.)  Leligdon did not provide any details about the "rumors/gossip/negative talk," and asked that her Performance Rating be adjusted to Outstanding.  (Id.)  Her Performance Rating was not changed. (Deposition of Paula Leligdon ("Leligdon Dep."), Vol. 1, 52:11-24.)[5]

On March 15, 2013, the same day Leligdon sent the letter, Fuehrer responded and asked that Leligdon forward a copy so that it could be provided to Human Resources. (Ex. D, ¶ 10.) Leligdon had sent the document using the "restricted" feature in Outlook so that the message could not be printed, copied, or forwarded.  (Id.) Despite her request, Fuehrer never received an unrestricted version.  (Id.)

In May and June of 2013, several of Leligdon's subordinates and co-workers contacted Esmurdoc and Aquilina to complain about her hostile, rude and demeaning behavior.  (Aquilina Decl., ¶ 6; Declaration of Felix Christopher Esmurdoc ("Esmurdoc Decl."), ¶ 8.)[6]  To appropriately respond, Esmurdoc and Aquilina asked the employees to put their concerns in writing, after which several employees submitted Reports of Contact ("ROC").  (Id.)  An ROC is not a disciplinary action; rather, an ROC is used to document incidents which occur in the

---

[4] A copy of Ms. Fuehrer's sworn EEO statement is attached as Exhibit D.

[5] A copy of Ms. Leligdon's deposition is attached as Exhibit E.

[6] A copy of Mr. Esmurdoc's declaration is attached as Exhibit C.

VAMC involving staff and/or patients.  (Aquilina Decl.,¶ 6.)   The ROCs were provided to Leligdon and she submitted responses to them.  (Aquilina Decl., ¶ 7; Esmurdoc Dec., ¶ 12.)

On May 20, 2013, Esmurdoc met with Leligdon to discuss the feedback received from Leligdon's subordinates.  (Esmurdoc Decl., ¶ 11.)  Esmurdoc asked Leligdon how he could assist her in dealing with her staff's perception and offered training opportunities about managing staff or staff- supervisor relations. (Id.)   Leligdon refused his offer. (Id.)

Esmurdoc and Aquilina conferred with HR and the EEO office regarding the ROCs they received from Leligdon's subordinates. (Esmurdoc Decl., ¶ 14.)  On May 29, 2013, EEO notified Esmurdoc that they had received complaints that Leligdon was creating a hostile work environment and initiated an investigation.  (Id.)  The investigation was completed on September 4, 2013.  (Esmurdoc Decl., ¶ 16.)  Approximately half of Leligdon's subordinates responded. (Id., Ex. C4, p. 2.)   Some of Leligdon's subordinates requested to remain anonymous due to fear that Leligdon would "in some way try to use their participation against them in a retaliatory manner."  (Id.)  The investigation found that "no information was obtained that suggested Leligdon was discriminatory in her actions or based on any supervisory actions on race, color, religion, sex, national origin, age, disability, reprisal, or genetic information."  (Esmurdoc Decl., ¶ 16.)

On June 7, 2013, Leligdon sent an email to Esmurdoc and Aquilina, copying Fuehrer, in which she contested the information in the ROCs and alleged that she was "targeted" due to "what's happened to [her] at the Medical Center."  (Esmurdoc Decl., ¶ 13, Ex. C3.)

In the summer of 2013, Esmurdoc attempted to discuss Leligdon's workload.  (Esmurdoc Decl., ¶ 17.)  Leligdon carried the lowest direct patient caseload of any of any supervisory social worker reporting to Esmurdoc.  (Id.)  On June 12, 2013, Esmurdoc asked Leligdon to discuss

how she could maximize her direct patient care workload.  (Id.)  Leligdon refused to consider increasing her direct patient workload and refused to discuss it with Esmurdoc.  (Id.)

In July 2013, Leligdon requested Esmurdoc's approval for reappointment to the Professional Standards Review Board ("PSRB"), as her current term was expiring September 20, 2013.  (Esmurdoc Decl., ¶ 18.)  The PSRB conducts credentialing reviews and makes recommendations on appointments and clinical privileges for social workers at the VA.  (Id.)  Membership on the PSRB does not affect an employee's pay or job status at the VA. (Aquilina Decl., ¶ 18.)

On July 22, 2013, Esmurdoc met with Leligdon.  He refused to support Leligdon's request to serve an additional term on the PSRB based on her poor attendance at PSRB meetings.  (Esmurdoc Decl., ¶ 18.) In the past year, Leligdon attended only 10 of the 21 scheduled meetings and 1 of the 7 ad hoc meetings.  (Id.)  Leligdon was not appointed to a second term on the PSRB.  (Id.)

In the same meeting, Esmurdoc again attempted to discuss patient workload with Leligdon.  Leligdon responded that she would not discuss the issue until Esmurdoc put his request in writing.  (Esmurdoc Decl., ¶ 19.)  Leligdon responded via email to Esmurdoc's written summary of the July 22, 2013, meeting and alleged that Esmurdoc had stated that his determination of whether he would support her application to serve an additional term on the PSRB would also be influenced by whether Leligdon cooperated and increased her clinic time.  (Esmurdoc Decl., ¶ 19, Ex. C5.)  Leligdon copied Fuehrer and Aquilina on the email. (Id., Ex. C5.)  Esmurdoc responded that he was willing to discuss Leligdon's concerns in person, but after several more emails copying Dr. Altose, Fuehrer, and Aquilina, Leligdon refused to meet with Esmurdoc.  (Id.)

A.     **Leligdon's Supervisors Issued Verbal and Written Counseling To Correct Her Unprofessional Behavior.**

Leligdon's supervisors attempted to correct her increasingly insubordinate behavior through the use of letters of counseling, which are not disciplinary in nature.  On July 31, 2013, Esmurdoc issued Leligdon a Written Counseling regarding inappropriate workplace behavior. (Esmurdoc Decl., ¶ 20, Ex. C6.)  The counseling advised the following:

> a.     On more than 4 occasions I have provided you verbal or written feedback about your lack of respect and argumentative approach and your lack of cooperation and collegiality.

> b.     On more than 4 occasions you have responded with a lack of flexibility and aggressive and blatant attempts to disrespect me as your supervisor and to discredit me as your supervisor personally and professionally.

> c.     On several occasions you have avoided and refused to discuss issues regarding your workload and clinic schedule with me, citing the need for me to put in writing my requests to you. This is insubordinate and inappropriate.

> d.     These violations of the code of conduct are consistent with feedback provided by some of your employees and provided to you in reports of contact on June 3, 2013. These are not isolated incidents and represent a pattern of hostility and conduct unbecoming of a VAMC employee and supervisor.

> e.     On many occasions I have offered you support as your supervisor in the following capacities: open discussion with myself; additional training; mentoring; and mediation. You have refused all of these offers of support.

Also on July 31, 2013, Esmurdoc also issued Leligdon a memorandum entitled "Reminder of policy on requesting leave MCP-005-007." (Esmurdoc Decl., ¶ 21, Ex. C7.)  The memorandum was issued because Leligdon had not been compliant with VAMC leave policy (Esmurdoc Decl., ¶ 22.)

6

On October 8, 2013, Leligdon called Esmurdoc to report that she was sick and requested leave for the same day.  (Esmurdoc Decl., ¶ 23.)   She then entered 6 hours of sick leave and 2 hours of annual leave into the time keeping system, VISTA.  An entry into VISTA is not a request for leave, but merely records the time taken.  (Id.)  The next week, Leligdon entered 15 minutes of annual leave into the system for October 16, 2013, without first making a request to Esmurdoc or informing him that she was not on duty.  (Esmurdoc Decl., ¶ 24; Leligdon Dep. , Vol. 1, 270:2- 271:14.)  Leligdon responded to an inquiry from Esmurdoc by stating that "I am more than responsible to manage my AL/SL effectively.   The fact that you are even questioning my AL/SL request/use is insulting as a Supervisor and appears another fishing expedition to find wrong-doing.  I hope this provides you the 'clarification' you are seeking."  (Esmurdoc Decl., ¶ 24, Ex. C9.)

On October 23, 2013, Esmurdoc documented his conversation on leave policy with Leligdon in a Report of Contact titled "Notification of violation of leave policy and opportunity to improve."  (Esmurdoc Decl., ¶ 25.)   The ROC documented that Leligdon would be charged two hours of AWOL for October 8, 2013 and 15 minutes of AWOL for October 16, 2013.  (Id.) The letter informed Leligdon that it constituted counseling and would not be placed in her official personnel folder.  (Id.)

**B.     The VAMC Investigated Leligdon's Claims.**

On November 25, 2013, in response to Leligdon's numerous emails and complaints, Fuehrer asked the VAMC to convene an Administrative Investigative Board ("AIB") to review Leligdon's manifold allegations of a hostile work environment, retaliatory actions, and inappropriate behavior towards Leligdon.   (Declaration of Paul DePompei ("DePompei Decl."),

¶ 2.)   The AIB, whose members were not employed in the Cleveland VAMC, was tasked to

investigate the following:

1. Leligdon's allegations that Aquilina and Esmurdoc engaged in hostile and retaliatory behavior towards Leligdon, including allegations that Leligdon was removed from several facility committees, documented counseling regarding Leligdon's time and attendance, as well as interactions by Esmurdoc and Aquilina with Leligdon's subordinates.
2. Leligdon's allegation that Freeman was hostile and inappropriate in denying Leligdon official time off to prepare for EEO meetings
3. The timeline of events and accusations to determine if the VAMC responded properly and timely to Leligdon's complaints.

(Id., Ex. F1.)   A final report was submitted to the Office of the Director on April 23, 2014,

finding all of Leligdon's allegations to be without merit.  (DePompei Decl., ¶ 4, Ex. F2.)

### C.    Leligdon Was Issued A Fully Successful Performance Rating.

Despite these issues, on December 2, 2013, Esmurdoc issued a Fully Successful

performance rating to Leligdon for the 2012-2013 fiscal year.  (Esmurdoc Decl., ¶ 26, Ex. C11.)

A Fully Successful rating is a satisfactory performance appraisal.

VA annual performance ratings are composed of ratings in five elements with the

following assigned weights:  Leading Change (20%), Leading People (20%), Business Acumen

(10%), Building Coalitions (10%), and Results Driven (40%).  (Esmurdoc Decl., ¶ 27.)   Leading

Change, Leading People, and Results Driven are considered "Critical Elements." (Id.)  An

individual may be rated exceptional, fully successful, or unacceptable in each category.  An

employee with an exceptional performance in any element means that the employee has "far

exceed[ed] normal expectations and results in major contributions to the accomplishment of

organizational goals."  (Id.)  In 2013, Esmurdoc rated Leligdon as exceptional in two of five

categories:  Leading Change and Business Acumen.  (Id.)  Esmurdoc rated Leligdon as fully

successful in Leading People, Building Coalitions, and Results Driven (Id.)  Because Leligdon

received a fully successful rating in at least one critical element and all other elements, critical or non-critical, were fully successful or higher, Leligdon received an overall rating of Fully Successful. (Id.)

**D. Leligdon Instigated Conflicts With Other VAMC Employees.**

Leligdon then began a dispute with Andrea Freeman, EEO Manager for the VAMC, in January 2014. Leligdon requested official time to prepare her EEO complaint, and Esmurdoc contacted Freeman for guidance. (Esmurdoc Decl., ¶ 29.) "Official time" is authorized absence without charge to leave, during which, among other things, an employee may work on their EEO claims. (Id.; Aquilina Decl., ¶ 8.) Freeman told Esmurdoc that he could approve the time, but to tell Leligdon that she needed to be cognizant of its use because Freeman was in the process of writing a policy defining a reasonable amount of official time as 16 hours, although it would vary by the person's complaint. (Esmurdoc Decl., ¶ 29.) The then-current policy stated that "reasonable" official time would be granted, and in practice generally only 8 hours was granted. (Id.) Esmurdoc then informed Leligdon that her official time was approved for January 8 and January 9, and informed her of the forthcoming policy. (Id.) Leligdon demanded to know who informed Esmurdoc of the change, and Freeman responded that she had done so. (Id., Ex. C13.) Leligdon then sent a series of hostile emails to Freeman, accusing her of bullying and harassing Leligdon. (Id.) However, Esmurdoc approved an additional 16 hours of official time for Leligdon in February 2014. (Id.) Indeed, between January 2012 and January 2015, Leligdon received a total of 72 hours to prepare her EEO complaints. (Aquilina Decl., ¶ 8.)

**E. The VAMC Chief Of Staff Attempted To Address Leligdon's Behavior Without Formal Discipline.**

In response to Leligdon's continued unprofessional and disruptive behavior, on January 2, 2014, Dr. Altose, the Chief of Staff of the Medical Center, issued her a Letter of Expectations,

detailing his expectations for Leligdon's conduct.  (Esmurdoc Decl., ¶ 28, Ex. C12.)  Although this letter also was not a disciplinary action, it stated that failure to correct her behavior could result in discipline.  (Id.)

The letter of expectations addressed Leligdon's conduct in a dispute about providing temporary coverage for one of Leligdon's employees who was transferring to a different position.  (Esmurdoc Decl., ¶ 28, Ex. C12.)   On December 20, 2013, Esmurdoc advised Leligdon that she was needed to provide temporary coverage.   Esmurdoc left Leligdon several messages on December 20, 2013, to schedule a meeting to discuss the issue.  (Id.)   Leligdon did not respond.  On December 23, 2013, Esmurdoc came to Leligdon's office to discuss the matter, but Leligdon refused to allow him into her office at the VAMC.  (Id.)   In her email responses to Esmurdoc on December 23, 2013, and December 27, 2013, Leligdon copied her private attorney, even though the conversation pertained only to work-related matters.  (Id.)

Dr. Altose advised Leligdon that all employees are required to meet face to face with their supervisors, and that it was inappropriate to copy her private attorney on emails involving daily interactions with her supervisors.  (Esmurdoc Decl., ¶ 28, Ex. C12.)   Dr. Altose ordered Leligdon to comply with all meeting requests from Aquilina and Esmurdoc, to stop copying her attorney on VAMC emails, and ordered her to assume additional clinic hours as needed.  (Id.)   However, Leligdon ignored Dr. Altose's instructions, and instead escalated her unprofessional behavior.  (Esmurdoc Dec., ¶ 28; Aquilina Decl., ¶ 9.)

Despite Leligdon's failure to correct her behavior, her supervisor once again attempted to correct it without issuing formal discipline.  On March 10, 2014, Esmurdoc issued a third Letter of Counseling to Leligdon.  (Esmurdoc Decl., ¶ 30, Ex. C14.)  Leligdon was counseled for calling her subordinate, John McKinney, at home while he was on sick leave. (Id.)  Leligdon also

was out on leave, and therefore should not have been performing work on behalf of the VA. (Id.) McKinney filed a Report of Contact stating that Leligdon called him at home on February 4, 2014, after he had left a message requesting sick leave. McKinney alleged that Leligdon was harassing him after he made a valid sick leave request, calling three times on his personal cell phone and leaving messages twice. (Id.) McKinney also stated that he had made clear that he did not want to be contacted at home on his personal cell phone in such circumstances. (Id.)

The letter informed Leligdon that because McKinney requested only one day off, left a voicemail, there was no emergency, and he had the proper amount of sick leave accrued, Leligdon's involvement was inappropriate, particularly when she was on leave herself. (Id., Ex. C6.)

### F. Leligdon's Continued Unprofessional Behavior Required Formal Disciplinary Measures.

Despite Dr. Altose's January 2, 2014 letter, Leligdon did not assume additional clinic hours. (Esmurdoc Decl., ¶ 28.) She also continued to copy her attorney on emails relating solely to VAMC business and refused to meet with her supervisors. (Id) Further, Leligdon continued to send emails with restrictions that prevented printing, copying, or forwarding, despite numerous instructions not to do so. (Id.) Such restrictions inhibit communication and management's ability to respond effectively. (Aquilina Decl., ¶ 10.) Esmurdoc and Aquilina completed Reports of Contact regarding these incidents. (Aquilina Decl., ¶ 10; Ex. A1; Esmurdoc Decl., ¶ 31, Ex. C15.) Leligdon's unprofessional behavior and failure to follow instructions continued unabated.

On April 7, 2014, Leligdon emailed Esmurdoc to request an authorized absence on April 11, 2014 to attend a non-VA social work training in Pittsburgh, Pennsylvania. (Esmurdoc Decl., ¶ 32.) On April 9, 2014, Esmurdoc advised Leligdon that based on the need for her to be on

duty for clinical coverage and to meet medical center responsibilities, he would not approve her request.  (Id.)  Leligdon responded to Esmurdoc's denial by sending a sarcastic email to Aquilina, Esmurdoc, Dr. Altose, and Fuehrer on April 23, 2014 asking for "information and verification of some of your management techniques." (Aquilina Decl., ¶ 12, Ex. A3, pp. 6-7.)

On April 14, 2014, McKinney completed another Report of Contact regarding Leligdon's behavior as his supervisor.  (Aquilina Decl., ¶ 11, Ex. A2.)  McKinney stated that Leligdon "summoned" him for a meeting about his performance evaluation. (Id., Ex. A2.)  McKinney alleged that at the meeting, Leligdon spoke for three minutes using terms included in a statement McKinney had made to AIB investigators. (Id.)  In the AIB, McKinney had described himself as a "ping-pong ball" between Leligdon and Dr. Bond, and Leligdon used the term during the meeting.   McKinney reported that he felt threatened by the interaction.  (Id.)

Given these serious allegations and Leligdon's failure to correct her behavior despite many written counselings, her supervisors determined that formal discipline was required. On June 3, 2014, Aquilina reprimanded Leligdon for discussion of non-performance related matters during a performance feedback session of a bargaining unit employee.  (Aquilina Decl., ¶ 11, Ex. A2.)  However, Leligdon's behavior only worsened.

On May 12, 2014, Aquilina served Leligdon with a Notice of Proposed Suspension, in which he proposed a three-day suspension for Conduct Unbecoming a Supervisor, Failure to Follow Instructions, and Inappropriate Use of Email.  (Aquilina Decl., ¶ 12, Ex. A3.)  Leligdon sent a series of sarcastic and disrespectful emails to her entire VAMC chain of command--Esmurdoc, Aquilina, Altose, and Fuehrer--on April 4, 2014, April 7, 2014, April 11, 2014, and April 23, 2014; to Freeman, the EEO manager, on March 12, 2014; and to her subordinates and Dr. Altose and Fuehrer on April 9, 2014.  (Id.)  On June 4, 2014, Aquilina upheld the proposed

suspension, which was served Monday June 23, 2014 though Wednesday, June 25, 2014. (Aquilina Decl., ¶ 13.)

On May 22, 2014, Leligdon was reprimanded for Failure to Follow Instructions, Inappropriate Use of Email, and Conduct Unbecoming a Supervisor.  (Aquilina Decl., ¶ 14, Ex. A4.)  Leligdon failed to follow instructions when, despite Dr. Altose's January 2, 2014 Letter of Expectations and the proposed suspension issued on May 12, 2014, she continued to copy her attorney on internal VAMC emails, and contradicted the advice of three supporting departments within the VA.  (Id.)  Leligdon spent most of an entire work day sending a series of disrespectful, argumentative emails to the VA's Office of Resolution Management, Risk Management department, and Human Resources.  (Id.)  Leligdon also copied Fuehrer, the Medical Center Director, on the emails, ignoring three levels of supervision. (Id.)

Leligdon then began to harass attorneys in the VA's Office of Regional Counsel.  On July 3, 2014, Aquilina sent a Letter of Counseling to Leligdon regarding her contact with Lisa Clark, VA Assistant Regional Counsel, by telephone and email, despite his prior instruction not to do so. (Aquilina Decl., ¶ 15, Ex. A5.)  Aquilina advised Leligdon that contact, by email or telephone, with any member of the VA Regional Counsel regarding her EEO claim was inappropriate and should stop immediately. (Id., Ex. A5.)   Aquilina further advised Leligdon that any contact with the VA Regional Counsel should be made only after she cleared it with either her supervisor or Service Chief.  (Id.)

On July 22, 2014, Leligdon requested that Esmurdoc support her application to the VISN 10 Social Work PSRB, a regional VA committee.  (Esmurdoc Decl., ¶33.)  Esmurdoc advised Leligdon that because of recent conduct issues, he could not support her request.  (Id.) VA policy requires that supervisors consider, among other factors, an employee's conduct and disciplinary

record when reviewing applications to serve on the PSRB.  (Id., Ex. C16.)  Participation on the

VISN 10 PSRB does not affect an employee's pay or job status at the VA. (Aquilina Decl., ¶ 18.)

Leligdon continued to openly defy instructions from her supervisors and subjected herself

to further discipline.  On July 31, 2014, Aquilina issued Leligdon a second Notice of Proposed

Suspension.  (Aquilina Decl., ¶ 16., Ex. A6.)   The notice proposed a three-day suspension for

Conduct Unbecoming of a Federal Employee and Failure to Follow Instructions. (Id.)   Three

incidents were cited to support the suspension.  First, despite prior verbal and written

instructions, on July 3, 2014, Leligdon sent an email to Fuehrer which misconstrued the facts of

her interactions with her supervisors. (Ex. A6.)   Second, on July 11, 2014, Leligdon copied

Fuehrer and Dr. Altose on a rude and disrespectful email to Esmurdoc.  (Id.)  Third, despite prior

counsel and discipline, and the offer of assistance from HR, Leligdon disregarded instructions

not to speak directly with VA Regional Counsel, without going through her supervisory chain of

command.  Leligdon's email was "angry, irrational, judgmental and accusative, and berating to

senior management." (Id.)  Leligdon served her three day suspension on September 5, 8, and 9,

2014.  (Aquilina Decl., ¶16.)

### G.    Leligdon Erroneously Claims She Was Removed From The Mental Health Area Ethics Team.

In her Second Amended Complaint, Leligdon also claims that the VAMC discriminated

against her when "[f]rom October 6, 2014, and continuing thereafter, defendant, through

Program Specialist Jason Gatliff and Chief of Staff Dr. Murray Altose, excluded the plaintiff

from participating in the Mental Health area Ethics Team."  (ECF No. 23, ¶ 96, PageID # 315.)

However, Leligdon has always remained a member of the Ethics Committee and is currently

serving as a member of the Mental Health Area Ethics Team, which is a recently created sub-

committee.  (Leligdon Dep., Vol. 2, 335:16-342:15.)  Regardless, participation in the Mental

Health Area Ethics Team does not affect an employee's pay or job status at the VA.  (Aquilina Decl., ¶17.)

> ### H.     Leligdon's Claims That The VA Has Her Under Surveillance Are Unsupported.

Leligdon also alleges that between 2010 and August 9, 2014, VA officials "have harassed Leligdon and deprived her of her privacy through surveillance of her home, elsewhere, and private communications."  (ECF No. 23, PageID # 314, ¶ 94.)  At her deposition, Leligdon claimed that she is being followed by large drones every night because "the federal government must be worried about something."  (Leligdon Dep., Vol. 1, 154:23-24.)  She claims that the drones, as big as planes, follow her wherever she goes and hover over her house at night.  (Id., Vol.1, 152:1-154:20.)  Leligdon also testified about other issues that she believes are related to this case.  This testimony is filed under seal, pursuant to the Stipulated Protective Order, as Exhibit E-3.

She also claims she has been followed by unidentified law enforcement teams.  Further, she asserts that "the federal government has been in my home and that some things that they may have found in my home may have caused them to be concerned," such as a vial of smallpox vaccine.  (Leligdon Dep., Vol. 1, 156:1; 157:15.)  She also stated that that unknown individuals may have tapped her phone. (Id., Vol. 2, 342:16-344:9.)

Leligdon further claims that she is under surveillance by the Medina Police Department and that she received a "death threat" when a dead squirrel and three flowers were left in her driveway.  (Leligdon Dep., Vol. 1, 188:14-191:12.)  There is absolutely no evidence, beyond

Leligdon's own speculation, that these events actually occurred,[7] let alone that the VA or even the federal government was involved in any way.

Leligdon gave several reasons that she believes she is being targeted, ranging from her involvement with "Islamabad" and a homeopathic society there; to terrorism; to the sale of World War II German artifacts; to a vial of small pox vaccine she keeps in her home; and to a report of contact she wrote about the death of a veteran at the VA in 2010.  (Leligdon Dep., Vol. 1, 157:10-25; 180:9-187:25.)  However, she also claims that the surveillance is occurring because she is a strong, older woman who has stood up to the VA.  (Id., 159:9-160:7.)

Leligdon produced more than 40 videos and pictures purporting to show drones following her and park police surveillance.[8] However, the videos do not clearly show drones or surveillance, but show only what appear to be aircraft lights at great distance and park rangers driving through parking lots at parks.  (Exs. G, H, I.)  None of the videos contain any indication, other than Leligdon's speculation, that the purported drones or surveillance are connected in any way to the VA or to the federal government.

## LAW AND ARGUMENT

### I.    Summary Judgement Standards.

Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, a court must construe the evidence and make all reasonable

---

[7] Leligdon did make a police report about the dead squirrel, but the report does not state that the officer actually saw the squirrel or provide any evidence that it was a threat, as opposed to a natural occurrence.  (Leligdon Dep. Ex. D).

[8] Three of these videos are attached as examples. Exhibit G purports to show park rangers conducting "surveillance" of Leligdon.  Exhibits H and I purport to show drones following Leligdon.

inferences from it in favor of the non-moving party.  Jones v. Potter, 488 F.3d 397, 403 (6th Cir. 2007) (citations omitted).

Summary judgment is appropriate when the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

> Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a genuine issue of material fact . . . . A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the nonmoving party. . . . A factual dispute concerns "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law.

Henderson v. Walled Lake Consol. Sch., 469 F.3d 479, 487 (6th Cir. 2006) (citations omitted).

Summary judgment is appropriate if the defendant "successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case. . . ." Combs v. Int'l Ins. Co., 354 F.3d 568, 576 (6th Cir. 2004).

## II.    Title VII Standards.

In this case, Leligdon asserts claims of gender discrimination and retaliation based on a hostile work environment and individual adverse actions, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  In each of these claims, absent direct evidence of discrimination, courts apply the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  Under the McDonnell Douglas analysis, a Title VII plaintiff must establish a prima facie case through circumstantial evidence.  Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009).

17

If a plaintiff succeeds in establishing a prima facie case, the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802.  Once the defendant has articulated such a reason, the burden of production then returns to the plaintiff to show by a preponderance of the evidence that the defendant's explanation is pretextual.  Id. at 803-04.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citations omitted).

### III.  Leligdon Has Failed To Exhaust Her Administrative Remedies Regarding Her Gender Discrimination Claim.[9]

Because the accepted claims in Leligdon's third EEO complaint contained only allegations of a hostile work environment and reprisal based on EEO activity, she may not now add claims of gender discrimination.  EEOC v. Bailey Co., 563 F.2d 439, 446 (6th Cir. 1977) (noting that complaint asserting Title VII claims is " 'limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.' " (quoting Tipler v. E. I. DuPont deNemours & Co., 443 F.2d 125, 131 (6th Cir. 1971)).

Despite the fact that Leligdon was represented by counsel when filing her EEO complaint and its numerous subsequent amendments, gender discrimination was not listed as one of the accepted charges.  Ang v. Procter & Gamble Co., 932 F.2d 540, 546 (6th Cir. 1991) ("[l]iberal construction is not necessary where the claimant is aided by counsel in preparing his charge" (citation omitted)).  Although Leligdon did mention a hostile work environment based on "sex

---

[9] In its October 2, 2015 Memorandum Opinion and Order, the Court did not dismiss Leligdon's gender discrimination claim because "it is unclear whether Leligdon appropriately raised this claim in her EEO complaint."  (ECF No. 28, PageID # 358.)

(gender)" in her Notice of Eleventh Amendment, gender discrimination was not accepted as part of the investigation.   The Notice states that the Agency will investigate "hostile work environment based on reprisal."  (Notice of Eleventh Amendment, ECF No. 11-6, PageID # 128).  The Notice does not mention the gender discrimination claim, nor was any such claim investigated. (Id.; Second Jindra Decl., ¶ 3, Ex. B1.)  Leligdon, who was represented by counsel, did not challenge the EEO's formulation of the claim, despite the opportunity to do so.  (ECF No. 11-6, PageID # 132.)

Furthermore, a charge of gender discrimination could not reasonably be expected to grow out of her existing charges of retaliation based on her prior EEO complaints.  Dixon v. Ashcroft, 392 F.3d 212, 217 (6th Cir. 2004).  Also, no evidence of gender discrimination or discrimination of any kind was discovered during the course of the investigation.  Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998).

Because Leligdon failed to adequately raise a charge of gender discrimination during the administrative process, the Agency had no reason or opportunity to investigate such charges, and she may not bring such claims for the first time in federal court.  Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974) (Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge); Dixon, 392 F.3d at 217.  Therefore, this Court must dismiss Leligdon's gender discrimination claims for failure to exhaust administrative remedies.

## IV.   Leligdon Has Not Established A Prima Facie Case of Discrimination Or Retaliation For The Majority Of Her Claims.

### A.   Leligdon Has Not Proven A Prima Facie Case Of Gender Discrimination.

In Count I of Leligdon's Second Amended Complaint, she asserts a claim of gender discrimination.  Specifically, Leligdon alleges that "the VA Medical Center engaged in unlawful . . . gender discrimination when it subjected Leligdon to invasive surveillance of her home, her

19

community and elsewhere, and her private communications."  (ECF No. 23 PageID # 323, 119.)

She further alleges that "[t]he VA's targeting of Leligdon for surveillance was based . . . [on

her] deviation from the stereotype of women being submissive."  (Id.)  At deposition, Leligdon

testified that she believes that every action alleged in her Second Amended Complaint, and

actions not included in this lawsuit, were taken, at least in part, because of her gender.  (Leligdon

Dep., Vol. 1, 86:25-90:17.)

To establish a prima facie case of gender discrimination, a plaintiff must show that: (1)

she is a member of a protected class; (2) she was subject to an adverse employment action; (3)

that she was qualified for the position; and (4) that she was treated less favorably than similarly

situated non-protected employees.  Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007).

Leligdon is a member of a protected class, was qualified for her position, and has alleged

an adverse employment action, but she cannot produce sufficient evidence to create a genuine

issue of material fact that she was treated less favorably that similarly situated non-protected

employees.

As an initial matter, Leligdon's two three-day suspensions without pay on June 6, 2014

and September 5, 2014, could qualify as adverse employment actions.  Although "fully

successful" performance ratings generally are not adverse actions, Leligdon's "fully successful"

rating in 2013 arguably could be if it resulted in her ineligibility for a performance bonus.

Compare Primes v. Reno, 190 F.3d 765, 767 (6th Cir. 1999) (satisfactory performance appraisal

not adverse employment action) with White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th

Cir. 2008) (satisfactory performance evaluation could be adverse if affects bonus).  "An adverse

employment action has been defined as 'a materially adverse change in the terms and conditions

of [a plaintiff's] employment.'"  Spees v. James Marine, Inc., 617 F.3d 380, 391 (6th Cir. 2010)

20

(quoting White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 795 (6th Cir. 2004), cert. granted in part, 546 U.S. 1060 (2005)).  A plaintiff's "'bruised ego,' " a "'mere inconvenience, or an alteration of job responsibilities'" are not sufficient to constitute adverse employment actions.  Id. (quoting White, 364 F.3d at 797.)  Adverse employment actions involve a "significant change in employment status," including hiring, firing, failing to promote, reassignment with significantly different responsibilities, suspensions, or a decision causing a significant change in benefits.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); Smith v. City of Salem, Ohio, 378 F.3d 566, 575-76 (6th Cir. 2004); White, 533 F.3d at 403. Leligdon cannot demonstrate that she suffered any adverse employment action other than the three day suspensions and, arguably, her 2013 Fully Successful performance rating, and therefore, cannot state a prima facie case of gender discrimination with respect to any other action alleged in the Second Amended Complaint.

Leligdon nonetheless fails to prove a prima facie case of gender discrimination because she fails to identify any similarly situated employees.  Leligdon cannot establish a prima facie case with generalized allegations of differential treatment.  Instead, she must produce evidence of similarly situated employees outside the protected class who were treated differently than she. See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998) ("[T]he plaintiff [must] demonstrate that he or she is similarly-situated to [a] non-protected employee in all relevant respects."); Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 363 (6th Cir. 2010). Leligdon has not identified any man, let alone any similarly situated man, who has received better treatment that she.  (Leligdon Dep., Vol. 1, 225:2-226: 12.)

Leligdon has failed to prove a prima facie case of gender discrimination, and the Defendant is entitled to summary judgment on her claim.

**B.      Leligdon Has Not Proven A Prima Facie Case Of Retaliation For The Majority of Her Claims.**

Title VII, at 42 U.S.C. § 2000e-3(a), prohibits retaliation against an employee "because [she] has opposed any practice made an unlawful employment practice . . . or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  To state a prima facie case of retaliation, a plaintiff must prove that: (1) she engaged in protected activities; (2) her exercise of her civil rights was known by the defendants; (3) that defendants thereafter took an employment action that was materially adverse to her; and (4) that there was a causal connection between the protected activity and the adverse employment action.  Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003). For a complaint or other action to constitute protected activity, it must concern the type of discrimination that is made unlawful by Title VII, such as race or gender discrimination.  Barrett v. Whirlpool Corp., 556 F.3d 502, 520 (6th Cir. 2009).   Furthermore, the Supreme Court has held that the causation element "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

**1.      Protected Activity.**

Defendant concedes that Leligdon has engaged in protected activity as defined in Title VII.   Leligdon filed three EEO claims during her employment at the VA relevant to this case:[10]

---

[10] Although Leligdon also claims that she engaged in protected activity by making disclosures regarding the death of a veteran and privacy violations, these allegations relate to her whistleblower claim, which was dismissed by this Court's June 9, 2015 Order, and do not concern the type of discrimination made unlawful by Title VII.  (Mem. Opinion & Order, ECF No. 22, PageID # 278.)  See Weaver v. Ohio State Univ., 71 F. Supp. 2d 789, 793-94 (S.D. Ohio 1998), aff'd, 194 F.3d 1315 (6th Cir. 1999); Barrett, 556 F.3d at 520 (to constitute protected

Agency Case No. 200H-0541-2011-102788, filed June 23, 2011; Agency Case No. 200h-0541-2012-03512, filed July 23, 2012; and Agency Case No. 200H-VI10-2013-103868, filed August 30, 2013.

## 2.    Materially Adverse Actions.

The standard for adverse actions in retaliation claims differs from the showing necessary for adverse employment actions in the discrimination context.  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse," which the Supreme Court defined as an action that would dissuade a reasonable worker from making or supporting a charge of discrimination.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).   A "'mere inconvenience or an alteration of job responsibilities'" or a "' bruised ego' " will not constitute an adverse employment action."  White, 364 F.3d at 797 (quoting Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996)).  The majority of Leligdon's claims cannot meet this threshold.

Leligdon does arguably allege three materially adverse actions:   she received a three day suspension without pay on June 6, 2014, a three day suspension without pay on September 5, 2014, and a Fully Successful performance rating in 2013, which, while not a negative evaluation or a "downgrade," resulted in her ineligibility for a performance-based bonus.  See Halfacre v. Home Depot, U.S.A., Inc., 221 F. App'x 424, 433 (6th Cir. 2007).  These actions, arguably, could be capable of dissuading a reasonable worker from making or supporting a charge of discrimination.

---

activity, a complaint must be one that concerns discrimination made unlawful by Title VII, such as discrimination based on race, gender, religion or national origin).

No other event at issue in this case would dissuade a reasonable worker from making or supporting a charge of discrimination. The counseling letters, which are not discipline, and the letters of reprimand, which did not reduce her pay, change her title, or reduce her future prospects, are not materially adverse actions. See, e.g., Taylor v. Geithner, 703 F.3d 328, 338 (6th Cir. 2013) (letter of reprimand not materially adverse action); Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 570 (2d Cir. 2011) (letter of counseling not materially adverse action). Nor is being charged two hours and 15 minutes of AWOL or the denial of two days of authorized absence to attend training.[11] See,e.g., Burlington, 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms."); Douglas-Slade v. LaHood, 793 F. Supp. 2d 82, 99 (D.D.C. 2011) (placement on AWOL status for one day insufficient to sustain plaintiff's retaliation claim); Blackburn v. Shelby Cty., 770 F. Supp. 2d 896, 926 (W.D. Tenn. 2011) ("denial of training that has no adverse impact on plaintiff's growth, advancement, or compensation fails to rise to the level of an adverse employment action.") (citations omitted).

Likewise, Esmurdoc's refusal to support Leligdon's request to apply to serve on the VISN 10 PSRB was not a materially adverse action because it had no adverse impact on her growth, advancement, or compensation. (Leligdon Dep., Vol. 2, 327:25-329:17; 412:11-21) (testifying that she had not applied for another job position since she was denied Assistant Chief

---

[11] Although Leligdon claims that Esmurdoc and Dr. Altose tried "to limit the amount of time [she has] to get her CEUs [continuing education units], (Leligdon Dep.. Vol. 2, 314:24-315:3), Leligdon was able to complete the 30 credit hours requirement to maintain her social work license, and was granted a total of 106 hours of authorized absences to attend training from January 2012 to January 2015. (Leligdon Dep., Vol. 1, 17:13-16; 18:10-15; 310:12-311:6; Aquilina Decl., ¶ 19.)

of Social Work, prior to the events at issue in this lawsuit); see Blackburn, 770 F. Supp. 2d at 926.

Leligdon also claims that she suffered a materially adverse action when Freeman provided advice and recommendations to Leligdon's supervisors to limit her official time to prepare her EEO complaints to 16 hours.  (Leligdon Dep., Vol. 2, 203:8- 210:10).    The undisputed facts, however, show that Leligdon was never limited to 16 hours of official time. See, e.g.,  Walz v. Potter, 3:06-cv-614, 2008 WL 4737493, at *3-4 (W.D. Ky. Oct. 27, 2008) (temporary denial of official time not a materially adverse action) (citation omitted); Stoyanov v. Mabus, 126 F. Supp. 3d 531, 551 (D. Md. 2015) ("A reasonable employee also would not view the denial of Plaintiff's request for additional time to work on an EEO complaint as materially adverse.").   From January 2012 to January 2015, Leligdon was in fact granted 72 hours of paid time, during work hours, to prepare her EEO complaints. (Aquilina Decl., ¶ 8.)  Being given nearly two weeks of official time, when an agency is not required to provide any such time at all, would not dissuade any reasonable person from bringing a complaint of discrimination.

### 3.    Causation.

To state a prima facie case of retaliation, Leligdon must show that the Defendant took the adverse actions because of her opposition to discriminatory practices—"proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 133 S. Ct. at 2533; Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 503 (6th Cir. 2014).  To satisfy this burden, a plaintiff must provide evidence from which a reasonable jury could find that the Defendant would not have imposed the material adverse actions had the plaintiff not made a charge or complaint.  EEOC v. Ford Motor Co., 782 F.3d 753, 770 (6th Cir. 2015).  At the summary-judgment stage the "burden to establish a prima facie

case of retaliation…'is a burden easily met.' " <u>EEOC v. Avery Dennison Corp.</u>, 104 F.3d 858, 861 (6th Cir. 1997) (citation omitted).

Here, for the purposes of summary judgment where her burden is easily met, Leligdon could arguably establish but-for causation for the June and September 2014 suspensions without pay and her 2013 "Fully Successful" performance evaluation.  Defendant is nonetheless entitled to summary judgment because, as discussed below, the VA can articulate legitimate nondiscriminatory reasons for its actions, and Leligdon cannot establish pretext.

### C.    Leligdon Has Not Proven A Prima Facie Case On Her Hostile Work Environment Claim.

Leligdon also alleges that she was subjected to a hostile work environment. To establish a prima facie case of gender discrimination based on a hostile work environment, a plaintiff must show that: (1) she is a member of a protected class (female); (2) she was subjected to harassment, either through words or actions, based on her gender; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile or offensive work environment; and (4) there exists some basis for liability on the part of the employer. <u>Grace v. USCAR</u>, 521 F.3d 655, 678 (6th Cir. 2008).

Harassment following a discrimination complaint also can constitute retaliation for the purposes of Title VII.  <u>See</u> <u>Akers v. Alvey</u>, 338 F.3d 491, 498 (6th Cir.2003). The standard for "severe or pervasive" harassment is "the same in the retaliation context as in the sexual and racial discrimination contexts." <u>Id.</u>  (quoting <u>Broska v. Henderson</u>, 70 F. App'x 262, 269 (6th Cir. 2003)). The harassment must be "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (quoting <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)); <u>Morris v. Oldham Cty. Fiscal Court</u>, 201 F.3d 784, 791-92 (6th Cir. 2000).  The

26

"conduct in question must be judged by both an objective and a subjective standard: The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997) (citations omitted).  To assess whether the harassment unreasonably interfered with the work performance and created a hostile environment, courts must consider the totality of the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance. . . .'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Harris, 510 U.S. at 23). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment. . . ." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (Id.) (internal citations and quotation omitted.)

The incidents alleged in this case do not constitute severe and pervasive harassment sufficient to constitute a hostile work environment.  As discussed above, Leligdon alleges, inter alia, that, over a two year period, VA management failed to respond with she informed them of unidentified "rumors and gossip" being spread about her at the medical center.  She makes this allegation even though an AIB investigation was convened, which found no merit to her claims. She also claims that an EEO investigation was conducted into her actions after her subordinates complained that she was creating a hostile work environment for them; that Esmurdoc threatened to discipline her for insubordination after she failed to appear for a meeting; that Esmurdoc did not support her request to serve an additional term on the PSRB; and that she was issued counseling letters and a letter of expectations.  Moreover, she asserts that her official time was

27

limited to 16 hours, even though she actually received four and a half times that amount to prepare for her various EEO claims from 2012 to 2015.  Also, she claims that Freeman accused Leligdon of bullying and harassing her in an email exchange.  She also claims that Dr. Bond, the medical director of the VAMC acute psychiatric ward, refused to complete a ROC at Leligdon's request and suggested to one of Leligdon's subordinates that he was needed on the ward at a time when Leligdon had asked to meet with him.  Further, she alleges that she was prohibited from using the "restricted" feature on Outlook which prevented recipients from printing, forwarding, or saving her emails; and that Freeman asked the EEO investigator about the status of Leligdon's complaint to determine if approval of additional official time was warranted.

These incidents occurred sporadically over a two-year period.  None of the incidents were physically threatening or intimidating. Instead, they were normal workplace disagreements, during which Leligdon's supervisors treated her with restraint and respect.   The alleged incidents do not indicate a workplace "permeated" with "discriminatory intimidation, ridicule and insult."  Indeed, the documentation shows that, despite Leligdon's repeatedly unprofessional behavior, VA management was respectful and polite during their interactions with her.  In addition, VA management sought to correct her behavior many times before imposing formal discipline.

The Sixth Circuit has held that such minor annoyances as those alleged in this case are insufficient to constitute a hostile work environment.  See, e.g., Willey v. Slater, 20 F. App'x 404, 405 (6th Cir. 2001); Cleveland v. S. Disposal Waste Connections, 491 F. App'x 698, 707 (6th Cir. 2012); see also Blake v. Potter, Nos. 1:04CV2112, 1:05CV649, 2006 WL 355321, at * 13 (N.D. Ohio Feb. 15, 2006) (Nugent, J.).  Otherwise, Title VII would become a "general civility code" for the workplace.  Williams v. Gen. Motors Corp., 187 F.3d 553, 564 (6th Cir.

1999) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)); see also

Thorn v. Sebelius, 766 F. Supp. 2d 585, 601 (D. Md. 2011), aff'd, 465 F. App'x 274 (4th Cir.

2012) ("Thorn disagreed with the management style or decisions of those who supervised him—

and that alone is not actionable under Title VII.").

      To state a claim for a hostile work environment, courts have required plaintiffs to allege

much more severe hardships than the at most minor annoyances suffered by Leligdon.  See, e.g.,

Morris, 201 F.3d at 793 (reversing grant of summary judgment in favor of employer when

supervisor followed employee from work, destroyed employee's television set, threw nails onto

employee's driveway, and visited and telephoned employee repeatedly merely to harass

employee); Austion v. City of Clarksville, 244 F. App'x 639, 652 (6th Cir. 2007) (affirming

denial of motion for judgment as a matter of law where a letter referred to the plaintiff, a police

officer, as "complainer" and "disgruntled employee," the Chief yelled at plaintiff for making

allegations of racial harassment, a drive-by shooting occurred at another officer's house, with

suspicion of intra-department racial motivation, a noose was hanging in the police station, and

racist remarks were made).  Leligdon's claims simply do not rise to this level.

      Leligdon does claim that she was subjected to a hostile work environment when she was

"deprived of her privacy through surveillance of her home, elsewhere, and private

communications."  (ECF No. 23, ¶ 94.)  In deposition, Leligdon testified that she believes she is

being "targeted" by the VA and unspecified parts of the federal government.   She believes she is

being targeted for many reasons, such as her "involvement with Islamabad" and a homeopathic

society there, the sale of World War II German artifacts, a vial of small pox vaccine she keeps in

her home, and a report of contact she wrote about the death of a veteran at the VA in 2010, and

because she is a strong older woman who has stood up to the VA. (Leligdon Dep., Vol. 1, p.

157:10-25; 180:9-187:25; 159:9-160:7.)  Specifically, she claims that she received a "death threat" when a dead squirrel and three flowers were left in her driveway, she is being followed by unidentified surveillance teams, drones as big as planes follow her wherever she goes and hover over her house at night, "law enforcement" has been inside her house, and unknown individuals may have tapped her phone.  (Leligdon Dep., Vol. 1, 188:14-191:12; 152:1-154:20.) Leligdon also has testified about other issues related to this case, as discussed in Exhibit E-3, filed under seal.  There is absolutely no evidence that these events actually occurred, let alone that the VA or even the federal government was involved in any way.

Even if such incidents were severe or pervasive enough to constitute a hostile work environment, Leligdon still fails to establish a prima facie case because she cannot show that the alleged harassment was based on her gender or retaliation for her prior EEO activity.  See Barnett v. Dep't of Veterans Affairs, 153 F.3d 338, 342–43 (6th Cir. 1998) (plaintiff could not establish prima facie case where conflict was the result of personal distaste rather than discriminatory animus).  Leligdon can present no evidence that any of the alleged harassment occurred because of her gender.  And Leligdon has no evidence of retaliation for her EEO activity other than her own speculation.   All of the work-related incidents were the result of standard workplace disputes, which Leligdon escalated when she disagreed with the normal business decisions of her coworkers and supervisors.

**V.**     **The VA Had Legitimate, Nondiscriminatory Reasons For Its Actions.**

As discussed above, out of Leligdon's numerous claims, she is only able to state a prima facie claim of retaliation for three events:  the 2013 Fully Successful performance rating, the June 2014 three-day suspension, and the September 2014 three-day suspension.  Defendant,

however, is entitled to summary judgment on those claims because it can articulate legitimate non-discriminatory reasons for its actions.

### A.    2013 Fully Successful Performance Rating

Leligdon received a Fully Successful rating in 2013 because it accurately reflected her work performance during the rating period.  Even though prior to 2012, Leligdon had received Outstanding ratings under different supervisors[12], an overall rating of Fully Successful is not a negative evaluation.  It means that she was meeting job expectations.  Although Leligdon argues that her performance was "downgraded," such a characterization is inaccurate.   A rating given one year is not guaranteed to be given the next year.  Even if it were, however, Leligdon also received a Fully Successful rating in 2012.  (Leligdon Dep., Vol. 1, 52:11-24.)

In 2013, Esmurdoc rated Leligdon as exceptional in two of five categories: Leading Change and Business Acumen.   Esmurdoc rated Leligdon as fully successful in Leading People, Building Coalitions, and Results Driven because he felt that he could not rate her as outstanding given her minimal direct patient workload, complaints from her subordinates and peers regarding her unprofessional behavior, her lack of collegiality, and her unwillingness to engage with her supervisor regarding these issues.  (Esmurdoc Decl., ¶27.)  Despite these issues, Leligdon received an overall rating of Fully Successful.  Given this, the VA had a legitimate, non-discriminatory reason to give Leligdon a Fully Successful performance review.

### B.    June 2014 Three-Day Suspension.

The VA also had a legitimate, non-discriminatory reason for suspending Leligdon for three days in June 2014.  Leligdon's sarcastic, unprofessional emails and failure to follow instructions fully warranted her suspension.

---

[12] Esmurdoc became Leligdon's supervisor in the summer of 2012.

31

On April 23, 2014, Leligdon, upset with her supervisor's denial of a request to attend off-site training, sent an email to the Director of the VAMC, the Chief of Staff, and to her supervisors with the subject line "Training/Education."  (Ex. A3, pp. 6-7.)  In that email, Leligdon sarcastically stated that "[i]n our direct interactions and my observation of your role-modeling actions and behavior as upper managers I am asking for information and verification of some of your management techniques."  (Id.)  She went on to request "information. . . regarding the following management techniques/options available to me for use as a Supervisor," which she identified as, among other things, "management can deny AA for CEU training without cause, logic, or a viable reason," management can refuse to respond or reply to a Subordinates request, simply ignoring their communication," "managers have the ability to use any excuse for decisions made against a Subordinate, even if the excuse has no logical basis," and ending with "logic and rational reasoning are not necessary when managing." (Id.)   She concluded with "[a]gain, as a Supervisor I want to thank you for the role-modeling and training you have consistently provided me and I look forward to clarification on the above management techniques." (Id.)

Leligdon sent this rude, sarcastic email not only to her supervisor and Service Chief, but to the Chief of Staff and the Director of the VAMC.  She was complaining about a relatively trivial matter, her supervisor's denial of her request for authorized absence attendance at a training seminar, in which she had no reason to involve the Chief of Staff and Director.  Moreover, the email's tone and content was entirely inappropriate for a workplace.  Leligdon's conduct in sending this email alone would have been sufficient reason to suspend her for three days.  Rattigan v. Holder, 604 F. Supp. 2d 33, 49 (D.D.C. 2009) ("Title VII anti-retaliation provision "'was not intended to immunize insubordinate, disruptive, or nonproductive behavior

32

at work.'") (quoting <u>Armstrong v. Index Journal Co.</u>, 647 F.2d 441, 448 (4th Cir. 1981)); <u>Mason v. Geithner</u>, 811 F. Supp. 2d 128, 204 (D.D.C. 2011), <u>aff'd</u>, 492 F. App'x 122 (D.C. Cir. 2012).

Moreover, Leligdon's suspension also was based on several other emails she had sent regarding Esmurdoc's decision to deny her request for authorized absence.  (Aquilina Decl., Ex. A3.)  Leligdon sent several disrespectful emails to Esmurdoc regarding this issue, copied Aquilina, the Chief of Staff, and the Medical Center Director, and demanded immediate responses from the Chief of Staff.  (<u>Id.</u>)   In addition, Leligdon sent many of these emails with restrictions that prevented the recipients from printing, copying or forwarding the emails, despite previous instruction not to do so.  (<u>Id.</u>, Ex. A3, p. 2.)  Leligdon also sent an insulting email to Freeman, the EEO manager, on which she also copied the Director, Chief of Staff, and Human Resources manager.  (<u>Id.</u>, Ex. A3.)  In addition, Leligdon sent an inappropriate email to her subordinates, with copies to the Director and Chief of Staff, to which she attached EEO policies and stated, "I have learned a great deal about civil rights and liberty's [sic] the past several years. (<u>Id.</u>)

The rude, sarcastic and unprofessional tone of Leligdon's emails, her repeated copying of the Director and Chief of Staff, and her continued use of email restrictions despite prior instruction provide ample legitimate, non-discriminatory reasons for the VAMC to suspend her without pay for three days.  Documented disciplinary incidents for unprofessional and rude behavior are legitimate, non-discriminatory reasons for adverse employment actions.  <u>See Carreno v. DOJI, Inc.</u>, 668 F. Supp. 2d 1053, 1062 (M.D. Tenn. 2009) (numerous complaints and cataloged disciplinary incidents of unprofessional and rude behavior were legitimate, non-discriminatory reasons for not promoting and for terminating employee).

### C.     September 2014 Suspension

The VAMC also had legitimate, non-discriminatory reasons to suspend Leligdon when it suspended her for three days without pay in September 2014.  Leligdon's conduct, which was similar to the conduct that earned her prior suspension, warranted additional discipline.

In July 2014, one of Leligdon's subordinates received a subpoena. Leligdon previously had been counseled not to contact VA Regional Counsel without going through her supervisors. She sent an email to Esmurdoc, with copies to the medical center Director and Chief of Staff, which began, "Per your unwarranted Counseling Plan I have to have permission from you before I can contact our Attorneys in Regional Counsel."  (Aquilina Decl., Ex. A6.)  Leligdon was told to give the subpoena to her supervisors, who would determine what needed to be done.  She instead insisted on contacting the Regional Counsel's office directly.  After receiving permission to fax the subpoena to Regional Counsel Dennis McGuire, she continued to email Mr. McGuire to argue with him about whether the procedure was correct.  (Id.)  An employer has a legitimate cause to discipline or terminate an employee who refuses to follow through on an employer's expressed directions.  Fullen v. City of Columbus, 514 F. App'x 601, 606 (6th Cir. 2013); Russell v. Univ. of Toledo, 537 F.3d 596, 604 (6th Cir. 2008).

As above, Leligdon's rude emails, unnecessary inclusion of the most senior officials at the VAMC, and failure to follow instructions merited the three-day suspension she was given in September 2014.  "Co-worker complaints regarding interpersonal skills constitute a legitimate, non-discriminatory reason for discipline. . . ."  Parikh v. Cleveland Hardware & Forging Co., No. 1:04CV2363, 2006 WL 1515667, at *9 (N.D. Ohio May 26, 2006) (Vecchiarelli, M.J.).

**VI.** **Leligdon Has Not Shown That Defendant's Legitimate, Nondiscriminatory Reasons Were Pretextual.**

Defendant is entitled to summary judgment because Leligdon cannot show that the VA's legitimate, non-discriminatory reasons for its actions were pretextual.

A plaintiff can prove pretext by showing that the stated reason:  (1) has no basis in fact; (2) was not the defendant's actual motivation; or (3) was insufficient to explain the defendant's actions.  Seay v. Tennessee Valley Auth., 339 F.3d 454, 463 (6th Cir. 2003).  "In assessing an employer's legitimate non-discriminatory reason, the question is not whether the employer's reasons are right, but whether the employer's description of its reasons is honest." Young v. Oakland Cty., 351 F. Supp. 2d 653, 658 (E.D. Mich. 2004), aff'd, 176 F. App'x 644 (6th Cir. 2006) (internal citations omitted).

Leligdon has provided no evidence that these reasons were pretextual, other than her own subjective perception, and unsupported speculation is not sufficient to create a triable issue on pretext.  Sutherland v. Michigan Dep't of Treasury, 344 F.3d 603, 623 (6th Cir. 2003).

**A.** **Leligdon Cannot Show That The Fully Successful Performance Rating Was Pretextual**.

Leligdon appears to argue that her 2013 Fully Successful performance rating was pretextual because it was not based in fact, because she believes that she should have received an Outstanding rating like she had in previous years.  (Leligdon Dep., 275:13-16.)  Leligdon's only evidence to support this argument is that she gave herself an Outstanding rating on her self-assessment.  (Leligdon Dep. 275:7-276:17 ).  Leligdon, who is a supervisor who rates employees, admits that while employees' self-assessments should be considered, employees "don't determine their [performance] rating."  (Leligdon Dep. 278:23-279:11).

The fact that Esmurdoc's assessment of Leligdon's performance did not comport with her self-assessment does not indicate that his reasons for assessing her at the fully successful level were not based in fact. "Disagreement with the employer's assessment of work performance cannot prove pretext." Zhu v. Vanderbilt Univ., No. 3:06-0460, 2007 WL 2963980, at *14 (M.D. Tenn. Oct. 5, 2007) (citing McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990)). Therefore, Leligdon has not provided evidence sufficient to create a triable issue that Defendant's legitimate business reasons for her Fully Successful performance rating were pretextual.

**B.      Leligdon Cannot Show That The Legitimate, Non-Discriminatory Reasons for Her Suspensions Were Pretextual.**

Leligdon also cannot show that the legitimate, non-discriminatory reasons for her suspensions were pretextual. Leligdon's rude, sarcastic, argumentative and unprofessional emails speak for themselves, and Leligdon does not deny that she wrote them. This correspondence provided a more than sufficient reason for discipline. See Siegner v. Township of Salem, No. 15-2063, 2016 WL 3426092, at *8  (6th Cir. June 22, 2016) (Board's failure to consider application not pretextual when "insulting" application contained references to Board's unjust and "corrupt practices").  Plaintiff's repeated unprofessional emails, and her insistence on copying upper management when she was instructed not to and there was no business reason to do so, warranted a suspension, particularly when letters of counseling and reprimands had failed to correct her behavior.

Plaintiff also has presented no evidence, other than her own subjective belief that she has been "targeted," that her behavior did not actually motivate the decision to suspend her. Such subjective beliefs are insufficient to show pretext. See Mitchell v. Toledo Hosp., 964 F.2d 577, 585 (6th Cir. 1992) (stating that "rumors, conclusory allegations and subjective beliefs" are

"wholly insufficient evidence to establish a claim of discrimination, as a matter of law.")

(Citations omitted).

Because Leligdon cannot show that Defendant's legitimate, non-discriminatory reasons for its actions were pretextual, this Court should grant summary judgment in favor of Defendant.

### CONCLUSION

For all of the foregoing reasons, this Court should grant summary judgment in favor of Defendant, and dismiss this case with prejudice, with costs to Plaintiff.


Respectfully submitted,

CAROLE S. RENDON
Acting United States Attorney
Northern District of Ohio


By:  /s/ Lisa Hammond Johnson
Lisa Hammond Johnson(#0061681)
Erin E. Brizius (#0091364)
Assistant United States Attorneys
United States Court House
801 West Superior Ave., Suite 400
Cleveland, Ohio 44113
216-622-3679 – Hammond Johnson
216-622-3670 - Brizius
216-522-4982 - Fax
Lisa.Hammond.Johnson@usdoj.gov
erin.e.brizius2@usdoj.gov

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

Pursuant to 28 U.S.C. § 1746, undersigned declares under penalty of perjury that this

Memorandum in Support of Defendant's Motion for Reconsideration is thirty-seven (37) pages

in length and is within the 40-page limitation set by this Court's June 23, 2016 Order granting

Defendant's Motion to Exceed Page Limitations (ECF No. 45.).


s/ Lisa Hammond Johnson
Lisa Hammond Johnson
Assistant U. S. Attorney