UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| PAULA M. LELIGDON, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT A. MCDONALD, | ) | |
| SECRETARY, | ) | Case No. 1:14-cv-02810 |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF VETERANS' AFFAIRS | ) | |
| Louis Stokes Cleveland VA Medical Center | ) | JUDGE DONALD C. NUGENT |
| 10701 East Boulevard, | ) | |
| Cleveland, Ohio 44106 | ) | |
| | ) | |
|     Defendant. | ) | |

DECLARATION OF JAMES D. JINDRA
PURSUANT TO 28 U.S.C. § 1746

I, James D. Jindra, make the following declaration in lieu of an affidavit, as permitted by 28 U.S.C. § 1746:

1. I occupy the position of District Manager, North Atlantic District, Department of Veterans Affairs.

2. I have reviewed my declaration dated March 13, 2015, outlining Paula Leligdon's EEO activity.

3. A true and correct copy of ORM's Investigative Report Summary of Ms. Leligdon's third EEO complaint, Case No. 200H-VI10-2013103868, is attached hereto as Exhibit 1.

4. On September 29, 2015, Ms. Leligdon filed a fifth EEO complaint, Case No. 200H-0541-2012103512, against the Department of Veterans Affairs.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 23rd day of June, 2016.

James D. Jindra
District Manager, North Atlantic District-1
Office of Resolution Management

GOVERNMENT
EXHIBIT
B



**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**151 Knollcroft Road, Building 16**
**Lyons, NJ 07939**

## Investigative Report
### In the Matter of the EEO Complaint of Discrimination of:

Paula Leligdon                                         )
190 Walnut Drive                                       )
Medina, OH 44256                                       )
Complainant                                            )
                                                       )
                                                       )
v.                                                     ) ORM No. 200H-VI10-2013103868
                                                       )
                                                       )
Paul A. McDonald, Secretary                            )
Department of Veterans Affairs                         )
810 Vermont Avenue, N.W.                               )
Washington, D.C. 20420                                 )
Respondent                                             )

Facility:  Louis Stokes Cleveland VA Medical Center, Cleveland, Ohio

Nancy Baumgarten
EEO Investigator
Susan Grimes Associates, Inc.
2900 M Street NW
Washington, D.C. 20007

## I. Introduction

Having met all procedural requirements for acceptance, with respect to the issues specified hereafter, this complaint was assigned for investigation on January 7, 2014.

## II. Background

Paula Leligdon, hereinafter referred to as the complainant, has been a Supervisor for the Psychiatry Social Work Service at the Louis Stokes Cleveland VA Medical Center at both the Wade Park and Parma facilities since April 2009. Believing she has been subjected to a hostile work environment and discrimination based on reprisal for prior EEO activity, she contacted an EEO Counselor on July 18, 2014 (A-3).  Counseling did not result in resolution and the complainant filed a formal complaint on August 30, 2013 (A-4). Issues 1-8 were accepted on October 17, 2013 (A-6).  Additional Claims 9-13 were accepted on



GOVERNMENT
EXHIBIT
B-1

1

November 25, 2013 (A-6).  Subsequent claims were accepted and are part of two supplemental investigation.  This investigative file covers Claims 1 through 13.

## III. Claims and Bases

**Whether the complainant was subjected to a hostile work environment based on reprisal for prior EEO activity as evidenced by the following events:**

1) **In August 2012, CE acknowledged that he was aware of the rumors and gossip going around the Medical Center about the complainant and he failed to act after the compliant [SIC] advised him that she was being harassed by her subordinates.**

2) **In November 2012, Jason Gatliff (JG), Head of Ethics Committee, stated he had difficulty working with the complainant due to the rumors, gossip and negative talk about her that was going around the Medical Center, admitted he participated in said gossip and rumors, and that he was aware of her EEO complaint.**

3) **In June 2012 and November 2012, management failed to act when the complainant advised them of the bullying, rumors and gossip being spread about her throughout the VA Medical Center.**

4) **On March 15 2013 [SIC], Susan Fuehrer, Director, failed to act after the complainant advised her about JG's admission that he had difficulty working with her and his participation in spreading rumors, gossip and negative talk about her.**

5) **In May 2013, just prior to the May 20th meeting, Joseph Aquilina (JA), Chief of Social Work Services, and Christopher Esmurdoc (CE), Assistant Chief of Social Work, Immediate Supervisor initiated a "witch-hunt" on the complainant by soliciting reports of contact (ROCs) from her subordinates, and contacting HR and EEO regarding an inquiry/investigation against her.**

6) **On May 20, 2013, during a meeting, CE threatened to discipline the complainant for alleged insubordination.**

7) **On June 3, 2013, CE and JA issued the complainant four different ROCs, which were dated May 14, 2013, May 20, 2013, May 21, 2013, and May 29, 2013, respectively.**

8) **On July 22, 2013, CE threatened to remove the complainant from the Professional Standards Review Board (PSRB) if she refused to assume increased duties.**

2

9) **On July 31, 2013, CE issued the complainant two Counseling Plans.**

10) **From July 2012 to October 16, 2013, JA and CE failed to support and/or have undermined the complainant's supervisory position and responsibilities.**

11) **On October 8, 2013, CE charged the complainant two hours for being absent without leave (AWOL).**

12) **On October 16, 2013, CE charged the complainant fifteen minutes AWOL.**

13) **On October 23, 2013, CE issued a third Counseling Plan to the complainant.**

**NOTE: Events 1 through 13 were accepted for investigation as a hostile work environment. Events 11, 12, and 13 also were accepted for investigation as discrete acts of discrimination based on reprisal.**

## IV. Document Review

The complainant's Prior EEO Activity

A summary of the complainant's prior EEO activity reveals that she has filed two prior complaints against the Agency in April 2011 and July 2012, in addition to her current complaint (C-1).

Organizational Chart

An organizational chart for the Social Work Service at the Louis Stokes Cleveland VA Medical Center in Cleveland, Ohio displays the complainant's work environment during the claims at issue in this complaint. A breakdown of the complainant's organizational unit shows the complainant's role as a Supervisory Social Worker involved in the supervision of eleven Social Workers and one Office Automation Assistant. The Agency states that it is unknown whether or not any of the employees within the complainant's work unit have filed any prior EEO activity against the Agency (C-2).

The Complainant's Functional Statement

A Functional Statement for the complainant's position as Social Work Supervisor describes the position as "responsible for the professional, clinical care and administrative management of an area in social work service, in a care line, in programs or multiple facilities" (C-3).

3

Documents Related to Claim 1

On October 31, 2013, Felix Christopher Esmurdoc, Assistant Chief of Social Work Service, and Joseph Aquilina, Chief of Social Work Service, wrote memos to Olivia Thomas, EEO Program Assistant, noting that they do not have any documentation related to the allegations at issue in this claim (C-26).

Documents Related to Claims 2 & 4

On March 15, 2013, the complainant wrote an email to Susan Fuehrer, Medical Center Director, and Murray Altose, Chief of Staff, attaching information related to her Performance Appraisal Grievance.  In that document, the complainant expressed her belief that the inability of Mr. Aquilina, Mr. Esmurdoc, and Dale Goldstein, former Assistant Chief of Social Work Service, to rate her fairly may have been influenced "by similar factors which have affected Jason Gatliff (Head of Ethics at the VA Medical Center), who stated he found it difficult to work with [her] due to what he had heard about [her], the rumors/gossip/negative talk going around the Medical Center about [her]" (C-4).

On November 1, 2013, Ms. Fuehrer wrote a letter to Colette Hill, EEO Document Management Specialist, informing her that she does not have information on the Chair of the Ethics Committee having issues with the complainant.  Ms. Fuehrer also noted that she does not have an email from the complainant dated March 15, 2013, regarding the Chair of Ethics Committee participating in spreading rumors and gossip, but she does have an email from the complainant on that date that she cannot forward or print (C-26).

On November 5, 2013, Jason Gatliff, Integrated Ethics Program Officer, wrote a statement indicating that he does not have any documentation of the complainant's communication with him other than an email she sent entitled "Thanks" that he could not open based on her security measures (C-26).

Documents Related to Claim 3

Emails between the complainant and Ms. Fuehrer between April 2013 and June 2013, provide examples of the complainant informing Ms. Fuehrer of issues with staff as well as bullying, along with the complainant's documentation of a lack of response from Ms. Fuehrer (C-5).

On November 6, 2013, Charles Franks, Chief of Human Resources Management Service, wrote an email to Paul DePompei, Risk Manager, discussing the initiation of an Administrative Investigation Board (AIB) to investigate the allegations raised by the complainant against the Agency.  Memos between Ms. Fuehrer and the Risk Management Coordinator between November 25, 2013 and January 13, 2014, discuss convening an AIB to investigate the following allegations raised by the complainant: (1) hostile and retaliatory behaviors by Mr.

4

Aquilina and Mr. Esmurdoc; (2) hostile and inappropriate actions by Andrea Freeman, EEO Manager, based on denying the complainant official time off to prepare for EEO meetings; and (3) investigation of the timeline of events and accusations to determine if the facility responded in a proper and timely manner to address the complainant's complaints (C-6).

*Investigator's Note:* The Investigator requested a copy of the AIB report and findings for inclusion in the Report of Investigation. On February 24, 2014, Mr. DePompei informed the Investigator that the AIB report and findings will not be complete or presented to the Medical Center Director for several weeks. Mr. DePompei further informed the Investigator that there have been several delays in the investigative process due to the availability of the complainant and her attorneys, as well as, the need to coordinate interviews and travel around the holidays. Mr. DePompei will provide a copy of the report for the file as soon as it is available (C-6).

Documents Related to Claims 5 & 7

On May 14, 2013 and May 20, 2013, two of the complainant's subordinate employees wrote reports of contact about the complainant containing allegations that she has created a hostile work environment for them. One report of contact was written to Mr. Esmurdoc's attention and noted that it was submitted pursuant to his request. On May 21, 2013 and May 24, 2013, Mr. Aquilina wrote two reports of contact about the complainant, one based on a physician informing him that the complainant spends a lot of time at the Parma VA Clinic demanding office space and the second based on a complaint he received from a third employee about the complainant's management style. The complainant provided her responses to the allegations raised against her in the reports of contact (C-7).

Emails between Lisa Myles, Employee/Labor Relations Specialist; Ms. Freeman, Bruce Kafer, EEO Coordinator; Mr. Esmurdoc, and Mr. Aquilina in May 2013 and June 2013, discuss the need to conduct an internal EEO investigation to address the complaints raised about the complainant. Emails between the complainant, Ms. Freeman, and other management officials in August 2013 discuss her objections to the denial of overtime to allow her time to prepare for participation in the investigation as well as her belief that she is being subjected to a hostile work environment, retaliation, and bullying (C-8).

Emails between the complainant, Mr. Aquilina, and Mr. Esmurdoc discuss the June 3, 2013 meeting during which the complainant was presented with the reports of contact written about her. Mr. Esmurdoc's email to the complainant noted her denial of the allegations raised against her in the reports of contact as well as his offer of support, education, training, or mentorship to assist in remedying the relationship with her subordinate employees. The complainant's email documented further issues discussed during the meeting and noted her belief that "what has been happening to [her] at the Medical Center has greatly

5

impacted [her] staff and other VA providers and their ability to work with [her]."
The complainant noted her belief that the actions by Mr. Esmurdoc and Mr.
Aquilina in encouraging these reports of contacts, as well as contacting the EEO
Office, instead of pursuing other resolutions were manipulative and retaliatory (C-
9).

On September 4, 2013, Mr. Kafer wrote a memo to Ms. Freeman regarding his
investigation of the hostile work environment allegations raised against the
complainant.  The memo indicates that there was no finding of hostile work
environment as defined in Equal Employment Opportunity law and that the
complainant took actions within her role as a supervisor in her efforts to fulfill her
supervisory responsibilities (C-10).

Documents Related to Claim 6

In May 2013, the complainant and Mr. Esmurdoc exchanged emails regarding
Mr. Esmurdoc's request to meet with the complainant to discuss ECF
performance plan expectations, feedback from her staff, and their May 20, 2013
meeting regarding these issues.  Mr. Esmurdoc noted in his summary of the May
20, 2013 meeting that he felt the complainant's response to his email request for
the meeting was inappropriate and looked like insubordination.  The complainant
responded to Mr. Esmurdoc's allegation that she was insubordinate and her
belief that his accusation against her may have been based on her previous
challenge of his performance rating, her EEO claims, or other factors that have
affected his ability to treat her in the same manner he expects his supervisors to
treat their staff members (C-11).

Documents Related to Claim 8

Email communications between the complainant and Mr. Esmurdoc between
June and September 2013, discuss the complainant's workload as well as her
role on the Professional Standards Review Board (PSRB) and Mr. Esmurdoc's
decision not to support her continued participation.  Mr. Esmurdoc noted that his
decision not to support her continued participation on the board was based on
her low attendance at meetings, including only eight of eighteen scheduled
meetings and one of seven ad hoc meetings.  The complainant provided her
response to Mr. Esmurdoc's decision and noted her belief that these actions are
unacceptable, inappropriate, and retaliatory (C-12).

VA Handbook 5005/17, Part II, Appendix P discusses Procedures for Selecting
Hybrid Title 38 Professional Standards Board Members and provides for the
consideration of criteria to determine board participation, including "the
employee's quality and quantity of experience in the occupation, the employee's
most recent performance appraisal, the employee's conduct and disciplinary
record, and other appropriate criteria …" (C-13).

6

Documents Related to Claim 9

On July 31, 2013, Mr. Esmurdoc wrote two counseling memos to the complainant. The first counseling memo was a reminder to the complainant of the policy on requesting leave, specifically noting that requests for annual leave should be made in advance. The second counseling memo notified the complainant of unacceptable conduct/opportunity to improve based on her alleged lack of respect, argumentative approach, lack of flexibility and aggressive and blatant attempts to disrespect Mr. Esmurdoc as her supervisor, her avoidance and refusal to discuss issues with Mr. Esmurdoc, and the pattern of hostility and conduct demonstrated by her actions. This memo noted that it is not a form of disciplinary action. The complainant noted that she was threatened into signing the document. The complainant wrote a letter to Ms. Fuehrer on August 4, 2013, responding to the allegations raised in the memo regarding her use of annual leave and noted that the memo changes the previous manner in which she has requested and been approved for leave since 2004 (C-14).

Documents Related to Claim 10

Emails between the complainant, Mr. Esmurdoc, and Mr. Aquilina between September 2012 and December 2013, display interactions between the complainant and her supervisors that the complainant believes demonstrate her supervisory responsibility and position were undermined, including the micromanagement involved in filling a position on her team; communication with her subordinate employees regarding a workload addition without speaking with her first; and making judgments and decisions about her staff's availability without adequate knowledge (C-15).

On November 19, 2013, Mr. Esmurdoc sent an email to one of the complainant's subordinate employees informing him that he should continue to communicate with the complainant as his supervisor if there are any times when he is required to leave his duty station (C-16).

On October 31, 2013, Mr. Esmurdoc and Mr. Aquilina wrote memos to Ms. Thomas noting that they do not have any documentation related to the allegations at issue in this claim (C-26).

Documents Related to Claims 11, 12, & 13

The complainant's time records document that she was charged AWOL for two hours on October 8, 2013 and for fifteen minutes on October 16, 2013 (C-17).

On September 12, 2013, Ms. Myles wrote an email to Mr. Esmurdoc informing him to prepare a report of contact about the complainant's leave issues (C-18).

7

On October 23, 2013, Mr. Esmurdoc wrote a report of contact to the complainant notifying her of her violation of leave policy and opportunity to improve.  The report of contact notes that she was charged with AWOL on both October 8, 2013 and October 16, 2013, based on her not requesting leave properly.  The report of contact notes that it is not a form of disciplinary action.  On November 2, 2013, the complainant wrote a letter to Ms. Fuehrer responding to the allegations raised against her in the report of contact, noting the change in previously accepted work conditions and manner in which she has requested and been approved for leave, and questioning upper management's commitment to the EEO process as well as employee civil rights (C-19).

*Investigator's Note*:  The Investigator requested information regarding other employees within the complainant's work unit and/or who report to Mr. Esmurdoc who were charged with AWOL in the two years prior to the date of the actions at issue in claims 11 and 12 and whether or not they have prior EEO activity.  Also, employees who were issued counseling plans in the two years prior to the date of the action at issue in claim 13 and whether or not they have prior EEO activity.  In response to these requests, Mr. Esmurdoc states that no other employees have been charged with AWOL or issued a counseling plan in the last two years (C-26).

Letter of Expectations Issued to complainant

On January 2, 2014, Dr. Altose issued a Letter of Expectations to the complainant informing her of the need to meet with her supervisor to discuss workplace issues as well as to not copy her attorney in daily interactions between her and her supervisors.  Dr. Altose noted that this letter is not a formal discipline or informal counseling against the complainant, but that it could result in the need for formal action and discipline if the complainant does not meet his performance and conduct expectations (C-20).

Agency's Policies & Procedures

Medical Center Policy 003-008 discusses Prevention of Workplace Harassment and provides that "[u]nwelcome harassing conduct will not be tolerated and immediate, appropriate action will be taken when management becomes aware of allegations" (C-21).

Medical Center Policy 003-011 discusses Prohibiting Retaliation or Reprisal Against Employees and provides that the "Medical Center does not tolerate retaliation or reprisal against any employee who makes a complaint of discrimination on the basis of race, sex, national origin, age, disability, religion, or other protected status" (C-22).

Medical Center Policy 005-024 discusses Employee Responsibility and Conduct and provides that workplace bullying, which is defined as "unwanted, aggressive,

8

demeaning behavior that involves a real or perceived power imbalance," is not tolerated (C-23).

Medical Center Policy 005-007 discusses Absence and Leave for General Schedule, Federal Wage System and Non-appropriated Fund Employees and provides that "[f]ailure to follow proper leave request procedures may result in being charged Absent Without Leave (AWOL) for the period of the absence, and may be used as a basis for progressive discipline" (C-24).

Medical Center Policy 005-005 discusses Disciplinary and Adverse Actions and does not list reports of contact and counseling plans as a form of disciplinary or adverse action against an employee (C-25).

## V. Summary and Analysis

The witnesses provided the following testimony:

**A. Summary**

**The complainant** (prior EEO activity) has been a Supervisor, Psychiatry Social Work Service at the Louis Stokes Cleveland VA Medical Center at both the Wade Park and Parma facilities since April 2009. She identified her first line supervisor as Christopher Esmurdoc, Assistant Chief of Social Work Service, and her second line supervisor as Joseph Aquilina, Chief of Social Work Service. She identified the prior EEO activity that forms the basis of her reprisal claim as two former complaints she filed against the Agency in 2011 and 2012 directed against various members of management. She states that Mr. Aquilina became aware of her prior EEO activity when she filed her first claim in June 2011 and Mr. Esmurdoc became aware of it by June 2012 when he began to hold his position as Assistant Chief of Social Work Service. She states that Susan Fuehrer, Medical Center Director, became aware of her prior EEO activity when she filed her first claim in June 2011 and Jason Gatliff, Ethics Officer, told her in November 2012 that he knew about her EEO claim (B-1, pp. 204-206).

**Felix Christopher Esmurdoc, RMO** (no prior EEO activity; became aware the complainant had prior EEO activity against the Agency on August 27, 2012) has been Assistant Chief of Social Work Service at the Louis Stokes Cleveland VA Medical Center in Cleveland, Ohio since July 1, 2012. He knows the complainant from serving as her supervisor since July 1, 2012 (B-2, pp. 258-259).

9

**Susan Fuehrer, RMO** (no prior EEO activity; aware the complainant has filed prior complaints against the Agency) has been the Medical Center Director at the Louis Stokes Cleveland VA Medical Center in Cleveland, Ohio for the past three years.  She knows the complainant from her role as a Supervisory Social Worker and has had limited contact with her (B-4, pp. 282-283).

**Joseph Aquilina, RMO** (no prior EEO activity; not aware of any EEO activity by the complainant prior to 2012) has been Chief of Social Work Service at the Wade Park Campus of the Louis Stokes Cleveland VA Medical Center since November 1990.  He knows the complainant from serving as her Service Chief since she began her employment at the Agency in 2004 (B-6, pp. 403-404).

**Jason Gatliff, Witness** (no prior EEO activity; became aware the complainant had a prior EEO complaint in November 2012 when the complainant informed him about it and also heard about it prior to that time) has been a Program Specialist and Integrated Ethics Program Officer at the Louis Stokes Cleveland VA Medical Center in Cleveland, Ohio since 2009.  He knows the complainant from serving on the Ethics Committee with her.  He states that he has found the complainant to be confrontational and difficult to work with (B-8, pp. 417-418).

**Andrea Freeman, Witness** (no prior EEO activity; aware the complainant has prior EEO activity against the Agency in her role as EEO Manager) has been EEO/Affirmative Employment Manager at the Louis Stokes Cleveland VA Medical Center in Cleveland, Ohio for the past fifteen years.  She does not know the complainant and does not have a working relationship with her, but she does know who the complainant is (B-9, pp. 427-428).

**Denise Calabrese, Witness** (no prior EEO activity; aware the complainant has prior EEO activity against the Agency based on her role as a Human Resources Technical Advisor for her case) has been an Employee/Labor Relations Specialist at the Wade Park Campus of the Louis Stokes Cleveland VA Medical Center for the past three years.  She knows the complainant from her work as a supervisor in the Social Work Service (B-10, pp. 436-437).

**Murray Altose, Witness** (no prior EEO activity; became aware the complainant has prior EEO activity on March 15, 2013) has been Chief of Staff at the Louis Stokes Cleveland VA Medical Center in Cleveland, Ohio for the past twenty-five years.  He knows the complainant from meeting her on March 13, 2013 during a hearing on her formal grievance pertaining to her performance rating (B-11, pp. 445-446).

**Joseph Picklo, Witness** (no prior EEO activity; not aware of any prior EEO activity by the complainant) has been a Privacy/FOIA Officer at the Louis Stokes Cleveland VA Medical Center in Cleveland, Ohio for over five years.  He knows the complainant from her soliciting his guidance on privacy-related issues as a

10

Social Worker.  He states that their working relationship has always been courteous, relevant, and professional (B-12, pp. 455-456).

**Dale Goldstein, Witness** (no prior EEO activity; not aware of whether or not the complainant has prior EEO activity against the Agency) was employed at the Louis Stokes Cleveland VA Medical Center in Cleveland, Ohio from July 1969 through July 2012.  He served as Assistant Chief of Social Work Service at the time he retired from the Agency, a position he held from February 1991 through July 1, 2012.  He knows the complainant from serving as her supervisor for approximately five years.  He states that they had a good working relationship until the last year of his employment when issues began to develop (B-13, pp. 465-466, 472).

**Susan Lipkin, Witness** (no prior EEO activity; not aware the complainant has prior EEO activity against the Agency) has been a Clinical Social Worker and Team Leader at the Wade Park facility of the Louis Stokes Cleveland VA Medical Center since December 2008.  She states the complainant is her direct supervisor and that their working relationship has been very difficult (B-14, pp. 475-476, 481).

**Ronald Copen, Witness** (no prior EEO activity but did submit a report of contact about the complainant in May 2013; not aware of any prior EEO activity by the complainant against the Agency) has been a HUD-VASH Case Manager at the Akron Comprehensive Homeless Center in Akron, Ohio for the past three months.  He knows the complainant from when she supervised him at the Wade Park facility of the Louis Stokes Cleveland VA Medical Center in Cleveland, Ohio during his prior duty assignment.  He described his working relationship with the complainant as non-existent to poor (B-15, p. 484).

**George Kasidonis, Witness** (no prior EEO activity; not aware the complainant has prior EEO activity against the Agency) has been a Clinical Social Worker at the Parma Clinic of the Louis Stokes Cleveland VA Medical Center since 2005.  He states that the complainant is his current supervisor and that he has a professional working relationship with her (B-16, pp. 491-492).

**David Blank, Witness** (no prior EEO activity; became aware of the complainant's prior EEO activity around April 2013) has been Assistant Chief of Psychiatry Service at the Wade Park and Parma facilities of the Louis Stokes Cleveland VA Medical Center and has served as a Psychiatrist for over thirteen years.  He knows the complainant through her work in mental health at the Agency (B-17, pp. 499-500).

**Robert Thomson, Witness** (no prior EEO activity; not aware of EEO activity by the complainant) has been a Management Analyst in Psychiatry Service at the Wade Park Campus of the Louis Stokes Cleveland VA Medical Center since March 2010.  He knows the complainant from serving as a resource for her to

11

handle matters ancillary to her job, like reserving conference rooms (B-18, pp. 509-510).

**Lisa Myles, HR Subject Matter Expert** (prior EEO activity; aware the complainant has prior EEO activity against the Agency) has been an Employee/Labor Relations Specialist at the Wade Park facility of the Louis Stokes Cleveland VA Medical Center since March 2013. She knows the complainant from contact with her about employment issues (B-19, pp. 519-520).

1) **In August 2012, CE acknowledged that he was aware of the rumors and gossip going around the Medical Center about the complainant and he failed to act after the compliant [SIC] advised him that she was being harassed by her subordinates.**

**The complainant** states that she first discussed the rumors and gossip going around about her at the Medical Center with Mr. Esmurdoc in a meeting in August 2012. She states the rumors and gossip concerned some providers not willing to work with her as well as her removal from committees. She also informed Mr. Esmurdoc that she was told that one of her subordinate employees, as well as other Agency employees, were badmouthing her. She states that Mr. Esmurdoc acknowledged hearing some of the rumors but was not aware of everything being said. She also discussed with Mr. Esmurdoc upcoming performance appraisals during that meeting, and Mr. Esmurdoc told her that the behavior of two of her subordinate employees would impact their scores. She states that Mr. Esmurdoc encouraged her to speak with Ms. Calabrese in Employee/Labor Relations as well as her staff about the rumors and gossip.

The complainant states that she did not receive any support or help with disciplinary actions against her subordinate employees or others who were badmouthing her. She states that in October 2012, Ms. Calabrese told her that the incidents did not warrant disciplinary action or any impact on performance ratings. She states that she repeatedly complained to upper management about the negative treatment she was enduring without any effort made to help her address these issues. She states that no investigation was ever conducted into the allegations she raised about her subordinates (B-1, pp. 206, 212-213).

The complainant states that from the beginning of her working career at the Agency in 2004 until she filed her first EEO complaint in 2011, she was highly regarded and involved in numerous committees. She states that after filing her first EEO complaint in 2011, she began to experience disrespectful behavior from employees and negative reactions from staff as well as lack of support and attacks from management. She states that providers no longer wanted to work with her and she was removed from committees. She discussed the reactions of both her fellow employees as well as her subordinate employees to her following the filing of her first EEO complaint. She states that this change in treatment

12

caused her to feel sick to her stomach, hurt, humiliated, disrespected, intimidated, bullied, and harassed (B-1, pp. 206-212).

**Felix Christopher Esmurdoc, RMO,** states that he did not acknowledge he was aware of rumors or gossip about the complainant. He also states that he was not aware of any rumors or gossip during the time at issue in this claim. He states that he had little to no contact with the complainant prior to August 27, 2012. He does not recall the complainant informing him of any complaint in August 2012. He states that he first met with the complainant as her supervisor on October 2, 2012. He states the complainant requested the meeting to get his feedback on completing performance reviews. He states the complainant discussed generally hearing a conversation in the parking garage between two of her employees. He states that he encouraged the complainant to complete the performance review focused on the employee's performance and not the employee's conduct. He also encouraged her to consult with Human Resources regarding the conduct she was concerned about and to follow their guidance. He states that he did not discuss issuing disciplinary action to the complainant's subordinate employees (B-2, pp. 259-260; B-3, p. 276).

**Susan Fuehrer, RMO** states that she is not aware of any rumors or gossip going around the Medical Center about the complainant (B-4, p. 283).

**Joseph Aquilina, RMO,** states that if Mr. Esmurdoc had information that one of the individuals he supervises was being harassed, he would take action to investigate and remedy the situation (B-6, p. 404).

**Andrea Freeman, Witness,** states that she is not aware of any rumors or gossip going around the Medical Center about the complainant (B-9, p. 428).

**Denise Calabrese, Witness,** states that she is not aware of the complainant speaking to her about rumors and gossip going around the Medical Center about her. She states that she is not able to impose discipline on employees and can only advise management on how to proceed. She states that she is not aware of any allegations raised by the complainant so she does not know whether or not any investigation was conducted into the allegations (B-10, p. 437).

**Murray Altose, Witness,** states that he was made aware of some of the complainant's concerns from an email she sent to him as a copied recipient. He states that emails and subsequent discussions with Mr. Aquilina and Mr. Esmurdoc demonstrated that they both have dealt with the complainant in an appropriate and professional manner (B-11, pp. 446, 453).

**Robert Thomson, Witness,** states the complainant asked him in the summer or fall of 2013 whether or not he was aware of things people were saying about her. He states that he had not heard and was not aware of what she was referring to and told the complainant that he was not familiar with anything being said about

13

her. He states that he has not heard anything involving gossip about the complainant (B-18, pp. 510, 516).

*Investigator's Note:* One of the issues being addressed by the AIB being conducted by the Agency into the complainant's allegations, is whether or not the facility responded in a proper and timely manner to address the complainant's complaints, which is at issue in claims 1, 3, and 4 accepted for investigation in this complaint. The Investigator requested a copy of the AIB report and findings, which will be included with this Report of Investigation as soon as the report is completed and provided (C-6).

2) **In November 2012, Jason Gatliff (JG), Head of Ethics Committee, stated he had difficulty working with the complainant due to the rumors, gossip and negative talk about her that was going around the Medical Center, admitted he participated in said gossip and rumors, and that he was aware of her EEO complaint.**

**The complainant** states that she had a meeting with Mr. Gatliff in November 2012 that she initiated after observing his lack of cooperation, support, and respect as a member of the Mental Health Advance Directive Committee. She told Mr. Gatliff that she was aware of rumors and gossip going around the Medical Center about her. She states that he first denied hearing any rumors or gossip and then acknowledged that he had heard rumors and gossip as well as participated in them. She states that Mr. Gatliff told her he has difficulty working with her due to what he has heard about her. She states that Mr. Gatliff told her that he heard she filed an EEO claim in 2011 and that it was gender-related. She states she told Mr. Gatliff how horrible it felt to be treated in that manner, especially by a member of the Ethics Committee. She states that Mr. Gatliff admitted he should have managed the rumors and gossip differently and that she should have been included in committee meetings (B-1, pp. 213-214).

**Felix Christopher Esmurdoc, RMO,** states that he is aware of this allegation, but does not have any other knowledge from Mr. Gatliff (B-2, p. 261).

**Susan Fuehrer, RMO,** states that she and Dr. Altose received an email from the complainant on March 15, 2013, contesting her fully successful performance rating. The complainant noted in her email that Mr. Gatliff stated that he found it difficult to work with her based on what he heard about her at the Medical Center. She states that she responded to the complainant and asked that she send the email in a way that a copy could be forwarded to Human Resources. She states she never received a version from the complainant that could be printed, forwarded, or copied (B-4, p. 284).

**Joseph Aquilina, RMO,** states that he has no direct knowledge of this allegation from Mr. Gatliff (B-6, p. 405).

14

**Jason Gatliff, Witness,** states the complainant asked him if he had spoken about her with other employees. He informed her that he had discussed his working relationship with her with other members of the Ethics Committee to get advice on how to improve their working relationship. He states that he did not tell the complainant that his difficulties working with her had anything to do with any rumors, gossip, or negative talk going around the Medical Center about her. He states that he is not aware of the rumors, gossip, and negative talk the complainant is referencing and did not participate in any rumors or gossip about the complainant. He states that in serving on the Psychiatric Advance Directive Subcommittee with the complainant, the complainant's behavior seemed to be confrontational, obstructive, and aggressive. He states that several members of the subcommittee discussed her witnessed behavior with him. He states the complainant asked if he knew that she filed an EEO complaint. He told her that he was aware of a previous EEO complaint in which she had concerns about not being selected for the Assistant Chief of Social Work position based on her gender (B-8, pp. 419-420).

**Ronald Copen, Witness,** states that Mr. Gatliff indicated that he had difficulty working with the complainant, but not due to rumors, gossip, and negative talk. He states that Mr. Gatliff discussed this issue with him in his capacity as Deputy Consulting Coordinator of the Ethics Committee. He states that Mr. Gatliff did not participate in gossip or rumors about the complainant to the best of his knowledge (B-15, p. 485).

3) **In June 2012 and November 2012, management failed to act when the complainant advised them of the bullying, rumors and gossip being spread about her throughout the VA Medical Center.**

**The complainant** describes the negative reaction and treatment of various employees, including her staff members, against her following the filing of her first EEO complaint in 2011. She states that she informed several management officials of these issues, including Mr. Aquilina, Dale Goldstein, Assistant Chief of Social Work Service through June 30, 2012, Mr. Esmurdoc, Ms. Fuehrer, Dr. Altose, Mr. Gatliff, Ms. Calabrese, Ms. Freeman, and Mr. Picklo in his role as VA Privacy Officer. She states that she informed management of these issues verbally and in writing on many occasions in 2013. She states the only response she received to her written communications was from Ms. Fuehrer in March 2013, who asked her to forward her email so that a copy could be provided to Human Resources in order to maintain a complete file.

The complainant states that Ms. Fuehrer initiated an AIB to investigate her allegations in November 2013 after her current EEO complaint was accepted for investigation. She believes that management should have intervened immediately upon first being informed of her complaints that she was subjected to a hostile work environment. She states that management's choice to begin

15

the AIB investigation in November 2013 instead of relying on the EEO process, added to the hostility of her work environment (B-1, pp. 215-217).

*Investigator's Note:* The complainant changed the wording of Interrogatory 20 from the time frame in the claim accepted for investigation (June 2012 and November 2012) to the time frame of 2011 through the present (B-1, p. 215).

**Felix Christopher Esmurdoc, RMO,** states that he did not have contact with the complainant in June 2012. He also states that he did not have direct knowledge of bullying, rumors, and gossip being spread about the complainant at the Medical Center. He states that he was first made aware of the complainant's allegation concerning "gossip, rumors, and secrets" in an email from her dated May 17, 2013. He states the complainant made vague and unspecific references to gossip and rumors. He states that he has made numerous attempts to meet with the complainant and respond to her concerns as well as offered mediation, training, and mentoring. He is aware there is an AIB scheduled to occur regarding the complainant's complaint in January 2014 (B-2, pp. 261-262; B-3, p. 277).

**Susan Fuehrer, RMO,** states that she is not aware of any rumors or gossip being spread about the complainant throughout the Medical Center. She is aware the complainant has made allegations about this issue. She is not aware of any complaints by the complainant dating back to June 2012. She was not advised that the complainant felt the bullying, rumors, and gossip were based on a protected category. She states the Agency has made numerous attempts to discuss, mediate, and review the complainant's EEO, MSPB, and performance appraisal grievances internally and through several different legal counsels. She states that an AIB was chartered in November 2013 to review the complainant's complaints, but the complainant and her attorney have not been available or willing to participate as of the date she submitted her interrogatory responses on January 23, 2014. She states that prior to this time, there were many previous attempts to work with the complainant (B-4, pp. 284-285; B-5, pp. 291-292).

*Investigator's Note:* The Investigator requested that Ms. Fuehrer provide more specifics regarding the numerous attempts to discuss, mediate, and review the complainant's complaints prior to the initiation of the AIB. Ms. Fuehrer noted that the complainant's supervisors, the Chief of Human Resources Management, the EEO Manager, and Regional Counsel have met with the complainant or one of her law firms on numerous occasions to attempt to mediate the complainant's complaints. Ms. Fuehrer did not provide any further specific details in response to this question as of the date of submission of this Report of Investigation (B-5, pp. 291-292).

**Joseph Aquilina, RMO,** states that he is not aware of any bullying, rumors, or gossip being spread about the complainant at the Medical Center. He states that he has seen the complainant raise allegations of these issues, but he was not

16

directly made aware of them. He states that he was not aware that these issues were related to a protected category or prior EEO activity. He states that he first became aware the complainant mentioned gossip and rumors in an email message she sent to Mr. Esmurdoc on May 17, 2013. He states that Mr. Esmurdoc offered to meet with the complainant continually regarding her concerns. He states that an AIB was scheduled to begin the week of January 27, 2014 to look into the complainant's allegations (B-6, p. 405; B-7, p. 412).

**Jason Gatliff, Witness,** states the complainant informed him in November 2012 that rumors and gossip were being spread about her, but she did not mention bullying. He states the complainant spoke generally and without specifics. He states that she asked him if he thought those activities were ethical. He states they discussed that rumors and gossip were contrary to an ethical environment. He offered to put together a series of talks focused on the ethics of rumors and gossip, but the complainant was not interested in his suggestion. He believes the complainant approached him as a colleague to discuss the ethical aspects of her concerns and he did not share their conversation with anyone else. He states that he does not have any supervisory responsibilities and is not considered a part of management. He does not have any knowledge of how management responded to the complainant's complaints (B-8, pp. 420-421, p. 425).

**Andrea Freeman, Witness,** states that she is not aware of any bullying, rumors, or gossip about the complainant and that the complainant did not advise her of any of these issues. She is not aware of how management responded to the complainant's complaints or whether or not anyone knew about the complainant's allegations. She states that no investigation was conducted into the complainant's complaints because no one knew that she felt she was being bullied. She states now that the Agency has been made aware, it is in the process of conducting an AIB to address her allegations (B-9, pp. 429-430).

**Murray Altose, Witness,** states he does not have knowledge of issues that may have been raised in June 2012 and November 2012. He states the complainant alleged a hostile work environment, bullying, and retaliation in an email sent to Ms. Freeman that he was copied on in August 2013. He is not aware the complainant made a formal complaint to management and does not know whether or not an investigation was conducted (B-11, pp. 447-448).

**Joseph Picklo, Witness,** states the complainant never advised him of bullying, rumors, or gossip being spread about her in June 2012 and November 2012. He states that he is not aware of how management responded to her allegations because he was not involved. He does recall meeting with the complainant around December 2012. He states the complainant was visibly upset and came to speak with him to solicit advice about privacy matters. He states the complainant asked him if he would dispose of documents or delete documents. He told her that his decision would depend on the type of document as well as

17

the Agency's regulations.  He does recall telling her that management has a poor track record of addressing privacy violations.  He states that it is his personal opinion that management does not pursue more stringent disciplinary actions for privacy violations.  He states that his discussion with the complainant did not pertain to her current issues because she did not disclose them to him.  He states that he probably told her she could look into a civil lawsuit, but not based on a specific claim (B-12, pp. 457-458, 463).

**Dale Goldstein, Witness,** states the complainant approached him in 2011 after receiving an outstanding evaluation and asked him whether or not she would be demoted.  He states that she felt something was going on and that her staff and peers were talking about her.  He states that she spoke in generalities and did not tell him what was being said or who specifically said anything.  He told the complainant that he did not know what she was referring to, but he does not think she believed him.  He states that she became more distant and did not bring up the topic again.  He told Mr. Aquilina about the exchange and asked him if he knew anything about it.  He states that Mr. Aquilina told him he did not hear anything about the complainant.  He states that he and Mr. Aquilina decided to see if anything else came up since the complainant did not provide specifics (B-13, pp. 466-468).

**Susan Lipkin, Witness,** states that she has not been involved in bullying or spreading rumors or gossip about the complainant.  She states that she is not aware the complainant made this complaint to management (B-14, p. 477).

**George Kasidonis, Witness,** states that he is not familiar with the complainant's claims of being bullied and did not participate in any rumors about her (B-16, p. 493).

**Robert Thomson, Witness,** states that he is not familiar with any bullying, rumors, or gossip related to the complainant.  He states that he does not know why there would be rumors or gossip spread about the complainant.  He states the complainant has always been courteous and professional in all interactions with him (B-18, pp. 511-512).

**Lisa Myles, HR Subject Matter Expert,** identified the Agency's policies and procedures that apply to bullying and the fact that such behavior is not tolerated at the Agency.  She states that she is not sure how management should have responded if they were informed of these issues (B-19, p. 522).

4) **On March 15 2013 [SIC], Susan Fuehrer, Director, failed to act after the complainant advised her about JG's admission that he had difficulty working with her and his participation in spreading rumors, gossip and negative talk about her.**

**The complainant** states that as of March 15, 2013, Ms. Fuehrer and Dr. Altose both acknowledged receipt of the contents of her grievance stating mistreatment

18

toward her, including Mr. Gatliff's statements to her.  She states that Ms. Fuehrer's response was a request that she forward her communication so a copy could be provided to Human Resources (B-1, pp. 217-218).

**Felix Christopher Esmurdoc, RMO,** states that he is not familiar with the allegation at issue in this claim (B-2, p. 262).

**Susan Fuehrer, RMO,** states that she and Dr. Altose received an email from the complainant on March 15, 2013, contesting her fully successful performance rating.  She states that in her email, the complainant noted that Mr. Gatliff stated he found it difficult to work with her based on what he heard about her at the Medical Center.  She states that she responded to the complainant and asked she send the email in a way that a copy could be forwarded to Human Resources.  She states she never received a version from the complainant that could be printed, forwarded, or copied.  She states that she did not fail to act after the complainant advised her of the situation with Mr. Gatliff.  She states there was a continuous follow-up to the complainant's complaints and that she did not follow up with Mr. Gatliff to address this issue because she did not have a reason to do so (B-4, pp. 286; B-5, p. 294).

*Investigator's Note*:  In response to a question raised by the Investigator to describe the continuous follow up to the complainant's complaints, Ms. Fuehrer provided a series of links to emails to and from the complainant.  Many of the links provided were for emails with no visible text based on restrictions set within the email's settings.  The remaining links that contained text have been attached to Ms. Fuehrer's Supplemental Affidavit and included in the Report of Investigation (B-5, pp. 292-293).

**Joseph Aquilina, RMO,** states that he is not familiar with the allegation at issue in this claim (B-6, p. 406).

**Jason Gatliff, Witness,** states that he did not speak with Ms. Fuehrer about his discussion with the complainant and the allegation at issue in this claim (B-8, p. 421).

**Lisa Myles, HR Subject Matter Expert,** identified the Agency's policies and procedures that apply to bullying and the fact that such behavior is not tolerated by the Agency (B-19, p. 523).

5) **In May 2013, just prior to the May 20th meeting, Joseph Aquilina (JA), Chief of Social Work Services, and Christopher Esmurdoc (CE), Assistant Chief of Social Work, Immediate Supervisor initiated a "witch-hunt" on the complainant by soliciting reports of contact (ROCs) from her subordinates, and contacting HR and EEO regarding an inquiry/investigation against her.**

19

**The complainant** provides a timeline of the actions taken by Mr. Esmurdoc and Mr. Aquilina between May 2013 and January 2014, to demonstrate the witch-hunt that she believes they initiated against her. In May 2013, she states that she was contacted by Mr. Esmurdoc requesting to meet with her to provide feedback from her staff. She states that Mr. Esmurdoc contacted Ms. Freeman to initiate an investigation into the allegations raised against her before speaking with her about them or receiving her feedback. She states that when Mr. Esmurdoc met with her regarding the complaints, he also accused her of insubordination for not meeting him on a certain day after he provided her with a three-day window to do so. She states that Mr. Esmurdoc initiated an EEO Investigation against her based on his predetermination that the complaints from her staff were true without proof or validation (B-1, pp. 218-219).

The complainant states that on June 3, 2013, she met with Mr. Aquilina and Mr. Esmurdoc and was issued four reports of contact from staff members, including Ms. Lipkin, Mr. Copen, Mr. Kasidonis, and Dr. Blank. She states that Mr. Aquilina mentioned that he encouraged staff members to complete the reports of contact and wrote two of the reports on behalf of the employees as well as contacted the EEO Office to initiate an investigation against her. She states that Mr. Aquilina noted that he encouraged Mr. Kasidonis to put his concerns in writing and that staff should call Ms. Myles and Ms. Freeman to express these complaints about the complainant. She states Ms. Lipkin notes in her report of contact that she is submitting the description of her concerns pursuant to Mr. Esmurdoc's request. She believes that Human Resources and the EEO Office were contacted to initiate an inquiry and investigation against her in an effort to retaliate against her and harass her. She states that she was found innocent of all allegations raised against her in the investigation (B-1, pp. 219-221).

**Felix Christopher Esmurdoc, RMO,** states that he did not solicit any reports of contact about the complainant. He states the complainant's subordinate employees complained to him and the EEO Office about the complainant. He states the EEO Office informed him on May 29, 2013 that complaints were received about the complainant and that a fact finding would be conducted. He received a summary report from the investigation indicating there was no information to suggest that the complainant was discriminatory in her actions against her staff. He states that he did not have an intent to initiate a witch-hunt against the complainant (B-2, pp. 263-264).

**Susan Fuehrer, RMO,** states that she is aware the complainant's subordinates made complaints about her that were not validated by the EEO Manager (B-4, pp. 287).

**Joseph Aquilina, RMO,** states that when an employee makes a complaint about another employee, it is appropriate to ask the employee to put the complaint in writing. He states he then consults with Human Resources or the EEO Office to address the complaint. He states that both Human Resources and the EEO

20

Office were contacted on or around October 15, 2013, after he and Mr. Esmurdoc received unsolicited complaints from more than one of the complainant's supervisees. He states that a fact finding was completed by September 4, 2013, which revealed there was no information to suggest that the complainant was discriminatory in her actions based on any protected category. He states that he and Mr. Esmurdoc did not have the intent to initiate a witch-hunt on the complainant (B-6, pp. 406-407; B-7, p. 413).

**Andrea Freeman, Witness,** states that the reports of contact about the complainant were not initiated by Mr. Aquilina and Mr. Esmurdoc. She states that some of the complainant's subordinate employees complained she was harassing and bullying them. She states that based on these allegations, contact was made with the complainant's staff by the EEO Office and a fact finding was conducted. She states the result of the investigation was that there was no evidence of a hostile work environment and that the complainant was acting within her supervisory scope. She states the complainant's mannerisms or behavior towards her subordinate employees could have been better (B-9, pp. 430-431).

**Susan Lipkin, Witness,** states that she was not solicited by Mr. Esmurdoc or Mr. Aquilina to provide a report of contact about the complainant. She states that she contacted Social Work Service management on May 8, 2013, asking for assistance with some problems working with the complainant. She states that she tried to address the issues directly with the complainant but the complainant refused to do so. She does not know whether or not management contacted the EEO Office or Human Resources about these issues. She states that she wrote a document of her concerns working with the complainant and that Mr. Esmurdoc asked her for a copy of what was written after she discussed the issue with him verbally. She states that she agreed to provide him with a copy of her written concerns and sent it to him in a memo dated May 10, 2013. She states neither Mr. Esmurdoc nor Mr. Aquilina told her what to write about the complainant. She believes the complainant was threatening and bullying her. She states that she is fearful of retaliation by the complainant (B-14, pp. 478-479).

**Ronald Copen, Witness,** states that he did file an EEO complaint against the complainant for creating a hostile work environment and bullying around May 2013. He states that he contacted Mr. Esmurdoc and Mr. Aquilina regarding these issues. He states they explained his options to him but did not offer any suggestions on which course to pursue. He states that he chose the EEO path on his own. He states that his EEO complaint was not solicited in any way (B-15, p. 486).

**George Kasidonis, Witness,** states that Mr. Aquilina and Mr. Esmurdoc did not solicit a report of contact from him about any previous event. He states that he did contact them about a concern with the complainant's supervision being abusive and coercive. He states that Mr. Aquilina gave him several options of

21

ways to respond.  He believes the report of contact he wrote about his supervision concerns was based on a meeting he had with an EEO Officer (B-16, pp. 494).

**David Blank, Witness,** states that Mr. Aquilina and Mr. Esmurdoc did not solicit a report of contact from him about the complainant (B-17, p. 502).

**Lisa Myles, HR Subject Matter Expert,** states there was no witch-hunt by Mr. Aquilina and Mr. Esmurdoc against the complainant.  She states that the Social Work Service contacted Human Resources based on some of the complainant's employees complaining of harassment and a hostile work environment.  She states that she contacted the EEO Manager because the EEO Office handles complaints of harassment (B-19, pp. 523-524).

6) **On May 20, 2013, during a meeting, CE threatened to discipline the complainant for alleged insubordination.**

**The complainant** states that on May 20, 2013, Mr. Esmurdoc wrongly accused her of insubordination for not meeting with him on Friday when he gave her a three day window to meet with him.  She states that she did comply with the three day window.  She states that Mr. Esmurdoc also told her that asking for more specifics about the meetings he initiates is not appropriate and would be viewed as insubordination.  She states that Mr. Esmurdoc threatened potential discipline for insubordination.  She informed Mr. Esmurdoc that she found his accusation to be threatening without cause, disrespectful, and offensive.  She states that on July 31, 2013, she was issued a counseling plan by Mr. Esmurdoc which in part was based on her alleged avoidance and refusal to discuss issues regarding her workload and clinic schedule with him.  She states that she was not issued a counseling for the previous threat of insubordination regarding the May 17, 2013 incident (B-1, pp. 222-223).

**Felix Christopher Esmurdoc, RMO,** states that he met with the complainant on May 20, 2013, to discuss complaints received about her from her staff as well as to share his expectations with her as her supervisor.  He also told the complainant that her response on Friday to his request to meet with her was insubordinate.  He states that he told the complainant that he offered her options for times and days to meet and she responded with questions and not a confirmation of meeting.  He states that he assumed she would respect his request to meet with him at 3pm on the day at issue, but she did not show up without any prior explanation.  He states that he did not threaten the complainant during the meeting or mention disciplinary action.  He states he shared with the complainant his thought that she was insubordinate by not responding and cooperating with his request to meet.  He states that he never issued any disciplinary action to the complainant based on this incident (B-2, pp. 264-266).

22

**Susan Fuehrer, RMO,** states that she is not aware of the allegation at issue in this claim (B-4, p. 287).

**Joseph Aquilina, RMO,** states that Mr. Esmurdoc did not threaten the complainant during the meeting at issue in this claim. He states that Mr. Esmurdoc met with the complainant as her supervisor to get her input on complaints raised against her as well as to share his expectations with her (B-6, pp. 407-408).

**Lisa Myles, HR Subject Matter Expert,** states that she was informed the complainant refused to meet with her supervisor. She explained that employees are expected to comply with their supervisor's request for a meeting (B-19, p. 524).

7) **On June 3, 2013, CE and JA issued the complainant four different ROCs, which were dated May 14, 2013, May 20, 2013, May 21, 2013, and May 29, 2013, respectively.**

**The complainant** states that she was issued four reports of contact from Ms. Lipkin, Mr. Copen, Mr. Kasidonis, and Dr. Blank, which were encouraged by Mr. Aquilina and Mr. Esmurdoc. She states that she denied the allegations raised against her in the reports of contacts. She states that being issued the four reports of contact affected her by discrediting her with her subordinates and colleagues, causing professional humiliation, and validating the lack of respect and support available to her at the Medical Center by Mr. Aquilina and Mr. Esmurdoc, the EEO Manager, Medical Center Director, and Chief of Staff. She states that she felt belittled, degraded, and embarrassed. She states this made it difficult for her to manage and supervise her staff. She states these issues caused her to suffer exhaustion, sleeping difficulties, and physical problems (B-1, pp. 221, 224).

**Felix Christopher Esmurdoc, RMO,** states that the four reports of contact issued to the complainant were from three of her staff members as well as one physician. He states that all three staff members described that the complainant demonstrated a pattern of hostility, public humiliation, intimidation, and aggressiveness. He states the physician complained that the complainant was spending a lot of time at the Parma VA Clinic and would drop into the clinic demanding office space. He states that two of the four reports of contact were written by Mr. Aquilina on behalf of the employees. He states the complainant denied the allegations raised against her in the reports of contact. He explained that a report of contact is not a form of disciplinary action and did not adversely affect the complainant's employment (B-2, p. 267).

**Susan Fuehrer, RMO,** states that she is not aware of the allegation at issue in this claim (B-4, p. 287).

23

**Joseph Aquilina, RMO,** states that the four reports of contact were from the complainant's subordinate employees with complaints about the complainant. He states that during a June 3, 2013 meeting with him and Mr. Esmurdoc, the complainant indicated the reports of contact were blatant lies and retaliation against her. He explained that a report of contact is not a form of disciplinary action against an employee (B-6, p. 408).

**George Kasidonis, Witness,** states that he did complain about an issue with the complainant involving two-and-a-half hours of feedback about charting. He found the style and aggressiveness of the feedback to be overbearing. He states that based on his interactions with the complainant, he avoids interacting with her and finds his clinical supervision from other methods (B-16, pp. 494-495).

**Lisa Myles, HR Subject Matter Expert,** states that the reports of contact about the complainant concerned her subordinate employees' complaints about harassment and hostile work environment. She states there also was a complaint from Dr. Blank about the complainant regularly demanding office space at the Parma CBOC when her duty station is Wade Park. She identified the Agency's policies and procedures regarding Prevention of Workplace Harassment that apply to the allegations at issue in this claim (B-19, p. 525).

8) **On July 22, 2013, CE threatened to remove the complainant from the Professional Standards Review Board (PSRB) if she refused to assume increased duties.**

**The complainant** states that she served on the PSRB from October 2011 through 2013 as a Board Member. She states that on July 22, 2013, Mr. Esmurdoc initiated a meeting with her to discuss increasing her clinical hours, her excessive sick leave and annual leave use, and her request to remain on the Board. She states that during the meeting, Mr. Esmurdoc threatened her compliance with increasing her clinic hours in order for her to remain on the Board. She states that when she requested to have her term on the Board continued for another year, Mr. Esmurdoc cited her attendance as an issue. She states that she disputed his allegation and explained her active involvement. She states that he indicated his decision on whether she could remain on the Board would be influenced by whether or not she cooperated and increased her clinic time. She believes management was attempting to overextend her workload unnecessarily. She states the decision was made to remove her from the PSRB without a valid reason. She believes this was another attempt to discredit, punish, humiliate, and silence her (B-1, pp. 224-225).

**Felix Christopher Esmurdoc, RMO,** states the complainant served on the PSRB for two years as a member of the Board. He states that he does not have the authority to remove anyone from the Board and did not threaten to remove the complainant. He states that PSRB board members are recommended by the Chief of Social Work Service and appointed by the Medical Center Director. He

24

states he did not support the complainant's request for reappointment to the PSRB as her supervisor based on her poor attendance during her last year on the Board.  He states that from October 1, 2012 through September 30, 2013, the complainant attended ten of twenty-one scheduled meetings and one of seven ad hoc meetings.  He states the complainant had the lowest attendance of all board members during that time frame.  He states that he did not support any other employee's request for reappointment to the PSRB.  He denies asking the complainant to assume increased duties.  He states that he discussed the complainant's workload with her on several occasions because she carries the lowest direct patient caseload of any of her peers.  He states that he made multiple attempts to discuss with the complainant increasing her caseload, but she has refused to engage in that discussion (B-2, pp. 268-269; B-3, p. 278).

**Susan Fuehrer, RMO,** states she is not aware that Mr. Esmurdoc threatened the complainant.  She is aware the PSRB rotates membership and that the complainant was not renewed.  She is aware the complainant's attendance at PSRB meetings was poor (B-4, pp. 287-288).

**Joseph Aquilina, RMO,** states that Mr. Esmurdoc did not threaten the complainant.  He states that Mr. Esmurdoc did not recommend the complainant for membership on the PSRB based on her poor attendance at meetings.  He states that membership on the PSRB is limited to one, two, or three year terms.  He explained that the complainant was not removed from the Board.  He states her term of membership on the Board expired and that Mr. Esmurdoc chose not to recommend her to continue as a member (B-6, p. 409; B-7, p. 413).

**Murray Altose, Witness,** states there were six individuals rotated off of the PSRB, including the complainant.  He states that Social Work Service leadership noted that the complainant was absent from several meetings.  He states he is not aware of any matter related to a refusal to assume increased duties (B-11, p. 450).

**Lisa Myles, HR Subject Matter Expert,** states that Mr. Esmurdoc told the complainant that her time on the PSRB was expiring and would not be extended (B-19, p. 525).

### 9) On July 31, 2013, CE issued the complainant two Counseling Plans.

**The complainant** states that she was issued a Counseling Plan for conduct and insubordination issues as well as a memo on leave policy and restrictions on July 31, 2013.  She states that she disagreed with both Counseling Plans.  She states that she was never issued a Counseling Plan in the past.  She states that being issued the Counseling Plan impacted her and her employment by discrediting her with her subordinates and colleagues, causing professional humiliation, and making her feel belittled, degraded, and embarrassed (B-1, p. 226).

25

**Felix Christopher Esmurdoc, RMO,** states that he issued a Letter of Counseling to the complainant on July 31, 2013, reminding her of the policy on requesting leave and asking her to comply with it.  He states that he issued a second Letter of Counseling to the complainant on July 31, 2013, notifying her of her unacceptable conduct, including lack of respect, lack of collegiality and cooperation, refusal to meet with him and discuss issues, and conduct inappropriate for a Supervisory Social Worker.  He explained that a Letter of Counseling is not a form of disciplinary action.  He states the complainant disagreed with the concerns raised in these Letters of Counseling (B-2, pp.269-270; B-3, p. 278).

**Susan Fuehrer, RMO,** states that she is not aware of the allegation at issue in this claim (B-4, p. 288).

**Joseph Aquilina, RMO,** states that Mr. Esmurdoc issued the complainant a memo reminding her of the Agency's leave policies.  He states that Mr. Esmurdoc's purpose in issuing the memo was to help the complainant comply with the Agency's policies (B-6, p. 409).

**Lisa Myles, HR Subject Matter Expert,** states that Mr. Esmurdoc gave the complainant two reminders about requesting leave and her conduct.  She identified the Agency's policies and procedures that apply to the facts at issue in this claim and explained that counseling letters are not considered disciplinary actions.  She states that counseling letters are used to demonstrate that an employee has been warned that his or her actions are inappropriate (B-19, p. 526).

10) **From July 2012 to October 16, 2013, JA and CE failed to support and/or have undermined the complainant's supervisory position and responsibilities.**

**The complainant** provided forty-six examples between July 2012 and January 2014, of how she believes that Mr. Aquilina and Mr. Esmurdoc failed to support her and undermined her supervisory position and responsibilities, including having reports of contact written on behalf of employees against her; not assisting with her removal from committees; appointing her subordinate employees to roles without her input as their supervisor; sending emails demeaning her; threatening to deny her participation in a committee unless her clinic hours increase; removing her from a committee; initiating an EEO investigation against her; denying her request for overtime for an EEO deposition; mocking her during meetings; failing to address her complaints of mistreatment; threatening her with discipline; and falsely charging her with AWOL (B-1, pp. 227-228).

**Felix Christopher Esmurdoc, RMO,** denies the allegation that he failed to support or undermined the complainant's supervisory position and

26

responsibilities from July 2012 through October 16, 2013.  He states that he does not know why the complainant would feel that way.  He states the complainant did express to him her belief that she was not supported and undermined.  He states that he has offered support, additional training, discussion, input, and counsel to her, as does with all staff members.  He reviewed the complainant's list of allegations regarding her belief that he failed to support and/or undermined her supervisory position and responsibilities.  He does not believe her allegations demonstrate a failure to support or undermine her supervisory positions.  He states that he and Mr. Aquilina have consistently offered to participate in discussions with the complainant to resolve issues (B-2, p. 270; B-3, p. 279).

**Susan Fuehrer, RMO,** states that she is not aware of the allegation at issue in this claim.  She states that her discussions with Mr. Esmurdoc and Mr. Aquilina have been positive in trying to create an improved and productive working relationship with the complainant.  She states that other members of the Medical Center, including the EEO Manager, Dr. Altose, and Human Resources representatives, have tried to establish a positive working relationship with the complainant (B-4, p. 288).

**Joseph Aquilina, RMO,** denies the allegation that he and Mr. Esmurdoc failed to support and/or undermined the complainant's supervisory position and responsibilities from July 2012 through October 16, 2013.  He states that he does not agree with the complainant's allegations related to this claim.  He states that he and Mr. Esmurdoc have treated the complainant with professional respect and have attempted to improve the issues that she and her subordinates presented to them (B-6, p 409; B-7, p. 413).

**Murray Altose, Witness,** states that he is not aware of any evidence to support the allegation that Mr. Aquilina and Mr. Esmurdoc undermined the complainant's supervisory position and responsibilities.  He believes they both conducted themselves professionally and appropriately (B-11, p 450-451).

**Ronald Copen, Witness,** states that he does not believe Mr. Aquilina and Mr. Esmurdoc undermined the complainant.  He states that both Mr. Aquilina and Mr. Esmurdoc consistently reminded him of the complainant's role as his supervisor in his discussions with them (B-15, p. 487).

**Lisa Myles, HR Subject Matter Expert,** states that she does not believe anyone undermined the complainant's supervisory position and responsibilities (B-19, pp. 526-527).

> **11) On October 8, 2013, CE charged the complainant two hours for being absent without leave (AWOL).**

27

**The complainant** states that Mr. Esmurdoc charged her with two hours of AWOL on October 8, 2013. She states that Mr. Esmurdoc wrongfully charged her with AWOL for following the same practices she used since 2009, which he had approved. She states she informed Mr. Esmurdoc on the morning of October 8, 2013, that she would be taking a sick day and using sick leave and annual leave to cover her absence that day. She states that Mr. Esmurdoc later informed her he would approve her six hours of sick leave for that day, but he would not approve the two hours of annual leave for that day because he claimed she did not request them when she called in sick that morning. She states that she reminded Mr. Esmurdoc that she did tell him about using both sick leave and annual leave as needed to cover her sick day. She does not agree with the decision to charge her with AWOL and expressed her disagreement in a November 2, 2013 memo to Ms. Fuehrer. She believes that Mr. Esmurdoc charged her with AWOL on October 8, 2013, in reprisal for her prior EEO activity. She states she is not aware that any other employee has been treated the way she has been treated, which she described as "disparagingly, disregarded, and professionally humiliated and destroyed" (B-1, pp. 220; 229-230; 235-236).

**Felix Christopher Esmurdoc, RMO,** states that he charged the complainant with AWOL on October 8, 2013, after consulting with Human Resources. He states the complainant continued to be noncompliant with requesting annual leave in advance even after receiving a counseling memo on July 31, 2013 reminding her to do so. He states that on October 8, 2013, the complainant called and asked to use sick leave. On October 9, 2013, she entered a request that included annual leave instead. On October 18, 2013, he emailed the complainant and requested that she clarify her entry in VISTA because it did not match her request. He states the complainant disagreed with his reason for charging her with AWOL on October 8, 2013 because she claims she requested use of annual leave. He states that he does not remember her doing so. He believes his decision to charge the complainant with AWOL complied with the Agency's policies and procedures. He states that he did not charge the complainant with AWOL on October 8, 2013, in reprisal for her prior EEO activity. He states that he has not charged other employees with AWOL under similar circumstances in the prior two years (B-2, pp. 270-271).

**Susan Fuehrer, RMO,** states that she is not directly aware of the allegation at issue in this claim, but she has been included on several emails regarding leave by the complainant. She discussed these issues with Human Resources and was informed they were working with the complainant's supervisors on the appropriate way for the complainant to request leave. She states that she did not feel there was any reason to initiate an investigation based on the information provided to her (B-4, p. 288; B-5, pp. 294-295).

**Joseph Aquilina, RMO,** states the complainant did not follow the Agency's leave policy in requesting two hours of annual leave. He states that Mr. Esmurdoc consulted with Human Resources in issuing the AWOL charge to the

28

complainant. He states the handling of this leave issue was not related to the complainant's EEO activity (B-6, pp. 409-410; B-7, pp. 413-414).

**Lisa Myles, HR Subject Matter Expert,** states that she was informed that the complainant continued to request annual leave at the last minute. She states that Mr. Esmurdoc counseled the complainant several times on the need to submit annual leave requests in advance. She states the complainant requested sick leave on the date at issue in this claim, but then entered a request for six hours of sick leave and two hours of annual leave. She states the six hours of sick leave were approved, but the two hours of annual leave were disapproved. She does not believe that Mr. Esmurdoc charged the complainant with AWOL in reprisal for her prior EEO activity. She states that Mr. Esmurdoc was just following procedures. She identified and described the Agency's policy on Absence and Leave that applies to the allegation at issue in this claim (B-19, pp. 527-528).

### 12) On October 16, 2013, CE charged the complainant fifteen minutes AWOL.

**The complainant** states that Mr. Esmurdoc charged her with fifteen minutes of AWOL on October 16, 2013, after she arrived to work late due to unavoidable traffic delays. She states that Mr. Esmurdoc wrongfully charged her with AWOL for following the same practices she used since 2009 which he had approved. She does not agree with the decision to charge her with AWOL and expressed her disagreement in a November 2, 2013 memo to Ms. Fuehrer. She believes that Mr. Esmurdoc charged her with AWOL on October 16, 2013, in reprisal for her prior EEO activity. She states that she is not aware that any other employee has been treated the way that she has been treated, which she described as "disparagingly, disregarded, and professionally humiliated and destroyed" (B-1, p. 230, 236-237).

**Felix Christopher Esmurdoc, RMO,** states that he charged the complainant with AWOL on October 16, 2013, after consulting with Human Resources. He states the complainant continued to be noncompliant with requesting annual leave in advance even after receiving a counseling memo on July 31, 2013 reminding her to do so. He states the complainant disagreed with his reason for charging her with AWOL on October 16, 2013, because she entered leave in that manner previously and had not been questioned about it. He believes that his decision to charge the complainant with AWOL complied with the Agency's policies and procedures. He states that he did not charge the complainant with AWOL on October 16, 2013, in reprisal for her prior EEO activity. He states he has not charged other employees with AWOL under similar circumstances in the prior two years (B-2, pp. 271-272).

**Susan Fuehrer, RMO,** states that she is not directly aware of the allegation at issue in this claim, but she has been included on several emails regarding leave

29

by the complainant.  She states that she discussed these issues with Human Resources and was informed that they were working with the complainant's supervisors on the appropriate way for the complainant to request leave.  She states that she did not feel there was any reason to initiate an investigation based on the information provided to her (B-4, pp. 289; B-5, pp. 294-295).

**Joseph Aquilina, RMO,** states the complainant was charged with AWOL on October 16, 2013, because employees who are late need to call their supervisor and request to be excused or request leave for their tardiness.  He states that Mr. Esmurdoc's actions were not tied to the complainant's prior EEO activity (B-6, p. 410; B-7, p. 414).

**Lisa Myles, HR Subject Matter Expert,** states that she was informed that the complainant entered fifteen minutes of leave into VISTA even though she never requested annual leave in advance.  She states that Mr. Esmurdoc indicated he had repeatedly counseled the complainant on the procedures for a proper leave request.  She identified and described the Agency's policy on Absence and Leave that applies to the allegation at issue in this claim (B-19, pp. 528-529).

### 13) On October 23, 2013, CE issued a third Counseling Plan to the complainant.

**The complainant** states that the third counseling plan she was issued on October 23, 2013, was for alleged violations of leave policy.  She believes that Mr. Esmurdoc issued this counseling plan to her in reprisal for her prior EEO activity based on the timing, the ongoing hostility to which she was subjected, and the deviation from normal practices.  She does not agree with the reason for issuing the third counseling plan to her, which she described in a November 2, 2013 memo to Ms. Fuehrer.  She states that she is not aware that any other employee has been treated the way she has been treated, which she described as "disparagingly, disregarded, and professionally humiliated and destroyed" (B-1, pp. 230-231, 238).

**Felix Christopher Esmurdoc, RMO,** states that he met with the complainant on October 23, 2013 and informed her of her violation of leave policy and opportunity to improve.  He states that he provided the complainant with a report of contact that day addressing her violation of leave policy on October 8, 2013 and October 16, 2013.  He states the complainant disagreed with the need for this counseling because she disagreed with his reasons for charging her with AWOL on the two dates at issue.  He explained that a report of contact and letter of counseling is not a form of disciplinary action and does not have any adverse effect on an employee's employment.  He states that he did not charge the complainant with AWOL in reprisal for her prior EEO activity.  He states he has not issued a counseling plan to any other employees in the prior two years (B-2, pp. 272-273).

30

**Susan Fuehrer, RMO,** states that she is not aware of the allegation at issue in this claim (B-5, p. 289).

**Joseph Aquilina, RMO,** states that a meeting was held with the complainant on October 23, 2013 to summarize the AWOL charges issued to her and to improve her compliance with leave policies.  He states the information presented and discussed was not related to the complainant's prior EEO activity (B-6, p. 410).

**Lisa Myles, HR Subject Matter Expert,** states that the Counseling Plan at issue in this claim counseled the complainant on her AWOL charges as well as her failure to follow proper leave request procedures.  She identified and described the Agency's policy on Absence and Leave which applies to the allegation at issue in this claim (B-19, pp. 529-530).

**Harassment Allegations**

**The complainant** believes that the thirteen claims accepted for investigation constitute a hostile work environment because she has never been treated so horribly in her working career and felt so sick and worried that she has to force herself to go to work.  She states that any reasonable person would feel unwelcome and punished for filing an EEO complaint based on what she has endured.  She states the actions taken against her have affected her by discrediting her with her subordinates and colleagues, causing professional humiliation, and validating the lack of respect and support available to her at the Medical Center by the Chief of Social Work Service, Assistant Chief of Social Work Service, EEO Manager, Medical Center Director, and Chief of Staff.  She felt belittled, degraded, and embarrassed and suffered from exhaustion, sleeping difficulties, and physical problems based on the environment she was subjected to at work every day.  She believes that all of this conduct was taken against her based on filing her EEO complaints because there were never any complaints against her as well as no concerns raised about her management or clinical capabilities prior to filing her EEO complaint in 2011 (B-1, pp. 224, 231-232).

**Felix Christopher Esmurdoc, RMO,** states that it was not his intention to subject the complainant to a hostile work environment in reprisal for her prior EEO activity in connection with the thirteen claims accepted for investigation.  He does not believe that the thirteen incidents at issue in this complaint were severe or pervasive because the complainant continues to function as a Supervisory Social Worker.  He states the complainant has alleged that she was subjected to a hostile work environment, but she has not made any specific complaint to him regarding a hostile work environment.  He states that he has not treated the complainant differently based on her EEO complaint (B-2, pp. 274-275; B-3, p. 279).

**Susan Fuehrer, RMO,** states that it was not her intention to subject the complainant to a hostile work environment in reprisal for her prior EEO activity in connection with the thirteen claims accepted for investigation.  She states that

31

she has not seen merit in the allegations raised by the complainant.  She states she has seen evidence that the complainant has been rude to her supervisor as well as others and she has not followed Agency policies related to time and leave.  She states the complainant also has stood in the back of the room at meetings and does not participate in meetings.  She states that she is not aware of the complainant being treated differently before, during, or after her filing of any EEO complaints (B-4, pp. 289-290; B-5, p. 297).

**Joseph Aquilina, RMO,** states that it was not his intention to subject the complainant to a hostile work environment in reprisal for her prior EEO activity in connection with the thirteen claims accepted for investigation.  He states that he continues to rely on the complainant as a member of the Social Work Service management team.  He explained that the complainant alluded in a vague and ambiguous manner to her belief she was subjected to a hostile work environment without any specifics.  He explained that in order to be able to investigate a complaint raised by an employee, the complaint would need to contain details about who made comments, what was said, and the date of the alleged incidents (B-6, pp. 410-411; B-7, p. 415).

**Jason Gatliff, Witness,** states that he did not have any intent to subject the complainant to a hostile work environment in reprisal for her prior EEO activity in connection with the thirteen claims accepted for investigation.  He states that he has always treated the complainant with the same respect and courtesy shown to all employees (B-8, pp. 424-425).

**Andrea Freeman, Witness,** states that she did not have the intent to subject the complainant to a hostile work environment based on her prior EEO activity in connection with the thirteen incidents accepted for investigation in this complaint.  She states the complainant never complained to her that she was subjected to a hostile work environment (B-9, pp. 433-434).

**Murray Altose, Witness,** states that it was not his intent to subject the complainant to a hostile work environment based on prior EEO activity in connection with the thirteen incidents at issue in this complaint.  He states that he has not observed any difference between how the complainant was treated before and after 2011 when she filed her first EEO complaint (B-11, pp. 452-453).

**Susan Lipkin, Witness,** states that she did not have the intent to harass the complainant.  She states that her intention in contacting Mr. Esmurdoc was to seek guidance to help improve her working relationship with the complainant.  She states that her direct experience is that the complainant bullied her and other staff members and created a hostile work environment for the employees she supervises (B-14, pp. 481-482).

**Ronald Copen, Witness,** states that he did not have any intent to harass the complainant.  He also does not believe that management had the intent to

32

subject the complainant to a hostile work environment based on her prior EEO activity in connection with the thirteen incidents at issue in this complaint. He believes that this investigation will reveal the complainant is the source of creating a hostile work environment and not the victim (B-15, p. 488).

**George Kasidonis, Witness,** states that he did not have the intent to harass the complainant. He does not believe that Mr. Aquilina and Mr. Esmurdoc intended to subject the complainant to a hostile work environment based on her prior EEO activity. He states that his experience with both management officials was always professional (B-16, pp. 496-497).

**David Blank, Witness,** states that he is not aware of any harassment of the complainant or any intention to subject the complainant to a hostile work environment based on her prior EEO activity (B-17, p. 504).

**Lisa Myles, HR Subject Matter Expert,** states that she did not have the intent to subject the complainant to a hostile work environment based on her prior EEO activity in connection with the thirteen incidents accepted for investigation in this complaint. She identified the Agency's policies and procedures that apply to a claim of hostile work environment. She states the complainant did not complain to her about a hostile work environment (B-19, pp. 530-531).

## B. Analysis

The complainant has alleged that she was subjected to a hostile work environment and discrete act of discrimination based on reprisal for prior EEO activity.

The complainant identified the prior EEO activity that forms the basis of her reprisal claim as two former complaints she filed against the Agency in 2011 and 2012 directed against various members of management. She states that all four management officials named in her complaint became aware of her prior EEO activity as early as June 2011, June 2012, or November 2012.

### *Hostile Work Environment*

In order to establish a prima facie case of hostile work environment harassment, the complainant must present evidence: (1) that she belongs to a protected class; (2) that she was subjected to unwelcome verbal or physical conduct; (3) that the harassment complained of was based on her prior EEO activity; and (4) that the harassment was sufficiently severe or pervasive to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably interfering with work performance and/or of creating an intimidating, hostile, or offensive work environment. In cases of harassment by coworkers or other nonsupervisors, the complainant must also show; (5) that management failed to take corrective action that was prompt, appropriate, and effective.

33

The complainant alleges that she was subjected to thirteen incidents of unwelcome conduct based on her prior EEO activity between August 2012 and October 2013, including initiating a witch-hunt against her by soliciting reports of contact from her subordinate employees; causing an EEO investigation to be conducted against her which revealed her innocence; threatening to discipline her for alleged insubordination; removing her from her position on a professional board; issuing three counseling plans to her; failing to support her and undermining her supervisory position and responsibilities; and charging her with AWOL. She states that management repeatedly failed to take action to investigate or address her complaints which she repeatedly brought to their attention regarding the rumors, gossip, and negative talk going around the Medical Center about her. She believes that these actions were taken against her based on her prior EEO activity because prior to filing EEO claims against the Agency, she was highly regarded and involved in numerous committees. She states that after filing her first EEO complaint in 2011, she began to experience disrespectful behavior from employees, negative reactions from staff, lack of support and attacks from management, and removal from committees. She states that these incidents impacted her because they caused her to feel sick to her stomach, hurt, humiliated, disrespected, intimidated, bullied, and harassed.

***Management's Response***

Management officials may rebut a prima facie case of hostile work environment harassment by the production of evidence to show that: (1) the conduct did not occur as alleged; (2) the conduct complained of was not unwelcome; (3) the conduct was not based on prior EEO activity; (4) the alleged harassment was not sufficiently severe or pervasive to adversely affect the complainant's employment opportunities, to unreasonably interfere with the complainant's performance, or to create an abusive working environment; and/or (5) in the case of harassment by coworkers and nonsupervisors, management was either unaware of the harassment (and should not reasonably have been aware of it), or took prompt, effective, and appropriate action.

The four management officials named in the complainant's claims accepted for investigation all were aware of the complainant's prior EEO activity against the Agency as early as 2012, but denied that any action was taken against her based on that prior EEO activity. Management denies the complainant's allegation that she was treated differently before and after filing her first EEO complaint in 2011.

Management explained that no witch-hunt was initiated against the complainant and that no reports of contact were solicited from her subordinate employees. Management states that the complainant's subordinate employees complained she was subjecting them to a hostile work environment, which required an investigation and revealed that the complainant did not violate any EEO laws in her interactions with her employees. Management states no threats or

34

disciplinary action were taken against the complainant based on her insubordination, but management did have discussions with her regarding expectations related to her cooperation and responsiveness in dealing with her supervisor.  Management explained that the decision was made not to renew the complainant's position on a professional board based on her limited attendance at meetings during the prior year.  Management states that three counseling plans were issued to the complainant based on her failure to comply with the Agency's leave policies as well as to remind her of the need to improve her cooperation with her supervisors and fellow employees.  Management states the complainant was charged with AWOL on two occasions based on her failure to follow the Agency's leave policies for requesting annual leave.

Management denies the complainant's allegation that it failed to take action to investigate or address her complaints about how she was being treated at the Medical Center as well as the rumors, gossip, and negative talk going around about her.  Management states the complainant raised vague allegations about these issues without specifics that could be investigated at the time. Management states that numerous attempts were made to follow up with the complainant to address her concerns.  Management states that as soon as it became aware of more specifics related to the complainant's complaints, an AIB was initiated in November 2013 to investigate her allegations.

### Disparate Treatment

Events 11 through 13 also were accepted for investigation as discrete acts of discrimination based on reprisal for prior EEO activity.

### *Reprisal Theory*

To establish a prima facie case of discrimination due to reprisal, the complainant must show that:  (1) she engaged in prior EEO activity (i.e., participation in the EEO complaint process, or some form of opposition to discriminatory practices, or other exercise of EEO rights);  and, (2) relevant management officials were aware of the complainant's prior protected activity; and, (3) management effected some action that adversely impacted on the complainant following the protected activity; and, the surrounding facts and circumstances raise an inference of retaliatory motivation, either because: a) the alleged retaliation occurred shortly after the participation (shortly is usually defined in terms of days, weeks, or months, not years), or b) complainant's treatment before engaging in protected activity was different than the treatment after such participation (i.e., complainant's treatment after the protected activity was noticeably worse than before), or c) complainant was treated differently than similarly situated persons who did not participate in protected activities.

**(11) On October 8, 2013, CE charged the complainant two hours for being absent without leave (AWOL).**

35

The complainant states this management official wrongfully charged her with two hours of AWOL on October 8, 2013.  She states that she was charged with AWOL even though she followed the same practices she used since 2009 which he had approved.  She states she informed this management official on the morning of October 8, 2013, that she would be taking a sick day and using sick leave and annual leave to cover her absence that day.  She states the management official later informed her that he would approve her entry for six hours of sick leave, but not the two hours of annual leave because he claimed she did not request them when she called in sick that morning.  She states that she informed him about using both sick leave and annual leave as needed to cover her sick day.  She believes she was charged with AWOL on October 8, 2013, in reprisal for her prior EEO activity.  She states that she is not aware that any other employee has been treated the way she has been treated which she described as "disparagingly, disregarded, and professionally humiliated and destroyed."

**Management's Response**

The management official who took the action at issue in this claim became aware of the complainant's prior EEO activity in August 2012.  Management denies that any action was taken against the complainant based on her prior EEO activity.  Management states the complainant was charged with two hours of AWOL on October 8, 2013 after consultation with Human Resources.  Management states the complainant continued to be noncompliant with requesting annual leave in advance even after receiving a counseling memo on July 31, 2013, reminding her to do so.  Management explained that on October 8, 2013, the complainant called and asked to use sick leave.  On October 9, 2013, she entered a request that included annual leave instead.  On October 18, 2013, management explained that the complainant's supervisor emailed her and asked that she clarify her entry in VISTA because it did not match her request.  Management states the complainant disagreed with the reason for charging her with AWOL on October 8, 2013, because she claims that she requested use of annual leave.  Management states the complainant's supervisor does not recall the complainant making this request.  Management states that the same management official has not charged other employees with AWOL under similar circumstances in the prior two years.

**(12) On October 16, 2013, CE charged the complainant fifteen minutes AWOL.**

The complainant states that this management official wrongfully charged her with fifteen minutes of AWOL on October 16, 2013, after she arrived late to work due to unavoidable traffic delays.  She states that she was charged with AWOL even though she followed the same practices she used since 2009 which he had approved.  She believes that she was charged with AWOL on October 16, 2013 in reprisal for her prior EEO activity.  She states that she is not aware that any

36

other employee has been treated the way she has been treated, which she described as "disparagingly, disregarded, and professionally humiliated and destroyed."

**Management's Response**

The management official who took the action at issue in this claim became aware of the complainant's prior EEO activity in August 2012. Management denies that any action was taken against the complainant based on her prior EEO activity. Management states that the complainant was charged with fifteen minutes of AWOL on October 16, 2013 after consultation with Human Resources. Management states the complainant continued to be noncompliant with requesting annual leave in advance even after receiving a counseling memo on July 31, 2013 reminding her to do so. Management states that the same management official has not charged other employees with AWOL under similar circumstances in the prior two years.

**(13) On October 23, 2013, CE issued a third Counseling Plan to the complainant.**

The complainant states that she was wrongfully issued a counseling plan on October 23, 2013, for the alleged violations of leave policy at issue in claims 11 and 12. She believes that she was issued this counseling plan in reprisal for her prior EEO activity based on the timing, the ongoing hostility to which she was subjected, and management's deviation from normal practices. She states that she is not aware that any other employee has been treated the way she has been treated which she described as "disparagingly, disregarded, and professionally humiliated and destroyed."

**Management's Response**

The management official who took the action at issue in this claim became aware of the complainant's prior EEO activity in August 2012. Management denies that any action was taken against the complainant based on her prior EEO activity. Management states the complainant was issued a report of contact on October 23, 2013 based on her violation of leave policy on October 8, 2013 and October 16, 2013. Management explained that a report of contact and letter of counseling are not a form of disciplinary action and do not have any adverse effect on an employee's employment. Management states that the same management official has not issued a counseling plan to any other employees in the prior two years.

**Pretext**

The complainant did not provide other evidence of direct discrimination on the part of management.

37

The information contained in this report was obtained from witness testimony and documents provided by the complainant and the Agency.

*Nancy E. Baumgarten*

July 7, 2014

_____     _____
Nancy Baumgarten                Date
EEO Investigator

38



**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**Washington, D.C. 20420**

**First Supplemental Investigative Report**
**In the Matter of the EEO Complaint of Discrimination of:**

| | |
|---|---|
| Paula Leligdon | ) |
| 190 Walnut Drive | ) |
| Medina, Ohio  44256 | ) |
| Complainant | ) |
| | ) |
| | ) |
| v. | ) ORM No. 200H-VI10-2013103868 |
| | ) |
| | ) |
| Robert A. McDonald, Secretary | ) |
| Department of Veterans Affairs | ) |
| 810 Vermont Avenue, N.W. | ) |
| Washington, D.C. 20420 | ) |
| Respondent | ) |

Facility: VA Medical Center, Cleveland, Ohio

Eraka Michelle Robertson
EEO Investigator
Susan Grimes Associates, Inc.
Washington, D.C. 20007

## I. Introduction

This is the first (one of two) supplemental report of investigation.  It addresses
Amendments Two through Six (Claims 14 -28) to the originally accepted
complaint.

## II. Background

Paula Leligdon, hereinafter referred to as the complainant, is a Supervisory
Psychiatric Social Worker, GS-12, at the VA Medical Center in Cleveland, Ohio.
Believing her previous EEO activity was a factor in her interactions with her
supervisors, other facility officials and in several personnel actions, she has
alleged a hostile work environment.

1

### III. Claims and Bases

**Second Amendment:**

Whether the complainant was subjected to a hostile work environment based on reprisal for prior EEO activity as evidenced by the following events:

\*14.    On December 2, 2013, CE issued to the complainant an adverse performance appraisal rating whereby he rated her "Fully Successful."

\*15.    On January 2, 2014, Andrea Freeman (AF), Director of EEO, provided advice and recommendations which caused the complainant's official time to be limited to 16 hours.

16.    On January 2, 2014, AF demeaned and disrespected the complainant by accusing her of harassment and bullying, and refused to communicate with the complainant about official business, including her pending EEO complaint.

17.    During a period from October 2013 thru January 29, 2014, Dr. Linda Bond (LB), Manager, Acute Inpatient Psychiatry Unit, undermined the complainant's supervisory duties by interfering with her investigation of a complaint from a Veteran's family member about the treatment received, influenced the complainant's subordinate to not meet with the complainant, and refused to act regarding the complainant's complaint about her (LB) interference.

**Third Amendment:**

18.    On January 2, 2014, Dr. Murray Altose (MA), Chief of Staff, issued the complainant a memorandum, Subj: Letter of Expectations.

**Fourth Amendment:**

19.    On March 26, 2014, CE and JA issued the complainant a Counseling Plan.

20.    On or about March 31, 2014, CE and JA issued the complainant a report of contact (ROC).

21.    On April 1, 2014, CE and JA prohibited the complainant from ever using the restriction option in Outlook for all email communications.

22.    On April 4, 2014, CE and JA issued the complainant two additional ROCs.

2

*23.    On April 4 and 7, 2014, CE denied the complainant's request for authorized absence to attend State Licensure and Medical Center training requirements on April 9 or April 11, 2014.

24.    On April 11, 2014, MA failed to act and supported CE's decision to deny the complainant's request for authorized absence to attend training and has not provided any viable rational.

**Fifth Amendment**

25.    On May 12, 2014, CE and JA issued the complainant a notice of proposed suspension.

*26.    On May 23, 2014, CE and JA issued the complainant a Letter of Reprimand.

**Sixth Amendment**

27.    On June 6, 2014, CE and JA issued the complainant a 3-day suspension.

*28.    On June 6, 2014, CE and JA issued the complainant a Letter of Reprimand.

**\*Events 14-15, 23, 26-28 have been accepted as independent actionable claims.**

## IV. Document Review

Most of the **administrative** and **organizational information** or **comparative data** was included or documented in the initial report of investigation for this complaint.

The complainant's FY2012 and FY2013 performance appraisals reflect her achievement of "Exceptional" ratings on specific critical elements and summary ratings of "Fully Successful" for both years (C-1). The FY2012 and FY2013 performance appraisals of the complainant's similarly situated colleagues appear at C-2.

Email correspondence between complainant and Felix Esmurdoc, dating between December 20, 2013 and December 27, 2013, relate to providing social work supervisory coverage for an expected staff gap in coverage. Mr. Esmurdoc concurs with a suggestion that the complainant provide four additional hours until the vacated position can be filled. The complainant responds with a description of the caseloads of her fellow supervisors and states they are more available than she to provide this coverage. The emails reflect attempts by Mr. Esmurdoc to meet personally with the complainant and the complainant's insistence that they

3

communicate by email instead. The complainant copies her attorney on the last few emails (C-3).

Email correspondence amongst the complainant, Andrea Freeman and Mr. Esmurdoc is related to the complainant's initial inquiry regarding official time to participate in her EEO activity. When the complainant requests policy statements and proof of Ms. Freeman's authority to establish said policy, Ms. Freeman states the complainant is beginning to bully and harass her (C-4).

Email correspondence amongst the complainant, Ms. Freeman and Mr. Esmurdoc regarding her request for official time reflects three requests by the complainant for a total of 32 hours. The correspondence reflects that each request was granted (C-5).

A "Letter of Expectations" from Dr. Murray Altose to the complainant asserts she failed to provide coverage in the absence of a staff person and to respond to messages meeting requests from her supervisors. It directs her to follow both of these directives and to stop copying her attorney on medical center business emails (C-6).

A Report of Contact (ROC) by John McKinney describes the complainant calling him at home on his personal mobile phone on February 4, 2014. It also references his October 25, 2013 ROC regarding her similar action at that time and his formal request she not do so again (C-7).

A written counseling from Joseph Aquilina to the complainant counsels her for contacting John McKinney as documented in his February 4, 2014 ROC. It states as its basis that both Mr. McKinney and the complainant were on leave and not authorized to conduct official business and it was in violation of Mr. McKinney's request not to be contacted on his personal phone (C-8).

Reports of Contact issued to the complainant by Mr. Esmurdoc and/or Mr. Aquilina, dating between March 20 and April 14, 2014, document their interactions with the complainant on March 20, March 26, April 1 and April 14, 2014. The ROCs describe the managers' efforts to meet with the complainant, the issue of corrective documents to her, their actions during these meetings, her demeanor and response during these contacts and some subsequent email communications (C-9).

In email correspondence between the complainant and Mr. Esmurdoc, he directs her to stop restricting emails sent to her manager and she responds by requesting he provide her with an explanation of his directive and a copy of the prohibitive policy (C-10).

Email correspondence between the complainant and Mr. Esmurdoc reflects two requests for official time to attend professional development trainings. The

4

complainant requests April 9th and April 11th, 2014 off and Mr. Esmurdoc denies both requests on the grounds of meeting medical center needs. The complainant sends an April 23, 2014 email expressing her opinions to her entire chain of command (C-11).

Joseph Aquilina proposed on May 9, 2014 to suspend the complainant for conduct unbecoming of a supervisor, failure to follow instructions and inappropriate use of email. The complainant responds via her attorney with a letter requesting certain policy and other information, a chronology of events dating back to 2012, the citation of several federal statutes and labor laws, and her response to each allegation in the proposal. Mr. Aquilina upholds the proposed action in a letter dated June 4, 2014 (C-12).

A Report of Contact by John McKinney, written on May 13, 2014, describes the October 2013 circumstances (C-13).

Letters of Reprimand to the complainant from Mr. Aquilina, dated May 22, 2014 and June 3, 2014, state as their bases the complainant's failure to follow instructions, inappropriate use of email, conduct unbecoming a supervisor and a discussion with John McKinney regarding his testimony in an administrative investigation (C-14).

Management's statements regarding pertinent comparators include Joseph Aquilina's confirmation that he has not issued any comparative, corrective or punitive actions to a supervisor within the 2 years preceding the timeframe covered by investigation. Felix Esmurdoc states he denied another supervisor's request for Authorized Absence to attend a professional development training in August of 2013 and submits the email chain documenting his response (C-15).

Policies pertinent to the accepted claims include the federal "No FEAR" policy against discrimination, harassment and reprisal, and an excerpt from the VAMC-Cleveland's Performance Management System (C-16).

An Investigator's Memo can be found at C-17.

## V. Summary and Analysis

**The witnesses provided the following testimony:**

**A. Summary**

**The complainant** references her February 16, 2014 testimony regarding her reasons for believing management's actions were intended as retaliation and reiterates she has been subjected to harassment since her 2011 complaint. She cites specific instances of animus, acts of hostility, suspicious timing of actions,

5

deviation from normal business practices and pretext to support her assertions (B-1, pp. 66-71)

**Joseph Aquilina**is the Chief of Social Work Service, GS-14, at the VAMC-Cleveland and the complainant's second-line supervisor. Mr. Aquilina states he was aware of the complainant's EEO activity and denies it was a factor in his actions or decisions in her regard. He denies having the intention or desire to create a hostile work environment for her (B-3, p. 109).

**Felix Christopher Esmurdoc** is the Assistant Chief of Social Work, GS-13, and the complainant's direct supervisor. He states he was aware of her previous EEO activity but it was not a factor in his actions or decisions. Mr. Esmurdoc states when the complainant first raised the issue of a hostile work environment with him in October 2012, it was not in the context of reprisal, but rather related to intra-office gossip about her among her co-workers. He states an administrative investigation was conducted into her allegations (B-4, pp.118-120).

**Claim #14:  On December 2, 2013, CE issued to the complainant an adverse performance appraisal rating whereby he rated her "Fully Successful."**

**The complainant** states Chris Esmurdoc was her rating official and Joseph Aquilina her approving official. She states she met with Mr. Esmurdoc in November 2013 for an appraisal meeting, during which Mr. Esmurdoc told her that her leadership skills were exceptional. The complainant asserts she should have received "Exceptional" ratings in the critical elements "Leading People," "Building Coalitions" and "Results Driven" because she received "Exceptional" ratings in "Leading Change" and "Business Acumen" and these elements are so closely related. She states she cannot compare herself to any colleagues because no other supervisor's scope of duty is comparable to her responsibilities. The complainant states she received an "Outstanding" rating for her annual appraisals up until her 2011 EEO complaint (B-1, pp.73-76).

**Felix Esmurdoc** states that a "Fully Successful" rating is not an adverse action. He confirms having rated her "Exceptional" on two of her critical elements and states the overall rating is the result of the non-numerical formula for the rating process. Mr. Esmurdoc states he explained his ratings to the complainant in an appraisal meeting, to which she had no direct response (B-4, pp. 120-121.).

**Antonio Suarez** is a Section Chief, Employee and Labor Relations Section, GS-13, Human Resources Management Service or "HRMS" for the VAMC-Cleveland. He states he had no professional relationship to the complainant outside of his overall duties to the medical center work force.  Mr. Suarez states he has conducted training for supervisors so it is probable that he has met the complainant but was never formally introduced to her. Mr. Suarez states he was aware of the complainant's EEO activity but he has never sought to retaliate

6

against her and has no knowledge that any management official has had that intention. He confirms he has participated previously in an EEO activity.
Mr. Suarez states a Fully Successful summary rating means the employee is honoring the employment agreement and meeting the expectations of their critical elements. He states it is in no way an adverse action (B-8, pp. 151-152).

**Claim #15:   On January 2, 2014, Andrea Freeman (AF), Director of EEO, provided advice and recommendations which caused the complainant's official time to be limited to 16 hours.**

**The complainant** states Andrea Freeman's approval of her December 13, 2013 request for official time to meet with her attorney included a statement limiting official time for any one EEO complaint to 16 hours (C-5). She states this limitation violates Agency policy and that Ms. Freeman's direct involvement in the matter violates her (Freeman's) role as a neutral party for all employees. She also states Ms. Freeman's decision oversteps the complainant's direct supervisor's authority to make decisions regarding her use of time and limits legal advice or effective management of her claim (B-1, p. 77).

**Andrea Denise Freeman** is the EEO/Affirmative Employment Manager, GS-12, for the VAMC-Cleveland. Ms. Freeman states she received an email from Mr. Esmurdoc stating the complainant was requesting official time and asking for her guidance on his response (C-5). She states she informed Mr. Esmurdoc she was in the process of revising the facility's policy on official time and was leaning toward a standard of 16 hours, subject to change depending upon the circumstances of the complaint. Ms. Freeman states Mr. Esmurdoc communicated to the complainant that the agency was limiting official time to 16 hours, to which the complainant responded with a request for the identity of the responsible management official.

Ms. Freeman states she gave the complainant the same explanation she gave Mr. Esmurdoc regarding the policy updates, plus additional detail. She states she advised Mr. Esmurdoc to approve the request for 16 hours official leave for January 8 & 9, 2014, and also for the complainant's subsequent requests for official time on February 5 & 12, 2014, for a total of 32 hours (B-6, pp. 144-146).

**Felix Esmurdoc** states he consulted with Ms. Freeman regarding the complainant's request on December 31, 2013. He states she said a policy was under development and that "the Medical Center is authorizing 16 hours total official time for each respective EEO complaint."  Mr. Esmurdoc states the complainant's request was approved, as well as two subsequent requests for official time totaling an additional 16 hours. He states Ms. Freeman was consulted about these requests (B-4, pp. 121-122).

7

**Claim #16:  On January 2, 2014, AF demeaned and disrespected the complainant by accusing her of harassment and bullying, and refused to communicate with the complainant about official business, including her pending EEO complaint.**

**The complainant** inserts the content of her email communications with Andrea Freeman on January 2, 2014, in response to the Investigator's questions regarding this claim (C-4).  In that email string, the complainant asks for specifics regarding the decision to limit her official time to 16 hours, such as the authority to amend, the policy classification and number, etc. Ms. Freeman responds that the complainant is "starting to harass and "bully" [her] as usual" and that she will not respond to further communication because she is officially on leave.  The complainant states in that email that she is "shocked and hurt" by Ms. Freeman's "false accusations," characterizing Ms. Freeman's response as being rude and disrespectful (B-1, pp. 78-79).

**Andrea Freeman** states she was on leave on this date. She states when the complainant began a lengthy email discourse about the policy, she responded that she was on leave and would forward the official leave policy when finalized but would not respond to the complainant's communications in the interim.  Ms. Freeman states when the complainant does not receive the response she desires from an agency official, she begins a continuous chain of communication that escalates up the chain of command and beyond the facility. She states she considers that behavior harassing and bullying, and when she wrote the complainant was "beginning to harass and bully" her, she was referring to this pattern of communications, not retaliating against her for her EEO activity (B-6, pp. 146-147).

**Claim #17:  During a period from October 2013 thru January 29, 2014, Dr. Linda Bond (LB), Manager, Acute Inpatient Psychiatry Unit, undermined the complainant's supervisory duties by interfering with her investigation of a complaint from a Veteran's family member about the treatment received, influenced the complainant's subordinate to not meet with the complainant, and refused to act regarding the complainant's complaint about her (LB) interference.**

**The complainant** states the family member of a patient complained about an interaction with John McKinney, a social worker on the complainant's staff. She states she was directed by Chief of Staff Joseph Aquilina to investigate the matter. The complainant states that on October 11, 2013, she requested a meeting with Mr. McKinney, who responded that "Dr. Bond does not believe I can be spared from the unit today." She states he did not attend the meeting, and that he characterized the matter as a disagreement between her and Dr. Bond (B-1, p. 80-81).

8

The complainant states Dr. Bond directly admitted telling Mr. McKinney that client issues took precedence over this meeting. She describes subsequent attempts to elicit Dr. Bond's participation in the investigation which she states were disregarded. She states she reported this unresponsiveness to Mr. Aquilina who acknowledged its impropriety but took no action (B-1, pp. 80-82).

**Linda Bond** is the Medical Manager for Inpatient Psychiatry, GS-15, for the VAMC-Cleveland. She states she was not aware of the complainant's previous EEO activity. Dr. Bond states several of the complainant's social work staff report to her unofficially as they care for patients on the Inpatient Psychiatry Service (B-5, p. 138).

Dr. Bond states she contended with the veracity of the complaint against Mr. McKinney based upon her years of interaction with him and describes other situations involving the reporting family member which she felt further impugned the complaint. She states she determined there was no cause for further action and she heard nothing more about the matter from the family member.  Dr. Bond states about two weeks later the complainant asked her to write a Report of Contact with the details of the incident which she declined because she did not find the complaint credible and considered the matter closed. She states the complainant never conveyed the impression she (Bond) was interfering with the complainant's supervision or that she felt harassed or subjected to hostility in any way so she could not have "refused to act" on allegations of interference. Dr. Bond states she was never contacted again or involved in the complainant's investigation of these events (B-5, pp. 138-139).

Dr. Bond denies influencing Mr. McKinney. She states he told her he had been called to a meeting with the complainant on a day the inpatient unit was extremely busy and she replied she did not see how he could complete all of his work in the time available.  Dr. Bond contends she did not direct him not to attend that meeting or to be unresponsive to the complainant (B-5, p. 139).

**Felix Esmurdoc** states he was informed of this matter by both parties. He states Dr. Bond and the complainant were in dispute over supervisory authority and were having problems communicating with each other. He states his response was to encourage them to work it out between them and offer his assistance in doing so. He states neither party requested his assistance and conveys his understanding the complainant completed her investigation of the complaint against Mr. McKinney (B-4, pp. 122-123).

Mr. Esmurdoc states he was not aware of the assertion Dr. Bond had influenced Mr. McKinney not to meet with the complainant. He states that would have been inappropriate and he would have interceded had he been informed of such influence. Mr. Esmurdoc states the issue was one of supervisory authority and that the complainant and Dr. Bond shared this authority (B-4, p. 123).

9

**Antonio Suarez** responds to the Investigator's description of the events by stating it would be an appropriate response for the manager to direct the two supervisors to work the problem out between themselves. He notes that a conduct issue would require the manager's intervention, but this issue was one of supervisory authority in a shared role (B-8, p. 152).

**Claim #18: On January 2, 2014, Dr. Murray Altose (MA), Chief of Staff, issued the complainant a memorandum, Subj: Letter of Expectations.**

**The complainant** states she was presented this letter in an unscheduled meeting with Mr. Esmurdoc and Mr. Aquilina (C-6). The letter alleges the complainant failed to make arrangements to cover a pending gap in service due to a staff member's departure, failed to meet with her supervisors and copied her attorney on internal communications.

The complainant contends with the assertions in the letter as follows: She asserts that she did make arrangements to accommodate the pending service gap; that she did not "refuse" to meet with her supervisors, but rather requested information in advance and an alternative means of communication and that the meeting was postponed pending management's response to these requests. The complainant states the emails on which she copied her attorney were directly related to her EEO claims and therefore the inclusion was appropriate, characterizing this charge as an attempt to interfere with her attorney/client communications. The complainant states she should have been given an opportunity to address these concerns prior to issue of this letter (B-1, pp. 83-85).

**Felix Esmurdoc** addresses the charges in this letter. He states he asked the complainant to cover for the departing staff member personally and she refused to do so on the grounds she was too busy. He states after multiple attempts by phone and email to arrange a meeting with her to discuss the matter, he showed up at her office and requested a meeting. Mr. Esmurdoc states she opened the door slightly, refused to admit him, told him she would email him and closed the door. He states the complainant routinely copied her attorney inappropriately on emails containing employee names, case numbers and other medical center information (B-4, pp. 123-125).

**Murray David Altose** is the Chief of Staff of the VAMC-Cleveland and the complainant's third-line supervisor. He states he is uncertain if he was aware of the complainant's previous EEO activity during the relevant timeframe. Dr. Altose states he was aware of the complainant's previous allegation of a hostile work environment and that the facility responded accordingly with an administrative investigation (B-2, pp. 104-105).

Dr. Altose states the complainant had ongoing issues with her supervisors, including refusing to meet with them and copying her attorney on their communications. He states the inclusion of her attorney on these emails raised

10

privacy issues and was inappropriate. Dr. Altose states he conferred with the Office of Human Resources and decided to issue the Letter of Expectations. He notes the letter is neither a corrective nor a punitive action, but simply a clarification of expectations (B-2, p.105).

**Paul DePompei** is Risk Manager, Nurse III, for the VAMC-Cleveland.  He states he was aware during the relevant timeframe of the complainant's allegations of harassment against the Agency but not of her formal EEO activity. Mr. DePompei states he coordinated an administrative inquiry in response to complaints of harassment made by the complainant against her supervisors and the facility's EEO program manager, adding the investigation itself was conducted by outside parties. He states the inquiry was initiated on November 25, 2013 and concluded on or around April 23, 2014.  The complainant's allegations were all found to be without merit (B-7, pp. 149-150).

**Antonio Suarez** states the VAMC-Cleveland has 34 service chiefs and hundreds of supervisors. He states for consistency and fairness, managers are required to confer with the HRMS before taking any corrective or punitive action. He states the HRMS looks at the offense and provides information on possible responses. He notes the final decision rests with the management official but all actions taken are in accordance with agency policies and procedures (B-8, p. 152).

**Claim #19:  On March 26, 2014, CE and JA issued the complainant a Counseling Plan.**

*[Investigator's Note: Management witnesses state the document issued on this date was a Letter of Counseling related to the complainant's communications with a subordinate employee (C-8).*

**The complainant** states she was wrongfully accused of not following sick leave procedures, violating federal labor laws and inappropriate conduct. She does not state the actions she did or did not take to elicit these charges. The complainant contends she did adhere to agency policy because sick leave was approved for the employee in question. The complainant states she has received no response to date to her request for the specific policies alleged to have been violated (B-1, p. 92).

The complainant asserts this was an act of reprisal because of management's standing "protection" of this employee from her supervisory authority to discipline him while his Reports of Contact are used to discipline her. She adds that Mr. Esmurdoc "snickered" at her during the meeting for this document's issue (B-1, p. 92).

**Felix Esmurdoc** states he received a ROC from John McKinney that the complainant had contacted him on his personal mobile phone while he was at home on leave (C-7). He notes a similar contact occurred in February 2014 and

11

Mr. McKinney had requested she not contact him on his personal phone. Mr. Esmurdoc states the complainant was on leave herself that date and not authorized to act in an official capacity. He states the combination of these two infractions led to the issue of this reprimand versus a lesser response from management (B-4, pp. 129-130).

Mr. Esmurdoc states during the meeting where he and Mr. Aquilina presented the complainant with this document, she was advised to submit any response within three business days and responded she would not be able to do so within the allotted timeframe. He notes for the record the relevant document was dated March 10, 2014 but was not issued to the complainant until March 26, 2014 (B-4, p.130-131).

**Joseph Aquilina** states he was the approving official for this action. He states the complainant did not deny that she contacted her staff member at home while they both were on leave. Mr. Aquilina affirms the complainant requested a copy of the agency policy which she violated in doing so and confirms there was no specific policy. He references a February 14, 2014 complaint from this staff member (C-7) specifically requesting the complainant not contact him at home as the basis for this action (B-3, pp. 109-110).

**Claim #20: On or about March 31, 2014, CE and JA issued the complainant a report of contact (ROC).**

**The complainant** states the Report of Contact (C-9) accused her of violating orders to cease copying her attorney on emails and restricting the use options in her emails to management. She states it also accused her of refusing to meet with her supervisors. The complainant asserts this was an act of reprisal for the previously stated reasons and because unannounced meetings deprived her of her right to legal representation (B-1, p. 93).

**Felix Esmurdoc** states these ROCs from him and Mr. Aquilina served to document the events of their March 26, 2014 meeting with the complainant. He states it also documents a subsequent request for the complainant to not use the restriction function on her Outlook email when communicating (B-4, p. 131).

**Joseph Aquilina** states the Reports of Contact issued on this date were dated March 26, 2014 and documented the circumstances of his and Mr. Esmurdoc's meeting with the complainant on that date. He stated the ROC was intended to document for the record the complainant's claim that Mr. Esmurdoc "smirked" at her during that meeting (B-3, p. 110).

**Antonio Suarez** states Reports of Contact or "ROCs" are a standard form used by the Agency that serve as a formal "notepad" to document any circumstance, incident or event. He states a ROC can be used to document a meeting, a conversation or an observation, and its use is not restricted to complaints. Mr.

12

Suarez states the purpose of a ROC is to ensure consistency and to capture a memory while it is fresh in the mind of the participants. He states the form ensures that basic information such as date, location, etc., are provided and consistent. Mr. Suarez states being presented with an ROC is not an adverse, corrective or punitive action. He states while it is not required, it is common that other participants in a documented event be presented with copies of any ROCs regarding that event (B-8, p. 151).

**Claim #21: On April 1, 2014, CE and JA prohibited the complainant from ever using the restriction option in Outlook for all email communications.**

**The complainant** states that on this date Mr. Esmurdoc prohibited her from using the restriction options when sending emails (C-10). She states these options are available to all employees and asserts this is an act of reprisal because it is intended to stifle her protected activity. The complainant notes she has received no response to her request for the policy supporting this prohibition (B-1, p. 94).

**Felix Esmurdoc** states on this date he sent the complainant an email after having met with her requesting she not send emails restricted in terms of the recipient's ability to save, forward, copy or print the communication. He notes this request was regarding all of her email communications, not a specific email. Mr. Esmurdoc states the complainant had been directed by himself and asked by others repeatedly over the past 12 months not to send emails with restrictions on them (B-4, pp. 131-132).

**Joseph Aquilina** states both he and Mr. Esmurdoc have repeatedly instructed the complainant not to send them emails that are restricted in their forwarding, printing and other capabilities because these restrictions inhibit his ability to respond to the complainant's emails fully. Mr. Aquilina states there were repeated infractions against this directive after it was issued verbally and in writing (B-3, pp. 110-111).

**Claim #22: On April 4, 2014, CE and JA issued the complainant two additional ROCs.**

**The complainant** states each supervisor issued her a ROC (C-9) regarding their meeting on March 26, 2014. She states it documented her statement on that date that she may not be able to respond within 3 business days to the ROC she had been given at that time, and it also denied that Mr. Esmurdoc had smirked at her. The complainant charges reprisal because she had done nothing wrong and a ROC was unwarranted (B-1, p. 95).

**Felix Esmurdoc** states these ROCs served to document his and Mr. Aquilina's perception of the events of their March 26, 2014 meeting with the complainant.

13

He notes it conveys her statement that she would not respond to the issued written counseling within the 3-day allotted timeframe (B-4, pp. 132).

**Joseph Aquilina** states these reports of contact were dated March 26, 2014 and served to document the March 26, 2014 meeting with the complainant (B-3, pp. 111).

*[Investigator's Note:  The ROCs in question were actually dated March 31, 2014 and served to document the meeting held on March 31, 2014. It was on March 31, 2014 that the ROCs dated March 26, 2014 were presented to the complainant, documenting the March 26, 2014 meeting with her.]*

**Claim #23:  On April 4 and 7, 2014, CE denied the complainant's request for authorized absence to attend State Licensure and Medical Center training requirements on April 9 or April 11, 2014.**

**The complainant** states the class she wished to attend would have enhanced her professional abilities and skills in her work with veterans and as a supervisor. She states it would also have provided Continuing Education Units (CEUs) toward completion of state and VAMC-Cleveland licensure recertification requirements. The complainant states Mr. Esmurdoc's denial on the basis of "clinical coverage and medical center responsibilities"(C-11, p. 211) is invalid because she would never be able to obtain the required training if this were true (B-1, pp. 96-97).

**Felix Esmurdoc** states the facility does require social workers to maintain current licensure but adds that is the responsibility of the employee to obtain the necessary training. He states a general number of hours is required for recertification but they are not specific to any courses. Mr. Esmurdoc confirms he denied the complainant's request for official time because she was needed to provide services at the facility (B-4, pp. 132-133).

**Joseph Aquilina** states he was consulted by Mr. Esmurdoc on this matter and concurred with the decision to deny the authorized absence. He states this decision is a management prerogative and that employees are responsible for obtaining the continuing education needed to maintain their professional certifications. Mr. Aquilina states the agency is not required to provide that education or any leave of absence related thereto, nevertheless it does offer accredited continuing education during work hours (B-3, pp. 111-112).

**Antonio Suarez** states the agency is not responsible for facilitating continuing education units for certified staff. He states employees may take annual leave to take classes but patient care is always the priority (B-8, p. 152).

14

**Claim #24:  On April 11, 2014, MA failed to act and supported CE's decision to deny the complainant's request for authorized absence to attend training and has not provided any viable rational.**

**The complainant** states Mr. Altose replied to her request by emailing that he "supports [Mr. Esmurdoc's] decision." She states he failed to provide an explanation for his decision or to respond to Mr. Esmurdoc's reasoning (B-1, p. 97; Note: This statement appears in response to Question #34 for Claim #23).

**Murray Altose** states he relies upon his management team to address leave and administrative issues, so he never "failed to act." He states he had no reason not to concur with Mr. Esmurdoc's decision that the denial was in the best interest of medical center operations (B-2, p. 106).

**Claim #25:  On May 12, 2014, CE and JA issued the complainant a notice of proposed suspension.**

**The complainant** confirms receipt of this document (C-12, pp. 219-239). She refers to her written response to the proposal as her testimony for this claim (B-1, p. 98).

**Felix Esmurdoc** states the proposed suspension was in response to several actions by the complainant, to include a sarcastic and disrespectful email to Mr. Aquilina, as well as other communications.  He states the proposal was a corrective action outlining three points: conduct unbecoming of a supervisor, failure to follow instruction, and continued inappropriate use of email.  He states he concurred with the issuance (B-4, p. 133-134).

**Joseph Aquilina** states this document was issued due to the complainant's continuation of actions and communications that she had been repeatedly instructed to cease (B-3, p. 112).

**Claim #26:  On May 23, 2014, CE and JA issued the complainant a Letter of Reprimand.**

**The complainant** states she was wrongly accused of copying her attorney on emails, failure to follow instructions and inappropriate email communications. She reiterates her previous justifications for these actions (B-1, p. 99).

*[Investigator's Note:  There are two letters of reprimand referenced in this complaint, and this claim references the first one, dated May 23, 2014. In his response to this claim, Joseph Aquilina gives testimony regarding the second letter, dated June 6, 2014. Testimony relevant to this document appears in the affiant's response to Claim #28.]*

15

**Joseph Aquilina** states this document was issued because of the complainant's failure to follow management's directives regarding her communications and conduct.  He refers to the Letter of Expectations given her previously and cites her failure to follow instructions (B-3, pp.112-114).

**Claim #27:  On June 6, 2014, CE and JA issued the complainant a 3-day suspension.**

**The complainant** confirms she appealed the proposal of this action and references the response prepared by her attorney as her testimony regarding this claim (B-1, p. 100, C-12).

**Joseph Aquilina** confirms this was the decision on the proposed suspension and that he was the deciding official. He states he reviewed the response to the proposal submitted by the complainant and did not find it germane enough to mitigate or rescind the proposed action (B-3, p. 113).

**Claim #28:  On June 6, 2014, CE and JA issued the complainant a Letter of Reprimand.**

**The complainant** states this document wrongfully accuses her of having "knowledge" of the testimony given by John McKinney during an administrative board investigation (C-14). She contends she was not aware of his participation in that investigation until she was presented with the ROC submitted by Mr. McKinney and alleging said knowledge (B-1, p. 100).

**Joseph Aquilina** states this document was issued because the complainant had an inappropriate conversation with an employee during his performance review about his participation in an administrative investigation (C-13).  He states while the complainant neither confirmed nor denied having made the statements attributed to her at the time, an inquiry comparing the alleged statements and the actual testimony found enough evidence to support the employee's claim (B-3, pp. 112-113).

*[Investigator's Note:  There are two letters of reprimand referenced in this complaint, and this claim references the second letter. Mr. Aquilina's testimony relevant to this document appears in his affidavit as his response to Claim #26 (B-3, pp. 112-113)]*

**B. Analysis**

The complainant has alleged that she was subjected to a hostile work environment and discrete act of discrimination based on reprisal for prior EEO activity.

The complainant identified the prior EEO activity that forms the basis of her reprisal claim as two former complaints she filed against the Agency in 2011 and

16

2012, directed against various members of management.  She states that all four management officials named in her complaint became aware of her prior EEO activity as early as June 2011, June 2012, or November 2012.

### Hostile Work Environment

In order to establish a prima facie case of hostile work environment harassment, the complainant must present evidence: (1) that she belongs to a protected class; (2) that she was subjected to unwelcome verbal or physical conduct; (3) that the harassment complained of was based on her prior EEO activity; and (4) that the harassment was sufficiently severe or pervasive to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably interfering with work performance and/or of creating an intimidating, hostile, or offensive work environment.  In cases of harassment by coworkers or other nonsupervisors, the complainant must also show; (5) that management failed to take corrective action that was prompt, appropriate, and effective.

### Reprisal

To establish a prima facie case of discrimination due to reprisal, the complainant must show that: (1) she engaged in prior EEO activity (i.e., participation in the EEO complaint process, or some form of opposition to discriminatory practices, or other exercise of EEO rights); and, (2) relevant management officials were aware of the complainant's prior protected activity; and, (3) management effected some action that adversely impacted on the complainant following the protected activity; and, the surrounding facts and circumstances raise an inference of retaliatory motivation, either because: a) the alleged retaliation occurred shortly after the participation (shortly is usually defined in terms of days, weeks, or months, not years), or b) complainant's treatment before engaging in protected activity was different than the treatment after such participation (i.e., complainant's treatment after the protected activity was noticeably worse than before), or c) complainant was treated differently than similarly situated persons who did not participate in protected activities.

The complainant filed an EEO complaint in 2011, naming some of the officials in this complaint as Responsible Management Officials. The complainant asserts that her performance appraisals and the accusations made within these personnel actions against her did not begin until her previous EEO complaint.

### Management's Response

The management officials in the complainant's direct chain of command acknowledge awareness of her EEO activity but contend it was not a factor in their actions or decisions in her regard.

17

Antonio Suarez, subject matter expert, states all actions taken were in accordance with agency policies and procedures. Andrea Freeman, subject matter expert, states she has no knowledge that any officials had the desire or intent to retaliate against the complainant in any way.

**Pretext**

The complainant did not provide other evidence of direct discrimination on the part of management.

The information contained in this report was obtained from witness testimony and documents provided by the complainant and the Agency.

*Eraka Michelle Robertson*

_____                    _____
Eraka Michelle Robertson                                                            Date
EEO Investigator

18



**DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management**
**Washington, D.C. 20420**

### Second Supplemental Investigative Report
### In the Matter of the EEO Complaint of Discrimination of:

| | |
|---|---|
| Paula Leligdon | ) |
| 190 Walnut Drive | ) |
| Medina, Ohio  44256 | ) |
| Complainant | ) |
| | ) |
| | ) |
| v. | ) ORM No. 200H-VI10-2013103868 |
| | ) |
| | ) |
| Robert A. McDonald, Secretary | ) |
| Department of Veterans Affairs | ) |
| 810 Vermont Avenue, N.W. | ) |
| Washington, D.C. 20420 | ) |
| Respondent | ) |

Facility: VA Medical Center, Cleveland, Ohio

Eraka Michelle Robertson
EEO Investigator
Susan Grimes Associates, Inc.
Washington, D.C. 20007

### I. Introduction

This is a second supplemental (two of two) report of investigation.  It includes
Amendments Seven through Eleven (Claims 29 through 33) to the originally
accepted complaint.

### II. Background

Paula Leligdon, the complainant, is a Supervisory Psychiatric Social Worker, GS-
12, at the VA Medical Center in Cleveland, Ohio.  Believing her previous EEO
activity was a factor in her interactions with her supervisors, other facility officials
and in several personnel actions, she has alleged a hostile work environment.

### III. Claims and Bases

**Seventh Amendment**

The claim in the Seventh Amendment letter was dismissed (A-1).

1

**Eighth Amendment**

29)     On July 3, 2014, CE and JA issued the complainant a Counseling Plan for
        sending Lisa Clark, Regional Counsel Staff Attorney, an email request for
        legal assistance regarding a matter about her subordinate employee (A-2).

**Ninth Amendment**

30)     On June 17, 2014, AF violated the complainant's confidentiality rights and
        privacy when she interfered with the complainant's EEO protected activity
        by contacting the assigned EEO Investigator and reviewing her EEO
        claims (A-3).

31)     On July 23, 2014, CE denied the complainant's request to endorse her as
        a candidate for the VISN 10 Social Work Professional Standards Review
        Board.

**Tenth Amendment**

32)     On July 31, 2014, CE and JA issued the complainant a notice of proposed
        suspension (A-4).

**Eleventh Amendment**

33)     On a continuous basis, beginning in 2010 thru August 9, 2014, agency
        officials and agents have harassed the complainant and deprived her of
        privacy through the surveillance of her home, elsewhere and private
        communications (A-5).

Events 29 and 31 were also accepted as independently actionable claims.

*Note: There was some renumbering of the claims in the amendment letters
received from the Agency.*

### IV. Document Review

Email correspondence dated June 16 and 17, 2014, between the complainant
and Andrea Freeman regarding the complainant's request for official time reflects
her request was denied on the basis that she had exceeded the allotted number
of hours for EEO activity. It also contains challenges to the complainant's need
for additional response time (C-1).

The letter to the complainant from Mr. Aquilina, Subject: "Written Counseling;" is
dated July 3, 2014. It responds to her contacts with the VA Office of the General
Counsel and gives specific directives, including cessation of future contacts. The

2

exhibit includes an additional email issued by the complainant in response to this action (C-2).

Email correspondence between the complainant and Felix Esmurdoc regarding her request for nomination to the VISN 10 Social Workers Professional Standards Board, dating between July 14 and 23, 2014, is included. Her request is denied on the basis of current conduct issues (C-3).

A letter from Joseph Aquilina to the complainant, "Subject: Proposed Suspension" is dated July 31, 2014, with the decision notice dated August 22, 2014. The stated charges are conduct unbecoming a supervisor and failure to follow instructions (C-4).

Email correspondence between the complainant and Felix Esmurdoc reflect a change in the dates of the approved suspension made at the complainant's request (C-5).

Policies pertinent to the procedures for selecting Hybrid Title 38 Professional Standards Board Members and Official Time for EEO Complaints are in C-6.

The Investigator's Memorandum regarding the conduct of this investigation and additional information is in C-7.

### V. Summary and Analysis

**The witnesses provided the following testimony:**

**A. Summary**

**Claim #29: On July 3, 2014, CE and JA issued the complainant a Counseling Plan for sending Lisa Clark, Regional Counsel Staff Attorney, an email request for legal assistance regarding a matter about her subordinate employee.**

**The complainant** states an employee in her chain of command requested that documents in his personnel file be destroyed. She states the documents in question are relevant to her EEO complaint and, therefore, cannot lawfully be destroyed. The complainant states she sent the email in question seeking advice from the VA Office of General Counsel (OGC) about how to respond to the employee's request, asserting that the Office of Human Resources (HR) was not qualified to provide legal advice. She states she is entitled to this advice from the OGC as she is a VA supervisor (B-1, p. 48).

**Lisa Marie Clark** is a Staff Attorney, GS-14, Region 7, OGC, VA. She states that, because of her professional role, she was aware of the complainant's previous EEO activity on May 1, 2014. Ms. Clark states when she received a call

3

from the complainant on May 1, 2014, requesting assistance, she responded that it was a conflict of interest for her to respond and told the complainant that either "another attorney or someone else" would get back to her. She states the matter appeared to be an administrative one that HR could handle, so she referred the inquiry to an Employee/Labor Relations Specialist in HR (B-4, pp. 83-85).

Ms. Clark confirms her direct involvement ended at that time but she was aware of subsequent communications because the complainant began copying her on emails. She states it appeared the complainant refused to accept that her inquiry was a matter HR could handle and insisted on legal advice from the OGC. Ms. Clark states that when the complainant began copying the Medical Center Director on these communications, she informed Joseph Aquilina of this activity and that she (Clark) was still repeatedly being contacted by the complainant. She states she is not aware of any subsequent actions.

**Felix Esmurdoc** confirms the described sequence of events. He states because the complainant had been warned previously against copying her entire chain of command on her email correspondence, he consulted with HR and he and Mr. Aquilina decided to issue a written counseling (C-2). Mr. Esmurdoc adds the complainant continued to email upper management and the OGC (C-2) within hours of receipt of this counseling (B-3, p. 75).

**Joseph Aquilina** states he was informed of this matter on June 27, 2014 by Lisa Clark. He states the Letter of Counseling directed the complainant to cease contact with the OGC, divest the facility's staff of any involvement in supporting her EEO activity, and request official time to work on anything outside of her supervisory duties during work hours (B-2, pp. 69-70).

**Claim #30:  On June 17, 2014, AF violated the complainant's confidentiality rights and privacy when she interfered with the complainant's EEO protected activity by contacting the assigned EEO Investigator and reviewing her EEO claims.**

**The complainant** refers to her June 17, 2014 email correspondence with Andrea Freeman (C-1) as her testimony regarding this claim.  In that email she requests from Felix Esmurdoc 8 hours of official time on June 18, 2014 to "work on [her] deposition" for this investigation. She also makes references to her "required deposition" (B-1, p. 54, C-1, p. 94)

*[Investigator's Note: The relevant correspondence reflects that Mr. Esmurdoc denied the complainant's request on the grounds that the official time threshold is 16 hours and she had been granted 40 hours as of that date. The relevant policy appears at C-6. The correspondence also reflects that Andrea Freeman was involved in the decision-making process (C-3).]*

4

**Andrea Freeman** states she was unaware of any additional EEO activity by the complainant when she was informed by Mr. Esmurdoc of the request for official time. She states she needed to make the distinction between a "deposition," which implies different time requirements than an "interrogatory." Ms. Freeman states she contacted this Investigator and asked (1) was there a new complaint or had the instant complaint been amended, and (2) was the complainant being required to give testimony in a direct interview or deposition. She states when informed the complaint had been amended, she asked if the amendments were "like or related to" the claims in the instant complaint and was told that they were. She adds the Investigator told her the complainant was not scheduled for interviews or depositions and was giving all of her testimony in the form of written interrogatories (B-5, p. 87).

*[Investigator's Note: The Investigator confirms she had a conversation with Andrea Freeman on or around June 13, 2014. Ms. Freeman stated she was responding to a request for official time and inquired as to the status of the investigation. She was informed by the Investigator that the complaint had been amended twice with nine additional claims since she (Freeman) had been interviewed for this investigation. Ms. Freeman asked whether the new claims were "like and related" to standing claims and the Investigator responded "Yes." Ms. Freeman asked whether the Investigator was deposing or interviewing the complainant, and the Investigator responded that the complainant was submitting written interrogatories. This was the extent of the information provided to Ms. Freeman by the Investigator.]*

Ms. Freeman states she conveyed this information to Felix Esmurdoc who consequently denied the complainant's request. She states the complainant then contacted her demanding an explanation, which she provided. Ms. Freeman adds she also offered the complainant one hour of official time to be used during her work tour-of-duty for the preparation of her written statement but the complainant declined that offer. She states as the specific claims were not conveyed to her, there was no breach of confidentiality (B-5, pp. 87-88).

**Claim #31: On July 23, 2014, CE denied the complainant's request to endorse her as a candidate for the VISN 10 Social Work Professional Standards Review Board.**

**The complainant** states that on July 22, 2014, she requested that Felix Esmurdoc approve and endorse her nomination to this board. She states that on July 23, 2014, he denied her request "in light of recent conduct issues." The complainant contended that, as these issues are part of her EEO complaint, denial on these grounds is an act of reprisal and constitutes "blatant animus" (B-1, p. 60).

**Felix Esmurdoc** describes the role of this board, including the approval of social workers for approving clinical privileges. He states agency policy for board

5

nominations require supervisors to consider an employee's conduct and professional record when making a recommendation and he could not in good conscious nominate the complainant given her standing conduct issues (B-3, p. 78).

**Claim #32:  On July 31, 2014, CE and JA issued the complainant a notice of proposed suspension.**

**The complainant** confirms she was issued this document (C-4) on this date. She references "all previous testimony for this case number" as her testimony for this claim (B-1, p. 65).

**Felix Esmurdoc** states he proposed this suspension because of the complainant's repeated engagement in inappropriate behavior and her willful disobedience of the directives given by her chain of command. He goes on to describe the specific email communications leading to this action. Mr. Esmurdoc notes the complainant's request to reschedule her suspension dates to coincide with approved leave (C-5) was granted by management (B-3, p. 81).

**Joseph Aquilina** states he was the approving official for this action and he approved Mr. Esmurdoc's recommendation because previous corrective actions had proven unsuccessful (B-2, p. 72).

**Claim #33:  On a continuous basis, beginning in 2010 thru August 9, 2014, agency officials have harassed the complainant and deprived her of privacy through the surveillance of her home, elsewhere and private communications.**

**The complainant** references "all previous testimony for this case number" as her testimony for this claim (B-1, p. 66).

**Susan Marie Fuehrer** (previous EEO activity) is the Medical Center Director, SES, of the Stokes VAMC and affirms that she was aware of the complainant's previous EEO activity on December 2013. Ms. Fuehrer states she has no knowledge that any kind of surveillance of the complainant's home, office or elsewhere, or of her private communications, has ever been conducted at any time (B-6, p. 90).

**Joseph Aquilina** refers to his previous testimony in response to this claim. He states he has no knowledge the agency conducts surveillance of any kind on any employee for any reason (B-2, p. 72).

**Felix Esmurdoc** refers to his previous testimony in response to this claim. He states he has no knowledge of any aspect of the Social Work Service operations or the mission of the medical center that would be served by surveillance of the complainant and he has no knowledge of any such surveillance (B-3, p. 82).

6

## B. Analysis

The complainant has alleged that she was subjected to a hostile work environment and discrete act of discrimination based on reprisal for prior EEO activity.

The complainant identified the prior EEO activity that forms the basis of her reprisal claim as two former complaints she filed against the Agency in 2011 and 2012 directed against various members of management.  She states that all four management officials named in her complaint became aware of her prior EEO activity as early as June 2011, June 2012, or November 2012.

### Hostile Work Environment

In order to establish a prima facie case of hostile work environment harassment, the complainant must present evidence: (1) that she belongs to a protected class; (2) that she was subjected to <u>unwelcome</u> verbal or physical conduct; (3) that the harassment complained of was based on her <u>prior EEO activity</u>; and (4) that the harassment was sufficiently <u>severe</u> or <u>pervasive</u> to affect a term or condition of employment, and/or that the harassment had the purpose or effect of unreasonably interfering with work performance and/or of creating an intimidating, hostile, or offensive work environment.  In cases of harassment by <u>coworkers</u> or <u>other</u> <u>nonsupervisors</u>, the complainant must also show; (5) that management failed to take corrective action that was <u>prompt</u>, <u>appropriate</u>, and <u>effective</u>.

### Reprisal

To establish a prima facie case of discrimination due to reprisal, the complainant must show that:  (1) she engaged in prior EEO activity (i.e., participation in the EEO complaint process, or some form of opposition to discriminatory practices, or other exercise of EEO rights);  <u>and</u>, (2) relevant management officials were aware of the complainant's prior protected activity; <u>and,</u> (3) management effected some action that <u>adversely</u> impacted on the complainant following the protected activity;  <u>and,</u> the surrounding facts and circumstances raise an inference of retaliatory motivation, either because: a) the alleged retaliation occurred shortly after the participation (shortly is usually defined in terms of days, weeks, or months, not years), <u>or</u> b) complainant's treatment before engaging in protected activity was different than the treatment after such participation (i.e., complainant's treatment after the protected activity was noticeably worse than before), <u>or</u> c) complainant was treated differently than similarly situated persons who did not participate in protected activities.

The complainant filed an EEO complaint in 2012 naming some of the officials in this complaint as Responsible Management Officials. The complainant asserts

that her performance appraisals and the accusations made within these personnel actions against her did not begin until her 2012 EEO complaint.

**Management's Response**

The management officials in the complainant's direct chain of command acknowledge awareness of the complainant's EEO activity but contend it was not a factor in their actions or decisions in her regard. The complainant's immediate and second-line supervisors assert that their actions were taken with guidance from the Office of Human Resources.

Andrea Freeman, subject matter expert, states she has no knowledge that any officials had the desire or intent to retaliate against the complainant in any way.

**Pretext**

The complainant did not provide other evidence of direct discrimination on the part of management.

The information contained in this report was obtained from witness testimony and documents provided by the complainant and the Agency.

*Eraka Michelle Robertson*
_____           _____
Eraka Michelle Robertson                                      Date
EEO Investigator

8