UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| PAULA M. LELIGDON, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| ROBERT A. MCDONALD, ) | |
| SECRETARY, ) | Case No. 1:14-cv-02810 |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF VETERANS' AFFAIRS ) | |
| Louis Stokes Cleveland VA Medical Center ) | JUDGE DONALD C. NUGENT |
| 10701 East Boulevard, ) | |
| Cleveland, Ohio 44106 ) | |
| ) | |
|     Defendant. ) | |

DECLARATION OF FELIX CHRISTOPHER ESMURDOC
PURSUANT TO 28 U.S.C. § 1746

I, Felix Christopher Esmurdoc, make the following declaration in lieu of an affidavit, as permitted by 28 U.S.C. § 1746:

1. I, Felix Christopher Esmurdoc, am the National Program Manager for Purchased Care in Geriatrics and Extended Care Operations. In this position, I oversee the development and execution of Geriatrics and Extended Care programs that are long term care and supportive services purchased nationally. This includes program development, oversight, review, compliance, and practice education.

2. I have been employed by the Department of Veterans Affairs since May 11, 2008.

3. From July 1, 2012 until March 19, 2016, I was employed as the Assistant Chief of Social Work at the Louis Stokes Veterans Affairs Medical Center in Cleveland, Ohio.

4. As Assistant Chief of Social Work, I served in a full-time administrative and clinical position with authority and responsibility for providing administrative support to the Chief of Social Work. I participated in overseeing the practice of all of the social workers at the Cleveland VAMC. I made independent professional decisions and recommendations to the Chief of Social Work. I also served as a liaison to other Services within the VAMC related to Social Work and managed the Home and Community-Based Care Programs.



GOVERNMENT
EXHIBIT
C

5. As Assistant Chief of Social Work, I was Paula Leligdon's first- line supervisor from July 1, 2012 until I left the position on March 19, 2016. Ms. Leligdon's second-line supervisor was the Chief of Social Work, Joseph Aquilina. Her third-line supervisor was Dr. Murray Altose. Ms. Leligdon's fourth-line supervisor was the Director of the Cleveland VAMC, Susan Fuehrer.

6. Ms. Leligdon's job-duties include supervising 11 social workers and direct clinical care of veterans. The staff Ms. Leligdon supervises is embedded in various mental health programs at the medical center, both inpatient and outpatient mental health services.

7. I first became aware of Ms. Leligdon's EEO activity on August 27, 2012, when Ms. Leligdon emailed me to request official time to prepare for Case No. 200H-0541-2012103512.  I had no knowledge of the case beyond her request.  I was later called as a witness in the case on January 30, 2013, and sat as a witness on February 26, 2103, and February 27, 2013.

8. On May 8, 2013, Susan Lipkin, a social worker supervised by Ms. Leligdon, contacted me to discuss concerns about Ms. Leligdon's behavior. After speaking with Ms. Lipkin, I asked her to put her concerns in writing so that management could appropriately address them.  On May 10, 2013, I received a Report of Contact from Susan Lipkin documenting her concerns, including that Ms. Leligdon had demonstrated an ongoing pattern of hostility, harassment, intimidation, public humiliation, discrimination, arbitrary decision-making, and demeaning interactions.  A true and accurate copy of the Report of Contact is attached hereto as Exhibit C1.

9. A Report of Contact is not disciplinary action.  It is used to document incidents involving VAMC staff or patients.

10. Mr. Aquilina also received complaints about Ms. Leligdon's behavior as a supervisor from Ronald Copen and George Kasidonis and a complaint from Dr. Blank, a physician in the psychiatry service, regarding her use of office space.

11. On May 20, 2013, I met with Ms. Leligdon to discuss the issues raised by her subordinates.  I asked Ms. Leligdon how I could assist her in dealing with her staff's perceptions and offered training opportunities on managing staff and staff-supervisor relations.  Ms. Leligdon refused my offer and stated that she learned from a former supervisor that if staff do not like the way she manages they can feel free to apply for positions in other departments.

12. On June 3, 2013, I presented Ms. Leligdon with the Report of Contact from Lipkin and Copen, and a Report of Contact completed by Mr. Aquilina documenting his conversations with Kasidonis and Dr. Blank.  True and accurate copies are attached hereto as Exhibit C2.

13. On June 7, 2013, Ms. Leligdon sent me and Mr. Aquilina, an email and copied Director Fuehrer, contesting the information in the Reports of Contact. A true and accurate copy of the email is attached hereto as Exhibit C3.

14. Mr. Aquilina and I conferred with Human Resources and the VA's EEO office regarding the ROCs received from Ms. Leligdon's subordinates. The EEO office had also received complaints that Ms. Leligdon was creating a hostile work environment for those she supervised. In response, the EEO office conducted an internal EEO investigation into the complaints.

15. In August 2013, Ms. Leligdon submitted written responses contesting the information in the Reports of Contact.

16. The EEO investigation concluded on September 4, 2013, and found "no information was obtained that suggested Leligdon was discriminatory in her actions or based on any supervisory actions on race, color, religion, sex, national origin, age, disability, reprisal, or genetic information." A true and accurate copy is attached hereto as Exhibit C4.

17. On June 12, 2013, I asked Ms. Leligdon to discuss how to maximize her direct patient care workload. At the time, Ms. Leligdon carried the lowest direct patient care caseload of any supervisory social worker reporting to me. All supervisory social workers were expected to have a direct patient care workload as part of their responsibility. It maintains a good social work practice for the supervisor and contributes to managing an ever increasing demand for patient services. Ms. Leligdon's contribution to direct patient care was minimal and remained minimal due to her refusal to discuss her workload with me as her supervisor. Ms. Leligdon refused to increase her direct patient workload and refused to discuss the issue.

18. On July 22, 2013, I met with Ms. Leligdon regarding her request to serve an additional term on the Professional Standards Review Board (PSRB). The PSRB is a group of social workers appointed by the Medical Center Director that reviews all applications for social work positions at the medical center and makes recommendations for appointment and clinical privileging to the Medical Center Director. Ms. Leligdon had served as a member of the Board from October 1, 2011 until September 30, 2013. I did not support Ms. Leligdon's request to serve an additional term on the PSRB because of her poor attendance during her last year on the Board. During the last year, Ms. Leligdon attended only 10 of 21 scheduled meetings and 1 of 7 ad hoc meetings. Ms. Leligdon was not recommended to the Medical Center Director, and therefore, she was not appointed for a second term.

19. At the same meeting on July 22, 2013, I also again attempted to discuss Ms. Leligdon's patient workload. She refused to discuss the issue with me. A true and correct copy of my email correspondence with Ms. Leligdon regarding the issue is attached hereto as Exhibit C5.

20. On July 31, 2013, I issued Ms. Leligdon a Written Counseling regarding her inappropriate workplace behavior. A true and accurate copy is attached hereto as Exhibit C6.

21. On July 31, 2013, I issued Ms. Leligdon a Reminder of Policy on Requesting Leave MCP-005-007. A true and accurate copy is attached hereto as Exhibit C7.

22. I issued the Reminder because Ms. Leligdon had not been compliant with VAMC policy for requesting leave. Ms. Leligdon had repeated instances of tardiness and not informing me, her supervisor, of these late arrivals. In addition, she did not provide adequate information when requesting leave, often times stating that she would use "whatever leave I have available."

23. On the morning of October 8, 2013, Ms. Leligdon called me to report that she was sick and requested leave for the day. To my recollection, Ms. Leligdon did not request to use annual leave. On October 9, 2013, Ms. Leligdon entered 6 hours of sick leave and 2 hours of annual leave into the VA's time-keeping system, VISTA. An entry into VISTA is not a request for leave, it is documentation of the leave taken. After consultation with Human Resources, Ms. Leligdon was charged Absent Without Leave (AWOL) for two hours. Ms. Leligdon violated Medical Center Policy 005-007, which was provided to her on July 31, 2013, by not requesting annual leave in advance. A true and accurate copy of this policy is attached as Exhibit C8.

24. On October 16, 2013, Ms. Leligdon arrived late to work. She did not inform me that she had not been on duty or that she had been delayed when she arrived in the office. Instead, on October 16, 2016, she entered 15 minutes of annual leave into VISTA. When I asked Ms. Leligdon about the request on October 18, 2016, she responded that it was "insulting" for me to question her sick leave and annual leave usage. A true and accurate copy of the email exchange is attached hereto as Exhibit C9. After consultation with Human Resources, Ms. Leligdon was charged 15 minutes of AWOL for violating Medical Center Policy 005-007. She did not request leave and she did not inform me that she was not on duty.

25. On October 23, 2013, I met with Ms. Leligdon and Mr. Aquilina to discuss and address Ms. Leligdon's continued violation of VAMC leave policy, for which she had previously been counseled on July 31, 2013. I also presented her with Reports of Contact documenting that Ms. Leligdon would be charged 2 hours of AWOL for October 8, 2013, and 15 minutes of AWOL for October 16, 2013. A true and correct copy of the Report of Contact is attached hereto as Exhibit C10.

26. On December 2, 2013, I issued a Performance Rating to Ms. Leligdon for the 2012-2103 fiscal year. Ms. Leligdon was rated "Fully Successful." A true and accurate copy of Ms. Leligdon's 2012-2013 Performance Appraisal is attached hereto as Exhibit C11.

27. In the Social Work Service, annual performance ratings for Supervisory Social Workers are composed of ratings in five elements with the following assigned weights: Leading

Change (20%), Leading People (20%), Business Acumen (10%), Building Coalitions (10%), and Results Driven (40%). These performance ratings are modeled on the Executivce Career Field performance plans and contain the same elements. Leading Change, Leading People, and Results Driven are considered "Critical Elements", which means that the employee is expected to demonstrate leadership in these areas and model performance for their employees. An individual may be rated exceptional, fully successful, or unacceptable in each category. An employee with an exceptional performance in any element means that the employee has "far exceed[ed] normal expectations and results in major contributions to the accomplishment of organizational goals. In 2013, I rated Ms. Leligdon as exceptional in two of five categories: Leading Change and Business Acumen. I rated Ms. Leligdon as Fully Successful in Leading People, Building Coalitions, and Results Driven because during this performance period I had received numerous complaints from both her subordinates and peers regarding her bullying and aggressive behavior, lack of collegiality, and her unwillingness to engage with me as her supervisor in discussing her work or staff. In addition, Ms. Leligdon maintained a very minimal direct patient workload because she refused to discuss her workload with me, her supervisor and refused to take on additional work when it was recommended to assist with staff changes in her unit. Because Ms. Leligdon received a fully successful rating in at least one critical element and all other elements, critical or non-critical, were fully successful or higher, she received an overall rating of Fully Successful.

28. On January 2, 2014, Dr. Altose issued a Letter of Expectations to Ms. Leligdon, outlining his expectations for her behavior. A true and accurate copy is attached hereto as Exhibit C12. Despite Dr. Altose's instructions, Ms. Leligdon did not assume additional clinic hours, refused to meet with me and Mr. Aquilina, continued to copy her attorney on VAMC emails, and send restricted emails.

29. In January 2014, Ms. Leligdon requested additional Official Time to prepare her EEO complaints. Official Time is authorized absence without charge to leave when (1) the activity is considered to be of substantial benefit to VA in accomplishing its general mission or one of its specific functions, or (2) the activity will clearly enhance employee's ability to perform the duties of the position presently occupied or may be expected to prospectively occupy, or (3) the basis for excusing the employee is fairly consistent with prevailing practices of other Federal establishments in the area concerning the same or similar activities. Because Ms. Leligdon had requested many hours of official time for EEO complaints, I contacted the EEO Manager Andrea Freeman to confirm VA policy on the issue. Ms. Freeman informed me that I could approve her request but to tell Ms. Leligdon that she should be congnizant of its use because Ms. Freeman was in the process of writing a VA policy that would define a reasonable amount of official time as 16 hours, although it would vary by the person's complaint. Ms. Freeman informed me that current VAMC policy stated that "reasonable" official time would be granted, which in practice, meant 8 hours. Based on Ms. Freeman's advice, I approved Ms. Lelidgon's requests for 8 hours of official time on January 8, 2014, and January 9, 2014, and informed her of the forthcoming policy. Ms.

Leligdon and Ms. Freeman then engaged in a series of emails, attached hereto as Exhibit C13, where Ms. Leligdon accused Ms. Freeman of bullying and harassing her. I also approved 8 hours of official time on February 5, 2014, and 8 hours on February 12, 2014.

30. On March 10, 2014, I issued a third Letter of Counseling to Ms. Leligdon. I counseled Ms. Leligdon for calling her subordinate, John McKinney, at home while he was on sick leave, while she was on leave herself. Mr. McKinney had submitted a Report of Contact stating that Ms. Leligdon called him at home three times after he made a valid sick leave request. A true and accurate copy of the Letter of Counseling and Report of Contact is attached hereto as Exhibit C14.

31. On March 20, 2014, I issued an ROC to Ms. Leligdon regarding her failure to meet with her supervisors upon request, and her failure to follow instructions by continuing to send restricted emails and to copy her attorney on emails. A copy of this Report of Contact is attached as Exhibit C15.

32. On April 7, 2014, Ms. Leligdon requested an Authorized Absence on April 11, 2014, to attend a social work training in Pittsburgh, Pennsylvania. On April 9, 2014, I advised Ms. Leligdon that I could not approve her request based on the need for her to be on duty for clinical coverage and to meet medical center responsibilities.

33. On July 22, 2014, Ms. Leligdon resquested that I support her application to the VISN PSRB. The VISN has a Social Work Professional Standard Review Board that is a group of social workers appointed by the VISN Director that reviews all applications for social work positions that are not reviewed by a local Medical Center PSRB and makes recommendations for appointment and clinical privileging to the appropriate Medical Center Director. I advised Ms. Leligdon that because of her recent conduct issues, I could not support her request. VA policy requires that supervisors consider an employee's conduct and disciplinary record when reviewing applications to serve on the VISN PSRB. A true and correct copy of VA Handbook 5005/17 Part II Appendix P is attached hereto as Exhibit C16.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 22nd day of June, 2016.

Felix Christopher Esmurdoc

Date:  5/10/2013

To:  Chris Esmurdoc, LISW-S
     Assistant Chief of Social Work
     VAMC
     Cleveland, Ohio  44106

From:  Susan Lipkin, LISW-S
       Clinical Social Worker
       Team Leader, MHACC
       VAMC
       Cleveland, Ohio  44106

Re:   Report of Contact

Chris,

Per your request, I am submitting a written description of the concerns I discussed with you on
Wednesday, 5/8/2013.

I have been experiencing problems with my supervisor, Paula Leligdon.  Ms. Leligdon has
demonstrated an ongoing pattern of hostility, harassment, intimidation, public humiliation,
discrimination, arbitrary decision-making, demeaning interactions, and an unwillingness to work with
me to cultivate a productive working supervisor/supervisee relationship.   As I explained to you in our
conversation, I have tried to avoid the need to bring this to the attention of Social Work Service
management by attempting to work directly with Ms. Leligdon.    I have been fearful of submitting a
complaint about her out of fear of retaliation.  However, I reached a "tipping point" due to comments
she made about me in a series of emails in which you and a member of Psychology Service were
copied,  regarding a request for me to assist on a committee planning a training for August, 2013.

By itself, this series of emails would not have caused me to seek you out regarding my working
relationship with Ms. Leligdon.   The comments in these emails were just the latest examples of the
difficulty in working with Ms. Leligdon.  As I stated to you, the way in which she responded to me
illustrated how Ms. Leligdon misuses her authority as my supervisor to exert power and control in our
workplace relationship.    I compared her behaviors to those of an abusive partner, based on my
extensive work with clients who have been in abusive relationships in domestic violence scenarios.
Borrowing from that analogy,  the similarities include arbitrary controlling behaviors, attempts to
undermine one's sense of efficacy and therefore increase insecurities, suggestions that she has engaged
others to agree with her regarding her perception of deficiencies, so that one doubts one has the ability
to survive outside of the relationship, 'honeymoon' periods where things appear to be ok, followed by
an unexpected "blow" that reinforces one's sense of insecurity.

Using the recent email exchanges as an example, the request from Psychology Service was for a social
worker to participate on a committee that has organized a training scheduled for this August.   You
apparently suggested my name to the psychologist, Dr. Delamatre, who then forwarded the request to
me.   I agreed to participate but out of respect for her position as my supervisor, I included Ms.
Leligdon in my response.   She returned an email stating that she did not think it was appropriate for
me to participate as requested.   In her email she stated:



GOVERNMENT
EXHIBIT
C-1

00607                Tab  C-7  LELIGDON-000607

"Given my recent support of your appointment to the SW Professional Standards Review Board of which you just became a committee member this year and our previous discussions regarding time management, your numerous responsibilities as a Team Leader and also clinical provider to the MHACC, I will request that you wait to take on any new/additional responsibility outside of your regular SW duties given your current involvements and commitments. I am cautious regarding any Team member getting involved in more than one committee at a time (at least within the first committee year) in order to limit impact on a service area and Veteran care. As a Team Leader you are also already participating in other meetings throughout the week. I appreciate your understanding and have already communicated this to Chris."

## I responded to her, explaining that her assumptions about the time commitments were not accurate:

"I certainly respect your decision. However, please let me clarify a couple of points. According to Jim Delamatre, as he said in one of his emails to me, "the meeting load should be low." Regarding Team Leader responsibilities, Dr Jurjus and I have worked out times in my daily schedule that are reserved for those activities. I have two team meetings per month, and those are held at lunchtime. I have no other regularly scheduled meetings throughout the week related to my role as Team Leader. From the information I have, my time involvement would be low and this is for a training scheduled for August, so the timeframe itself is brief."

## Dr. Delamatre also responded to her regarding her assumptions about the time commitments:

"There is really very little work to this. The workshop is already set, we have the presenter, and the location. We must have a Social Worker as an official member of the committee to approve content so we can offer CEUs. Since this particular presenter previously did this workshop and CEs were approved for social work, the review is fairly perfunctory."

## Despite this, Ms. Leligdon maintained her position as follows:

"I appreciate your response and as your Supervisor am mindful of our previous discussions, requests for overtime, your role as a social worker and provider in the MHACC and a Team Leader."

I am characterizing this as controlling for the following reasons: Ms. Leligdon insisted on her position despite information that her assumptions were not correct. She refused to support my participation on this committee because she could, not because she had any substantial reason for it. She also made statements that undermined my credibility and suggested that I present performance problems for which there is no evidence. She referred to "time management" as though this is a problem for me, and in fact you asked me if it is a problem. As I pointed out to you, my work is always completed within required timeframes. You could not recall any time that my name appeared on lists of past due progress notes. My clinic manager can attest, through her chart reviews, that other documentation is always up to date, such as treatment plans. Ms. Leligdon has never mentioned time management as a performance issue in any of my performance reviews. She referred to my "use of overtime." My record shows that in the 4 ½ years I've been at the VA, I've used 19 hours of comp time. That averages out to 4.22 hours per year. I will point out that I only asked for comp time after Ms. Leligdon herself advised me to request it if my work with veterans caused me to work over an 8 hour day. The last time I requested comp time was nearly three months ago. At that time, she refused to grant it based on a review of my progress notes for the day, not taking into account the many things I had told her I needed to take care of that were not reflected in progress notes. These included communication with other staff regarding three veterans I had very recently referred to the Suicide Prevention Team; I had felt it was necessary to respond to emailed inquiries before the start of a weekend in order to assure the safety of the veterans involved.

As I've stated, the recent email response from Ms. Leligdon is just the latest in a pattern of behaviors toward me. Ms. Leligdon has conveyed disapproval of me from the start of my employment at the VA. She has criticized me for doing psychotherapy with veterans and not enough "social work." As I said to you in our conversation, I don't make a distinction of this kind. I meet the veteran's needs as presented to me at any given time. I have generally found that services I provide to veterans are a blend of psychotherapy and psychosocial support or linkage to VA and community resources. Many veterans who present with a request for psychotherapy are experiencing psychosocial stressors that contribute to their need for psychotherapy, and a good social worker addresses both types of needs as presented. I have also found that many veterans who present with a request for assistance with

Tab C-7  LELIGDON-000608

00608

accessing resources also present a need for support, and often come back for psychotherapy.   I have tried to explain this "person in environment" holistic view to Ms. Leligdon.   I have in the past requested that she address her concerns with Kristie Phillips, CNS, who has acted as program manager for the outpatient mental health clinic, or with Dr George Jurjus, the current manager of the MHACC. I have provided services to the veterans referred to me, meeting whatever needs were presented.   Both Dr Jurjus and Ms. Phillips have conveyed to me an appreciation for the work I do with veterans and have told me I'm a valued member of the staff.   I would be comfortable having you speak with either or both of them to confirm their view of my work as it is perceived in my work area.

There are several other issues that have arisen in my interactions with Ms Leligdon.   She has encouraged the social workers she supervises to sign up for training in evidence-based therapies.   In one glaring example of treating me differently than she has others under her supervision, back in 2010 Ms. Leligdon denied me the opportunity to attend an EBT training after initially approving it.   In this case, it was requested by the management in my work area that I apply to participate in a training for Prolonged Exposure Therapy.   It was determined that the OPPC (later known as the MHACC) needed to have providers trained in this approach, as not every veteran with a PTSD diagnosis was appropriate for referral to the PTSD specialty clinic.   The course of events was that OPPC management approved me for applying for the training, the psychology service approved me,  Ms Leligdon initially approved me, and then Joe Aquilina signed off on the application.   It was only after Afsoon Eftekhari, Ph.D., who was organizing the training, requested that my supervisor email him with her support for the supervised follow-up to the training, that Ms. Leligdon withdrew her support and denied me the opportunity that had been encouraged by my work area and by SW Service.   This occurred in March of 2010.   While I have attended other trainings, none of them were determined to be of the high level of specific value to the work area as this one was.

Ms. Leligdon has a practice of coming to my office and knocking on my door without any prior notice. She has done this even when my office sign indicates I'm busy with a client.   This is disrespectful of my time.   This is another way she misuses her authority by not giving me any notice at all that she wishes to speak with me.

At a recent meeting with Ms. Leligdon and the social workers she supervises, she asked us to provide updates for our work areas.   Other social workers spoke about their work areas without interruption. When I tried to share information about a member of my team who had returned after an absence, and who, as part of her MHACC duties, was offering a new group, Ms Leligdon cut me off in mid-sentence, contradicted the information I was trying to convey, stated we were short on time and did not allow me to finish what I was trying to say.

Ms. Leligdon has used her position as a supervisor to "put me in my place."   Since I was asked to function as a Team Leader, I have taken on a leadership role in my work area that affects multiple issues.   I also have extensive experience as a manager in case management settings involving patients with serious and persistent mental illness.   Because of both of these features, I had a conversation with the MHICM supervisor about case management needs for patients who do not qualify for MHICM.   I had offered to provide the MHICM supervisor with an idea of how providers in the MHACC perceived the needs for their own patients for case management services.   This was based on my communication with multi-disciplinary staff as Team Leader.   When I conveyed this to Ms Leligdon, rather than acknowledge a show of initiative or my use of my areas of expertise, she basically told me it was not my place to discuss this with the MHICM supervisor and to mind my own business.

Tab _C-7_ 568

00609                                                        LELIGDON-000609

In March of 2012, I was subpoenaed by a local court in relation to a child custody and DCFS case.  Ms. Leligdon did guide me in how to share this with the office for Regional Counsel.  However, I kept receiving notices from this court and I had several questions I wanted to address with Regional Counsel myself.  Among these questions were issues related to any personal liability I faced and any potential effect on my license.  I requested contact information from Ms. Leligdon and she responded "if your services are required they will contact you."  She indicated that it was inappropriate for me to speak with them directly.  I consulted others in authority and was told I had every right to speak to Regional Counsel about a concern, and in fact when I did speak with someone in that office, they were very helpful.  I found Ms. Leligdon's response to me to be inappropriate, demeaning, disrespectful, and dismissive.   It felt as though she was trying to control the flow of information and to, again, show me my "place."

Along these same lines, Ms. Leligdon has repeatedly told me that "big changes are coming" but refused to say anything about what these are.   She points out that she has access to information that I don't.  While I'm sure that's very true, by presenting this information in this way, she creates a sense of uncertainty about the future and my work.  This seems like another attempt to control the flow of information while at the same time abusing her position of authority by pointing out she has information that may affect me but leaving me with no idea how I will be affected.

As I shared with you during our conversation, last year I had an upsetting day that had involved a variety of issues.  I honestly don't recall at this time what all of those issues were.  I found myself alone in an elevator in the employee parking garage when one of my close colleagues entered the elevator.  This person perceived that I was upset and asked me about it.  When we stepped out of the elevator, we continued to talk.  I recall mentioning Ms. Leligdon in passing, but she was not the focus of this conversation.   At that point, she appeared on the stairway in the parking garage, said something I couldn't hear, and kept walking.   I didn't think much about it because in my mind, this didn't involve her beyond the point that it was awkward to have my supervisor find me in conversation about my tough day.   She said nothing about this to me for many months after that date.   Then, in November of 2012, she told me she needed me to sign my performance appraisal form for the new fiscal year.  Once we did that, she said she wanted to talk to me about something.  At that point, she accused me of talking about her negatively in a public place and said that this was a form of insubordination.   She said she had spoken to you, to Joe Aquilina, and to HR, and that all of you agreed that this could be grounds for a disciplinary action and that she could have written me up.  She said she chose not to write me up, but threatened me.  She said that in the future, she would start a disciplinary action if I repeated this behavior.  I asked her for clarification and for better information about what she heard, because I was confused by her accusations.   The only thing she would say was that it referenced an event that took place in the employee parking garage.  I still don't know what she thought I said about her.   She left me with the impression that I was perceived by management as a performance problem.

About a week later, Ms. Leligdon gave me my annual performance appraisal.   For the first time, she rated me lower on the Safety element, which caused my overall rating to be reduced from my Outstanding rating I had received for the past two years.  This also cut my performance bonus in half.  She did not have any criticism of me, she just said I had not addressed the issue separately in my Self-Assessment, so she rated that piece lower than the others.  I will point out that I had never addressed this separately in my Self-Assessments, because I had put this information in the other sections as an integrated document.  For the prior two appraisals, she had accepted that and in fact had commented herself on this element, even though I had not separated the topic out from the rest.  I don't know why she changed how she evaluated this and I had received no warning that she was using the Self-Assessments differently last year than she had in prior years. Again, this affected my performance

Tab *C-7*  LELIGDON-000610
00610

record and I was concerned that it would also affect how I am perceived by management.  I have attached the notes I made at the time concerning both of these last two issues.  I will point out that, as I state in the notes, I tried to discuss these issues with Ms. Leligdon.  She declined to discuss any of these issues further, even when I put it in the context of trying to improve our working relationship.

You asked me what I wanted management to do about these complaints, and I still have difficulty answering this question.  What *can* be done?   I have tried to provide some specific examples of difficult interactions I have had with Ms. Leligdon, and I have tried to demonstrate a pattern of behavior through those examples.    In many ways, this represents a build-up of smaller, less dramatic events that contribute to overall sense of being bullied and disrespected.   I believe Ms. Leligdon has demonstrated hostility toward me and has misused her authority to exert power and control, creating an environment that is very difficult in which to work.    I submit this with some trepidation; I fully expect that once she learns of this complaint, Ms. Leligdon will find some way to retaliate.  I would appreciate your guidance in what to do next.

Thank you for the opportunity to discuss my concerns.  I look forward to discussing this further as needed.


Susan Lipkin, LISW-S
5/10/2013

Tab  *C-7*   
00611  LELIGDON-000611

Susan M Lipkin, LISW-S
Notes from November, 2012

November 8, 2012

I met with my supervisor Paula Leligdon today at approximately 12:40pm.  Paula had called me this morning asking to meet at 12:30pm, in order to have me sign the performance appraisal form for the new fiscal year.  I did sign the form.  Paula noticed something on the form she said should not be there and asked me for white out.  I told her I don't keep whiteout because I've been trained to never use it on official documents.  Paula said she would get a corrected form and then give me a copy of the corrected form.

Paula then said she needed to speak with me about something.  Paula became very angry, raised her voice, and said to me that she was speaking to me about something that Chris Esmurdoc, Joe Aquilina, and Human Resources were all aware of.  She said that she had over heard me making remarks to a coworker that were critical of Paula, and that the remarks were made in a public place.  She said that this was unprofessional and a privacy violation.  She said that HR had told her this could be grounds for a charge of insubordination.  Paula said she could have written me up for this but chose not to.  She said that this conversation was intended to serve as a warning that if this behavior is ever repeated that she would write me up.  She repeated several times that Chris, Joe, and HR were aware of this incident and of the fact that she was speaking to me about this today.

I asked Paula to clarify what incident she was talking about.  At first, she declined to be specific.  She stated that she knew her staff members were being affected "by what is going on with me."  She repeated that by discussing her in a negative or critical way in a public place I was acting unprofessionally and that the behavior should not be repeated.  I again asked for clarification because I was not clear what she was referring to.  She said it referred to an incident in the parking garage.  What I remember about this is that one day I was very upset by several situations in my work area, as well as some brief interaction I had with Paula, and I do not remember what that interaction involved.  I recall running into one of my coworkers in the parking garage elevator and that it was just the two of us in the elevator.  I was apparently visibly upset and the other coworker asked me what was wrong, and I shared what I was upset about.  The elevator then stopped at my floor and we got out and spoke for a few more minutes, with my coworker trying to assist me.  At that point, I became aware that Paula was on the stairs and appeared to have overheard the conversation.  She said something as she kept going up the stairs but I didn't hear what she said.  She never spoke about this to me until today.  At no point prior to today has Paula confronted me about this, asked me why I was so upset, attempted to come to some resolution about what happened, offered coaching on why this may have been inappropriate and how it could have been handled differently/better.   In all of my many and extensive years working as a supervisor and manager before coming to this job, I never reprimanded a subordinate without speaking to them first about what I believed was a problem.  Paula made no attempt to address this with me directly before taking it to the highest levels in our service and to HR.  I think that with my record on this job and consistently Outstanding ratings on my performance reviews, I at least deserved the opportunity to address this directly before it turned into a reprimand.

Tab *C-7* p.*573*

LELIGDON-000612

Paula asked me if I had anything else to say or add and I stated I did not.  The meeting ended and Paula left my office.

Susan Lipkin, LISW-S
11/8/2012

November 15, 2012
Ms. Leligdon came to my office stating she had my performance review and asked if I had time to go over it with her.   When I came into the office she is using, she stated "Despite our conversation from last week I have given you a performance rating of Excellent.  Please read it and ask any questions."  I proceeded to read through the document.  She did not reference the conversation or it's content from 11/8/2012.  She did, however, downgrade my performance rating from Outstanding for the previous two performance years to Excellent for this past fiscal year.  I asked her to explain the reason for the downgrade.  She stated that in my Self-Assessment, I didn't address the section regarding Safety, so she rated me a Fully Successful for that element.  She had given me Exceptional on all other elements, including all of the critical elements.  I questioned this, and she said it was because I hadn't commented on Safety in my Self-assessment so she could not do other than give me the rating she did.  I will point out that during the past two performance rating cycles in which she rated me as Outstanding, I did not comment on Safety as a separate item.  I told her that I thought this was unfair.  I pointed out that I go "above and beyond" my job description every day since I took on the responsibilities of Team Leader, which gives me no additional compensation, no change in salary grade or step.  She repeatedly referred to the Safety element as the reason I received the rating.  I told her that I didn't realize  I hadn't addressed this element and I asked her why she said nothing about it.  She said I was responsible for my self-assessment and it wasn't her job to point out if something was missing.  I stated that by downgrading my rating she is affecting my career and this is important.  She stated that I am responsible for my own career.  I stated that while that is true, her actions as my supervisor have a significant effect on my career and that this rating becomes part of my permanent record.  I asked her how this would affect any potential performance bonuses this year and she said she didn't know.  I told her I found this downgrading of my performance rating to be unfair and I stated on the form that I did not concur with the reduction in my performance rating.  I signed the document with that statement.
I next asked her if we could revisit the conversation from 11/8/2012.  She said she had nothing further to say, but I stated that I did.  I told her that I was shocked by the way she confronted me last week.  I told her that the only circumstance I could recall where she evidently overheard a conversation I was having in the parking garage happened many months ago and I did not recall the specifics of the conversation, and therefore I'm not clear about what she was reprimanding me for.  She refused to tell me what she overheard.  I told her my recollection of that date was that I was very upset about a series of events on a difficult day at work and that anything involving her was at best a minute part of it.  She again refused to state what she overheard or how she interpreted it.  I told her that as a supervisor, it would have been helpful for her to address whatever she thought was inappropriate at the time it happened.  I stated that if she had given us a chance to discuss it at the time, it would have been an opportunity to clear the air and support the relationship between us as supervisor/supervisee.  She stated it wasn't possible for her to address it at the time "because of the things going on with me that everyone knows about."

Tab C-7     p. 573
00613
LELIGDON-000613

I stated I don't know what "is going on" with her.   I pointed out to her that I have gone out of my way to support her, that I've contributed to her team meetings, volunteered to organize team events (such as a going away party for a team member) and that I've volunteered to present cases. I stated that it has always been my intent to maintain a positive relationship with her and I expressed regret that she apparently didn't value that.  She stated that the point is if I have something to say about another employee (her) that I should say it behind closed doors rather than in a public place where others could overhear it.  She repeated what she said on 11/8/12 that she chose not to document this formally.  She then cut off the conversation and ended the meeting.

At 1:06pm Ms.Leligdon knocked on my door and I let her into my office.  She said she had meant to ask me something but our earlier conversation had gotten us sidetracked.   She said she wanted to know if there is anything she can do to support me in my work and help me be successful.  I stated that I didn't feel I could answer that question right now because I'm still very upset.  I stated I felt it was ironic that she would ask me a question like that when she had just taken an action that has undermined my performance record and damaged my reputation with people in positions of authority who could potentially be considering me for a promotion in the future.  She stated she asks everyone this regardless of the performance rating she gave them.  I told her I didn't have an answer for her but I would think about it.

A review of the performance appraisals for the past two fiscal years, in which Ms. Leligdon gave me an overall rating of Outstanding, includes her comments regarding each of the performance elements.  I did not comment separately on Safety in my self-Assessments for those years, but Ms. Leligdon did.  She provided a narrative explanation for why she rated me as Exceptional for Safety on each of those past performance reviews.  For the current review, she did not comment at all on Safety.  She did not state that my performance was deficient in this area or explain what has changed from the previous two appraisal periods.  My question is – what has changed?  The only explanation she provided was a verbal, not written, answer to my question about why my overall rating was downgraded from Outstanding to Excellent.   The only deficiency she described is that I didn't write this down on my self-Assessment.  Of the things she wrote about Safety in my last two reviews, what no longer applies?

Susan Lipkin 11/15/12

Tab C-7  LELIGDON-000614

00614

**Report of Contact**

Received:  May 14, 2013

From:  Susan Lipkin

Regarding:  Supervisor, Paula Leligdon


A copy of this ROC was provided to Paula Leligdon on 6/3/2013.

_F. Esmurdoc 6/3/13_

F. Christopher Esmurdoc, Asst. Chief of Social Work


I received a copy of this report of contact.

_Paula Leligdon_ _6-3-13_

Paula Leligdon                          Date

Tab _C-7_ P. _575_

To: Andrea Freeman

From: Ronald Copen, LISW-S

RE: Report of Contact


I have been experiencing numerous problems with my supervisor, Paula Leligdon, for an extended period of time.  She has been exercising her authority as a supervisor to create an atmosphere of hostility, utilizing paranoia, intimidation, public embarrassment and criticism, to create and maintain this hostile work environment.

She has shown a total unwillingness to work within the framework of a supervisor/supervisee relationship to affect any change, preferring instead to misuse her authority and engage in arbitrary decision making which at times is utilized in a punitive manner.  I have been reluctant to submit this or say much due to a very real fear of retaliation but recent problems that have arisen have precipitated these actions.

Ms. Leligdon has created this hostile environment through a series of subtle, seemingly innocuous, actions.  These actions have resulted in feelings of self-doubt about my clinical abilities and decisions and  an inaccurate portrayal of my duties to my peers, causing public humiliation.  A look at the chronology of these actions will clearly illustrate the accumulative damage caused over a period of time.

Ms. Leligdon became our team supervisor in 2009 after having served as the interim supervisor for a period of time.  I had no real problems at first with her, and I would have to admit that we actually had at least a cordial relationship. At times, she would even ask me to cover for her as supervisor when she was on leave.  I began to get uneasy with her when, at a staff meeting, in response to question regarding making a clinical judgment, she began to single out various members of the team, telling them they were not therapists, only social workers and to remain within their scope of practice. It goes without saying that not only is clinical judgment within an LISW's scope of practice, it is essential to perform the duties expected. This was one of the first examples of her utilizing a public forum to embarrass and intimidate and it was an insult to many of the staff.

This became a pattern of hers; utilizing criticism without suggestions for improvement, making demands on staff performance while purposely leaving expectations vague, allowing her to arbitrarily decide if the standards were being met without need for proof,  denigrating the skills of members of the team both privately and in public, and making changes in job duties without discussion with the clinician or more importantly, without regard for the effect these changes would have on services rendered to the veteran population. I have had the occasion to find  her



GOVERNMENT
EXHIBIT
C-2

00628

Tab _C-7_ p. _588_          LELIGDON-000628

outside my office, listening to conversations, causing an overall feeling of unease that further promotes the hostile atmosphere. The implied message she consistently transmits to her team is "I'm your supervisor, I don't need to discuss or explain anything to you.".

This became very apparent to me in May of 2011, when she came to my office and announced that effective immediately, I was to no longer see any clients in outpatient mental health. Her statement to me was accusatory in nature, telling me that I had "interjected" myself into outpatient mental health and I had no business being there . I reminded her that my role in outpatient had been formulated by Joe Aquilina and Eric Steiner as a means to further utilize my skills and that I acted as a "bridge" for patients discharged from the psych ER who were perhaps somewhat unstable and were waiting to resume services with their regular providers and that over 60% of my workload consisted of the clinic. I further reminded her that I also saw walk-ins at times and often assisted the outpatient psychiatrists with difficult or dangerous patients. I reminded her that the new process of placing a consult would delay veterans getting services thus increasing the need for my role. Her response was that she had specifically discussed this with Joe Aquilina and that he had approved. She then stated, "they can wait, there are plenty of social workers now; you just aren't needed".  Additionally, she had arbitrarily decided that my role would change to only dealing with persons in the psych ER and that I would also now be available to work on the 6th floor in support of the three social workers up there; I was no longer "allowed" to see anyone outside of these parameters.

I was angry regarding these changes, not so much because of the changes themselves, but rather from the heavy handed way I was treated and the lack of respect I was shown. It should be noted that early in her time as supervisor, she had  admitted to me that she had no real concept of the workings of the psych ER and really had no idea as to my duties. I supplied her with a copy of the job duties list compiled by Eric Steiner and myself about 2 months into my assignment (this had been necessary because the role was a newly created position). Even though she was supplied with this document and the rationale behind  its development, she showed little interest in further discussion or observing ( she has spent approximately 3 hours in the psych ER in the past 4 years). Her arbitrary decisions regarding my duties was based on nothing but supposition, showed very little regard for the well-being of the veterans I had been serving but was certainly consistent with a pattern she had established of supervision by intimidation and the self-serving goal of intimidation through bullying.

As time passed, I adjusted  to the new regimen, with the social workers on the 6th floor calling me when they had a need as she had dictated.  However, she continued to insist that I be utilized even more despite there being no need. This reached a climax in September of 2011 at my annual evaluation. It should be noted that I had had a rating of "outstanding " across the board since arriving at the psych ER, including evaluations she had previously completed. Therefore, I was quite surprised that she had dropped me down to "fully successful" in the area of customer service. I questioned this since she had no explanation written for this decline.  She noted that I had not done as she had asked, going to the 6th floor and assisting so I was denying customer

Tab _C-7_  LELIGDON-000629
00629

service to the patients upstairs. I replied that I went when asked unless I was busy in the psych ER and her response was that I had intimidated the workers up there and that they were afraid to ask for my help. She then demanded that I "fix this" and make myself more available. Once again, she was making an accusation without any corroboration and demanding correction without suggestion of a solution or clarifying a standard by which it would be determined, again illustrating her consistent pattern of utilizing implied threats to intimidate.

Still not satisfied with my actions, she changed the protocol from them asking for help when needed, to me being required to contact them on a daily basis if there was no one in the psych ER. Consistent with her pattern of keeping things vague, she informed me that sometimes I would have to make choices, even if there are people in the psych ER, to prioritize. This is another situation where clarification was needed, yet she preferred to leave her expectations vague, causing me further uncertainty and doubt regarding any actions I took. In addition to this fomentation of doubt, she continued to arbitrarily decide, without discussion , when I was doing right or wrong.

Since she was still not satisfied with the time I was spending upstairs, she once again changed the process insisting that I report to my colleagues and then be excused to go to my own duty station. Currently, I am now to report by e-mail to the social workers upstairs what is happening in the psych ER and when I can be available. Additionally, I am now required to go there physically and report to them later in the day to, as she stated, "encourage them to use you". I've tried to discuss with her the unpredictable nature of an ER and the virtual impossibility of predicting my schedule but to no avail.

These past incidents laid the groundwork to the actions that precipitated my decision to enter this report.

In January of 2012, I had made the decision to transfer from my job, primarily because the environment I was working in was beginning to affect me physically and mentally. I accepted a position in Akron in February of 2012 but there was a delay in my transfer. My reasons for transfer were questioned by the doctors I worked with and they met with Joe Aquilina to complain. Consequently, I also met with Mr. Aquilina and confirmed that her treatment of me was the sole reason for my transfer request. I mentioned her interactions with me when I was taken out of outpatient mental health, a position he had recommended for me, without a clear reason. Mr. Aquilina's response was telling, in regards to Ms. Leligdon's methods, when he informed me that she had told him I was "double dipping', seeing people that were being seen by others. I reminded him of my role as a "bridge". He stated that she had told him I was doing much more than I should be which was why he approved the action. At that time, I realized that she had manipulated this issue, had not told the truth to either Mr. Aquilina or myself when she enacted this, and that the after effect of her misrepresentation of my work was a questioning of my character. Despite all of this, I also began to question my decision to transfer.

Tab _C.7_ LELIGDON-000630
00630

During this delay, I came to the conclusion that I could best serve by remaining where I was and that I would try to fix things with Ms. Leligdon. When I withdrew from the position in June 2012, Ms. Leligdon contacted me to meet. She confronted me with, "You told Joe you didn't want to work for me, but you're staying? Why? I'm not going anywhere." I informed her that my decision was based upon where I could best serve and that I was willing to start fresh and try to reconcile our differences. She stated, "No, we need to discuss the past, you're angry because I took your clinic, that's it; I know it is. She angrily told me that there would be more changes coming and "It's not too late, you can change your mind and go".  I promised cooperation and resumed my duties.

In November of 2012, Ms Leligdon wanted to meet to discuss my performance review. Unlike the previous year where she had downgraded me on customer service, my review was once again perfect, all outstanding.  She then stated she wanted to talk about another matter. She told me that "Joe Aquilina, Chris Esmurdoc, and HR are all aware of this conversation and have given me permission to talk about this".  At that time she became somewhat angry, accusing me of talking to everyone about her and then added,  "Everyone knows about what's going on with me, it's no secret".  She then related that per HR, Joe, and Chris, saying things about her was insubordination and I could be written up for that but she had decided to not do that.  I informed her that whereas I have questioned her clinically, I had not spoken about her personally and I had no idea of "what was going on" with her.  She became angry at this time, telling me, "I can't believe the damage you've caused to this team with your attitude".  She then questioned my ethics and character, telling me I should resign as deputy ethics consultation coordinator since "your actions towards me are so unethical". I mentioned that I had been asked to serve that I had not sought it and she stated, "I know, Dr. Altose, and Jason and Joe Aquilina said it was OK;  I'm just telling you, I would have never approved you if they had asked me, you aren't ethical". Once again, I felt uncertain of my actions since she had presented this in such a way that it made me feel defensive, despite not knowing what I had to defend since I had just received a perfect rating from her. I now was beginning to feel anxiety during any contact with her and began to question every action I took.

 In the beginning of April, Ms. Leligdon scheduled a meeting with the three social workers that work on the 6th floor and myself. She reminded me that as part of that team, it was necessary that I attend this meeting, which ostensibly was for purposes of assimilating new assignments for the three upstairs to accommodate the new doctor.  During the meeting, she then began to ask me about working upstairs. I affirmed that I was going upstairs and my colleagues informed her that I was always available, ER workload permitting, when they had a need.  She commented that there was always a need, and I should be called on more frequently. Two of my colleagues then informed her that they felt more than able to do their job and that it was sufficient for me to be available as needed.

Her response was, "You don't understand, I want you to use him whether you need to or not, because when the psych ER is empty, he does nothing, so put him to work." I had no response to

Tab *C-7*  00631  LELIGDON-000631

her statements because of the shame and anger I felt at the time. My colleagues were noticeably shocked and said nothing.

The last straw, so to speak, was during my mid-year review when she again questioned my work ethic, asking me, "really, what do you actually do?" At that time I realized that I had become so intimidated by her that I was having an anxiety attack and could not defend myself.

I contacted my doctor because of heart flutters and had an EKG. There had been some changes, but nothing drastic and she opined that most of the problems lay with the anxiety I had been experiencing. I'm also mildly depressed. The fact that my body is telling me to do something is prompting this action.

To summarize, Ms Leligdon has created a hostile work environment that has affected my health and morale. Her weapons are not overt, but rather covert, relying on paranoia, bullying, public attacks that impugn the characters of those she supervises, and a concerted effort to establish vague standards of performance that allow for her to make arbitrary decisions.

It is admittedly difficult to put down on paper what she has done, as she has accomplished this slowly and subtly over time. However, I believe this has established a pattern of behaviors that demonstrates her misuse of authority to exert power and control, which in turn, has created a toxic work environment where one can never really feel safe to just perform his job.

I experienced a war in Vietnam and never had the anxiety that this has caused. I have been rated as outstanding for six straight years in my current position, yet none of this matters as a result of the effects of her pervasive attacks on my character, work ethic, and abilities. Even as I type this, I can't help but be concerned about the inevitability of retaliation and the fact that maybe none of this will matter. I also realize that I should have spoken out long ago, not just for me, but for the damage she is inflicting on others that are too frightened to speak. I thank you for the opportunity to present this and look forward to discussing this in the future as needed.


Ronald Copen, LISW-S

Tab C-7    PLEIGDON-000632
00632    LELIGDON-000632

## Aquilina, Joseph T. (VHACLE)

| | |
|---|---|
| **From:** | Copen, Ronald G. (VHACLE) |
| **Sent:** | Tuesday, May 21, 2013 12:48 PM |
| **To:** | Aquilina, Joseph T. (VHACLE) |
| **Cc:** | Esmurdoc, Felix C. (VHACLE); Freeman, Andrea M. (VHACLE) |
| **Subject:** | Report |
| **Attachments:** | report of contact2.docx; freemanletter.doc |

Date: May 21, 2013

To:  Joe Aquilina, Chief of Social Work

    VAMC, Wade Park Division

From: Ronald Copen, LISW-S

      Clinical Social Worker, Psychiatric Emergency Room

      VAMC, Wade Park Division


RE: Report of Contact


Joe,

I have decided to proceed with registering a report of contact with Andrea Freeman due to the hostile work environment that has been created over time by my supervisor, Paula Leligdon, and the perpetuation of same. It is not without some trepidation that I am taking this action, as I believe the threat of retaliation is very real.

This action is precipitated by the reality that her interactions with me are now affecting me physically, causing increased anxiety and a degree of depression. This is a direct result of her ongoing misuse of power. You are, of course, aware of my problems with her, having first spoken to you about this in January of 2012, when I had decided to transfer due to her actions toward me. When I made the decision to remain in my position in June of 2012, like you, I was hopeful that things would be different. Unfortunately they have deteriorated, prompting this action.

Attached is the summary that I am submitting. I felt that ethically, I could not submit this without your knowledge, since this is potentially a matter that not only impacts me, but could affect our team as well. Thank you for your consideration in this matter. I am available to you for any further discussion you deem necessary.


Ronald Copen, LISW-S


Cc: Andrea  Freeman, Chris Esmurdoc

Tab *C-7*  p. *593*
LELIGDON-000633

**Report of Contact**

Received:   May 20, 2013

From:   Ronald Copen

Regarding:  Supervisor, Paula Leligdon


A copy of this ROC was provided to Paula Leligdon on 6/3/2013.

_F. Esmrdh 6/3/13_

F. Christopher Esmurdoc, Asst. Chief of Social Work


I received a copy of this report of contact.

_Paula Leyldn_          _6-3-13_

Paula Leligdon                          Date

Tab  C-7   Pg  594   LELIGDON-000634

00634

| REPORT OF CONTACT<br>NOTE: This form must be filled out in ink<br>or on typewriter as it becomes a permanent<br>record in veterans' folders. | VA OFFICE<br><br>VA Medical Center<br>Cleveland, Ohio | IDENTIFICATION NOS. (C,XC,SS,XSS,V,K, etc.) |
|---|---|---|
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | | DATE OF CONTACT<br>5/21/2013 |
| ADDRESS OF VETERAN | | TELEPHONE NO. OF VETERAN |
| PERSON CONTACTED<br>Dr. David Blank | | TYPE OF CONTACT (Check)<br><br>PERSONAL        XX TELEPHONE |
| ADDRESS OF PERSON CONTACTED<br>LSCVAMC | | TELEPHONE NO. OF PERSON CONTACTED |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

I received a telephone call from VA physician, Dr. Blank inquiring about some practices of supervisory social worker, Paula Leligdon. Dr. Blank asked me what Ms. Leligdon's duty station was. He told me that she is spending a great deal of time at the Parma VA Clinic and often drops into the clinic "demanding" office space. I asked him if she was requesting space to treat patients and he said no. I told him she may have been there to meet with one staff member she supervises at Parma, George Kasidonis. He said that he was not aware of such a meeting, but that would not take longer than an hour or so, and that she was at Parma for extended periods of time. He said that requests for such office space are disturbing to the administrative staff in the Mental Health clinic. I told him that her duty station was Wade Park. He then asked that I ask her to refrain from spending time at the Parma Clinic unless she is treating Veterans or meeting with her supervisee.

CC: C. Esmurdoc 122(W)

| DIVISION OR SECTION<br>Social Work Service | EXECUTED BY (Signature and Title)<br>*Joseph T. Aquilina*<br>Joseph T. Aquilina, Chief,SWS |
|---|---|

Automated VA Form 119

Tab C-7  p. 599<br>LELIGDON-000639<br>00639

| REPORT OF CONTACT<br>NOTE: This form must be filled out in ink<br>or on typewriter as it becomes a permanent<br>record in veterans' folders. | VA OFFICE<br><br>VA Medical Center<br>Cleveland, Ohio | IDENTIFICATION NOS. (C,XC,SS,XSS,V,K, etc.) |
|---|---|---|
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | | DATE OF CONTACT<br>5/24/2013 ....12:05 pm |
| ADDRESS OF VETERAN | | TELEPHONE NO. OF VETERAN |
| PERSON CONTACTED<br>GEORGE KASIDONIS | | TYPE OF CONTACT (Check)<br><br>· PERSONAL TELEPHONE |
| ADDRESS OF PERSON CONTACTED<br>Social worker, VA Clinic, Parma, Ohio | | TELEPHONE NO. OF PERSON CONTACTED<br>838--2303 |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

I received a voice mail message to call Mr. Kasidonis, social worker at the Parma VA CBOC. I returned his call. Mr. Kasidonis indicated that he has a concern, which was sensitive, and he wanted to get my feedback. He reminded me that Paula Leligdon was his supervisor. He said that there are things about her supervision of him which are troublesome. I asked him to tell me his concerns. He said in his whole VA career (his EOD is 1/20/1998) he has never felt so micromanaged. He said her level and style of supervision are "emotionally aggressive" and he feels very uncomfortable. He gave an example of his social work assessments, which Ms. Leligdon reviewed. He said there was an obvious "typo" with one word and that after several excessively long pauses continued to tell him "I don't get it" after he explained to her it was a typo error. He said he feels "grilled" and that while some of her feedback is OK, the problem is how the feedback is given. He also said that one day when **she** was off; he had to leave early and contacted the person who was acting supervisor. He said when Ms. Leligdon returned he was grilled as to why he did not get approval (although she was not on duty to provide the approval). He also said, "she is not here all the time".

Mr. Kasidonis said "she is at Parma half the time she is at work – she is there today" I asked him if she had a scheduled meeting with him today. He said no. I suggested that she may be treating patients at Parma. She said she does not. He went on to say that she was at the Parma Clinic all-day on May 17th. He said he was planning to leave early that day and she called him from the Parma clinic at 8:30 am. She asked if he needed coverage for the end of the day and he told her no, that social worker Linda Hadden-Robinson was going to cover for her. Mr. Kasidonis said that Ms. Leligdon is at the Parma CBCO 2-3 times per week. I asked if the purpose was to meet with him and he said no. He said that supervision meetings should be scheduled, not drop-in. On Friday, May 17th he did tell her that he did not like to be micro-managed. He said she wanted him to shorten is mini-mental state exam. He told her that it was not appropriate to do so as this was a standardized assessment tool and that he would not shorten it. He said he feels that he is in a "power struggle" with her.

Mr. Kasidonis said that Ms. Leligdon's level of supervision is "aggressive, abusive" and that while holding a unit meeting recently she told the staff that she was aware that some of them had a problem with her supervision and that "the VA is full of other jobs and if staff don't like her they can apply for other jobs". Mr. Kasidonis said that he believes that while staff has to adjust to the demands of their supervisor, supervisors also need to adjust to their supervisees. He said he used the word "nitpick" to her when describing how she treats him. He said he is uncomfortable with her supervision, and does not trust her clinical judgment about things. He asked about the protocol for supervision at Parma. I asked what he meant. He said that his team leader, Dr. Marqua prefers that patient care coverage be in-person. He said that Ms. Leligdon allows coverage by phone. He said he doesn't feel he can take big clinical issues to his supervisor as they won't be handled correctly. He said things are very different for the supervisees of Cher Stone. He questioned why he is the only MH social worker at Parma CBOC under Ms. Leligdon" supervision. I asked him how he was certain that she was at the Parma CBOC today (5/24/2013). He said one of the MH clerks; "Vince" reported to him that she was using Dr. Marqua's office at 9 or 9:30am. He is often chided by other Parma staff when Ms. Leligdon is seen at Parma..." George, your girlfriend is here" was referring to Ms. Leligdon. He said he has seen Ms. Leligdon more in 2 weeks than he saw his previous supervisor, Kathy Cooney, in five years. He reported that an administrative person at Parma, Carol Sacher can provide information on Ms. Leligdon's time at Parma as she is asked to provide office space. I encouraged Mr. Kasidonis to put his concerns in writing. I told him that I would provide my notes to Lisa Myles ELR. I encouraged him to call Ms. Myles as well as Andrea Freeman. He is concerned about confidentiality. I told him that employees have a right to know who is complaining about them, but if he has any negative reactions about this, he needs to tell me immediately. He said he would put his concerns in writing.

| DIVISION OR SECTION<br>Social Work Service | EXECUTED BY (Signature and Title)<br><br>Joseph T. Aquilina, LCSW Chief, SWS *Joseph T. Aquilina* |
|---|---|

Automated VA Form 119

Tab C-7 602<br>00642 LELIGDON-000642

5, 0

**Report of Contact**

Received:  May 29, 2013

From:   George Kasidonis, via Joseph Aquilina

Regarding:  Supervisor, Paula Leligdon

A copy of this ROC was provided to Paula Leligdon on 6/3/2013.

_F. Esmurd 6/3/13_

F. Christopher Esmurdoc, Asst. Chief of Social Work

I received a copy of this report of contact.

_Paula Myden_          _6 - 3 - 13_

Paula Leligdon                         Date

Tab C-7 p. 603       LELIGDON-000643

00643

## Esmurdoc, Felix C. (VHACLE)

| | |
|---|---|
| **From:** | Leligdon, Paula M. (VHACLE) |
| **Sent:** | Friday, June 07, 2013 4:27 PM |
| **To:** | Esmurdoc, Felix C. (VHACLE); Aquilina, Joseph T. (VHACLE) |
| **Cc:** | Leligdon, Paula M. (VHACLE); Fuehrer, Susan M. (SES) (VHACLE) |
| **Subject:** | RE: Meeting Summary 6/3/13 |

Chris and Joe:

Several other discussions which occurred at our meeting on 6/3/13 are also to be noted, the  information included below is only a partial component to our conversation,  which I want documented with the summary attached.

Ron Copen's  previous complaints about me when I adjusted  his work responsibilities to include the Acute Inpt. Psych Ward, an area in which he did not want to work.  The changes to his work duties were  approved by Dr. Konicki, Dr. Jurjus, Joe Aquilina and Dale Goldstein.  When Ron asked Joe at that time to give him a new Supervisor,  Joe denied his request and told Ron that if he did not want to remain under my Supervision that he could apply for other SW positions in the VA under other Supervisors.

When Ron met with me in 2012 he admitted that he had been "badmouthing" and disrespecting me. He apologized directly to me, acknowledged that it was unprofessional and stated it would never happen again. Ron  stated that he was going to resign from his newly appointed role as Ethics Consult Coordinator, given his behavior had been so unethical. My communication to him regarding his admission of behavior and potential resignation of new appointment was simply that I did not have an opinion, it was a decision he would have to make for himself, to resign or not.

Several issues with Lipkin and also Copen had been previously discussed with Joe, Dale and Chris. During a meeting with Chris in 2012 he encouraged me to contact HR and specifically Denise Calabrese directly, stating there could be cause for disciplinary action due to their behavior.

I stated that what has been happening to me at the Medical Center has greatly impacted my staff and other VA providers and their ability to work with me.

I directly communicated the following 3 statements and asked you to make sure it was in your documentation, you did not however add it to your summary:

1.  An employee at the Medical Center told me that they were told  (rumor/gossip) that I was "dangerous", although they never felt worried or concerned.

2.  An employee at the Medical Center told me that because of what has happened to me at the Medical Center (gossip/rumors/treatment by VA), they do not even want to consider going into VA management.

3.  The head of the VA Ethics Committee Jason Gatliff stated directly to me in a meeting that he knew about my EEO complaint, which I did not tell him about. He went on to say that due to the gossip and rumors about me that were going around the Medical Center which he had been hearing (and participated in),  he has found it difficult to work with me.

Targeted (ROC) due to what's happened to me at the Medical Center, unrealistic to receive 4 ROC within 15 days of each other , when I have never received a ROC relative to me in my entire life, coincidence - I think not.



GOVERNMENT EXHIBIT C-3

1

00664

Tab  C-9   634  LELIGDON-000664

Blanks complaint and ROC retaliation due to my EEO complaint against him. Certainly no reason to complete an ROC for something that had never been mentioned as a problem and could have been communicated to me directly.

I communicated that there have been several complaints by Dr. Marqua regarding Kasidonis psychosocial assessments after he joined my Team in October 2012. I have been working with him to get on board with what is expected and appropriate documentation. Kasidonis communicated to me that he doesn't like to be told what to do, he likes to do things his own way. I had found numerous problems, major elements which he was not addressing/missing that were paramount to the Veterans assessment info. His assessments have been improving since I've been working with him. He did state directly to me at one of our meetings that he has never had this kind of good supervision before, he appreciated the case discussions and feedback.

You informed me that you contacted the EEO regarding the ROC's, that they would be doing an investigation and interviews.

Observations:

I appreciate the more professional tone of summary 6/4/13 vs. the previous threatening tone from summary 5/20/13, written by Chris.

As would have been the case previous, neither Chris or Joe even attempted to have a conversation with me directly about any of these complaints, prior to the completion of ROC's, which they encouraged. Given that the response to these complaints were not addressed as past issues were, because both Chris and Joe are aware and involved in my current EEO claims, encouraged completion of ROC by my staff and choose to contact the EEO instead of attempting other avenues of resolution first, I find these circumstance of events both manipulative and retaliatory.

Thank you,

Paula Leligdon, LISW-S
Supervisor, Psychiatry Social Work

Cc: S. Fuehrer

---

**From:** Esmurdoc, Felix C. (VHACLE)
**Sent:** Tuesday, June 04, 2013 8:29 AM
**To:** Leligdon, Paula M. (VHACLE)
**Cc:** Aquilina, Joseph T. (VHACLE); Esmurdoc, Felix C. (VHACLE)
**Subject:** Meeting Summary 6/3/13

Paula,
Thank you for meeting yesterday.
I wanted to briefly summarize our meeting yesterday 6/3/13.

During our meeting I shared with you and provided you a copy of 3 reports of contact:
5/14/13 from S. Lipkin
5/20/13 from R. Copen
5/29/13 from G. Kasidonis via Joe Aquilina.

I understand that your overall response to the allegations in these ROC was denial of the allegations. You stated you "found it highly offensive" and were "disappointed."

I once again want to offer any support, additional education, training, or mentorship that you believe would assist in remedying the relationship with these individuals on your team. It is my goal to assist you and your staff in any way I



can to make your work here productive and positive, for the benefit of the veterans we serve and for the staff we are responsible for managing.

During the meeting, Joe also shared a ROC from Dr. Blank regarding your presence at the Parma clinic.  Joe made it clear that your duty station is WP and there is not a need for you to be at Parma unless you are scheduled with a veteran or meeting with your staff (George).

If you have further questions or reactions to the ROC, please contact me.

I also mentioned I would like to schedule with you to discuss your workload and duty station as well as your sick leave balance.
Please let me know what days/times next week you are available to meet.
Thank you.
Chris


*F. Christopher Esmurdoc, LISW-S*
Assistant Chief of Social Work
Louis Stokes Cleveland VAMC
(216)791-2300 ext. 2341
(216)338-8877 (mobile)
felix.esmurdoc@va.gov


**Connect With Us!**
www.cleveland.va.gov

### Louis Stokes Cleveland VA Medical Center

To:     Andrea Freeman, EEO / ADR Manager

From:   Bruce Kafer, RN, MSN, EEO Office Investigator / Population Health Nurse

Subject:  Final Report: Hostile Work Environment Allegations Regarding
          Paula Leligdon, LISW-S

Date:   September 4, 2013

**Summary**

This memorandum outlines the outcomes of a fact finding investigation conducted by the Louis Stokes Cleveland VA Medical Center (LSCVAMC) EEO Office in response to allegations submitted by employees of Ms. Paula Leligdon, LISW-S, who is a supervisor within Social Work Service.

Pursuant to standard guidelines and practices regarding complaints submitted to the EEO Office, the complainants and other VA staff were questioned to gain factual data related to this complaint.

In brief, there was no finding of a hostile work environment as defined in Equal Employment Opportunity Law. It became apparent Ms. Leligdon took actions within her role as a supervisor in her efforts to fulfill her supervision responsibilities for twelve clinical social worker employees.

Included in this document is a brief overview of the allegations, interviews conducted, assessment, and findings.

**Allegations**

Three Clinical Social Worker employees, Ms. Susan Lipkin, Mr. Ronald Copen, and Mr. George Kasidonis made separate allegations in writing that their supervisor, Ms. Paula Leligdon, LISW-S, was creating a Hostile Work Environment by repeatedly harassing them. These allegations were in writing and submitted to Social Work Service and were subsequently forwarded to the Cleveland Veterans Affairs Medical Center EEO office.

**Interviews**

An email communication was sent out to all staff providing an opportunity to meet if they had Hostile Work Environment concerns.

*Report of Contacts*

Each of the three complainants that submitted a Report of Contact agreed to meet in person and stated in the meeting that Ms. Leligdon's actions were controlling, punitive, and were creating a Hostile Work Environment.  Essentially, Ms. Leligdon had discussed their performance with them and they perceived she was overly critical, did not understand their clinical environment, or was just being controlling.



GOVERNMENT
EXHIBIT
C-4

00667



Tab *C-10*  LELIGDON-000667

*Final Report: Hostile Work Environment Complaints regarding Paula Leligdon, LISW-S*

*Other Subordinates*

Approximately half of Ms. Leligdon's subordinates responded in total, the three that were interviewed, and the others called or emailed. They stated they had no problems with Ms. Leligdon and found her supportive and helpful. They did state Ms. Leligdon's communication style was blunt and they thought this may be perceived as problematic for some and they also thought it might come across as abrasive.

In the course of communicating with the complainants and other subordinates, additional VA staff were identified by this group that might provide further insight into the workplace environment issues in question and /or Ms. Leligdon's social work supervision practice.

*Other Interviews*

Other persons interviewed requested they remain anonymous as they were fearful Ms. Leligdon may in some way try to use their participation against them in a retaliatory manner. Overall, they described her style as controlling. In contrast, one person stated they never had any problems with her. Another person emailed they too never had any problems with her.

*Ms. Paula Leligdon Interview*

An interview was requested of Ms. Leligdon pursuant to the Reports of Contacts submitted as is standard procedure. Ms. Leligdon responded that she needed to secure a personal attorney and would then be willing to meet. She was advised an attorney was unnecessary but if she wanted one present the EEO office would allow this as it is a courtesy afforded when requested.

Ms. Leligdon was able to provide thorough and detailed responses to questions concerning the three Reports of Contact. She also submitted a CD which she reported provided further detail regarding actions she took with the three employees who were the complainants. It became clear to this writer that Ms. Leligdon's actions were non-discriminatory and were based on responsibilities she had as a supervisor to address social workers under her supervision regarding performance and functional position duties. In addition, it was also clear that she sought input from the Human Resource Management Service Employee Labor Relations Specialist as well as from her supervisor regarding the employee performance, conduct, and other supervisory issues.

**Findings**

No information was obtained that suggested Ms. Leligdon was discriminatory in her actions or based any supervisory actions on race, color, religion, sex, national origin, age, disability, reprisal, or genetic information. This case is closed by the EEO office and this report will be forwarded to the Chief of Social Work Service.

Tab *C-10* LELIGDON-000668

**References**

A hostile work environment results when repeated episodes of harassment occur and are based on race, color, religion, sex, national origin, age, disability, reprisal, or genetic information, and they are ongoing and pervasive such that a reasonable person would conclude this.

***Medical Center Policy 003-008 "Prevention of Workplace Harassment"***

***VHA Directive 2009-071 "Prevention of Workplace Harassment"***

***VHA Directive 2008-045 "Anti-Harassment Policy"***

Tab *C-10* p. *679*  LELIGDON-000669

00669

Privacy Violation

## Leligdon, Paula M. (VHACLE)

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Monday, July 29, 2013 11:00 AM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** Fuehrer, Susan M. (SES) (VHACLE); Aquilina, Joseph T. (VHACLE); Altose, Murray D. (VHACLE); Leligdon, Paula M. (VHACLE)
**Subject:** RE: Meeting

Chris:

On July 22, 2013 you refused to respond to my confidential emails sent using VA "restrictions" per your statement below when you said "I repeated to you that I cannot respond to emails that are encrypted and limit my ability to print, save, or copy the email. Please utilize a lesser level of encryption when emailing me." The emails attached below which I sent you where sent by PKI (encryption "meeting your demand") due to again my concern of confidentiality and privacy which has already been sorely violated here at the VA. You choose to remove the PKI when you responded, attaching and sending my locked emails unsecured making them vulnerable. This action was purposeful and a is blatant disregard for my right to confidentiality and privacy, which is of great importance to me as you already know. You could have sent your email separately from my locked emails, you did not, in fact you unlocked the message before you sent your response, an abuse of power as my Supervisor. I feel horrible regarding your actions against me which cause me even more discomfort and mistrust, showing your apparent disrespect for me. How would you feel if management repeatedly treated you the way I've been treated here at the Medical Center, in such an ill-mannered, unethical way, why is this allowed? Now you are "requiring" yet another meeting with me, of which I will comply despite the difficulty, I do not want to be threatened again by you with insubordination. If you are still "requiring" a meeting please reschedule for later in the week, due to personal reasons, I will not be available tomorrow.

Paula Leligdon, LISW-S
Supervisor, Psychiatry Social Work

**From:** Esmurdoc, Felix C. (VHACLE)
**Sent:** Friday, July 26, 2013 2:35 PM
**To:** Leligdon, Paula M. (VHACLE)
**Cc:** Fuehrer, Susan M. (SES) (VHACLE); Aquilina, Joseph T. (VHACLE); Altose, Murray D. (VHACLE)
**Subject:** RE: Meeting

Paula,

I have reserved room 1M-620 on the first floor of the EUL Bldg. for Tuesday, 7/30 at 2pm.
Please meet me there.
Thank you.
Chris

GOVERNMENT EXHIBIT C-5

1

Tab C-12 LELIGDON-000694
00694

*F. Christopher Esmurdoc, LISW-S*
Assistant Chief of Social Work
Louis Stokes Cleveland VAMC
(216)791-2300 ext. 2341
(216)338-8877 (mobile)
felix.esmurdoc@va.gov


*Connect With Us!*
www.cleveland.va.gov

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Friday, July 26, 2013 9:46 AM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** Fuehrer, Susan M. (SES) (VHACLE); Aquilina, Joseph T. (VHACLE); Altose, Murray D. (VHACLE); Leligdon, Paula M. (VHACLE)
**Subject:** Meeting

Chris:

Certainly if you have something more to say I would appreciate your remarks by email, I am currently not comfortable having yet another "discussion" with you, only to feel belittled and intimidated. I personally have no further need to "discuss" our previous discussion, I stand by my remarks and documentation below. If you are an honorable person, honorable Supervisor and Assistant Chief of Social Work for the VA Medical Center, you will take responsibility for your inappropriate actions.

Please let me know if you are "requiring" a meeting.

Thank you,

Paula

**From:** Esmurdoc, Felix C. (VHACLE)
**Sent:** Thursday, July 25, 2013 10:47 AM
**To:** Leligdon, Paula M. (VHACLE)
**Cc:** Fuehrer, Susan M. (SES) (VHACLE); Aquilina, Joseph T. (VHACLE)
**Subject:** RE: Meeting

Paula,
I have received your email and I am always willing to discuss this with you in person.
Please contact me to discuss this in person.

2

Tab _C-12_ LELIGDON-000695

Thank you.
Chris

*F. Christopher Esmurdoc, LISW-S*
Assistant Chief of Social Work
Louis Stokes Cleveland VAMC
(216)791-2300 ext. 2341
(216)338-8877 (mobile)
felix.esmurdoc@va.gov


**Connect With Us!**
www.cleveland.va.gov

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Wednesday, July 24, 2013 4:25 PM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** Fuehrer, Susan M. (SES) (VHACLE); Aquilina, Joseph T. (VHACLE); Leligdon, Paula M. (VHACLE)
**Subject:** Meeting

Chris:

I will provide some clarification given you have once again left elements of our discussion out of you summary (below).

You did not ever state during our meeting that "This does not demonstrate an ability to make a strong enough commitment to this board." I have shown more of a commitment to our Board that many other members, given my "active" participation and preparation at each meeting. During our personal meeting you communicated directly to me that I have been a valuable member of the SWPSRB, despite my absences. In-fact at our SWPSB meeting on 7/22/13 I was the only member to state I would be challenging issues with one of the applicants and then was the only member that had recognized that the LSW requesting increased steps did not meet the VA listed criteria, a circumstance you did not even recognize as the Chair of the Committee. This is just one of many elements I have brought to the attention of this Board which have influenced determinations and would have been overlooked.

I also reminded you that you changed meeting dates and times for our Board Meetings during this year and that members have missed meetings.

You once again "stated concern" of my use of AL/SL, stating that I had very little SL and AL left. I reminded you of our previous communication about this at our 6/12/13 meeting and at our other meetings also, stating the difficulty in managing the treatment I have received at the VA from my co-workers and management, bullying, harassment and intimidation, it has had a direct correlation with my AL/SL usage.

You stated that you wanted me to add additional clinic time to my schedule, take on even more workload. You stated that because the MH clinic was in need of clinic services, an area you are unfamiliar with, that I should provide more clinical care. I communicated to you once again as I had previous that no one has ever

3

Tab C-12  LEBIGDON-000696
00696

done as much as I have in this position. That I am the first Supervisor in this role to carry a regular caseload/clinic, have this many staff and cover this many clinic area's which I have been managing successfully since 2009 without any complaints from management until now. I reminded you that when I accepted this position and requested to also carry a scheduled clinic that I was told by both Dale Goldstein , my previous Supervisor and Chief of Social Work Service as well as Joe Aquilina  Chief of Social Work, that I did not need to carry a clinic due to the amount of work involved in the management of the staff, which by the way was less at that time then the current 12 staff I manage now. I stated that your actions where an attempt to cause me more problems, given that I am already managing more than anyone else in this position ever has and there has never been a complaint about my caseload before now.  I stated that I was not being insubordinate, which you acknowledged that I was not. I said that this is an attempt of unfair treatment by you/management to force further complications for me relative to my VA position.

You then stated that your determination of my request to remain on the SWPSB would also be influenced by whether I cooperated and increased my clinic time or not. That this would be one of the factors you would be considering to approve or deny my board member request.  I told you then that that was a direct threat to me to comply or consideration of my Board request would be denied, blatantly inappropriate, threatening and harassing actions, by my Supervisor.

You stated a reminder by Dr. Blank regarding his request, which I stated I have complied. I also told you that Dr. Blank needs to communicate directly with me if there are issues I am unaware and  need addressed.

During our meeting several times you smirked at me, as though you where about to laugh at me, this caused me great discomfort and humiliation, I felt sick at your behavior. When I mentioned that I would be reviewing all of this with my Attorney, you smirked again and at that time I told you that your smirking was inappropriate, that your actions and behavior toward me as my Supervisor where unacceptable and unprofessional, especially given that you are my Supervisor and the Assistant Chief of Social Work. I told you that you had once again threatened me. Your comment (as you continued to smirk and smile), was that no one else saw your behavior toward me that way, which felt like another warning and an abuse of your power.  This caused me even greater discomfort.

You denied my right to confidentiality as your subordinate, per below refusing to accept my emails that have confidential restrictions.

The continued attempts from the VA to remove me from all committee involvement is blatant retaliation.

You stated that you had difficulty having discussions with me, that I have cause to be defensive, feeling attacked  whenever I meet with you, which makes me fearful of further ill treatment, retaliation and  harassment; actions and behaviors from management/staff that must be stopped.

Paula Leligdon, LISW-S
Supervisor, Psychiatry Social Work

-----

**From:** Esmurdoc, Felix C. (VHACLE)
**Sent:** Monday, July 22, 2013 3:56 PM
**To:** Leligdon, Paula M. (VHACLE)
**Cc:** Esmurdoc, Felix C. (VHACLE)
**Subject:** Follow up to meeting today

4

Tab C-12 P. 652

00697                LELIGDON-000697

Paula,

As a follow up to our meeting today:

1. I have received your request to continue on the SWPSRB. I shared with you that your attendance over the past year has been 8 of the 18 scheduled meetings and 1 of the 7 ad hoc meetings. This does not demonstrate an ability to make a strong enough commitment to this board. I will consider this in my response to your request.

2. I would like to discuss with you scheduling additional clinic time for direct care. Your current workload of direct care is Thursday mornings for 3 hours. This is 7.5% of your time. I would like to work with you on developing additional opportunities for direct patient care. We can discuss this in person.

3. I reminded you of the need to avoid having staff cancel any clinic time to attend staff meetings. You confirmed that you are aware of this request and working to hold meetings at the end of the day and provide telephone access for staff off site. Thank you.

4. I repeated to you that I cannot respond to emails that are encrypted and limit my ability to print, save, or copy the email. Please utilize a lesser level of encryption when emailing me.

Thank you.
Chris

*F. Christopher Esmurdoc, LISW-S*
Assistant Chief of Social Work
Louis Stokes Cleveland VAMC
(216)791-2300 ext. 2341
(216)338-8877 (mobile)
felix.esmurdoc@va.gov


**Connect With Us!**
www.cleveland.va.gov

5

# Department of
# Veterans Affairs

# Memorandum

**Date:** July 31, 2013

**From:** Chris Esmurdoc, Assistant Chief, Social Work Service

**To:** Paula Leligdon, Supervisory Social Worker

**CC:** Lisa Myles, HRMS
Joseph Aquilina, Chief Social Work Service

**Subj:** Reminder of policy on requesting leave MCP 005-007

1. This is to notify you that from this day moving forward all requests for leave must be in accordance with MCP 005-007.

2. Specifically, requests for annual leave "will be made in advance except in unusual situations." (3.c.)

Please note, "where annual leave is not requested in advance, approval or disapproval will be based on the nature of the emergency, staffing and workload requirements and the timeliness of the leave request;" (3.c.1.c)

"The employee is not in an authorized leave status until the appropriate leave approving official has approved the request for leave." (3.c.1.d)

3. The majority of your leave requests in the past year are not in advance and typically are the day of the leave or the evening prior to your leave.  From today forward, I expect that requests for AL will be made at least 72 hours prior to the expected leave, unless there is an emergency need for leave.

In order to request AL you will need to speak to myself, or Joseph Aquilina, prior to your leave and provide us with the time period you are taking leave and the staff responsible for coverage while you are on leave.  Voicemail messages and emails do not suffice for AL requests.  You will not be in an authorized leave status until you have at least verbal approval from myself or Joseph Aquilina.

_F. Christopher Esmurdoc_      _7/31/13_
F. Christopher Esmurdoc, Asst. Chief of Social Work    Date

_Paula Leligdon_      _7-31-13_
Received by: Paula Leligdon      Date

**GOVERNMENT EXHIBIT**
C-6

00722

Tab C-14 p 682    LELIGDON-000722

# Department of Veterans Affairs

# **Memorandum**

**Date:** July 31, 2013

**From:** Chris Esmurdoc, Assistant Chief, Social Work Service

**To:** Paula Leligdon, Supervisory Social Worker

**CC:** Joseph Aquilina, Chief, Social Work Service
Lisa Myles, HRMS

**Subj:** Notification of unacceptable conduct/opportunity to improve

1. This is to inform you that you are being counseled for the following reasons: your conduct is unacceptable as a Supervisory Social Worker and employee as outlined in the Code of Conduct, MCP 005-024.

2. Specifically, since the beginning of this performance period (10/1/2012), your conduct has been in direct conflict with the standards outlined in the Code of Conduct for Employees of the Cleveland VA Medical Center.

   a. On more than 4 occasions I have provided you verbal or written feedback about your lack of respect and argumentative approach and your lack of cooperation and collegiality.

   b. On more than 4 occasions you have responded with a lack of flexibility and aggressive and blatant attempts to disrespect me as your supervisor and to discredit me as your supervisor personally and professionally.

   c. On several occasions you have avoided and refused to discuss issues regarding your workload and clinic schedule with me, citing the need for me to put in writing my requests to you. This is insubordinate and inappropriate.

   d. These violations of the code of conduct are consistent with feedback provided by some of your employees and provided to you in reports of contact on June 3, 2013. These are not isolated incidents and represent a pattern of hostility and conduct unbecoming of a VAMC employee and supervisor.

   e. On many occasions I have offered you support as your supervisor in the following capacities: open discussion with myself; additional training; mentoring; and mediation. You have refused all of these offers of support.

3. It is my hope that this letter of counseling will serve as an instrument to correct your behavior in an effort to bring to your attention your inappropriate conduct. It is anticipated that you will make every attempt to improve your conduct.

4. This letter of counseling is not a form of disciplinary action and will not be placed in your electronic Official Personnel Folder (e-OPF). However, it will be retained as a reminder of



GOVERNMENT
EXHIBIT
_____
C-7

00723



Tab *C-14* LELIGDON-000723

this counseling for a period of six (6) months unless additional related misconduct occurs, and then it may be retained up to one (1) year. If there are no additional acts of misconduct similar to that as described above, this letter of counseling will be destroyed. However, if similar misconduct is again displayed, this letter will form the basis for progressive discipline. In the future, if you should find yourself in a situation as described above, you should seek supervisory intervention so that the situation can be dealt with appropriately.

5.  If a personal, medical or other situation is affecting your conduct, this medical center has an Employee Assistance Program (EAP) that offers short-term counseling and referral.  You may contact Coordinator of the EAP Program, at (216) 791-3800 extension 6922.  They would be happy to arrange for an EAP counselor to meet with you on a confidential basis.

6.  It is expected that you will make every effort to improve your conduct. If you have any questions or wish to discuss this counseling, I am available to meet with you upon request.


_F. Christopher Esmurdoc_        _7/31/13_
F. Christopher Esmurdoc, Asst. Chief of Social Work      Date

_Paula Leligdon_       _7-31-13_
Received by: Paula Leligdon     Date


I have been threatened with the inability to review this document before signing with legal counsel.
I am not refusing which is what I have been threatened with.
I have signed due to the threat.

Tab _C-14_ P. _684_
00724
LELIGDON-000724

**LOUIS STOKES CLEVELAND**  
**VA Medical Center**  
**10701 East Boulevard**  
**Cleveland, Ohio  44106**

**MEDICAL CENTER POLICY 005-007**  
March 21, 2011

### Absence and Leave for General Schedule, Federal Wage System and Non-appropriated Fund Employees

1. **PURPOSE.**  To establish Medical Center policy and procedures covering the administration of leave for General Merit (GM), General Schedule (GS), Federal Wage System (FWS), and Veterans Canteen Service (VCS) employees.

2. **POLICY.**  Employee leave will be managed in accordance with the intent of VA policy as set forth in VA Handbook 5011, Part III, and the provision of applicable negotiated agreements.  Specific topics covered by this policy include procedures regarding:

   a.  Annual leave and advanced annual leave requests;

   b.  Sick leave and advanced sick leave requests;

   c.  Sick leave abuse;

   d.  Leave without pay requests;

   e.  Absence without leave;

   f.  Tardiness;

   g.  Jury duty;

   h.  Court leave;

   i.  Military leave; and

   j.  Authorized Absence

3. **RESPONSIBILITIES**

   a.  Human Resources Management Service is accountable for:

      (1) Interpreting leave regulations and policy and advising Medical Center personnel on appropriate implementation;

      (2) Developing and implementing local policy guidance;

      (3) Training managers/supervisors to effectively manage leave and orientating members of the employee work force to local leave policy and rules;

      (4) Assisting top management and line officials in the review of leave requests and recommending approval or disapproval of those requests;

      (5) Advising/assisting employees regarding leave for Office of Workers'



GOVERNMENT EXHIBIT  
C-8

Tab C 24 p. 758

00798

LELIGDON-000798

MEDICAL CENTER POLICY 005-007
                                                   March 21, 2011

Compensation Programs (OWCP) claims; and

     (6) Discussing or negotiating with local labor organizations regarding matters related to leave policy and/or its implementation.

     b.  Managers and supervisors are accountable for:

     (1)  Effectively interpreting leave regulations and policy in making decisions regarding individual leave requests;

     (2)  As appropriate, developing service, section, or unit procedures for the control of leave consistent with this policy and the terms of the Master Agreement;

     (3)  Seeking advice and assistance from Human Resources Management Service, as appropriate, in interpreting policy or in developing/implementing procedure;

     (4)  Assuring subordinate managers/supervisors are properly trained to effectively manage leave in their areas of jurisdiction, and that all covered employees are familiar with the provisions of this policy;

     (5)  Assuring consistency, to the extent possible, with service and Medical Center practices in making leave granting determinations;

     (6)  Assuring the granting of leave does not interfere with coverage of essential services;

     (7)  Assuring that time and attendance reports are completed in a timely and accurate manner;

     (8)  Assuring leave is planned in advance where practicable, properly scheduled and supported by appropriate documentation;

     (9)  Determining the appropriate leave charge for each absence, and promptly addressing tardiness or unexcused absence;

     (10) Assuring employees are properly returned to duty after absences due to illness, with medical clearance where appropriate; and

     (11) Processing all paperwork associated with the review and approval or disapproval of leave requests in a timely, accurate manner.

     c.  Employees are accountable for:

     (1)  Adhering to policy, rules and procedures governing leave and excused absence and attendance;

     (2)  Using leave for the purpose for which it is intended;

Tab *C-24* p. *759*
LELIGDON-000799

3                                    MEDICAL CENTER POLICY 005-007
                                              March 21, 2011

(3)  Submitting accurate statements regarding absences, applications for leave, and medical certificates when requested;

(4)  Scheduling leave in advance to the extent possible and recognizing the needs of the service in providing necessary coverage;

(5)  Making timely, proper requests for leave not previously submitted and approved;

(6)  Requesting leave only from the appropriate leave approving official;

(7)  Being cognizant of leave balances and only requesting leave that is available to them; and

(8)  Providing additional information in support of any leave request, as required by the supervisor.

## 3.  PROCEDURES

a.  Leave requests will be processed as indicated by the chart in Attachment A. Managers and supervisors at each level will be held accountable for the way in which they exercise their leave granting prerogatives.  Any absence or leave request (excluding annual leave) requiring approval by the Service Chief, Chief of Staff, Associate Medical Center Director, Deputy Medical Center Director, Associate Director/Patient Care Services/Nurse Executive as appropriate, or Medical Center Director must be fully documented in accordance with Attachment B.

b.  All requests for leave must be requested and approved on the Enhanced Time and Attendance (ETA) system or by the completion of an OPM Form 71, Request for Leave or Approved Absence.  OPM Form 71 is available in Human Resources Management Service.

c.  Annual Leave may be requested for any duration, for any time and in any pattern desired by an employee, but must be requested in 15 minute increments.  Such requests will be made in advance except in unusual situations.

(1) Proper leave request procedures for annual leave requests are as follows:

(a) Leave is requested in a timely fashion, and if advance notification is not possible, will generally be requested within two hours of the beginning of the tour of duty;

(b) The request is made of the appropriate leave approving official;

(c) Whether or not the leave approving official approves or denies the request for leave is dependent on staffing and workload requirements. In those unusual situations where annual leave is not requested in advance, approval or disapproval will



be based on the nature of the emergency, staffing and workload requirements and the timeliness of the leave request;

      (d) The employee is not in an authorized leave status until the appropriate leave approving official has approved the request for leave.

      (2) Generally speaking, messages left for a leave approving official, whether through voicemail, e-mail, a co-worker, etc. does not constitute following proper leave request procedures, as leave must be requested from and approved by the appropriate leave approving official. Service officials shall ensure there is an alternate leave approving official or leave approving mechanism in place.

      (3) Failure to follow proper leave request procedures may result in being charged Absent Without Leave (AWOL) for the period of the absence, and may be used as the basis for progressive discipline.

      (4) Full time Title 5 employees may only carry over 240 hours of annual leave to the next leave year.  Employees must use any excess annual leave, also known as "Use or lose" leave, by the end of the leave year or risk losing it. "Use or lose" leave must be scheduled, in writing, before the start of the third biweekly pay period prior to the end of the leave year.

      (a) If the employee's scheduled "Use or lose" leave is cancelled due to the exigency of the public business, sickness, or administrative error, and the employee is unable to use it by the end of the leave year, the employee can request administrative approval for carry-over, or restoration, of the excess leave. The scheduling, and as necessary, rescheduling of excess leave must be in writing before the start of the third biweekly pay period prior to the end of the leave year.

  d. Advanced Annual Leave may only be approved by those officials designated in Attachment A.  It may only be advanced in an amount that can be earned by the end of the leave year in which it is requested/granted.  Requests for advanced annual leave shall generally be discouraged, and only endorsed or approved where judicious review finds appropriate support.

e. Sick Leave may be requested when an employee is incapacitated for duty because of sickness, injury, pregnancy or confinement; receives medical dental, or optical examination or treatment; or is required to give care and attendance to an immediate family member who is afflicted with a contagious disease.  (Sick leave granted because of a contagious disease shall be limited to the period prescribed by regulations of local health authorities or certified by a physician where health regulations do not specify the period of isolation, quarantine or restricted movement.) Sick leave may be granted when the presence of the employee on duty would jeopardize the health of others because of exposure to a contagious disease.  Sick leave may also be requested under the provisions of the Family Friendly Leave Act (Medical Center Policy 005-012). Sick leave requests made in connection with medical, dental or optical examinations or treatment will only be approved for the time required for that examination or treatment, and additional documentation may be required to support such leave requests.

Tab C 24 LELIGDON-000801
00801

MEDICAL CENTER POLICY 005-007
March 21, 2011

(1)  Proper leave request procedures for sick leave requests are as follows:

(a) A request for sick leave should be made by an employee who is incapacitated for duty, or a responsible person on behalf of the employee;

(b) Sick leave is requested as early as practicable, but not later than two hours after the employee is scheduled to report for duty. Prompt notification facilitates shifting of personnel to assure coverage of essential services;

(c) The request is made of the appropriate leave approving official;

(d)    The employee is not in an authorized leave status until the appropriate leave approving official has approved the request for leave;

(e)    An employee who expects to be absent more than one day should inform the appropriate leave approving official of his/her expected date of return to duty and notify the appropriate leave approving official of any change.  Daily reports will not be required, but management may request additional information in support of any request in making a final decision to approve or disapprove the leave where leave misrepresentation may be suspected.  Where uncertainty exists concerning the exact date of return to duty, the employee should notify the appropriate leave approving official as early as possible before reporting for duty so appropriate staffing and workload adjustments can be made.

(2)  Generally speaking, messages left for a leave approving official, whether through voicemail, e-mail, a co-worker, etc. does not constitute following proper leave request procedures, as  leave must be requested from and approved by the appropriate leave approving official.

(3)  Failure to follow proper leave request procedures may result in being charged AWOL for the period of the absence, and may be used as the basis for progressive discipline.

f.  Sick Leave Certification is required for absences due to illness of more than three consecutive workdays or for those employees on sick leave restriction.  Such certification will ordinarily be submitted upon the employee's return to duty but no later than fifteen calendar days thereafter.  Where an employee has been absent for three or more consecutive workdays due to illness/injury, clearance by Personnel Health may be required.

g.  Sick Leave Abuse may be evidenced by frequent use of sick leave or a pattern of requests for sick leave in connection with days off or weekends.  Frequency or amount of leave used will not be the sole factor for determining sick leave abuse, nor will leave for which medical documentation has been provided. In such instances, the employee's supervisor will (1) carefully prepare a record of all absences due to illness; (2) counsel the employee in writing and advise him/her of the possibility of future medical certification requirements should the absence continue; (3) if the abuse continues,

Tab C-24   LELIG2682-000802
00802

notify the employee in writing of the need to provide medical documentation in support of all absences due to illness for the next six months (See Attachment C); (4) review the employee's use of sick leave not later than six months afterward, notifying him/her in writing if the sick leave restriction is to be continued or removed; and (5) charge the employee AWOL for each absence due to illness that is not supported with medical documentation, and initiate progressive discipline where appropriate. Annual leave and leave without pay (LWOP) in lieu of sick leave may also be the basis for counseling and subsequent sick leave restriction. Sick leave certification may be required for absence due to illness/injury for periods of absence less than 3 consecutive workdays where leave misrepresentation may be suspected.

h. In cases where Personnel Health cannot recommend approval to return an employee to work after an illness/injury-related absence for reasons appropriate to the situation (e.g. insufficient medical documentation, continued illness, unsafe conditions, etc.), or recommends an employee be granted leave due to illness/injury, the employee will request and receive approval from his/her supervisor to take the appropriate leave prior to absenting him/herself from work. Management is the sole leave-approving authority in such cases.

i. Advanced Sick Leave may be approved in cases of serious disability or ailments for employees who can reasonably be expected to return to duty and who have demonstrated, through their prudent use of leave, that they will be able to readily reduce the advanced leave balance during the tenure of their employment. Employees on appointments without time limit may be advanced up to 30 days (240 hours) of sick leave, while those on time-limited or term appointments may be granted sick leave up to the total number of hours that would accrue during their current appointment. Any documentation submitted in support of any period of absence for which sick leave would normally be approved, must be on the official stationary of the treating physician. Requests for advanced sick leave should be supported by appropriate evidence in accordance with Attachment B.

j. Family Friendly Leave Programs include the Voluntary Leave Transfer Program (VLTP), the Family Medical Leave Act (FMLA), and the Family Friendly Leave Act (FFLA) for Federal employees. Under these programs, employees of the Cleveland VA Medical Center may use various forms of leave for expanded reasons including medical emergencies involving the employee or a family member. For information regarding these leave programs, please see Medical Center Policy 005-012, Family Friendly Leave Programs.

k. Maternity and Paternity Leave

(1) Leave related to maternity reasons may consist of accrued sick leave, annual leave, Family & Medical Leave (FMLA), or Leave Without Pay (LWOP). Leave for maternity reasons is not to be construed as sanctioning the use of sick leave for infant care or for the conditions of pregnancy without regard to whether the employee is incapacitated for duty or undergoing medical examination or treatment.

(2) The date on which the employee becomes incapacitated for duty by



Tab C-34 p. 763  LELIGDON-000803

7                                    MEDICAL CENTER POLICY 005-007
                                     March 21, 2011

pregnancy will be determined according to the circumstances of her individual case in consultation with the employee's private physician and/or Personnel Health physician. The date that the employee is able to return to work will be determined in the same manner.  The granting of leave for maternity reasons will take into consideration the need for protecting the mother and the infant, of avoiding occupational hazards to the other employees, and for maintaining work requirements. Advanced sick leave in cases of serious disability and annual leave and LWOP may be granted under conditions meeting the criteria for such leave.

     (3)  Male employees may request annual and sick leave, family and medical leave (FMLA), or leave without pay (LWOP), as appropriate, for purposes of assisting or caring for their minor children or the mother of their minor children while she is incapacitated for maternity reasons.

     l. Leave Without Pay (LWOP) is a temporary non-pay status and absence from duty.  Supervisors may grant LWOP for periods of one day or less where good judgment indicates approval is warranted.  Service chiefs and Care Line Managers may approve LWOP for two days through 30 calendar days.  Requests for more than three days of LWOP must be made on an OPM Form 71, Request for Leave or Approved

Absence. Requests for LWOP of 31 calendar days through 1 year must be made on an OPM 71 along with leave documentation submitted through the Chief, Human Resources Management Service (05), to the Chief of Staff (11), Associate Medical Center Director (001A) or Deputy Medical Center Director (001D), Associate Director, Patient Care Services/Nurse Executive (118W) as appropriate.  Requests for more than 1 year of LWOP will flow through channels mentioned above, with appropriate documentation attached, to the Medical Center Director (00).  Only the Medical Center Director can approve LWOP of more than 1 year.  A service's failure to carefully monitor and control LWOP may be the basis for disapproving overtime requests.

     (1)  Notification to employees regarding status of leave request correspondence will be prepared by the appropriate service chief or care line manager and addressed to the requesting employee regarding each approval or disapproval of LWOP of 31 days or more and for advanced sick or annual leave requests.  Approval/disapproval correspondence will be prepared as indicated in Attachments D, E, and F.

     (2)  LWOP requests in connection with on-the-job injury/illness, or enrollment in a drug or alcohol treatment program should be discussed between appropriate line officials and Human Resources Management Service Employee Relations staff to assure compliance with regulatory constraints.

     m. Absence Without Leave (AWOL) is an absence from duty which is not authorized.  The employee receives no pay for such an absence.  While periods of AWOL may be used to support progressive discipline, simply charging an employee AWOL should not be considered disciplinary in nature.

     (1)  The reason(s) for charging an unapproved absence to AWOL should be

Tab  C - RELIGION-000804
00804

documented by the leave approving official at the time the decision is made to charge AWOL.  This may be done by a written statement on the reverse of the time and attendance report or by a memorandum filed with the time and attendance report. Employees shall be given a reasonable amount of time to respond to AWOL charges. If AWOL is later excused because of circumstances surrounding the absence, the charge should be changed to authorized absence, sick or annual leave, or LWOP based upon the employee's request.

(2)  Employees charged AWOL should be notified by their supervisor upon their return to duty, or by the end of the following pay period, of the charges and the reason that leave was not approved.

(3)  If disciplinary action is contemplated for failure to follow leave regulations, bargaining unit employees should be informed of their right to a union representative before meeting to discuss circumstances leading to any AWOL charge.  Simply notifying an employee of an AWOL charge will not obligate a supervisor to afford that employee the right to union representation.

(4)  Supervisors should assure that the following entry is made in the remarks section of the Time and Attendance Report, VA Form 4-5631, for each AWOL charge: "AWOL from (time & date) to (time & date)."  A Report of Contact, VA Form 119, should be completed, with a copy provided to the employee, documenting any meeting held or contacts made in connection with AWOL charges, unexcused absences and tardiness. These reports will provide a sound basis for any subsequent disciplinary action.  No reports or notes on unexcused absences or tardiness should be retained beyond six months unless the problem continues and/or disciplinary action is initiated.

(5)  If an employee makes a request for leave that their leave balances do not support, AWOL charges may be appropriate, but only after careful consideration of all the facts surrounding the absence.

n.  Tardiness of a frequent nature, regardless of duration, will be cause for appropriate administrative action. The employee will be counseled and may or may not be permitted to use annual leave or charged AWOL in 15 minute increments.  As a violation of conduct and leave regulations, tardiness may form the basis for progressive discipline.

o.  Jury Duty is considered by the VA to be a civic responsibility, and absences for such service will ordinarily be approved without charge to leave.  However, employees released by the court for any day or substantial portion of a day are expected to return to duty unless distance or the small portion of the workday remaining would make returning unreasonable.  Requests for release of employees from jury duty will be made only in exceptional situations such as (1) to provide critically necessary patient care or (2) where the services of the employee are absolutely necessary to meet important deadlines.  All requests to excuse an employee from jury duty must address either or both of those considerations and be initiated by the Service Chief for routing through Human Resources Management Service to the Associate Medical Center Director or Deputy Medical Center Director, or to the Chief of Staff, or Associate Director, Patient

Tab  C-24   LELIGDON-000805
                                    00805

MEDICAL CENTER POLICY 005-007
March 21, 2011

Care Services/Nurse Executive, as appropriate, and on to the Medical Center Director for approval.  If the situation warrants approval, a letter will be directed to the court explaining the circumstances and requesting that the employee be released from jury duty.

  p.  Court or Court-Related Services

    (1)  Absences for court or court-related services will also be approved without charge to leave or loss of VA salary when the employee is to appear (1) as a witness on behalf of the federal, state or local government; (2) as a witness on behalf of a private party in an official, job-related capacity or to produce official records; or (3) as a witness on behalf of a private party in an unofficial capacity when one of the parties is the federal, state or local government.  The employee will provide appropriate

supporting documentation to the supervisor, as requested.  If the court-related matter does not meet one of the criteria above, the employee will not receive AA; rather, s/he will request and receive approval to use his/her own leave after providing appropriate documentation to supervisor as it relates to anticipated dates and/or duration of court appearance.

    (2)  Fees received by an employee in connection with jury duty or court leave when the employee would otherwise have been in a duty status must be turned in to the agent cashier immediately upon the employee's return to duty.

  q.  Military Leave

    (1)  Kinds of Military Leave.  There are four kinds of military leave for VA employees who are members of the Reserve components of the Armed Forces or National Guard, as follows:

      (a)  Not to exceed 15 calendar days in a fiscal year authorized by 5 U.S.C. 6323(a) for active duty and active and inactive duty training.  An employee can carry over a maximum of 15 days into a new fiscal year.  Therefore, potentially they may have a total of 30 days to use in any one fiscal year.  In addition, reservists whose military duty spans two fiscal years may use up to 45 days of military leave at one time. (Inactivity Duty Training is authorized training performed by members of a Reserve component not on active duty and performed in connection with the prescribed activities of the Reserve component.  It consists of regularly scheduled unit training periods, additional training periods, and equivalent training.

      (b)  Not to exceed 22 workdays per calendar year for emergency duty as ordered by the President or a State governor authorized by 5 U.S.C. 6323(b).  This can be for law enforcement or the protection of life and property.

      (c)  Unlimited military leave to members of the National Guard of the District of Columbia for certain types of duty (ordered or authorized under title 10 of the District of Columbia Code) is authorized by 5 U.S.C. 6323(c).

Tab  C-24  RELIGION-000806

(d)  Reserve and National Guard Technicians (only) are entitled to 44 workdays of military leave for duties overseas under certain conditions as authorized by 5 U.S.C. 6323(d).

(2)  Effect of Military Leave on Civilian Pay.  An employee's civilian pay remains the same for periods of military leave under 5 U.S.C. 6323(a) and (c), including any premium pay an employee would have received if not on military leave.  For military leave under 5 U.S.C. 6323(b), the employee's civilian pay is reduced by the amount of military pay for the days of military leave.  However, an employee may choose not to take military leave and instead take annual leave in order to retain both civilian and military pay.

(3)  Eligibility.  Regular full-time employees (permanent, temporary indefinite, temporary pending the establishment of a register, or term appointment for more than 1 year), who are members of the National Guard or a Reserve component of the Armed Forces are eligible for military leave when ordered to perform military duty.  Intermittent, or temporary (time limited to 1 year or less) employees are not eligible for military leave (5 U.S.C. 6323(a)(1) 2 and (b) (See 18 Comp. Gen. 538.)

(4)  Granting and Charging Military Leave.  To the extent authorized by law, military leave shall be granted for active and inactive duty training, or engaging in field or coast defense training when appropriate documentation pertaining to these activities is presented to the leave approving official.  Military leave is credited to full-time and part-time employees on the basis of an 8-hour workday.  The minimum charge to leave is 1 hour.  An employee may be charged military leave only for hours that the employee would otherwise have worked and received pay.  Employees who request military leave for inactive duty training (which generally is 2, 4, or 6 hours in length) will now be charged only the amount of military leave necessary to cover the period of training and necessary travel.  Non-workdays (weekends and holidays) that occur within the period of military service will not be charged to military leave.  NOTE:  Military leave is charged if an employee is scheduled to work on a holiday.

(5)  Final Approval.  Final approval of military leave shall be contingent upon the employee furnishing certification from the military authorities confirming that military duty was performed for the period that military leave was granted.

(6) Advance Notice.  All eligible employees will be encouraged to notify approving officials as far in advance as possible of their need for military leave so that arrangements can be made to prepare for their absences while on leave.

(7) Unless they freely and knowingly provide written notice of their intent not to return to a position (e.g. request to be separated or to resign), VA employees enlisting into the active duty uniformed service must be carried in a leave without pay status for up to a cumulative of 5 years (see 38 USC 4312 for exceptions to the 5-year maximum regulation).  A LWOP-military status will entitle employee to military leave as described in this section.  Management, with the assistance of Human Resources Management Service, as needed, will be responsible for providing counsel to employees regarding their options and their rights in such cases.

Tab  C-24  767
00807  LELIGDON-000807

11

MEDICAL CENTER POLICY 005-007
March 21, 2011

r.  Authorized Absence

(1)  An employee may be given authorized absence without charge to leave when (1) the activity is considered to be of substantial benefit to VA in accomplishing its general mission or one of its specific functions, or (2) the activity will clearly enhance an employee's ability to perform the duties of the position presently occupied or may be expected to prospectively occupy, or (3) the basis for excusing the employee is fairly consistent with prevailing practices of other Federal establishments in the area concerning the same or similar activities.  Without exception, the Medical Center Director will make the determination with respect to granting authorized absence and/or liberal leave during periods of bad weather or other emergencies for employees of this Medical Center.

(2)  Service Chiefs may approve short periods of authorized absence consisting of one (1) day or less.  Requests for authorized absence in excess of one day must be submitted through supervisory channels to Human Resources Management Service for approval by the Chief of Staff, Associate Director, Patient Care Services/Nurse Executive, Associate Medical Center Director, and/or the Deputy Medical Center Director.  Requests for authorized absence in excess of fourteen (14) days must be submitted through supervisory channels to Human Resources Management Service for approval by the Medical Center Director.  Employees requesting authorized absence should contact Human Resources Management Service regarding the documentation required to support requests.

5.  **REFERENCES.**  5 CFR 630, Absence and Leave; VA Handbook 5011, Hours of Duty and Leave, dated April 15, 2002; Medical Center Policy 005-012, Family Friendly Leave Programs, dated March 27, 2009; and the Master Agreement between the VA and AFGE, effective March 21, 1997.

6.  **RESCISSION.**  Medical Center Policy 005-007, Absence and Leave for General Schedule, Federal Wage System and Non-appropriated Fund Employees, dated March 26, 2008.  The review date of this policy is March 26, 2014.

7.  **FOLLOW-UP RESPONSIBILITY.**  Chief, Human Resources Management Service.

/s/
SUSAN M. FUEHRER
Medical Center Director

Tab  C-24     LELIGDON-000808
00808

**ATTACHMENT A**

**MEDICAL CENTER POLICY 005-007**
March 21, 2011

Approval official is marked with an "A" on this chart.  Where necessary pertinent documents should be routed through Human Resources Management Service.  These items are marked with a "*".

| TYPE | AMOUNT REQUESTED | SUPVR | SVC CHIEF | 05 | 001D(W) 001A(W) 11(W) 11(B) 118(W) | 00 |
|---|---|---|---|---|---|---|
| Annual | 14 days or less | A | | | | |
| | Over 14 days | | A | | | |
| Advanced Annual | Limited to amount of leave that can be earned by end of leave year in which granted | | | * | A | |
| Sick | 14 days or less | A | | | | |
| | Over 14 days | | A | | | |
| Advanced Sick | 30 calendar days or less | | | * | A | |
| Military | Not to exceed 15 calendar days, per Fiscal Year | | A | | | |
| Leave Without Pay (LWOP) | 1 day or less | A | | | | |
| | 2 days to 30 calendar days | | A | | | |
| | 31 calendar days to 1 year | | | * | A | |
| | Over 1 year | | | * | | A |
| Court | Subpoena or Court Order & record of attendance | | A | | | |
| Voting | Excused—no charge to leave time necessary— not to exceed 1 day | | A | | | |
| Authorized Absence in relation to misconduct or discipline | Short period of absence (1 day or less) for official duty | | A | | | |
| | 1 to 14 calendar days | | | * | A | |
| | More than 14 calendar days | | | * | | A |
| Other Absences | Weather/emergency conditions; participation in civic organizations; etc. | | | * | | A |
| | | | | | | |

**ATTACHMENT B**                                    **MEDICAL CENTER POLICY 005-007**
                                                    March 21, 2011

LEAVE DOCUMENTATION

1.   All requests for leave without pay in excess of 30 calendar days and for advanced leave must be supported by an OPM-71 and will include:

   a.  The anticipated date leave will begin;

   b.  The anticipated amount of time in calendar days that leave will continue;

   c.  The anticipated date of return to duty; and

   d.  The medical evidence, if appropriate.

2.   The supervisor's endorsement must show an analysis of the employee's current leave balance, comments concerning the employee's past leave use or abuse, a review of current staffing levels, and a statement of the impact expected on unit functions.

3.   Service chiefs will not routinely approve requests lacking the documentation indicated in paragraph 1 above.

4.  Fiscal Service will perform periodic audits on employee timecards.  Human Resources Management Service will audit leave documentation; i.e., employee requests with endorsements, for compliance with the provisions of this policy.  Leave documentation will be maintained for this purpose by each service for a minimum of three calendar years.

Tab *C-34* Page *220*  LELIGDON-000810

00810

ATTACHMENT C

**MEDICAL CENTER POLICY 005-007**
March 21, 2011

## PHYSICIAN'S STATEMENT - USE OF SICK LEAVE

1.  Effective this date, in order to be granted any period of sick leave you will be required to submit a physician's certificate stating that you have been incapacitated for work.

2.  This action is required because you... (state reason and also indicate written counseling by supervisory personnel, the date or dates of such counseling, and the fact that during the counseling the employee was informed that if his/her sick leave did not improve, he/she would be issued a statement requiring a physician's certification for each period of sick leave).

3.  The physician's statement must include the following:

    a.  Date of visit;

    b.  A statement indicating you were unable to work due to illness;

    c.  The period of absence covered by this illness; and

    d.  The physician's signature.

A statement which does not include the proper information may be rejected or you may be required to obtain the appropriate information.  A statement which merely indicates you have been to a doctor's office is unacceptable, since many people visit a doctor and then return to work.  It is your responsibility to inform your physician of what information is needed.

4.  Your physician's certificate should be submitted as soon as possible after your return to duty from sick leave but in no case later than three work days after your return. Failure to furnish such a certificate will be cause for disapproval of sick leave.

5.  This policy will remain in effect until rescinded by written notice.  At the end of six months it will be reviewed to determine whether the requirement for furnishing a physician's statement may be eliminated.  You will be notified in writing of the decision based upon that review.  We hope that you will make every effort to improve your attendance.

Supervisor's Signature

Tab *C-24* *771*

LELIGDON-000811

00811

**ATTACHMENT D**                                      **MEDICAL CENTER POLICY 005-007**
                                                      March 21, 2011


### SAMPLE LETTER OF APPROVAL OF LEAVE WITHOUT PAY


Mr. John Doe
100 North St.
Cleveland, Ohio  44100

SUBJECT:  Leave Without Pay (LWOP)

1.  Your request for leave without pay has been approved for the period, (dates).

2.  You are required to communicate with your supervisor at least two calendar weeks before the expiration of your LWOP to arrange for your return to duty.

3.  You are expected to return to your former position; however, it may be necessary in the interest of the Service to reassign you to another position during your absence or upon your return to duty.

4.  In the event of a reduction-in-force during your absence which will affect your position, you will be given the same consideration as employees in a duty status.

5.  If you are reached for reduction-in-force reassignment to a position in another organizational element, your LWOP will be subject to termination if your active services are required by the organizational element.


NAME OF SERVICE CHIEF


Tab C-24  LELIGDON-000812
00812

**ATTACHMENT E**

**MEDICAL CENTER POLICY 005-007**
March 21, 2011

SAMPLE LETTER OF DISAPPROVAL OF LEAVE WITHOUT PAY

Mr. John Doe
100 North St.
Cleveland, Ohio  44100

SUBJECT:  Leave Without Pay (LWOP)

   This is to indicate your request for leave without pay has been disapproved for the following reasons for the period (dates).

   a.  Citation of poor leave record.

   b.  Citation of need for additional justification.

   c.  Citation of untimely submission.

   d.  Citation of staffing constraints.

   e.  Other

NAME OF SERVICE CHIEF

Tab  C-24  p. 773  LELIGDON-000813

00813

**ATTACHMENT F**                                   **MEDICAL CENTER POLICY 005-007**
                                                    March 21, 2011


SAMPLE LETTER OF DISAPPROVAL OF ADVANCED SICK (ANNUAL) LEAVE


Mr. John Doe
100 North Street
Cleveland, Ohio  44100

SUBJECT:  Advanced Sick (Annual) Leave

This is to notify you that your request for advanced sick (annual) leave has
been disapproved for the following reason(s):

   a.  Citation of poor leave record.

   b.  In cases of advanced annual leave, citation of staffing and/or
workload constraints.

   c.  In cases of advanced sick leave, citation of the need for additional
justification and/or evidence of the likelihood the employee will be able to
return to duty.

   d.  Citation of untimely submission.

   e.  Other


NAME OF SERVICE CHIEF

Tab *C-24* No. *774*
00814                          LELIGDON-000814

11-12-13-1

4 2014 HRB
Request

**Leligdon, Paula M. (VHACLE)**

| | |
|---|---|
| **From:** | Leligdon, Paula M. (VHACLE) |
| **Sent:** | Thursday, October 24, 2013 3:39 PM |
| **To:** | Esmurdoc, Felix C. (VHACLE) |
| **Cc:** | Aquilina, Joseph T. (VHACLE); Fuehrer, Susan M. (SES) (VHACLE); Leligdon, Paula M. (VHACLE) |
| **Subject:** | leave requests |

Chris:

I just received a message which you left on my voicemail at 9:44am, stating that you were meeting with me about my Leave requests, **which you are not** approving. You cannot deny my leave request of which was communicated to you, acknowledged and of which you did not deny, changing your mind later. Along with that, certainly the fact that I took responsibility to clock 15 minutes late arrival because of unavoidable traffic issues, in the same manner I have for the past 4-5 years without any complaint, would not reasonably warrant any wrong-doing or denial. The fact that you are "going after me" yet again is unbelievable and wrong.

Paula

| | |
|---|---|
| **From:** | Leligdon, Paula M. (VHACLE) |
| **Sent:** | Thursday, October 24, 2013 9:01 AM |
| **To:** | Esmurdoc, Felix C. (VHACLE) |
| **Cc:** | Aquilina, Joseph T. (VHACLE); Fuehrer, Susan M. (SES) (VHACLE); Leligdon, Paula M. (VHACLE) |
| **Subject:** | leave requests |

Chris:

I am asking for clarification on what this meeting will be addressing, I do not want to be sabotaged, yet again. When you asked to meet with me last week to discuss the "best way to proceed" with the customer complaint about McKinney and his non-compliance with the meeting with his Supervisor, you apparently forgot to tell me you would be issuing me, yet another ROC (from McKinney), which you stated you wrote-up on his behalf. Needless to say when Joe mentions the ROC and shows it to me in his hand, I'm shocked. Then you issue me the ROC you wrote, imagine my surprise. I thought you were there to discuss with me "the best way to proceed", hoping you would provide me support and guidance, yet I was attacked without warning once again. Needless to say you, never provided any suggestions or guidance about "the best way to proceed, let-alone any support. I have cause to be concerned and want to be prepared, not humiliated again.

I look forward to your clarification and response.

Paula

GOVERNMENT EXHIBIT
C - 9

Leligdon Document Production 288

**From:** Esmurdoc, Felix C. (VHACLE)
**Sent:** Thursday, October 24, 2013 8:24 AM
**To:** Leligdon, Paula M. (VHACLE)
**Cc:** Aquilina, Joseph T. (VHACLE); Fuehrer, Susan M. (SES) (VHACLE)
**Subject:** RE: leave requests

Paula,

Please meet with me in room 2M-670, the HR conference room at 4pm today. I have asked Joe to meet with us.

Thank you.
Chris

Connect With Us
www.cleveland.va.gov

felix.esmurdoc@va.gov
(216)338-8877 (mobile)
(216)791-2300 ext. 2341
Louis Stokes Cleveland VAMC
Assistant Chief of Social Work
*F. Christopher Esmurdoc, LISW-S*

Chris:

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Wednesday, October 23, 2013 6:16 PM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** Aquilina, Joseph T. (VHACLE); Fuehrer, Susan M. (SES) (VHACLE); Leligdon, Paula M. (VHACLE)
**Subject:** leave requests

Today I received a voicemail message from you stating you wanted to meet with me regarding my below email. You stated you wanted to respond to my email in person. I already know to expect the worst from you and I dread it. As you already know I am very uncomfortable meeting with you due to the treatment I have received. I have never had any problems with any Supervisor before, yet you always try to find fault and make me feel belittled, why? If you are requiring I meet with you, despite my discomfort, I will however oblige. If you are still available, 4pm tomorrow will be ok, let me know where, if possible I would prefer however that you respond by email instead. Please understand my direct, open communication with you is not inappropriate or disrespectful, it is honest and straightforward and due to what's happened to me at this Medical Center, it will not be stifled.

Paula

Leligdon Document Production 289

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Monday, October 21, 2013 9:46 AM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** Leligdon, Paula M. (VHACLE); Aquilina, Joseph T. (VHACLE)
**Subject:** RE: leave requests

Chris:

For the record, I have never taken leave inappropriately.

First let me remind you that I have very little SL available. When I spoke with you on 10/8/13, I directly communicated to you that I was taking SL, however would also use AL to cover the day due to low SL available.

Secondly, on 10/16/13, I was 15 minutes late due to an unexpected accident which had traffic stopped/backed-up. When needed, this has been managed the same way since 2008, without any complaint from any previous Supervisor.

I have been an employee at the VA for almost 10 years and have never once been questioned about my SL/AL requests/use, until you became my Supervisor in 2012. I am more than responsible to manage my AL/SL effectively. The fact that you are even questioning my AL/SL request/use is insulting as a Supervisor and appears another fishing expedition to find wrong-doing.

I hope this provides you the "clarification" you are seeking.

Paula

.

**From:** Esmurdoc, Felix C. (VHACLE)
**Sent:** Friday, October 18, 2013 12:58 PM
**To:** Leligdon, Paula M. (VHACLE)
**Cc:** Esmurdoc, Felix C. (VHACLE)
**Subject:** leave requests

Paula,

I need clarification on two leave requests.  The first is on 10/8.  I did receive your call that morning to let me know you were on leave and using SL.  You entered into VISTA 6 hours of SL which I approved and 2 hours of AL which I did not approve.  Please explain.

```
02:30P  8-Oct-13 to 04:30P  9-Oct-13 2 hrs Annual Leave Requested
                Goodall covers
         Requested:  9-Oct-13  4:28pm
```

3

The second is on 10/16 you entered a request into VISTA for AL but I have no recollection or record of you calling to request the use of AL. Please explain.

08:00A 16-Oct-13 to 08:15A 16-Oct-13 .25 hrs Annual Leave Requested
Self Coverage
Requested: 16-Oct-13 4:31pm

Thank you.
Chris

F. Christopher Esmurdoc, LISW-S
Assistant Chief of Social Work
Louis Stokes Cleveland VAMC
(216)791-2300 ext. 2341
(216)338-8877 (mobile)
felix.esmurdoc@va.gov

Connect With Us!
www.cleveland.va.gov

4

Leligdon Document Production 291

# REPORT OF CONTACT

**Date:** October 23, 2013

**From:** Chris Esmurdoc, Assistant Chief, Social Work Service

**To:** Paula Leligdon, Supervisory Social Worker

**CC:** Joseph Aquilina, Chief, Social Work Service

**Subj:** Notification of violation of leave policy and opportunity to improve

1. This is to inform you that you are being counseled for the following reasons: Violation of the leave policy (MCP 005-007) on 10/8/13 and 10/16/13 following a written reminder of the policy and expectations around requesting Annual Leave on 7/31/2013 which you received.

2. Specifically,

   a. On 7/31/2013 I met with you to discuss your use of leave. I provided you with a copy of the MCP 005-007 and a memo highlighting the areas of the policy specifically regarding the request for annual leave.

   b. On 10/8/13 you called to report that you were sick and requesting leave. You stated you would use Sick Leave and you stated your coverage person. You entered into VISTA on 10/9/13 a request for 6 hours of SL and 2 hours of AL. The Annual Leave you entered was never verbally requested from you during the phone call of 10/8/13.

   c. On 10/16/13 you entered into VISTA a request for Annual Leave from 8:00-8:15am. I received no phone call or message that you were requesting annual leave that day. My back up, Joseph Aquilina received no phone call or message from you requesting annual leave on that day.

3. You will be charged AWOL for 10/8/13 2:30-4:30pm and 10/16/13 8:00-8:15am. It is my hope that this letter of counseling will serve as an instrument to correct your behavior in an effort to bring to your attention your inappropriate use of leave. It is anticipated that you will make every attempt to improve your conduct in this area.

4. This letter of counseling is not a form of disciplinary action and will not be placed in your electronic Official Personnel Folder (e-OPF). However, it will be retained as a reminder of this counseling for a period of six (6) months unless additional related misconduct occurs, and then it may be retained up to one (1) year. If there are no additional acts of misconduct similar to that as described above, this letter of counseling will be destroyed. However, if similar misconduct is again displayed, this letter will form the basis for progressive discipline. In the future, if you should find yourself in a situation as described above, you should seek supervisory intervention so that the situation can be dealt with appropriately.

5. If a personal, medical or other situation is affecting your conduct, this medical center has an Employee Assistance Program (EAP) that offers short-term counseling and referral. You may contact Coordinator of the EAP Program, at (216) 791-3800



00769

Tab *C-19* LELIGDON-000769

extension 6922.  They would be happy to arrange for an EAP counselor to meet with you on a confidential basis.

6.  It is expected that you will make every effort to improve your conduct. If you have any questions or wish to discuss this counseling, I am available to meet with you upon request.

_F. Christopher Esmurdoc_         _10/24/12_

F. Christopher Esmurdoc, Asst. Chief of Social Work       Date

_____      _____

Received by: Paula Leligdon         Date

_Mr. Leligdon refused to sign._
_She was given a copy._

Tab _C-19_  730
00770  LELIGDON-000770

**VA** Department of Veterans Affairs

## EXECUTIVE CAREER FIELD (ECF) PERFORMANCE APPRAISAL PROGRAM
## VETERANS HEALTH ADMINISTRATION (VHA)

### PERFORMANCE PLAN AND APPRAISAL OF

| EMPLOYEE'S NAME *(Last, First, Middle Initial)* | POSITION TITLE, SERIES AND NUMBER | GRADE/SALARY |
|---|---|---|
| Leligdon, Paula | Supervisory Social Worker 0185 | GS-12 |

| DEPARTMENT/OFFICE | LOCATION |
|---|---|
| Social Work Service/Psychiatry | Louis Stokes Cleveland VAMC |

| DATE ASSIGNED PRESENT POSITION | PERFORMANCE CYCLE COVERED BY THIS PERFORMANCE PLAN *(MM/DD/YYYY)* |
|---|---|
| 04/12/2009 *(MM/DD/YYYY)* | FROM 10/01/2012 TO 09/30/2013 |

### SECTION A - PERFORMANCE PLAN

Identify the elements (critical, non-critical, and additional) and performance standards for the position to be rated. Critical elements (i.e., those elements which contribute towards accomplishing organizational goals and objectives and are of such importance that unacceptable performance of them would result in unacceptable performance in the position) are to be identified with an asterisk. Each position must have at least one critical element and one non-critical element. Performance standards are statements of the individual's expectations and organizational expectations or requirements established by management for each element. There are usually three to five performance standards for each element. Attach Performance Plan.

### PERFORMANCE PLAN COMMUNICATED

| DATE COMMUNICATED | SIGNATURE OF RATER | SIGNATURE OF EMPLOYEE |
|---|---|---|
| 4-15-2013 | *Felix Conrad LISD-S* | *Paula Leligdon LISWS* 4-15-13 |

### CHANGES TO PERFORMANCE PLAN

Attach changes to Performance Plan. Changes may be recorded anytime during the rating period. Communication of changes must be documented.

| DATE COMMUNICATED | SIGNATURE OF RATER | SIGNATURE OF EMPLOYEE |
|---|---|---|
| | | |

### SECTION B - PROGRESS REVIEW

At least one progress review is required during the appraisal year. Employee must be informed of his/her level of performance as measured against the performance plan.

A performance review was conducted and discussed, and the employee's performance as of this date:

☑ Is considered Fully Successful or better.
☐ Needs improvement to be Fully Successful or better.

| SIGNATURE OF RATER | DATE |
|---|---|
| *Felix Conrad LISD-S* | 4-15-2013 |

| SIGNATURE OF EMPLOYEE | DATE |
|---|---|
| *Paula Leligdon LISWS* | 4-15-13 |

COMMENTS

**GOVERNMENT EXHIBIT C-11**

| VA FORM JUN 2011 **3482e** | SUPERSEDES VA FORM 3482e, SEP 2008, WHICH WILL NOT BE USED. | |

Tab C-1 LELIGDON-001032
00176 Supplemental

## SECTION C - ACTUAL ACHIEVEMENT

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. **Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpassed. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.**

| ELEMENTS *(Use the same keyword description for each element as in Section A)* | *INDICATES CRITICAL ELEMENT | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
|---|---|---|---|---|
| | | LEVELS OF ACHIEVEMENT | | |
| 1. Leading Change (20%) | ☒ | ☒ | ☐ | ☐ |
| 2. Leading People (20%) | ☒ | ☐ | ☒ | ☐ |
| 3. Business Acumen (10%)  (NOT CRITICAL) C.E. | ☒ | ☒ | ☐ | ☐ |
| 4. Building Coalitions (10%)  (NOT CRITICAL) C.E. | ☒ | ☐ | ☒ | ☐ |
| 5. Results Driven (40%) | ☒ | ☐ | ☒ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned. Specific achievements at the Fully Successful level may also be described.

ELEMENTS/ACHIEVEMENT(S)

*See page attached.*

This section may also be used to describe significant accomplishments not otherwise described in the appraisal, to comment on the potential for higher level positions, and/or to document VHA Personal Development Plans. Append additional pages as necessary.

VA FORM 3482e, JUN 2011

Tab  *C-1*  LELKGDON-001033

ECF Performance Appraisal Program VHA

October 1, 2012—September 30, 2013

Paula Leligdon, Supervisory Social Worker—Psychiatry

Element 1:  Leading Change (20%) (Critical)

In the area of leading change, Ms. Leligdon has demonstrated a level of exceptional performance.  She documented a number of examples of her work in this area in her self-assessment which I concur demonstrate exceptional performance in this element.  She has taken initiative in these examples to bring relevant information to her staff and peers in the medical center.  Her actions have a positive impact the practice of health care in the VAMC.

Element 2:  Leading People (20%) (Critical)

Ms. Leligdon demonstrates a fully successful level of performance in the area of leading people.

Element 3:  Business Acumen (10%)

Ms. Leligdon has demonstrated an exceptional level of performance in this past year.  As she notes in her self-assessment she works to manage her team effectively and efficiently to achieve maximum coverage and optimal workload performance.  She works with other VAMC staff and community partners to ensure her staff is updated and informed on all policy and procedural changes.  She works with her team to ensure compliance and safety,

Element 4:  Building Coalitions (10%)

Ms. Leligdon has demonstrated a level of fully satisfactory in the area of building coalitions,

Element 5:  Results Driven (40%) (Critical)

Ms. Leligdon demonstrates a fully successful level of performance in this area.

*C. Esmode 10/27/2013*

## SECTION D - SUMMARY RATING

TYPE OF RATING

☒ ANNUAL RATING OF RECORD     ☐ SPECIAL RATING (Position Changes - Employee or Rater)

PERIOD COVERED BY THIS APPRAISAL

FROM _10 / 01 / 2012_ (MM/DD/YYYY)     TO _09 / 30 / 2013_ (MM/DD/YYYY)

**NOTE: Performance Rating** - Using achievement levels assigned in Section C (excluding additional elements if used) and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

☐ **OUTSTANDING** - Achievement levels for all elements are designated as Exceptional.

☐ **EXCELLENT** - Achievement levels for all critical elements are designated as Exceptional. Achievement levels for noncritical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.

☒ **FULLY SUCCESSFUL** - The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

☐ **MINIMALLY SATISFACTORY** - Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as Unacceptable.

☐ **UNACCEPTABLE** - The achievement level(s) for one (or more) critical element(s) is (are) designated as Unacceptable.

SIGNATURE OF RATER: F. Christopher Enright    TITLE OF RATER: Asst. Chief Social Work    DATE (MM/DD/YYYY): 10/27/2013

## SECTION E - HIGHER LEVEL APPROVAL

**NOTE:** Required _only_ for Minimally Satisfactory and Unacceptable ratings of record.

☐ Concur with recommended rating.

☐ Do not concur with rating. Approve rating of: _____.

BASIS FOR PERFORMANCE RATING CHANGE

Tab _C-1_ p. _160_

SIGNATURE AND TITLE OF APPROVING OFFICIAL     DATE (MM/DD/YYYY)

A copy of this performance appraisal was given to me. ▶     SIGNATURE OF EMPLOYEE     DATE (MM/DD/YYYY)

VA FORM 3482e, JUN 2011     3

_- Ms. Galigdon was given a copy and refused to sign. She stated she would give it to her attorney._  LELIGDON-001035

00179  Supplemental

## SECTION F - REQUEST FOR RECONSIDERATION

NOTE:  This page is only required if the ECF employee requests reconsideration of the summary rating assigned by the rating official or approving official (if one was required).  This reconsideration process must be requested by the employee in accordance with Appendix F of VA Handbook 5013, Part I.

STEP 1 (Reconsideration by rating official or approving official (*if used*))

☐    Concur with assigned rating.

☐    Do not concur with assigned rating.  Rating changed to: _____ .

BASIS FOR RATING CHANGE

| SIGNATURE OF RATER *(Or Approving Official if used)* | TITLE | DATE *(MM/DD/YYYY)* |
|---|---|---|
| SIGNATURE OF EMPLOYEE | | DATE *(MM/DD/YYYY)* |

STEP 2 (Reconsideration by next higher official)

☐    Concur with assigned rating.

☐    Do not concur with assigned rating.  Rating changed to: _____ .

BASIS FOR RATING CHANGE

| SIGNATURE OF NEXT HIGHER LEVEL OFFICIAL | TITLE | DATE *(MM/DD/YYYY)* |
|---|---|---|
| SIGNATURE OF EMPLOYEE | | DATE *(MM/DD/YYYY)* |

ADDITIONAL SPACE, IF NEEDED

Tab *C-1* p. *161*

VA FORM 3482e, JUN 2011

4

LELIGDON-001036

# Department of Veterans Affairs

# **Memorandum**

**Date:**  January 2, 2014

**From:**  Chief of Staff, 11(W)

**Subj:**  Letter of Expectations

**To:**  Ms. Paula Leligdon

1. You are employed as a Supervisory Social Worker GS-0185, Step 4, in Social Work Service.  On December 20, 2013, you were advised of the need to provide temporary coverage for one of your employees who is transferring to a different location.  Felix Esmurdoc, Assistant Chief of Social Work left you several messages to schedule a meeting to discuss his decision with you but you failed to respond to any of his messages.  On December 23, 2013, Mr. Esmurdoc came to your office to discuss this situation with you but you refused to allow him into your office.  Furthermore, in your email response to Mr. Esmurdoc on December 23, 2013, and December 27, 2013, you copied your attorney on the emails, although the dialogue pertained only to work-related matters.

2. As a Supervisor of this Medical Center, it is expected that you will conduct business in a professional, efficient and effective manner.  All employees are required to meet face to face with their supervisors to discuss workplace issues.  Your behavior in refusing to meet with your supervisor is hindering Medical Center business and is inexcusable and will not be tolerated.  In addition, it is inappropriate to include your private attorney in daily interactions between you and your supervisors.  Effective immediately you are hereby ordered to comply with all meeting requests from your supervisors and managers, Felix Esmurdoc and/or Joseph Aquilina and to cease and desist the practice of copying your attorney on emails because it is both intimidating and inappropriate.  Furthermore, you are ordered to assume additional clinic hours on Dr. Chen's team in the Mental Health Ambulatory Care Clinic (MHACC) to cover during the transition time when your employee leaves.  You are required to meet face to face with Felix Esmurdoc and Joseph Aquilina and you are prohibited from copying your attorney on emails concerning Medical Center business.

3. This letter of expectations is being provided to you out of concern for your welfare.  Your recent conduct is not in keeping with the expectations I have for senior leadership within Social Work Service, or the medical center.  It is my sincere hope and expectation that you will use this letter of expectations as an opportunity to evaluate your own behavior, and to pursue an appropriate course of action that returns you to cooperative productivity.

4. This letter does not represent formal discipline or even an informal counseling.  Yet, failure on your part to meet my performance and conduct expectations may result in the need for formal administrative action to include formal discipline.  In this regard, you should interpret this letter of expectations as an order from me, and to conduct yourself in keeping with your supervisors' expectations of you and your position.



GOVERNMENT
EXHIBIT
C-12

Tab _C-20_ p. _737_

00777

LELIGDON-000777

Page 2
Letter of Expectations
Paula Leligdon

5. If a personal, medical, or other situation is affecting your performance, conduct, or attendance on the job, this medical center has an Employee Assistance Program (EAP) that offers short-term counseling and referral.  You may contact EAP Counselor, Dr. James Delamatre, at 216.791.3800, x6922.  He will be happy to meet with you on a confidential basis.  I strongly recommend that you avail yourself of this program.

6. I am not unsympathetic to your concerns, but I must be clear in my expectations of you, moving forward.  If you have any questions or wish to discuss this letter of expectations, I am available to meet with you upon request.

*Murray D. Altose*

Murray D. Altose, M.D.
Chief of Staff

I certify receipt of the original and one copy of this document.

_____          _____
Paula Leligdon                                              Date

*This copy was personally given to ms. Leligdon on Jan. 6, 2014 she refused to sign the receipt.*

541/053/LM/lm/1-2-14 *LM* 053____ 05 *96* 11 ____ 122 *JTH9*     *Joseph Aguila*
                                                                                                    *1-6-2014*
                                                                                                    *9 45 AM*

Tab *C-20* p. LELIGDON-000778
00778

## Freeman, Andrea M. (VHACLE)

| | |
|---|---|
| **From:** | Leligdon, Paula M. (VHACLE) |
| **Sent:** | Thursday, January 02, 2014 2:38 PM |
| **To:** | Freeman, Andrea M. (VHACLE) |
| **Cc:** | Leligdon, Paula M. (VHACLE); rrenner@kcnlaw.com; Fuehrer, Susan M. (SES) (VHACLE) |
| **Subject:** | RE: OT Request |
| | |
| **Sensitivity:** | Confidential |

Andrea:

I am completely shocked at your response and hurt by your remarks and false accusations. You are the Agencies EEO Manager, a neutral party to EEO claims and the individual in which employees are referred for information and advice on these matters. You chose to respond to the email I addressed to my Supervisor and I was simply following up with questions from your response, as you know I want to be as informed as possible, it is my right. You are well aware that I have EEO claims against the VA and the fact that you are the EEO Manager, an individual that is to be impartial and an advocate for employee rights, anti-discrimination, anti-retaliation and anti-harassment, why would you respond with such rudeness and disrespect, it truthfully makes no sense. Do you actually know the definition of bullying and harassing? Do you have any idea of the true meaning and commitment of your position on behalf of all employees here at the Medical Center? For you, the " EEO/Affirmative Employment Manager, Facility ADR Coordinator and Local Reasonable Accommodation Coordinator" to show such hostility toward me is inconceivable and discomforting, not to mention a poor reflection on the Medical Center's stated commitment to uphold employee rights and the EEOC process.

Have good evening.

Paula Leligdon, LISW-S
Supervisor, Psychiatry Social Work

**From:** Freeman, Andrea M. (VHACLE)
**Sent:** Thursday, January 02, 2014 10:35 AM
**To:** Leligdon, Paula M. (VHACLE); Watts, Patrick
**Cc:** 'rrenner@kcnlaw.com'
**Subject:** Re: OT Request
**Sensitivity:** Confidential

Paula it will be a medical center policy. It will be an 003 policy which are the eeo policies. As a management official at this medical center you know the process for policies and how they are written and who approves them. There are 6 eeo policies expiring in january that I will be updating. Now I am on leave but I answered your original email out of common courtesy. Now I see that you are starting to harass and "bully" me as usual so I will no longer respond to your email on this subject. I will be happy to send you a copy of the updated policy upon my return to work. Thank you and have a nice day.

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Thursday, January 02, 2014 10:20 AM
**To:** Freeman, Andrea M. (VHACLE)
**Cc:** 'rrenner@kcnlaw.com' <rrenner@kcnlaw.com>; Leligdon, Paula M. (VHACLE)
**Subject:** RE: OT Request

Hi Andrea:

GOVERNMENT EXHIBIT C-13

1

Tab C-4 p. 187

00206 Supplemental

LELIGDON-001062

Who is the individual responsible for determining a 16 hour limit?  Who initiated the policy amendment to address OT for EEO claims to include a standard of 16 hours and what VA authority will be responsible for this policy approval?

Please verify the policy name and number to be amended?

Thank you,
Paula

**From:** Freeman, Andrea M. (VHACLE)
**Sent:** Thursday, January 02, 2014 9:36 AM
**To:** Leligdon, Paula M. (VHACLE); Esmurdoc, Felix C. (VHACLE)
**Cc:** 'rrenner@kcnlaw.com'; Watts, Patrick
**Subject:** Re: OT Request
**Sensitivity:** Confidential

It was andrea freeman. A policy is currently being amended to address EEO official time. All employees who have eeo complaints and wish to utilize eeo official time will be allowed 16 hours per each complaint. This will allow consistency and standardization across the facility. Please note individuals who currently have actions or grievances and need to prepare a response only receive 8 hours. 8 hours was our "unofficial" policy for years and it has been increased to allow some time during the investigative and hearing stage. This will be our official policy. This does not include the time spent giving testimony to the investigator or at hearing as that time is covered by administrative leave. You can also use annual leave is 16 hours is not sufficient.

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Thursday, January 02, 2014 08:50 AM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** Freeman, Andrea M. (VHACLE); rrenner@kcnlaw.com <rrenner@kcnlaw.com>; Leligdon, Paula M. (VHACLE)
**Subject:** RE: OT Request

Chris:

Please clarify the individual that informed you that "... the medical center is not going to approve any time over 16 hours for any given EEO claim"?

Thank you,
Paula

**From:** Esmurdoc, Felix C. (VHACLE)
**Sent:** Tuesday, December 31, 2013 3:43 PM
**To:** Leligdon, Paula M. (VHACLE)
**Cc:** Esmurdoc, Felix C. (VHACLE); Freeman, Andrea M. (VHACLE)
**Subject:** RE: OT Request
**Sensitivity:** Confidential

Paula,

I approve of OT on 1/8 and 1/9 from 8-4:30 in reference to your EEO claim below (16 hours).

I have been informed that the medical center is not going to approve any time over 16 hours for any given EEO claim.

Thank you.
Chris

Tab *C-4* p. *188*



LELIGDON-001063

00207  Supplemental

*F. Christopher Esmurdoc, LISW-S*
Assistant Chief of Social Work
Louis Stokes Cleveland VAMC
(216)791-2300 ext. 2341
(216)338-8877 (mobile)
felix.esmurdoc@va.gov


*Connect With Us!*
www.cleveland.va.gov

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Tuesday, December 31, 2013 9:40 AM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** 'rrenner@kcnlaw.com'; Leligdon, Paula M. (VHACLE)
**Subject:** OT Request
**Sensitivity:** Confidential

Chris:

I am requesting Official Time on 1/8/14 and 1/9/14 from 8am-4:30pm in order to meet with my Attorney regarding my EEO claim.  L. Kaplafka will be providing supervisor coverage in my absence.

EEO number: 200H-Vl10-2013103863

Thank you,

Paula Leligdon, LISW-S
Supervisor, Psychiatry Social Work

3

Tab *C-4* P. *189*

LELIGDON-001064

00208  Supplemental

## Esmurdoc, Felix C. (VHACLE)

| | |
|---|---|
| **From:** | Esmurdoc, Felix C. (VHACLE) |
| **Sent:** | Tuesday, December 31, 2013 3:43 PM |
| **To:** | Leligdon, Paula M. (VHACLE) |
| **Cc:** | Esmurdoc, Felix C. (VHACLE); Freeman, Andrea M. (VHACLE) |
| **Subject:** | RE: OT Request |
| | |
| **Sensitivity:** | Confidential |

Paula,

I approve of OT on 1/8 and 1/9 from 8-4:30 in reference to your EEO claim below (16 hours).

I have been informed that the medical center is not going to approve any time over 16 hours for any given EEO claim.

Thank you.
Chris

*F. Christopher Esmurdoc, LISW-S*
Assistant Chief of Social Work
Louis Stokes Cleveland VAMC
(216)791-2300 ext. 2341
(216)338-8877 (mobile)
felix.esmurdoc@va.gov


**Connect With Us!**
www.cleveland.va.gov

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Tuesday, December 31, 2013 9:40 AM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** 'rrenner@kcnlaw.com'; Leligdon, Paula M. (VHACLE)
**Subject:** OT Request
**Sensitivity:** Confidential

Chris:

I am requesting Official Time on 1/8/14 and 1/9/14 from 8am-4:30pm in order to meet with my Attorney regarding my EEO claim. L. Kaplafka will be providing supervisor coverage in my absence.

EEO number: 200H-VI10-2013103863

Thank you,

Paula Leligdon, LISW-S
Supervisor, Psychiatry Social Work

**Esmurdoc, Felix C. (VHACLE)**

| | |
|---|---|
| **From:** | Aquilina, Joseph T. (VHACLE) |
| **Sent:** | Monday, February 03, 2014 3:13 PM |
| **To:** | Leligdon, Paula M. (VHACLE) |
| **Cc:** | Esmurdoc, Felix C. (VHACLE); Aquilina, Joseph T. (VHACLE) |
| **Subject:** | RE: OT 3 Claim |

Your request for eight hours of Official Time for February 5, 2014 is approved.
The Medical Center generally considers requests up to 16 hours reasonable. Please be cognizant that this request could take you above that threshold. However, the Medical Center considers all requests for official time on a case-by-case basis. After review I have decided to approve this request for official time. In submitting any additional requests, please provide information so we can make a determination if this time will be utilized for preparation, meetings with attorneys, depositions or hearing.
Joe Aquilina

---

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Monday, February 03, 2014 10:17 AM
**To:** Aquilina, Joseph T. (VHACLE)
**Cc:** pkdl@zoominternet.net; rrenner@kcnlaw.com; Esmurdoc, Felix C. (VHACLE)
**Subject:** FW: OT 3 Claim

Hi Joe:

You sent an email to staff recently telling us that Esmurdoc is out today which means you are covering as my Supervisor in his absence. I am requesting a response today regarding the below email for OT so that I can make necessary arrangements.

I appreciate your attention in this matter.

Thanks,
Paula Leligdon, LISW-S
Supervisor, Psychiatry Social Work

---

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Monday, February 03, 2014 8:46 AM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** rrenner@kcnlaw.com; Leligdon, Paula M. (VHACLE)
**Subject:** OT 3 Claim

Chris:

I am requesting 8 hours of Official Time on 2/5/14 in order to complete my deposition for EEO number: 200H-VI10-2013103863.
L. Kaplafka will provide Supervisor coverage.

Thank you,

Paula Leligdon, LISW-S
Supervisor, Psychiatry Social Work

## Esmurdoc, Felix C. (VHACLE)

| | |
|---|---|
| **From:** | Esmurdoc, Felix C. (VHACLE) |
| **Sent:** | Tuesday, February 11, 2014 11:41 AM |
| **To:** | Leligdon, Paula M. (VHACLE) |
| **Cc:** | Esmurdoc, Felix C. (VHACLE) |
| **Subject:** | RE: OT 3 Claim |

Paula,

The Medical Center generally considers requests up to 16 hours reasonable. Please be cognizant that this request will take you above that threshold. However, the Medical Center considers all requests for official time on a case-by-case basis. After review I have decided to approve this request for 8 hours of official time on 2/12/14. In submitting any additional requests, please provide information so we can make a determination if this time will be utilized for preparation, meetings with attorneys, depositions or hearing.
Thank you.
Chris

*F. Christopher Esmurdoc, LISW-S*
Assistant Chief of Social Work
Louis Stokes Cleveland VAMC
(216)791-2300 ext. 2341
(216)338-8877 (mobile)
felix.esmurdoc@va.gov


*Connect With Us!*
www.cleveland.va.gov

**From:** Leligdon, Paula M. (VHACLE)
**Sent:** Monday, February 10, 2014 4:22 PM
**To:** Esmurdoc, Felix C. (VHACLE)
**Cc:** rrenner@kcnlaw.com; Leligdon, Paula M. (VHACLE)
**Subject:** OT 3 Claim

Chris:

I am requesting 8 hours of Official Time on 2/12/14 in order to work on my deposition for EEO number: 200H-VI10-2013103868. The nature and complexity of my claims are so extensive that they have initiated over 150 question for me to respond to in detail. This has proven to be very time consuming and I am unable to accomplish this necessary requirement in one day.

Chris Goodall will be covering in my absence.

Thank you for the consideration.

Paula Leligdon, LISW-S
Supervisor, Psychiatry Social Work

**Department of Veterans Affairs**

| **REPORT OF CONTACT**<br>*(NOTE: This form must be filled out in ink or on typewriter<br>as it becomes a permanent record in veterans' folders.)* | **VA OFFICE**<br><br>VA Maryland Health Care System<br>(VAMHCS)<br>Perry Point, MD 21902 | **IDENTIFICATION NOS. (C,XC,SS,XSS,<br>V,K, etc.)**<br><br>541 |
|---|---|---|

| **LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN** *(Type or print)*<br>LELIGDON, PAULA, LISW-S, LSCVAMC EMPLOYEE | **DATE OF CONTACT**<br>2/4/14 |
|---|---|

| **ADDRESS OF VETERAN** | **TELEPHONE NO. OF VETERAN**<br><br>( ) - , Ext. |
|---|---|

| **PERSON CONTACTED**<br>John J. Mc Kinney | **TYPE OF CONTACT** (Check)<br>☐ PERSONAL  ☒ TELEPHONE |
|---|---|

| **ADDRESS OF PERSON CONTACTED**<br>10701 EAST BLVD<br>CLEVELAND OH 44106 | **TELEPHONE NO. OF PERSON CONTACTED**<br><br>(216) 791-3800, Ext. 1623 |
|---|---|

**BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN**

On Friday, October 25, 2013, I completed a report of contact noting that Ms. Leligdon was bothering me at home when I was on leave by calling me on my personal cell phone, even though I have told her not to bother me when I am not at work. I subsequently began a process of Alternative Dispute Resolution with Ms. Leligdon during which, in the presence of the arbiter, I made clear I find it an instance of bullying for Ms. Leligdon to annoy me at home. I noted then and in my 10/25/13 ROC that "The only reason Ms. Leligdon has my personal cell phone number is that the LSCVAMC required me to provide it to the VAMC in case the Medical Center Director declared a disaster and I needed to be contacted." I further noted in the ADR that I have authorized Dr. Linda Bond, Medical Manager, Inpatient Psychiatry, where I work, to contact me should there be any patient need that made it necessary to have my input. In such an instance, it would be Dr. Bond who would need to hear from me.

On Tuesday, February 4, I left messages with both Ms. Leligdon, as my supervisor, and Dr. Bond, as the psychiatrist working with my patients, to inform them of my request for sick leave for that date. Despite my previous requests, Ms. Leligdon three times called my cell phone that day against my wishes, leaving messages twice. Dr. Bond, meanwhile, never contacted me that day, as there was no need.

I once again believe Ms. Leligdon is invading my privacy, and is attempting to bully and harass me when I am away from work, as she does when I am at work. I want this behavior to stop.

| **DIVISION OR SECTION**<br>Social Work Service | **EXECUTED BY (Signature and Title)**<br>JOHN J. MC KINNEY, LISW-S<br>CLINICAL SOCIAL WORKER |
|---|---|

GOVERNMENT
EXHIBIT
C-14

Automated VA Form 119

Tab *C-7* LELIGDON-001073



## Department of Veterans Affairs

# Memorandum

Date: March 10, 2014

From: Assitant Chief of Social Work Service

Subj: Written Counseling

To: Ms. Paula Leligdon

1.     This is to inform you that you are being counseled for the following reasons:  You are employed as a Supervisory Social Worker, GS-0185-12, at the Louis Stokes Cleveland VA Medical Center.  Your tour duty is Monday thru Friday, 8:00 a.m. to 4:30 p.m.  On February 5, 2014 a Report of Contact was submitted by your employee John McKinney.   Mr. McKinney stated on February 4, 2014, he left messages for both you and Dr. Bond to inform both of you of his sick leave request.  Mr. McKinney stated you called him on February 4, 2014, after he left a message requesting sick leave.  Mr. McKinney believes you are bullying and harassing him once again after he has made a valid sick leave request.  Mr. McKinney stated he submitted another Report of Contact on October 25, 2013 complaining about you contacting him at home after he had made a valid sick leave request.  Mr. McKinney previously made it clear that he did not want to be contacted at home after making a valid request for leave.  Furthermore, you were not on duty on February 4, 2014.  Specifically you were out on approved annual leave on February 4, 2014, the day in question.

2.     The employee only requested one day off and there was no emergency which required you to contact him.  The employee had the proper amount of accrued sick leave to cover his request.  Mr. McKinney made a proper sick leave request and he also notified his Program Manager and Ward Chief, Dr. Linda Bond.    Thus your involvement was inappropriate.

3.     Furthermore, you were not on duty at the time as you had previously requested and had been approved annual leave on February 4, 2014.  As an employee who is out on approved annual leave, you should not have contacted  Mr. McKinney.  Neither you nor your employee can perform work for the medical center while out on approved annual leave as this would have the medical center in violation of Federal Labor laws.

4.     As a Supervisory, Social Worker of this Medical Center, you are required to become familiar with, and adhere to the 2011 Master Agreement between the Department of Veteran Affairs and the American Federation of Government Employees, as this Medical Center is a unionized facility.   The 2011 Master Agreement between the Department of Veteran Affairs and the American Federation of Government Employees, Article 35, Time and Leave, Section 4-Sick Leave, states, "*Sick leave is an employee's earned benefit and will be granted to the employee for appropriate absences.   It is the responsibility of the employee who is incapitated for duty to notify the immediate supervisor or designee (or have any responsible person make the notification for the employee) at the work site as*

VA FORM
MAR 1989   **2105**

Tab *C-8*   LELIGDON-001074

00218  Supplemental

*soon as possible but no later than two hours after the employee is scheduled to report for duty unless mitigating circumstances exit. The Department will assure a designated number is established for the supervisor or designee to receive such notifications; the employee's obligation is to complete one phone call, to either the established number, or to an alternate number the employee was notified to use. In the event that the supervisor or designee is not available, employees may use voice mail to notify the supervisor or designee of the type of leave requested. An employee who expects to be absent more than one day will inform the supervisor or designee of the expected return to duty and notify the supervisor of any change. In the case of extended illness, daily reports will not be required."*

5. You are hereby being warned that this type of behavior is unacceptable and will not be tolerated. Your actions as outlined above were clearly inappropriate. It is my hope that this letter of counseling will serve as an instrument to correct your behavior. Any further acts of such behavior will result in progressive discipline. This letter of counseling is not a form of disciplinary action and will not be placed in your Official Personnel Folder (OPF). However, it will be retained as a reminder of this counseling for a period of six (6) months unless additional related misconduct occurs, and then it may be retained up to one year. If there are no additional acts of misconduct similar to that as described above, this letter of counseling will be destroyed. However, if similar misconduct is again displayed, this letter will form the basis for progressive discipline. In the future, if you should find yourself in a situation as described above, you should seek supervisory intervention so that the situation can be dealt with appropriately.

6. If a personal, medical or other situation is affecting your performance or conduct on the job, the Louis Stokes Cleveland VA Medical Center has an Employee Assistance Program (EAP) that offers short term counseling and referral. You may contact EAP Program Manager, Dr. James DeLamatre at extension 820-6922. He will be glad to meet with you on a confidential basis.

7. If you have any questions or wish to discuss this counseling, I am available to meet with you upon request.

*Felix Esmurdoc*

Felix Esmurdoc
Assistant, Social Work Service

I certify receipt of the original and one copy of this document.

_____     _____
Ms. Paula Leligdon                                          Date

Tab *C-8*   p. *200*

*Paula refused to sign. We asked her to respond within 3 days. She stated she would take longer. We repeated we expect her response in 3 days. She stated she would take whatever time she needed.*

VA 5088
MAR 1989

00212 Supplemental   3-26-14

LELIGDON-001075

| **VA** Department of Veterans Affairs | **REPORT OF CONTACT** |
|---|---|

NOTE: *As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE<br>Louis Stokes Cleveland VAMC (541) | IDENTIFICATION NOS. (C,XC, SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)*<br>**VAMC Employee** | DATE OF CONTACT<br>03/20/2014 |
|---|---|

| ADDRESS OF VETERAN<br>N/A | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT *(check one)*<br>☐ PERSONAL   ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED<br>*(Include Area Code)* |
|---|---|

| PERSON WHO CONTACTED YOU<br>Paula Leligdon | TYPE OF CONTACT *(check one)*<br>☒ PERSONAL   ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON WHO CONTACTED YOU<br>VAMC<br>10701 East Boulevard<br>Cleveland, Ohio 44106 | TELEPHONE NO. OF PERSON WHO<br>CONTACTED YOU *(Include area code)* |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

In a memo dated January 2, 2014 from Dr. Murray D. Altose, Chief of Staff, Ms. Leligdon was "ordered to comply with all meeting requests from your supervisors and managers" and "to cease and desist the practice of copying your attorney on emails because it is intimidating and inappropriate." Ms. Leligdon has also been asked on several occassions by both Mr. Aquilina and myself to refrain from using restrictive settings on emails in her communications with us.

On March 20, 2014 Ms. Leligdon sent an email to myself and Mr. Aquilina. In this email Ms. Leligdon ignored the clear directives outlined above. Ms. Leligdon delayed the meeting with Mr. Aquilina and myself by demanding to have a copy of the material prior to our meeting and not agreeing to meet until she was able to review the material. Secondly, the email she sent to us on 3/20/14 was copied to her attorney. Finally, Ms. Leligdon set restrictions on this email.

All of these things demonstrate conduct unbecoming of an employee of the medical center and a pattern of failing to carry out instructions as given to Ms. Leligdon by the Chief of Staff, the Chief of Social Work, and her immediate supervisor.

*Ms. Leligdon took a copy and refused to sign.*
*F. Esmurdo 4/1/14*

I have received a copy of this ROC.

*Felix Esmurdo 3/31/14*
felix.esmurdo@va.gov
Digitally signed by felix.esmurdo@va.gov
DN: cn=felix.esmurdo@va.gov
Date: 2014.03.31 13:08:13 -04'00'

| DIVISION OR SECTION | EXECUTED BY *(Signature and title)*<br>felix.esmurdo@va.gov<br>Digitally signed by felix.esmurdo@va.gov<br>DN: cn=felix.esmurdo@va.gov<br>Date: 2013.11.03 10:15:03 -05'00' |
|---|---|

VA FORM
SEP 1997 (R)  **119**

GOVERNMENT
EXHIBIT
C-15

00222 Supplemental

Tab C-9

LELIGDON-001078

JUNE 15, 2006

VA HANDBOOK 5005/17
PART II
APPENDIX P

## PENDIX P.  PROCEDURES FOR SELECTING HYBRID TITLE 38 PROFESSIONAL STANDARDS BOARDS MEMBERS

1. **SCOPE.** This appendix provides a fair, consistent, and objective process for approving officials to follow when selecting national, regional, VISN, and facility Professional Standards Boards (PSB) members.  All employees will have the opportunity to participate in the peer review process for their occupation.  Approval and Selecting officials are encouraged to consider and select from all interested, available, and qualified employees, whenever possible.

2. **PROCEDURES.**

   a.  Approving officials, or designees, will solicit applications for PSB members annually from all interested employees.  Unions will also be asked for employee recommendations for PSB membership.  These applications and recommendations will comprise the selection pool.

   b.  When reviewing applications and Union recommendations, the selecting official will consider such criteria as the employee's quality and quantity of experience in the occupation, the employee's most recent performance appraisal, the employee's conduct and disciplinary record, and other appropriate criteria determined by the Service Chief and VISN Medical Officer in consultation with the Human Resources Manager.

   c.  The employees selected for the initial Board will serve either a 1-year, 2-year, or 3-year term.  At the end of each of these initial terms, all new members will be selected to serve a 2-year term.  Thus, members will rotate off the Board on a staggered basis and there will always be at least one member remaining on the Board from the previous year.

   d.  Selections for the Boards will be made by the Facility Director, the VISN Director, or the Program Director, as appropriate.

   e.  The Chair of the Board will notify all applicants if they were qualified or not.  Unqualified applicants will be informed of which criteria they did not meet.

   f.  Unions will be notified of the selections for the boards and may express concerns regarding those selections to management.]



GOVERNMENT
EXHIBIT
C-16

II-P-1

Tab  C-6  Page 119
LELIGDON-001270
00128  Supplemental