1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

- - -

PAULA LELIGDON,              )

       Plaintiff,        )

    vs.                      )

ROBERT A. MCDONALD,          ) CASE NO. 1:14-CV-02810-DCN

SECRETARY, U.S.              )

DEPARTMENT OF VETERANS       )

AFFAIRS,                     )

      Defendants.        )

- - -

    Videotaped deposition of LINDA C. BOND, M.D., a Witness herein, called by the Plaintiff for Cross-Examination pursuant to the Federal Rules of Civil Procedure, taken before me, the undersigned, Carina C. Meszaros, a Registered Merit Reporter and Notary Public in and for the State of Ohio, at the offices of Court Reporters, Inc., Suite 105, 1900 East Superior Avenue, Cleveland, Ohio, on Thursday, the 26th day of May, 2016, commencing at 2:26 o'clock p.m.

- - -

2

1    **APPEARANCES:**

2        **On Behalf of the Plaintiff:**

3            **KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.**

4        **BY:  Richard R. Renner, Attorney at Law**

5            **Suite 610**

6            **1901 L Street Northwest**

7            **Washington, DC  20036**

8            **(202) 466-8696**

9            **rrenner@kcnlaw.com**

10

11       On Behalf of the Defendant:

12           OFFICE OF THE U.S. ATTORNEY

13       BY: Lisa Hammond Johnson

14           and

15           Erin E. Brizius

16           Assistant United States Attorneys

17           United States Courthouse

18           Suite 400

19           801 West Superior Avenue

20           Cleveland, Ohio  44113

21           (216) 622-3679

22           lisa.hammond.johnson@usdoj.gov

23           erin.e.brizius2@usdoj.gov

24

25

3

1    APPEARANCES (Continued):

2

3    **ALSO PRESENT:**

4            **Ms. Paula Leligdon**

5            **Mr. Jim Kafantaris, Videographer**

6                      **- - -**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          I N D E X

2

3    EXAMINATION (By Mr. Renner)4

4

5                              - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE VIDEOGRAPHER: We're on the record.

2    This begins videotape number 1 in the deposition of

3    Linda Bond, M.D., in the matter of Paula Leligdon

4    versus Robert A. McDonald, Secretary of the United

5    States Department of Veterans Affairs, being heard

6    before the United States District Court for the

7    Northern District of Ohio, having a cause number of

8    1:14-CV-02810-DCN.

9           This deposition is being held at 1900 East

10   Superior Avenue, Cleveland, Ohio, on May 26, 2016, at

11   approximately 2:26 p.m.  My name is Jim Kafantaris,

12   I'm the videographer, along with the court reporter

13   Carina Meszaros.

14          Will counsel please state your names and

15   affiliations at this time on the record.

16          MR. RENNER:     Richard Renner, attorney

17   for the Plaintiff, Paula Leligdon.

18          MS. JOHNSON:    Lisa Hammond Johnson,

19   Assistant U.S. Attorney for the Defendant.

20          MS. BRIZIUS:    Erin Brizius, Assistant

21   U.S. Attorney for the Defendant.

22          THE VIDEOGRAPHER:  You may swear the

23   witness in.

24             LINDA C. BOND, M.D.,

25   of lawful age, a Witness herein, having been

6

1    **first duly sworn, as hereinafter certified, deposed**

2    **and said as follows:**

3                         **EXAMINATION**

4    **BY MR. RENNER:**

5    **Q.**   Dr. Bond, I'm Richard Renner, the attorney for

6    Paula Leligdon.  For the record could you state your

7    name and address?

8    **A.**   Linda C. Bond, M.D.  My address is 10701 East

9    Boulevard, Cleveland, Ohio 44106.

10   **Q.**   Your home address?

11   **A.**   37250 Chagrin Boulevard, Moreland Hills, Ohio

12   44022.

13   **Q.**   How are you employed?

14   **A.**   I'm a physician at the VA hospital.

15   **Q.**   Have you engaged any legal counsel for counsel

16   or advice or representation in this matter?

17   **A.**   No.

18   **Q.**   Have you ever been deposed before?

19   **A.**   Yes.

20   **Q.**   What for?

21   **A.**   Divorce.

22   **Q.**   When was that?

23   **A.**   1997.  I'm not sure what month.

24   **Q.**   In Cuyahoga County?

25   **A.**   Yes.

7

1  **Q.**   Any other depositions?

2  **A.**   No.

3  **Q.**   What are your duties at the VA?

4  **A.**   I'm the medical manager for the inpatient

5  psychiatry service.

6  **Q.**   How long have you worked for the VA?

7  **A.**   Since February of 2000.

8  **Q.**   In the same position?

9  **A.**   No, I was an attending physician for about a

10  year and a half before I became the medical manager.

11  **Q.**   Do you have a GS level?

12  **A.**   Yes.

13  **Q.**   What is it?

14  **A.**   I think it's 15.  I think all physicians are 15.

15  I'm not sure.

16  **Q.**   Who is your supervisor?

17  **A.**   Dr. Eric Konicki.

18  **Q.**   And his title?

19  **A.**   He is the chief of psychiatry.

20  **Q.**   His supervisor?

21  **A.**   Murray Altose, the chief of staff.

22  **Q.**   How did you get along with Mr. Altose -- with

23  Dr. Altose?

24  **A.**   Well.

25  **Q.**   Do you consider yourself to have any particular

8

1    management style?

2    **A.**    No.

3    **Q.**    Do you supervise other employees?

4    **A.**    Yes.

5    **Q.**    Which employees?

6    **A.**    Physicians on the inpatient psychiatry service,

7    mid-level medical providers on inpatient psychiatry

8    service, weekend psychiatrists to residential

9    addiction psychiatrists and the residential PRTP

10   psychiatrists.

11   **Q.**    How many direct reports is that?

12   **A.**    Ten.

13   **Q.**    Do any of those ten have subordinates of their

14   own?

15   **A.**    No.

16   **Q.**    Who are the mid-level employees that you

17   supervise?

18   **A.**    A nurse practitioner and a physician's

19   assistant.

20   **Q.**    What's your relationship to the other personnel

21   that work in the ward?

22   **A.**    I'm the director of the inpatient service.  So

23   I'm responsible for the clinical program on the

24   service overseeing the groups and activities and

25   collaborating with the various other disciplines that

9

1    form part of the treatment team.

2    **Q.**    Are you in the chain of command for any of those

3    other employees?

4    **A.**    No.

5    **Q.**    Who's responsible for maintaining coverage of

6    the nurses, pharmacists and social workers?

7    **A.**    The various services that they report to.

8    **Q.**    So for the social workers, it would be Paula

9    Leligdon's responsibility; is that correct?

10   **A.**    Yes.

11   **Q.**    So if you have concerns about the performance or

12   management of coverage issues, to whom would you

13   address those?

14   **A.**    Concerns about coverage issues?

15   **Q.**    (Nodding head up and down.)

16   **A.**    To the supervisor of the particular disciplined

17   employee.

18   **Q.**    And if you had concerns about the performance of

19   any of the staff in the ward that are not your direct

20   reports, who --

21   **A.**    I would first discuss that with the individual

22   themselves, and then, if necessary, with their

23   supervisor.

24        There's a bug flying around.

25   **Q.**    Does the VA have a policy on the chain of

10

1    command?

2    **A.**    I'm not aware of it if it does.

3    **Q.**    Are you responsible for staffing the psychiatry

4    staff?

5    **A.**    Yes.

6    **Q.**    How's that been going for you?

7    **A.**    Fine.

8    **Q.**    So you've not had any problems filling

9    vacancies?

10              **MS. JOHNSON:**        **Objection.  You may**

11   **answer.**

12              **THE WITNESS:**        **I don't fill the**

13   **vacancies.  The chief of psychiatry does.**

14   **BY MR. RENNER:**

15   **Q.**    How are call-offs managed on your ward?

16   **A.**    That's a fairly broad question.  I'm not sure

17   what you're asking me.

18   **Q.**    Well, say a social worker calls off, how does

19   that impact your ward?

20   **A.**    When a social worker calls off, how does it

21   impact my ward?

22   **Q.**    (Nodding head up and down.)

23   **A.**    The -- the duties that they would have been

24   expected to do have to be somehow either postponed or

25   reassigned amongst the social workers who will be

11

1   there.

2   **Q.**   And who's responsible for managing those issues?

3   **A.**   Not me, that would be Paula.

4   **Q.**   Can a call-off with short notice affect patient

5   care?

6   **A.**   Yes.

7   **Q.**   How so?

8   **A.**   There may have been loose ends to tie up, say,

9   before a discharge or a family meeting schedule,

10  something like that.  Those sort of pressing issues

11  would be covered by one of the other social workers.

12  I usually don't get involved in that.  One of them

13  volunteers.  I don't know if they're directed by

14  Paula to -- to do it or to cover it, but one of them

15  will step in for those acute issues and help the team

16  out.

17  **Q.**   On a typical day, how many social worker are

18  staffed to your ward?

19  **A.**   Three.

20  **Q.**   So if one of them calls off on short notice,

21  that would leave the other two with their regular

22  duties, plus maybe 50 percent more?

23  **A.**   I -- I couldn't say that.  It really depends.

24  The -- the things that we would worry about covering

25  would be the acute issues, and it's hard to know from

12

1    day to day what issues might be acute or how much

2    extra work might need to be divvied up.

3    **Q.**    Mm-hmm.

4          How long have you known my client, Paula

5    Leligdon?

6    **A.**    I'm not really certain.  I was thinking about

7    that the other day.  She was first a student working

8    with one of my social workers on the inpatient

9    service back when we were still at Brecksville, but

10   I'm not sure how many years ago that was.

11   **Q.**    You -- you've known her certainly since she

12   became the supervisor of social workers --

13   **A.**    Yes.

14   **Q.**    -- is that correct?

15   **A.**    I've known her since she was a student, as I

16   said.

17   **Q.**    So that would be more than --

18   **A.**    More than five years.  I don't know if it's more

19   than eight years.

20   **Q.**    How would you describe your relationship with

21   her?

22   **A.**    We have a very courteous relationship.

23   **Q.**    Is she a good social work manager?

24   **A.**    I don't know.

25   **Q.**    Have you observed anything she has said or done

1  that would indicate to you she's not a good social

2  work manager?

3  **A.**  Have I directly observed anything?  No.

4  **Q.**  What about indirectly?

5  **A.**  Indirectly for many years all the social workers

6  under her supervision have routinely complained about

7  her being micromanaging and hostile and unreasonable,

8  giving them direction that ran counter to what their

9  clinical expectations were on the service

10  consistently.

11  **Q.**  What directions would run counter?

12  **A.**  Telling them not to attend rounds but to do

13  other paperwork instead at one point.

14  **Q.**  Who made that complaint?

15  **A.**  Multiple social workers.

16  **Q.**  Can you give me their names?

17  **A.**  Kristi Sack, Cailen Haggard, Nicole Wiley,

18  Sherry McCaffrey, John Stone, John McKinney, Carol

19  Doubler.  Probably others whose names aren't coming

20  to me right now because there's been more than that.

21  **Q.**  Have you ever discussed this concern with Paula?

22  **A.**  No.

23  **Q.**  Why not?

24  **A.**  It's not my business.  I suggest that they talk

25  about their concerns with her and that's the end of

14

1    it.

2    **Q.**    Do you discuss it with anyone else?

3    **A.**    No.

4    **Q.**    Any other concerns about Paula Leligdon's

5    performance that you know of?

6    **A.**    I don't know any other aspects of her

7    performance.  I'm not in her chain of command.

8    **Q.**    How important are the social workers to the care

9    of veterans in your ward?

10   **A.**    Very.

11   **Q.**    Social workers have to trade off

12   responsibilities from one team to the next; is that

13   correct?

14   **A.**    I'm not sure what you're asking.

15   **Q.**    Well, there are times where -- where care for a

16   patient has to be handed off from one social worker

17   to another; is that correct?

18   **A.**    I don't know what you're talking about.  Are you

19   talking about when they change teams --

20   **Q.**    Yes.

21   **A.**    -- or are you talking about something else?

22   **Q.**    Mm-hmm.

23   **A.**    So all of the clinical staff in recent years

24   have been rotating teams.  We had a change in

25   scheduling with one of our part-time doctors and it

15

1    made it challenging for those members of the teams

2    that had to cover more than one attending.

3         So the fairest thing to do, I thought, as the

4    clinical manager, was to rotate that around so it

5    wasn't the same people impacted all the time and

6    having to split their time between two teams.

7    **Q.**   What's the process for the team changes?

8    **A.**   We say -- we -- we have a huddle every morning

9    where we meet the whole -- all -- everyone on the

10   clinical team, and we discuss things such as that in

11   the team huddle, "Today we're gonna" -- "gonna

12   change, we'll change next Monday or we'll change two

13   weeks from now" so everybody has lead time to know

14   that that's happening and -- and then we proceed that

15   way.

16   **Q.**   What does an outgoing social worker have to do

17   for the team -- for the team change?

18   **A.**   They're -- they're not outgoing, they're still

19   staying on the ward.  They're not leaving the ward.

20   **Q.**   All right.  But they have to pass on the -- the

21   clients; is that correct?

22   **A.**   Right.

23   **Q.**   And who -- what work is involved with that?

24   **A.**   That's the normal clinical thing.  You do a sign

25   out to the person who is going to be assuming the

16

1   care of the patient.  You can do it verbally, some

2   people do it written.  Most of the time it's

3   informal.

4   **Q.**   But sometimes a social worker might have as many

5   as ten patients; is that correct?

6   **A.**   Yeah.

7   **Q.**   And they would have to do the sign out for each

8   one of them; is that correct?

9   **A.**   Yes.

10  **Q.**   Is the information contained in that sign out

11  important for the veteran's care?

12  **A.**   As I said, it's an informal sign out.  So

13  talking about it like it's some formal document

14  doesn't make sense to me.

15  **Q.**   But the passing along of information about the

16  status of caring for that veteran is still important

17  to that veteran; is that correct?

18  **A.**   Important, but, again, the person is not leaving

19  the ward, they're still available.  They may be

20  sharing an office where they are right next to each

21  other.  So it's not as if they need to give, you

22  know, an exhaustive report on the patient because

23  they're going to be leaving going to some other

24  service or another, you know, hospital or something

25  and they won't be available to discuss.

17

1      So I don't know that it has to be extensive, and

2    it may -- may even occur, as far as I know -- I

3    haven't really monitored how the hand off is going

4    on.  It may kind of happen in a more naturalistic

5    way.

6    **Q.**   Mm-hmm.

7    **A.**   Sort of an ongoing daily thing.  I don't know.

8    **Q.**   All right.  How much --

9    **A.**   I haven't had any problems with the transitions

10   of care.

11   **Q.**   How much advance notice do the social workers

12   get before there's a change in team?

13   **A.**   As I said, it's not a set thing.

14   **Q.**   Nothing --

15   **A.**   It's been a week, a couple of weeks, once was a

16   month.  We talk every day, so --

17   **Q.**   Was there a time last February where staff had

18   just two days' notice?

19         **MS. JOHNSON:**      **Objection.  You may**

20   **answer.**

21         **THE WITNESS:**      **I -- I have no idea.  I**

22   **don't recall that.**

23   **BY MR. RENNER:**

24   **Q.**   Was there a time -- time in February when you

25   were away on leave?

18

1  A.   Yes.

2        MS. JOHNSON:        Objection.  You may

3  answer.

4        THE WITNESS:        Yes, I was away on leave.

5  BY MR. RENNER:

6  Q.   And you came back on a Thursday?

7  A.   I don't remember what day I came back on.

8  Q.   And when you came back, did you announce any

9  changes in the teams?

10  A.   I don't remember.

11  Q.   What education do you have?

12  A.   I have a medical degree.

13  Q.   Where from?

14  A.   Northeastern Ohio Universities College of

15  Medicine.

16  Q.   What year?

17  A.   1986.

18  Q.   Any other degrees?

19  A.   I have a BS from Kent State University also

20  awarded in 1986.

21  Q.   Any others?

22  A.   No.

23  Q.   Have you ever felt threatened by Paula Leligdon?

24  A.   I -- I do at times, yes.

25  Q.   How so?

1  **A.**   She has -- has been very hostile and angry and I

2  think distorted things that I've said or distorted

3  things that other people have said; and I'm aware, as

4  a psychiatrist, that people behave in that paranoid

5  kind of way, they're very unpredictable and can be

6  prone to violence.  So it's always something in the

7  back of my mind that I need to be aware of.

8  **Q.**   You're saying that's a professional medical

9  opinion on your part?

10  **A.**   Yes.

11  **Q.**   Have you documented it?

12  **A.**   No, but I can't divorce my personal feelings

13  from my -- my training as a psychiatrist when

14  encountering that kind of behavior.

15  **Q.**   Have you done anything to protect you or anyone

16  else from Paula?

17  **A.**   I plan to limit my contact with her to having

18  another person engaged in any sort of interaction we

19  need to have other than telephone or email.

20  **Q.**   Who's that?

21  **A.**   I -- when the -- when the occasion arises, I

22  guess I'll decide.

23  **Q.**   Who have you used recently?

24  **A.**   I haven't used anyone yet.  Based on my last

25  interaction with her, I plan to do that going

20

1    forward.

2    **Q.**   What was that last interaction with her?

3    **A.**   I wrote a Report of Contact about it.

4    **Q.**   When was that?

5    **A.**   I want to say in October, not positive.

6    **Q.**   What was the issue?

7    **A.**   She asked me to come down to her office to meet

8    with her about some general issues with social work,

9    I thought.

10   **Q.**   For that you wrote a report?

11   **A.**   She was nasty and demeaning and hostile, and I

12   left rather than sit there and endure that

13   interaction any longer.

14   **Q.**   What was the issue that Paula was raising?

15   **A.**   That I -- that I unfairly -- that -- that she

16   heard rumors -- she said she heard rumors that I have

17   favoritism towards John McKinney.  She didn't say who

18   said it, she wouldn't give me any more specifics than

19   that other than it was rumors.  And, again, her whole

20   demeanor and manner of speaking to me was hostile and

21   inappropriate.  So I said that was ridiculous and I

22   wasn't going to talk about it and I left.

23   **Q.**   Do you know of any outcome from the Report of

24   Contact?

25   **A.**   No, I don't.

21

1    **Q.**   Who did you give the Report of Contact to?

2    **A.**   My supervisor, Dr. Konicki, as well as

3    Mr. Aquilina.

4    **Q.**   Anyone else?

5    **A.**   No.

6    **Q.**   Have you ever felt threatened by anyone

7    associated with Paula Leligdon?

8    **A.**   I don't know what you mean.

9    **Q.**   Were you ever concerned that someone else was

10   threatening to you on behalf of Paula Leligdon?

11   **A.**   No.

12   **Q.**   To your knowledge, is Paula Leligdon willing to

13   discuss issues with you?

14   **A.**   I wouldn't presume to know what she thinks.

15   **Q.**   Have you ever tried to raise issues with her?

16   **A.**   I have in the past, yes.

17   **Q.**   When was the last time?

18   **A.**   Long time ago.

19   **Q.**   More or less than five years ago?

20   **A.**   Probably less.

21   **Q.**   What was the issue?

22   **A.**   I don't remember.

23   **Q.**   Was she willing to listen to you?

24   **A.**   I believe we had an email exchange.  Wasn't

25   important.  I don't remember the details.

22

1    **Q.**   What is the nature of your relationship with
2    John McKinney?
3    **A.**   He is a social worker in the ward.
4    **Q.**   What's your assessment about his -- how good an
5    employee he is?
6    **A.**   Meaning how good of a social worker he is?
7    **Q.**   Well, let's start with that.
8    **A.**   That would be the only thing I could give an
9    opinion about.
10    **Q.**   Right.
11    **A.**   I think he is a decent social worker.  He is not
12    the best one; he is not the worst one.
13    **Q.**   And what's -- what's your assessment of how --
14    how good an employee he is with respect to
15    supervision?
16    **A.**   I don't have an opinion about that.
17    **Q.**   Do you recall a time when the Medical Center
18    received a family complaint about John McKinney?
19    **A.**   Yes.
20    **Q.**   Do you know what happened with that family
21    complaint?
22    **A.**   What do you mean?
23    **Q.**   Whose job was it to manage the Medical Center's
24    response to the family complaint?
25    **A.**   The complaint was made to the patient rep, I

23

1   believe, who spoke with a nurse manager on the ward,

2   as well as, I think, Paula.

3   **Q.**   What was the nature of the complaint?

4   **A.**   I'm not a hundred percent certain.  I know part

5   of it was that he was rude.

6   **Q.**   When you say "he," you mean John McKinney?

7   **A.**   Yes.

8   **Q.**   Whose job was it to assess that on behalf of

9   management at the Medical Center?

10  **A.**   What do you mean?

11  **Q.**   Well, did Paula Leligdon have the responsibility

12  of interviewing John McKinney about it?

13  **A.**   I don't know.

14  **Q.**   Did you give any directions to John McKinney

15  about whether or not he should meet with Paula

16  Leligdon about it?

17  **A.**   No.

18  **Q.**   Did you have any discussions with John McKinney

19  about it?

20  **A.**   I remember he told me that she wanted him to

21  come downstairs to speak with her, and that was a day

22  when one of other social workers was off and we had a

23  bunch of admissions.  I don't remember how many, but

24  we had a lot of admissions.  And he was concerned he

25  wouldn't be able to get done what he needed to get

24

1    done, and I said, "I can't tell you what to do one

2    way or the other."

3         I know that in the past when we've brought up

4    the issues about the clash between clinical

5    responsibilities on the ward and some administrative

6    thing that we've always understood that clinical

7    things should come first.  So I suggested that he

8    talk to Paula about it.  That was the extent --

9    extent of it.  I don't know if he went or not

10   actually.

11   Q.   Do you know if John McKinney ever met with Paula

12   Leligdon about that family complaint?

13   A.   I just said I don't know if he went or not.

14   Q.   Do you know what the outcome was of the family

15   complaint?

16   A.   Nothing as far as I know.

17   Q.   Do you recall if John McKinney had a

18   self-assessment to do on that day?

19   A.   A what?

20   Q.   Self-assessment.

21   A.   I -- I don't know.  I'm not sure what a

22   self-assessment is.  What are you talking about?

23   Q.   Isn't that what the employee fills out as part

24   of their performance rating process where they have

25   to do --

25

1   **A.**   My employees don't do that so I wouldn't be

2   familiar with that.   Physicians don't do that.

3   **Q.**   Do you think it's important for the Medical

4   Center to take family complaints seriously?

5   **A.**   Yes.

6   **Q.**   Do you think it's important that the Medical

7   Center document their investigation of those

8   complaints?

9   **A.**   I'm not sure all complaints warrant an

10  investigation in a formal sense.

11  **Q.**   How long do you think John McKinney's meeting

12  with Paula Leligdon about the family complaint would

13  have taken?

14  **A.**   I have no idea.

15  **Q.**   Were you asked to write a Report of Contact

16  about this particular family complaint?

17  **A.**   Yes.

18  **Q.**   And did you?

19  **A.**   No.

20  **Q.**   Why not?

21  **A.**   I didn't witness anything so that I had nothing

22  to write about.

23  **Q.**   Did you make any documentation about what you

24  told John McKinney with respect to whether or not he

25  should meet with Paula about it?

1   **A.**   No.

2   **Q.**   If you would, in the book in front of you would

3   you turn to page 1934?

4   **A.**   (Witness complies with the request.)

5        Reading glasses.

6   **Q.**   Let me know when you're ready.

7   **A.**   I'm at the page.  Yes, I'm ready.

8   **Q.**   All right.

9   **A.**   Did you want me to read it?

10  **Q.**   Well, I want to know if you recall sending this

11  email to Paula Leligdon on November 19, 2013?

12  **A.**   I don't remember it, but obviously I sent it

13  since my name is there.

14  **Q.**   And your email has a single line here saying, "I

15  do not remember the details sufficiently to complete

16  a ROC at this late date"?

17  **A.**   Yes.

18  **Q.**   So at that time your reason for not issuing the

19  Report of Contact was because you no longer

20  remembered the details?

21  **A.**   It wasn't about the complaint.  If you'll

22  notice, she is asking me about his noncompliance in

23  attending the meeting.  That's not what you asked me

24  about.

25  **Q.**   All right.  Well, I did ask you if you had made

27

1   any documentation about what you told John McKinney,

2   and you said you had not; is that correct?

3   **A.**   I had not.  I did not.

4   **Q.**   And here Paula Leligdon is directly asking you

5   for it, and you said you could not because you could

6   not remember; is that correct?

7   **A.**   You asked me if I made any documentation, I said

8   I didn't make any documentation of my discussion with

9   John McKinney.  I don't see where this is the same

10  thing as you're asking me.  (Indicating.)

11  **Q.**   But today when I asked you about what you told

12  John McKinney, you were able to recite to me what you

13  told him; is that correct?

14  **A.**   Yes.

15  **Q.**   But here two and a half years ago when Paula

16  asked you to write an ROC, you said you did not

17  remember the details sufficiently; is that correct?

18  **A.**   Yes.  I subsequently looked at my EEO testimony

19  and that refreshed my memory before today.

20  **Q.**   What was that testimony?

21  **A.**   That I -- that I had told him that we were busy

22  and that he needed to check with her about whether he

23  could -- whether he was going to attend or not,

24  roughly.

25  **Q.**   Was that testimony you gave in writing or

28

1    verbally?

2    **A.**    Verbally, but then they wrote up a copy of it

3    and sent me a copy to keep.

4    **Q.**    When was that?

5    **A.**    I'm not sure.  I don't remember the date.  2014

6    sometime.

7    **Q.**    So that would have been many months after this

8    email that we're looking at right now; is that

9    correct?

10   **A.**    Mm-hmm.

11   **Q.**    Can you use a word to answer, please?

12   **A.**    Yes.

13   **Q.**    Have you ever done or said anything that would

14   indicate that the family complaint itself was

15   debunked?

16   **A.**    Have I ever done or --

17   **Q.**    Said anything that would debunk the complaint

18   the family made about John McKinney?

19   **A.**    I -- I don't know.

20   **Q.**    Did you yourself ever come to any conclusion

21   about whether the family complaint had merit?

22   **A.**    Not about -- not about having been spoken

23   rude -- rude to or if that had happened.  I think

24   that was the essence of the complaint.

25         But I was not concerned that the paperwork that

29

1   that individual had brought to the hospital to have

2   signed was not brought up to me because I didn't have

3   a release and I would not have filled out the

4   paperwork that she wanted me to fill out.  It was

5   power of attorney form on a patient in the hospital,

6   not even a direct relative of hers.  So I wouldn't

7   have filled it out.

8   **Q.**   Did you feel that debunked that part of the

9   family complaint?

10  **A.**   No.  I don't know that that was part of the

11  family complaint.  The complaint, as I remember it,

12  centered around the manner in which he spoke with the

13  family member and I didn't observe that.

14  **Q.**   Was it your responsibility to make any decision

15  about the family complaint?

16  **A.**   What do you mean?

17  **Q.**   Was it a normal part of your job duties to

18  receive and manage how the VA Medical Center

19  responded to that family complaint?

20  **A.**   If a complaint was brought to me about one of my

21  employees, then I would address it.

22  **Q.**   Was John McKinney one of your employees?

23  **A.**   No.

24  **Q.**   So then it was not your responsibility to

25  address it; is that correct?

30

1    **A.**    Right, which is why I didn't write the Report of

2    Contact about what happened in the complaint.

3    **Q.**    Now, what is the Algart Assisted Living Center?

4    **A.**    It's the Algart Assisted Living Center.

5    **Q.**    Where is it?

6    **A.**    I don't know the address.  It's in the near west

7    side of Cleveland.

8    **Q.**    From time to time, do you have to visit patients

9    there?

10    **A.**    No.

11    **Q.**    Did you ask John McKinney to accompany you

12    there?

13    **MS. JOHNSON:**    **Objection.  You may**

14    **answer.**

15    **THE WITNESS:**    **John McKinney and**

16    **Jennifer Roche and I went to the facility to look at**

17    **it because we were thinking about placing one of our**

18    **patients there.  Someone else went, too.  I can't**

19    **remember.  I think there was four of us.**

20    **BY MR. RENNER:**

21    **Q.**    Was there anything time sensitive or urgent

22    about that visit?

23    **A.**    Meaning it was an emergency?

24    **Q.**    That's --

25    **A.**    It wasn't an emergency.

31

1   **Q.**   Is it normally difficult to place veterans from
2   the acute inpatient unit?
3           **MS. JOHNSON:**        **Objection.  You may**
4   **answer.**
5           **THE WITNESS:**         **It's not normally**
6   **difficult.**
7   **BY MR. RENNER:**
8   **Q.**   Did you personally ask John McKinney to
9   accompany you?
10          **MS. JOHNSON:**        **Objection.  You may**
11  **answer.**
12          **THE WITNESS:**        **As I said, there were**
13  **four of us going in, yes.**
14  **BY MR. RENNER:**
15  **Q.**   Why did you select him?
16  **A.**   He was on my team working with the patient who
17  we were thinking about placing in that facility on a
18  Medicaid assisted waiver.
19  **Q.**   Have you ever heard John McKinney refer to
20  himself as being a ping pong between you and Paula
21  Leligdon?
22  **A.**   No.
23  **Q.**   Have you ever heard the phrase "ping pong"
24  before in reference to John McKinney?
25  **A.**   No.

1   Q.   So you told me how of the three social workers

2   if one of them calls off that -- that can add to the

3   workload for the other two.  Are there ever times

4   where there are two social workers who are off and

5   there's only one social worker on the ward?

6   A.   I can't specifically recall a time when that

7   occurred.

8   Q.   Do you recall telling Paula Leligdon that if

9   there's only one social worker on the ward, you would

10  consider that the unit was in emergency mode?

11  A.   I don't remember saying it was in emergency

12  mode.  I do remember discussing that I thought as a

13  minimum staffing we should always have two social

14  workers.

15  Q.   On the day that John McKinney went to the Algart

16  Center, how many social workers were left on the

17  ward?

18          MS. JOHNSON:      Objection.  You can

19  answer.

20          THE WITNESS:      I don't know.

21  BY MR. RENNER:

22  Q.   Did you and John McKinney go anywhere else

23  together that day?

24  A.   No, I don't remember.

25          MS. JOHNSON:      Objection.  You can

33

1   answer.

2            THE WITNESS:        I don't remember.

3   BY MR. RENNER:

4   Q.   Does John McKinney confide in you?

5            MS. JOHNSON:        Objection.  You can

6   answer.

7            THE WITNESS:        No.

8   BY MR. RENNER:

9   Q.   How often does he complain about Paula Leligdon?

10  A.   Not often.

11  Q.   Has John McKinney complained to you about any

12  other VA employees?

13  A.   No.

14  Q.   Did John McKinney ever ask you to review any

15  complaint or Report of Contact he made?

16  A.   No.

17           MS. JOHNSON:        Objection.  You may

18  answer.

19           THE WITNESS:        Sorry.

20           MS. JOHNSON:        That's okay.

21  BY MR. RENNER:

22  Q.   If a social worker calls off on short notice

23  leaving just one other social worker on your ward,

24  would that be a situation you would want the social

25  worker supervisor to address?

34

1   **A.**   Yes.

2   **Q.**   And in determining whether or not there were any

3   sign offs or coverage issues for the veterans on your

4   ward, would it be appropriate for the supervisor to

5   call that social worker at home?

6   **A.**   I don't think it's ever appropriate to call an

7   employee at home.

8   **Q.**   Why is that?

9   **A.**   I don't do it.  I think your private time is

10   your private time.

11   **Q.**   Well, it is possible that issues of veteran care

12   might be addressed by calling an employee at home?

13   **A.**   My opinion is as I stated.  It's not

14   appropriate.

15   **Q.**   Do you know when John McKinney was absent on

16   February 4, 2014?

17   **A.**   No.

18   **Q.**   Do you recall what the staffing level was in

19   your ward at that time?

20   **A.**   No.

21   **Q.**   Do you know what the bed count was on your ward

22   then?

23   **A.**   No.

24   **Q.**   Do you know whether Paula Leligdon herself was

25   on leave at the time?

35

1  **A.**   No.

2  **Q.**   Are you familiar with the mental health monitor?

3  **A.**   There are many mental health monitors.

4  **Q.**   Are you aware of the seven day follow-up

5  monitor?

6  **A.**   Yes.

7  **Q.**   Can you explain what its purpose is?

8          **MS. JOHNSON:**      **Objection.  You may**

9  **answer.**

10          **THE WITNESS:**      **I'm not certain what its**

11  **purpose is.  I can say what it is.**

12  BY MR. RENNER:

13  **Q.**   What -- what is it?

14  **A.**   It is a requirement that patients discharged

15  from the acute inpatient service -- actually it's

16  been expanded as well as from residential care, have

17  a mental health visit within seven days of discharge

18  from the hospital.  It's had multiple iterations over

19  the past few years.

20  **Q.**   Is there a mental health monitor committee to

21  manage this program?

22          **MS. JOHNSON:**      **Objection.  You can**

23  **answer.**

24          **THE WITNESS:**      **No.**

25  BY MR. RENNER:

1  **Q.**   Are you familiar with the mental health monitor

2  committee?

3  **A.**   There's been no mental health monitor committee.

4  **Q.**   If you would, turn to page 2065.

5  **A.**   Five five.

6  **Q.**   Do you see here Mr. Aquilina's email refers to

7  the "Monthly Mental Health Council"?

8  **A.**   Yes.

9  **Q.**   You're familiar with that council?

10  **A.**   Yes.

11  **Q.**   Do they have any responsibility over the mental

12  health monitors?

13  **A.**   They -- that is the leadership group for all of

14  mental health, and they keep track of the various

15  quality assurance ORYX measures and other monitors

16  that are required in the -- across the department,

17  psychology, psychiatry, et cetera.

18  **Q.**   Does that include the mental health monitors?

19  **A.**   Yes.

20  **Q.**   All right.  So they would be a committee that

21  oversees the mental health monitors; is that correct?

22  **A.**   No, I would not characterize it that way.

23  They're the -- they're the -- the executive oversight

24  for all issues in the department, all performance

25  measures, all suspenses, all -- all leadership issues

37

1    across the department, but they're not specifically

2    having anything to do with the monitor itself.  They

3    simply hear about it and hear what the results are of

4    the clinical staff, you know, who are responsible for

5    meeting it.

6    **Q.**   If you turn two pages forward to 2067.

7    **A.**   (Witness complies with the request.)

8    **Q.**   Let me know when you're ready.

9    **A.**   Okay.

10   **Q.**   Do you recall this email chain with Paula

11   Leligdon in 2012?

12   **A.**   I don't recall it but I see it.

13   **Q.**   And in the second email, you say that

14   Mr. Aquilina is the Social Work representative?

15   **A.**   To the management level work group that's

16   mentioned in the first email there.

17   **Q.**   The subject line for that email is "MH Monitor";

18   is that correct?

19   **A.**   Okay.

20   **Q.**   Then in the bottom email on that page you say

21   that "The committee in question no longer exists

22   subsequent to the creation of an upper level

23   management work group" --

24   **A.**   Mm-hmm.

25   **Q.**   -- "from which now all processes flow, so your

38

1  point is a moot one and further discussion is

2  unnecessary."

3  **A.**  Mm-hmm.

4  **Q.**  Could you use words to answer?

5  **A.**  Yes.

6  **Q.**  So this email suggests that there was a mental

7  health monitor committee, and you're reporting to

8  Paula that it was disbanded and replaced by an upper

9  level management work group.  Do you see that?

10  **A.**  I can read it, yes.

11  **Q.**  All right.  What is the name of this upper level

12  management work group?

13  **A.**  That no longer exists either.  It didn't have a

14  name.

15  **Q.**  So who is responsible for managing the mental

16  health monitors now?

17  **A.**  Some of the management analysts, the data

18  management analysts in psychiatry monitors the

19  results.  They're reported every month, brings them

20  to my attention, as necessary to Dr. Konicki's

21  attention, and ultimately brings them to the mental

22  health council.

23  **Q.**  Can you give me their names?

24  **A.**  Whose names?

25  **Q.**  The names of these data analysts who do --

1          MS. JOHNSON:       Objection.  You can

2     answer.

3          THE WITNESS:       The previous data analyst

4     was Paul Marshall and Ross Vincent.  I believe Paul

5     Marshall still monitors that data as well.  I think

6     William Speirs is -- is the administrative officer.

7     He also has some oversight of the data.

8     BY MR. RENNER:

9     Q.    And who do they report to?

10    A.    I'm not sure; maybe Jackie Hartville.  Their --

11         MS. JOHNSON:       I'd like to go off the

12    record, please.

13         THE VIDEOGRAPHER: We're going off the

14    record.  The time is now 3:11.

15         (Thereupon, a recess was taken.)

16         THE VIDEOGRAPHER: We're back on the record.

17    The time is now 3:22.  You may proceed.

18    BY MR. RENNER:

19    Q.    Dr. Bond, the mental health monitor has a box to

20    indicate whether the social worker spoke with the

21    Veteran for at least 11 minutes; is that correct?

22    A.    The monitor has a box?  No.  There's a social

23    worker note that has a box.  It's a template, I

24    believe, that has a box.

25    Q.    What is the purpose of that note?

40

1          MS. JOHNSON:         Objection.  You can

2     answer.

3          THE WITNESS:         The notice of documents,

4     a call from the social worker to the patient after

5     discharge reminding them of their appointment and to

6     check up on them and see how they're doing just to

7     see if they need anything.

8               If they speak to them about anything of

9     substance for -- I believe it's 11 minutes or more,

10    then that can also serve as evidence of a follow-up

11    and partially meet the measure.

12    BY MR. RENNER:

13    Q.   What is the measure for?

14    A.   So you -- as I said, the measure had several

15    iterations.  So originally the requirement was the

16    patients had to be seen within 14 days for a

17    face-to-face encounter and a telephone contact before

18    that within the first seven days would then extend

19    the requirement to be seen -- you know, would be okay

20    to be seen in 14 days.  If we have phone contact in

21    the first 7, then it was okay to have a face to face

22    in 14.

23         So I think it was to have the opportunity to

24    have a meaningful interaction, checking up with the

25    patients and remind them about the appointment to try

41

1    to maximize the likelihood that they would show up

2    for their scheduled appointments.

3        The -- the measure's changed a little bit.  Now

4    we don't have the 14 day anymore.  It's a seven --

5    seven-day requirement.  It can either be met by the

6    face to face or by a substantive phone call.

7    Q.   Part of the purpose for this process is suicide

8    prevention; is that correct?

9            MS. JOHNSON:       Objection.  You can

10   answer.

11           THE WITNESS:       That -- that wasn't

12   explicitly stated as the measure first came out, no.

13   The first -- the issue really was to look at the

14   highest risk patients, which were those who were

15   hospitalized on inpatient service and knowing that

16   they have the highest degree of problems after they

17   get out of the hospital, that include suicide,

18   relapse, noncompliance with medication, various kinds

19   of things.

20           So it really wasn't just about suicide, it

21   was to address the broader issues that patients are

22   at risk at when they first leave the hospital from an

23   inpatient psychiatric stay.

24   BY MR. RENNER:

25   Q.   All of those purposes are for quality of care to

42

1    the veterans; is that correct?

2    **A.**    Yes.

3    **Q.**    And -- and this program has been in effect for

4    about four years now; is that correct?

5    **A.**    No, it's been longer than that.  We -- we --

6    we -- our first work -- when the measure first came

7    out as -- in -- well, we were still at Brecksville,

8    because the first work group that we had to figure

9    out what processes we were going to put in place to

10   meet the measure took place at Brecksville, and we

11   moved -- the psychiatric unit moved from Brecksville

12   to Wade Park in June of 2011.  So it happened

13   sometime before 2011 that the measure came out.

14   **Q.**    Have social workers reported to you that it's

15   sometimes hard to keep a veteran talking to them for

16   the full 11 minutes?

17   **A.**    No.

18   **Q.**    You've never heard any concerns about that?

19   **A.**    No, never.

20   **Q.**    Have you ever told any staff that they should

21   check the box saying that they met with the veteran

22   for at least 11 minutes when, in fact, they had not?

23            **MS. JOHNSON:**        **Objection.  You can**

24   **answer.**

25            **THE WITNESS:**        **No.**

43

1   BY MR. RENNER:

2   Q.    If you would now, turn back to 2065.

3   A.    (Witness complies with the request.)

4   Q.    In the email on the top, Mr. Aquilina is saying

5   that he is "not a member of any other group reviewing

6   MH monitors."  Do you see that?

7   A.    Mm-hmm.

8   Q.    Could you use a word, please?

9   A.    Yes.

10  Q.    All right.  Does that contradict what you said

11  on page 2067 in the second email where you say

12  Mr. Aquilina is the social service representative?

13            MS. JOHNSON:        Objection.  You may

14  answer.

15            THE WITNESS:        I don't -- I don't

16  think they're referring to the same subject actually.

17  Even if -- even though it's the same subject line, I

18  don't -- I think they're not talking about the same

19  thing.

20  BY MR. RENNER:

21  Q.    How are they different?

22  A.    Well, I understand the -- the --- the process

23  of what was being discussed.  So the question is --

24  he's -- he's responding to something about being a

25  member of a group reviewing monitors, meaning, like,

1   I don't know, quality assurance group or something.

2   I -- I don't know what he was asked to know that he

3   responded to that.  That seems pretty generic and,

4   like, it's responding to more than one monitor.

5   **Q.**   If you would, look at page 2066.

6   **A.**   (Witness complies with the request.)

7       **MS. JOHNSON:       Objection to this entire**

8   **line of questioning.  This has nothing to do with**

9   **this litigation.  But go ahead, you can answer.**

10       **THE WITNESS:       He didn't ask me a**

11  **question.  He just told me to turn to page 266 --**

12  **2066.**

13  **BY MR. RENNER:**

14  **Q.**   All right.  Doesn't this email from Paula

15  Leligdon clarify that Mr. Aquilina was, in fact,

16  responding to the very issue that you were reporting

17  to Paula about earlier in the month?

18  **A.**   That I was reporting -- I was reporting to --

19  **Q.**   Yeah.

20  **A.**   -- to Paula about an issue?

21  **Q.**   Yeah.  If you go back to 2067, right, you told

22  Paula that there's now this upper level management --

23  **A.**   I -- I -- I can't -- I can't give an opinion on

24  emails written by people other than myself.  I'm

25  sorry.

45

1  **Q.**  Okay.

2  **A.**  It's all -- this is too confusing.  I don't know

3  what you're talking about.  I -- I can only answer to

4  the email I might have written, if you want to ask me

5  a question about that, I guess.

6  **Q.**  So you're saying now that you don't know whether

7  or not Mr. Aquilina's email contradicts your email or

8  not?

9  **A.**  This is -- this is very confusing is what I'm

10  saying.  They're talking about different things.

11  They're talking about "monitors" with an S, so it's

12  plural, then there's "monitor" with no S, so it's

13  singular.  Then they're talking about a committee,

14  which there isn't, as opposed to a work group.  So

15  there is no committee.  There was never a committee

16  ever.  So referring to a committee is referring to

17  something that never existed.  So it's very

18  confusing.

19  **Q.**  Would you please turn to page 1977.

20  **A.**  (Witness complies with the request.)

21        **MS. JOHNSON:        Can you repeat the page?**

22        **MR. RENNER:        1977.**

23  BY MR. RENNER:

24  **Q.**  Is it true that you deleted Paula Leligdon's

25  email without reading it?

46

1          MS. JOHNSON:          Objection.  You may
2   answer.
3          THE WITNESS:          That's what it says.
4   (Indicating.)
5   BY MR. RENNER:
6   Q.   Is it true?
7   A.   I don't know.  I don't remember it, but that's
8   what it says.  (Indicating.)
9   Q.   You said it was around October when Paula asked
10  to meet with you about favoritism for John McKinney.
11  Do you recall --
12  A.   I think, but I don't recall the date
13  specifically, as I said.
14  Q.   Turn three pages later to 1980.  On the bottom
15  of the page there, do you see your email from the day
16  before, September 30, 2015, saying that you agree
17  with Paula about the email, "If you want to have a
18  conversation with me, please call me at your
19  convenience today?"  Do you see that?
20  A.   Yes.
21  Q.   All right.  And then it was the next day that
22  you deleted her email without even reading it; is
23  that correct?
24  A.   That's what it says.
25  Q.   Do you know any of the suicide prevention

47

1   coordinators?

2           MS. JOHNSON:        Objection.   You can

3   answer.

4           THE WITNESS:        Yes.

5   BY MR. RENNER:

6   Q.   Who are they?

7   A.   I can't name all of them.  Katie Rotolo was in

8   charge of the program.

9   Q.   Did you know her as a student?

10  A.   Yes.

11  Q.   Do you know who she trained under as a student?

12          MS. JOHNSON:        Objection.   You can

13  answer.

14          THE WITNESS:        I believe it was Kristi

15  Sack -- Kristi Fredritz.  I'm sorry.

16  BY MR. RENNER:

17  Q.   Do you know who was involved in hiring her?

18          MS. JOHNSON:        Objection.

19          THE WITNESS:        No.

20  BY MR. RENNER:

21  Q.   Were you involved?

22  A.   No.

23  Q.   Are Ms. Rotolo and Ms. Fredritz involved in the

24  mental health seven-day follow up monitor?

25          MS. JOHNSON:        Objection.   You may

48

1    answer.

2              THE WITNESS:        No.

3    BY MR. RENNER:

4    Q.   Do you have any personal relationship with

5    either of them?

6              MS. JOHNSON:        Objection.  You can

7    answer.

8              THE WITNESS:        They're my colleagues.

9    BY MR. RENNER:

10   Q.   Any -- do you socialize with them?

11   A.   No.

12   Q.   Did you attend any of their weddings?

13   A.   I attended Kristi Sack's wedding a long time

14   ago.

15   Q.   What's her name now?

16   A.   Fredritz.

17             MR. RENNER:        We need to take a short

18   break.

19             THE VIDEOGRAPHER: Let's go off the record.

20   This concludes tape number 1.  The time is now 3:34.

21             (Thereupon, a recess was taken.)

22             THE VIDEOGRAPHER: We're back on the record.

23   This begins tape number 2.  The time is now 3:37.

24   You may proceed.

25   BY MR. RENNER:

1  Q.   Dr. Bond, are you familiar with the concept

2  called "complicit bias"?

3  A.   No.

4  Q.   Do you know whether it's possible for people to

5  harbor biases that they are not consciously aware of?

6           MS. JOHNSON:       Objection.  You may

7  answer.

8           THE WITNESS:       No.

9  BY MR. RENNER:

10  Q.   Who is Sara West?

11           MS. JOHNSON:       Objection.  You may

12  answer.

13           THE WITNESS:       Psychiatrist.

14  BY MR. RENNER:

15  Q.   What was your work relationship with her?

16  A.   I was her supervisor in inpatient service.

17  Q.   For how long?

18  A.   I'm not sure.

19  Q.   Are you still her supervisor?

20  A.   No.

21  Q.   Why not?

22  A.   She took a job at the state hospital.

23  Q.   When was that?

24  A.   I'm not certain.

25  Q.   Do you know if it was months or years ago?

50

1          MS. JOHNSON:        Objection.  You can

2   answer.

3          THE WITNESS:        I said I'm not certain.

4   BY MR. RENNER:

5   Q.   I'd like to know if you're familiar with what

6   the time range is.

7   A.   I'm not certain.

8   Q.   Do you know why she left?

9   A.   No.

10  Q.   Did you have any conflict with her?

11  A.   No.

12         MS. JOHNSON:        Objection.

13  BY MR. RENNER:

14  Q.   Had you trained her as a resident?

15         MS. JOHNSON:        Objection.  You can

16  answer.

17         THE WITNESS:        I -- she did do a

18  rotation or two on the inpatient psychiatry service

19  when she was a resident.

20  BY MR. RENNER:

21  Q.   At that time you would have been responsible for

22  training her; is that right?

23         MS. JOHNSON:        Objection.  You can

24  answer.

25         THE WITNESS:        I wasn't the only

1    attending she worked with when she did her months on

2    the inpatient service.

3    BY MR. RENNER:

4    Q.    You were among those that she was training --

5    A.    Yes.

6    Q.    Did you participate in the decision to hire her?

7    A.    Yes.

8    Q.    How so?

9    A.    I was part of the interviewing panel.

10   Q.    Did you recommend hiring her?

11   A.    Yes.

12   Q.    Did the two of have you any professional

13   disagreements --

14            MS. JOHNSON:        Objection.

15   BY MR. RENNER:

16   Q.    -- about patient care?

17            MS. JOHNSON:        Objection.

18            THE WITNESS:        We had no professional

19   disagreements about patient care, no.

20   BY MR. RENNER:

21   Q.    There was a time where she moved from acute

22   psychiatry to the PRRTP program; is that correct?

23            MS. JOHNSON:        Objection.  You may

24   answer.

25            THE WITNESS:        Yes.

52

1   BY MR. RENNER:

2   Q.   Why did she move?

3            MS. JOHNSON:        Objection.  You may

4   answer.

5   BY MR. RENNER:

6   Q.   Why did she move?

7   A.   I moved her.

8   Q.   Why did you move her?

9   A.   It was a clinical decision.

10  Q.   Why?

11           MS. JOHNSON:        Objection.

12           THE WITNESS:        I felt that she would be

13  better suited for that service.

14  BY MR. RENNER:

15  Q.   Why?

16           MS. JOHNSON:        Objection.  You may

17  answer.

18           THE WITNESS:        I'm thinking.

19           As best I can recall, we had a discussion

20  about the pace and intensity of the inpatient unit

21  and the difficulties of balancing those, the

22  requirements of that kind of patient care with

23  student teaching.  So the position at PRTP didn't

24  have a student teaching.  So she agreed to transfer

25  there.

53

1  BY MR. RENNER:

2  Q.   Do you want staff people to be afraid of you?

3           MS. JOHNSON:        Objection.

4           THE WITNESS:        No, that's ridiculous and

5  insulting.

6  BY MR. RENNER:

7  Q.   Do you have any disability affecting your work?

8           MS. JOHNSON:        Objection.  Don't answer.

9           You need to explain the relevance of this

10  on the record.  You are -- this has nothing to do

11  with this litigation and I'm really done.  I don't

12  think you've asked five questions in this deposition

13  that have any relevance to the case.  Can you explain

14  why you are asking such a question, just how it could

15  be related to this litigation on the record.

16           MR. RENNER:        It's a background

17  question related to credibility and bias.

18           MS. JOHNSON:        I don't think that's -- I

19  don't think there is any basis to ask a question like

20  that.

21           MR. RENNER:        Okay.  I'll move on.

22           MS. JOHNSON:        I'm going to instruct her

23  not to answer.

24  BY MR. RENNER:

25  Q.   Have you ever heard any rumors or gossip about

54

1    Paula Leligdon?

2    **A.**    No.

3    **Q.**    Have you talked to anyone else at the Medical

4    Center about Paula Leligdon?

5    **A.**    No.

6    **Q.**    Have you ever talked with Joe Aquilina about

7    Paula Leligdon?

8    **A.**    Yes.

9    **Q.**    What about?

10   **A.**    As I mentioned in my earlier testimony, the

11   Report of Contact that I recently wrote, also

12   requested many years ago, again, before we left

13   Brecksville, to meet with he and Paula and my

14   supervisor Dr. Konicki to discuss some conflicts

15   about management of the social work staff on the

16   ward.

17   **Q.**    When was that?

18   **A.**    I -- it was before 2011.

19   **Q.**    What did you say about Paula?

20   **A.**    We had a meeting and I expressed concern that

21   she had given direction to the social workers that

22   ran counter to the clinical direction and plan for

23   patient care on the ward such as not going to rounds

24   but doing assessments instead of meeting with the

25   team.  There were other issues as well I can't

55

1    specifically remember.

2        Mr. Aquilina was supportive in saying that my

3    direction in terms of the clinical activities on the

4    ward was to be followed as opposed to anything that

5    conflicted with that.

6    Q.    Do you have any familiarity with stereotyping?

7             MS. JOHNSON:        Objection.  You can

8    answer.

9             THE WITNESS:        No.

10   BY MR. RENNER:

11   Q.    Are you familiar with the concept?

12   A.    Minimally.

13   Q.    In your opinion, does Paula Leligdon fit with or

14   deviate from the stereotype of women over 40?

15            MS. JOHNSON:        Objection.

16            THE WITNESS:        I'm not familiar with

17   what the stereotype of a woman over 40 is.  I am one

18   myself, but I don't know what the stereotype is.

19            MR. RENNER:        Let me take a short

20   recess.

21            THE VIDEOGRAPHER: Going off the record.

22   The time is now 3:47.

23            (Thereupon, a recess was taken.)

24            THE VIDEOGRAPHER: We're back on the record.

25   Time is now 4:03.

56

1    **BY MR. RENNER:**

2    **Q.**   Dr. Bond, can you --

3    **A.**   What page?

4    **Q.**   1969.

5          Let me know when you're ready.

6    **A.**   Okay.

7    **Q.**   Do you recognize this email?

8    **A.**   I -- I sent it.  That's my signature.

9    **Q.**   All right.

10   **A.**   I don't remember it.

11   **Q.**   All right.  Is it correct that you were

12   concerned when there was not a supplemental social

13   work coverage plan for your ward in the event that

14   two of the three social workers were out?

15              MS. JOHNSON:      Objection.  This email

16   does not appear to be completed.

17              MR. RENNER:      Oh, yeah, the previous

18   page has the header on it.

19              MS. JOHNSON:      Okay.

20              MR. RENNER:      1968.

21              MS. JOHNSON:      I may want to direct the

22   witness to the complete email so she can actually

23   read it.

24              MR. RENNER:      That's fine.

25              THE WITNESS:      Previous page?

57

1    BY MR. RENNER:

2    Q.    Yeah, has the head and continues on 1969.  Do

3    you see that there at the bottom?

4    A.    It's on the other page, too.

5    Q.    October 25, 2013.  Let me know when you're

6    ready.

7    A.    I'm not ready yet.

8          So there's one, two, three, four pages of the

9    email you're referring to?

10   Q.    I'm only asking you about the October 25, 2013,

11   email at 1:52 p.m., the body of which is on page

12   1969.

13            MS. JOHNSON:      Which you can feel free

14   to review the entire document if you want to.

15            THE WITNESS:      Okay.  Something is

16   missing here, my signature part and there's nothing

17   that it goes to, or this one.

18            MS. JOHNSON:      What page is that that

19   you're pointing to?

20            THE WITNESS:      1966.  There's some other

21   email that isn't there, that's part of my signature

22   block.

23            MS. JOHNSON:      I wonder if that

24   continues on to the next page.  I -- I don't know.

25            MS. BRIZIUS:      Is it the bottom of 1965?

1           MS. JOHNSON:        Okay.  1965.

2           THE WITNESS:        I'm having trouble

3    following the sequence.

4           What -- what is it you want to ask me?

5    BY MR. RENNER:

6    Q.   Is it true that on October 2013 you were

7    concerned that there was not a supplemental social

8    work coverage plan for when you had two of your three

9    social workers out?

10   A.   So there's an email to that effect.

11   (Indicating.)

12   Q.   The answer is yes; is that correct?

13   A.   There's an email to that effect.  I don't

14   remember the incident specifically.

15   Q.   You did tell Paula Leligdon that you were

16   concerned?

17   A.   This email appears to be, in fact, written by

18   me; otherwise, I have no memory of that.

19   (Indicating.)

20   Q.   All right.  And the next sentence you said,

21   "What this means is that we are in 'emergency mode'

22   and the regular business of the Ward is unable to

23   proceed," correct?

24   A.   I see that written, yes.

25           MR. RENNER:        I have no further

1    questions.

2             MS. JOHNSON:       Okay.  You -- you have

3    the right to read the transcript or to waive

4    signature.  I would recommend that we read the

5    transcript.

6             THE WITNESS:       Okay.

7             MS. JOHNSON:       So if you would tell the

8    court reporter whether you'd like to read it or not.

9             THE WITNESS:       I would like to read the

10   transcript.

11            MS. JOHNSON:       Okay.  And we would waive

12   the video transcript.

13            THE VIDEOGRAPHER: This concludes the

14   deposition.  We're going off the record at 4:09.

15            (Thereupon, the Linda Bond, M.D.,

16             deposition was concluded at 4:09 p.m.)

17                      - - -

18

19

20

21

22

23

24

25

60

1

2

3      I, LINDA C. BOND, M.D., do verify that I have

4    read the foregoing transcript consisting of 61

5    pages and have had the opportunity to make

6    corrections/changes; and that the foregoing is a

7    true and correct transcript of my testimony given

8    May 26, 2016.

9

10    Corrections/Changes Made _____

11

12    No Corrections/Changes Made _____

13

14

       _____

15                      LINDA C. BOND, M.D.

16

17       Sworn to before me, _____,

                       Notary Public

18

19    this _____ day of _____, _____.

20

21                      _____

                       Notary Public

22

23    My commission expires _____.

24                      - - -

25    ccm

```
1              C  E  R  T  I  F  I  C  A  T  E
2
   STATE OF OHIO,    )
3                    )   SS:
   SUMMIT COUNTY.    )
4
5        I, Carina C, Meszaros, a Registered Merit
   Reporter and Notary Public within and for the State
   of Ohio, duly commissioned and qualified, do hereby
6  certify that the within named witness, LINDA C. BOND,
   M.D., was by me first duly sworn to testify the
7  truth, the whole truth and nothing but the truth in
   the cause aforesaid; that the testimony then given by
8  her was by me reduced to Stenotypy in the presence of
   said witness, afterwards prepared and produced by
9  means of Computer-Aided Transcription and that the
   foregoing is a true and correct transcription of the
10 testimony so given by her as aforesaid.
         I do further certify that this deposition was
11 taken at the time and place in the foregoing caption
   specified, and was completed without adjournment.
12       I do further certify that I am not a relative,
   employee of or attorney for any party or counsel, or
13 otherwise financially interested in this action.
         I do further certify that I am not, nor is the
14 court reporting firm with which I am affiliated,
   under a contract or defined in Civil Rule 28(D).
15       IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my seal of office at Akron, Ohio, on this
16 22nd day of June, 2016.
17
18
                          _____
19                        Carina C. Meszaros, RMR
20            My commission expires March 11, 2019.
21                          -  -  -
22
23
24
25
```

**A**

**able**
23:25 27:12
**absent**
34:15
**accompany**
30:11 31:9
**action**
61:13
**activities**
8:24 55:3
**acute**
11:15,25 12:1
31:2 35:15
51:21
**add**
32:2
**addiction**
8:9
**address**
6:7,8,10 9:13
29:21,25 30:6
33:25 41:21
**addressed**
34:12
**adjournment**
61:11
**administrative**
24:5 39:6
**admissions**
23:23,24
**advance**
17:11
**advice**
6:16
**affairs**
1:10 5:5
**affect**
11:4
**affiliated**
61:14
**affiliations**
5:15
**affixed**
61:15
**aforesaid**

61:7,10
**afraid**
53:2
**age**
5:25
**ago**
12:10 21:18,19
27:15 48:14
49:25 54:12
**agree**
46:16
**agreed**
52:24
**ahead**
44:9
**akron**
61:15
**algart**
30:3,4 32:15
**altose**
7:21,22,23
**analyst**
39:3
**analysts**
38:17,18,25
**angry**
19:1
**announce**
18:8
**answer**
10:11 17:20
18:3 28:11
30:14 31:4,11
32:19 33:1,6
33:18 35:9,23
38:4 39:2 40:2
41:10 42:24
43:14 44:9
45:3 46:2 47:3
47:13 48:1,7
49:7,12 50:2
50:16,24 51:24
52:4,17 53:8
53:23 55:8
58:12
**anymore**
41:4

**appear**
56:16
**appearances**
2:1 3:1
**appears**
58:17
**appointment**
40:5,25
**appointments**
41:2
**appropriate**
34:4,6,14
**approximately**
5:11
**aquilina**
21:3 37:14 43:4
43:12 44:15
54:6 55:2
**aquilinas**
36:6 45:7
**arent**
13:19
**arises**
19:21
**asked**
20:7 25:15
26:23 27:7,11
27:16 44:2
46:9 53:12
**asking**
10:17 14:14
26:22 27:4,10
53:14 57:10
**aspects**
14:6
**assess**
23:8
**assessment**
22:4,13
**assessments**
54:24
**assistant**
2:16 5:19,20
8:19
**assisted**
30:3,4 31:18
**associated**

21:7
**assuming**
15:25
**assurance**
36:15 44:1
**attend**
13:12 27:23
48:12
**attended**
48:13
**attending**
7:9 15:2 26:23
51:1
**attention**
38:20,21
**attorney**
2:4,12 5:16,19
5:21 6:5 29:5
61:12
**attorneys**
2:16
**available**
16:19,25
**avenue**
1:20 2:19 5:10
**awarded**
18:20
**aware**
10:2 19:3,7 35:4
49:5

**B**

**back**
12:9 18:6,7,8
19:7 39:16
43:2 44:21
48:22 55:24
**background**
53:16
**balancing**
52:21
**based**
19:24
**basis**
53:19
**bed**
34:21

**begins**
5:2 48:23
**behalf**
2:2,11 21:10
23:8
**behave**
19:4
**behavior**
19:14
**believe**
21:24 23:1 39:4
39:24 40:9
47:14
**best**
22:12 52:19
**better**
52:13
**bias**
49:2 53:17
**biases**
49:5
**bit**
41:3
**block**
57:22
**body**
57:11
**bond**
1:13 5:3,24 6:5
6:8 39:19 49:1
56:2 59:15
60:3,15 61:6
**book**
26:2
**bottom**
37:20 46:14
57:3,25
**boulevard**
6:9,11
**box**
39:19,22,23,24
42:21
**break**
48:18
**brecksville**
12:9 42:7,10,11
54:13

**brings**
38:19,21
**brizius**
2:15 5:20,20
57:25
**brizius2**
2:23
**broad**
10:16
**broader**
41:21
**brought**
24:3 29:1,2,20
**bs**
18:19
**bug**
9:24
**bunch**
23:23
**business**
13:24 58:22
**busy**
27:21

**C**

**c**
1:13,17 2:3 5:24
6:8 60:3,15
61:1,1,4,6,19
**cailen**
13:17
**call**
34:5,6 40:4 41:6
46:18
**called**
1:14 49:2
**calling**
34:12
**calloff**
11:4
**calloffs**
10:15
**calls**
10:18,20 11:20
32:2 33:22
**cant**
19:12 24:1

30:18 32:6
44:23,23 47:7
54:25
**caption**
61:11
**care**
11:5 14:8,15
16:1,11 17:10
34:11 35:16
41:25 51:16,19
52:22 54:23
**carina**
1:17 5:13 61:4
61:19
**caring**
16:16
**carol**
13:18
**case**
1:7 53:13
**cause**
5:7 61:7
**ccm**
60:25
**center**
22:17 23:9 25:4
25:7 29:18
30:3,4 32:16
54:4
**centered**
29:12
**centers**
22:23
**certain**
12:6 23:4 35:10
49:24 50:3,7
**certainly**
12:11
**certified**
6:1
**certify**
61:6,10,12,13
**cetera**
36:17
**chagrin**
6:11
**chain**

9:2,25 14:7
37:10
**challenging**
15:1
**change**
14:19,24 15:12
15:12,12,17
17:12
**changed**
41:3
**changes**
15:7 18:9 60:6
60:10,12
**characterize**
36:22
**charge**
47:8
**check**
27:22 40:6
42:21
**checking**
40:24
**chief**
7:19,21 10:13
**chuzi**
2:3
**civil**
1:16 61:14
**clarify**
44:15
**clash**
24:4
**cleveland**
1:20 2:20 5:10
6:9 30:7
**client**
12:4
**clients**
15:21
**clinical**
8:23 13:9 14:23
15:4,10,24
24:4,6 37:4
52:9 54:22
55:3
**collaborating**
8:25

**colleagues**
48:8
**college**
18:14
**com**
2:9
**come**
20:7 23:21 24:7
28:20
**coming**
13:19
**command**
9:2 10:1 14:7
**commencing**
1:21
**commission**
60:23 61:20
**commissioned**
61:5
**committee**
35:20 36:2,3,20
37:21 38:7
45:13,15,15,16
**complain**
33:9
**complained**
13:6 33:11
**complaint**
13:14 22:18,21
22:24,25 23:3
24:12,15 25:12
25:16 26:21
28:14,17,21,24
29:9,11,11,15
29:19,20 30:2
33:15
**complaints**
25:4,8,9
**complete**
26:15 56:22
**completed**
56:16 61:11
**complicit**
49:2
**complies**
26:4 37:7 43:3
44:6 45:20

**computeraided**
61:9
**concept**
49:1 55:11
**concern**
13:21 54:20
**concerned**
21:9 23:24
28:25 56:12
58:7,16
**concerns**
9:11,14,18 13:25
14:4 42:18
**concluded**
59:16
**concludes**
48:20 59:13
**conclusion**
28:20
**confide**
33:4
**conflict**
50:10
**conflicted**
55:5
**conflicts**
54:14
**confusing**
45:2,9,18
**consciously**
49:5
**consider**
7:25 32:10
**consistently**
13:10
**consisting**
60:4
**contact**
19:17 20:3,24
21:1 25:15
26:19 30:2
33:15 40:17,20
54:11
**contained**
16:10
**continued**
3:1

**continues**
57:2,24
**contract**
61:14
**contradict**
43:10
**contradicts**
45:7
**convenience**
46:19
**conversation**
46:18
**coordinators**
47:1
**copy**
28:2,3
**correct**
9:9 12:14 14:13
  14:17 15:21
  16:5,8,17 27:2
  27:6,13,17
  28:9 29:25
  36:21 37:18
  39:21 41:8
  42:1,4 46:23
  51:22 56:11
  58:12,23 60:7
  61:9
**corrections**
60:6,10,12
**couldnt**
11:23
**council**
36:7,9 38:22
**counsel**
5:14 6:15,15
  61:12
**count**
34:21
**counter**
13:8,11 54:22
**county**
6:24 61:3
**couple**
17:15
**court**
1:1,19 5:6,12

59:8 61:14
**courteous**
12:22
**courthouse**
2:17
**cover**
11:14 15:2
**coverage**
9:5,12,14 34:3
  56:13 58:8
**covered**
11:11
**covering**
11:24
**creation**
37:22
**credibility**
53:17
**crossexaminat...**
1:15
**cuyahoga**
6:24

**D**
**d**
1:13 4:1 5:3,24
  6:8 59:15 60:3
  60:15 61:6,14
**daily**
17:7
**data**
38:17,25 39:3,5
  39:7
**date**
26:16 28:5
  46:12
**day**
1:21 11:17 12:1
  12:1,7 17:16
  18:7 23:21
  24:18 32:15,23
  35:4 41:4
  46:15,21 60:19
  61:16
**days**
17:18 35:17
  40:16,18,20

**dc**
2:7
**debunk**
28:17
**debunked**
28:15 29:8
**decent**
22:11
**decide**
19:22
**decision**
29:14 51:6 52:9
**defendant**
2:11 5:19,21
**defendants**
1:11
**defined**
61:14
**degree**
18:12 41:16
**degrees**
18:18
**deleted**
45:24 46:22
**demeaning**
20:11
**demeanor**
20:20
**department**
1:9 5:5 36:16,24
  37:1
**depends**
11:23
**deposed**
6:1,18
**deposition**
1:13 5:2,9 53:12
  59:14,16 61:10
**depositions**
7:1
**describe**
12:20
**details**
21:25 26:15,20
  27:17
**determining**
34:2

**deviate**
55:14
**didnt**
20:17 25:21
  27:8 29:2,13
  30:1 38:13
  44:10 52:23
**different**
43:21 45:10
**difficult**
31:1,6
**difficulties**
52:21
**direct**
8:11 9:19 29:6
  56:21
**directed**
11:13
**direction**
13:8 54:21,22
  55:3
**directions**
13:11 23:14
**directly**
13:3 27:4
**director**
8:22
**disability**
53:7
**disagreements**
51:13,19
**disbanded**
38:8
**discharge**
11:9 35:17 40:5
**discharged**
35:14
**disciplined**
9:16
**disciplines**
8:25
**discuss**
9:21 14:2 15:10
  16:25 21:13
  54:14
**discussed**
13:21 43:23

**discussing**
32:12
**discussion**
27:8 38:1 52:19
**discussions**
23:18
**distorted**
19:2,2
**district**
1:1,2 5:6,7
**divorce**
6:21 19:12
**divvied**
12:2
**doctors**
14:25
**document**
16:13 25:7
  57:14
**documentation**
25:23 27:1,7,8
**documented**
19:11
**documents**
40:3
**doesnt**
16:14 44:14
**doing**
40:6 54:24
**dont**
10:12 11:12,13
  12:18,24 14:6
  14:18 17:1,7
  17:22 18:7,10
  20:25 21:8,22
  21:25 22:16
  23:13,23 24:9
  24:13,21 25:1
  25:2 26:12
  27:9 28:5,19
  29:10 30:6
  32:11,20,24
  33:2 34:6,9
  37:12 41:4
  43:15,15,18
  44:1,2 45:2,6
  46:7,7,12 53:8

53:11,18,19
55:18 56:10
57:24 58:13
**doubler**
13:19
**downstairs**
23:21
**dr**
6:5 7:17,23 21:2
38:20 39:19
49:1 54:14
56:2
**duly**
6:1 61:5,6
**duties**
7:3 10:23 11:22
29:17

**E**

**e**
2:15,23 4:1 61:1
61:1
**earlier**
44:17 54:10
**east**
1:20 5:9 6:8
**education**
18:11
**eeo**
27:18
**effect**
42:3 58:10,13
**eight**
12:19
**either**
10:24 38:13
41:5 48:5
**email**
19:19 21:24
26:11,14 28:8
36:6 37:10,13
37:16,17,20
38:6 43:4,11
44:14 45:4,7,7
45:25 46:15,17
46:22 56:7,15
56:22 57:9,11

**emails**
44:24
**emergency**
30:23,25 32:10
32:11 58:21
**employed**
6:13
**employee**
9:17 22:5,14
24:23 34:7,12
61:12
**employees**
8:3,5,16 9:3
25:1 29:21,22
33:12
**encounter**
40:17
**encountering**
19:14
**ends**
11:8
**endure**
20:12
**engaged**
6:15 19:18
**entire**
44:7 57:14
**eric**
7:17
**erin**
2:15,23 5:20
**essence**
28:24
**et**
36:17
**event**
56:13
**everybody**
15:13
**evidence**
40:10
**examination**
4:3 6:3
**exchange**
21:24

**executive**
36:23
**exhaustive**
16:22
**existed**
45:17
**exists**
37:21 38:13
**expanded**
35:16
**expectations**
13:9
**expected**
10:24
**expires**
60:23 61:20
**explain**
35:7 53:9,13
**explicitly**
41:12
**expressed**
54:20
**extend**
40:18
**extensive**
17:1
**extent**
24:8,9
**extra**
12:2

**F**

**f**
61:1
**face**
40:21,21 41:6,6
**facetoface**
40:17
**facility**
30:16 31:17
**fact**
42:22 44:15
58:17
**fairest**
15:3
**fairly**
10:16

**familiar**
25:2 35:2 36:1,9
49:1 50:5
55:11,16
**familiarity**
55:6
**family**
11:9 22:18,20,24
24:12,14 25:4
25:12,16 28:14
28:18,21 29:9
29:11,13,15,19
**far**
17:2 24:16
**favoritism**
20:17 46:10
**february**
7:7 17:17,24
34:16
**federal**
1:15
**feel**
29:8 57:13
**feelings**
19:12
**felt**
18:23 21:6
52:12
**figure**
42:8
**fill**
10:12 29:4
**filled**
29:3,7
**filling**
10:8
**fills**
24:23
**financially**
61:13
**fine**
10:7 56:24
**firm**
61:14
**first**
6:1 9:21 12:7
24:7 37:16

40:18,21 41:12
41:13,22 42:6
42:6,8 61:6
**fit**
55:13
**fitch**
2:3
**five**
12:18 21:19
36:5,5 53:12
**flow**
37:25
**flying**
9:24
**follow**
47:24
**followed**
55:4
**following**
58:3
**follows**
6:2
**followup**
35:4 40:10
**foregoing**
60:4,6 61:9,11
**form**
9:1 29:5
**formal**
16:13 25:10
**forward**
20:1 37:6
**four**
30:19 31:13
42:4 57:8
**fredritz**
47:15,23 48:16
**free**
57:13
**front**
26:2
**full**
42:16
**further**
38:1 58:25
61:10,12,13

**G**

**general**
20:8
**generic**
44:3
**give**
13:16 16:21
20:18 21:1
22:8 23:14
38:23 44:23
**given**
54:21 60:7 61:7
61:10
**giving**
13:8
**glasses**
26:5
**go**
32:22 39:11
44:9,21 48:19
**goes**
57:17
**going**
10:6 15:25
16:23,23 17:3
19:25 20:22
27:23 31:13
39:13 42:9
53:22 54:23
55:21 59:14
**gonna**
15:11,11
**good**
12:23 13:1 22:4
22:6,14
**gossip**
53:25
**gov**
2:22,23
**group**
36:13 37:15,23
38:9,12 42:8
43:5,25 44:1
45:14
**groups**
8:24

**gs**
7:11
**guess**
19:22 45:5

**H**

**haggard**
13:17
**half**
7:10 27:15
**hammond**
2:13,22 5:18
**hand**
17:3 61:15
**handed**
14:16
**happen**
17:4
**happened**
22:20 28:23
30:2 42:12
**happening**
15:14
**harbor**
49:5
**hard**
11:25 42:15
**hartville**
39:10
**havent**
17:3,9 19:24
**head**
9:15 10:22 57:2
**header**
56:18
**health**
35:2,3,17,20
36:1,3,7,12,14
36:18,21 38:7
38:16,22 39:19
47:24
**hear**
37:3,3
**heard**
5:5 20:16,16
31:19,23 42:18
53:25

**held**
5:9
**help**
11:15
**hereinafter**
6:1
**hereunto**
61:15
**hes**
43:24,24
**highest**
41:14,16
**hills**
6:11
**hire**
51:6
**hiring**
47:17 51:10
**home**
6:10 34:5,7,12
**hospital**
6:14 16:24 29:1
29:5 35:18
41:17,22 49:22
**hospitalized**
41:15
**hostile**
13:7 19:1 20:11
20:20
**hows**
10:6
**huddle**
15:8,11
**hundred**
23:4

**I**

**id**
39:11 50:5
**idea**
17:21 25:14
**ill**
19:22 53:21
**im**
5:12 6:5,14,23
7:4,15 8:22,23
10:2,16 12:6

12:10 14:7,14
19:3 23:4
24:21 25:9
26:7,7 28:5
35:10 39:10
44:24 45:9
47:15 49:18,24
50:3,7 52:18
53:11,22 55:16
57:7,10 58:2
**impact**
10:19,21
**impacted**
15:5
**important**
14:8 16:11,16,18
21:25 25:3,6
**inappropriate**
20:21
**incident**
58:14
**include**
36:18 41:17
**indicate**
13:1 28:14
39:20
**indicating**
27:10 46:4,8
58:11,19
**indirectly**
13:4,5
**individual**
9:21 29:1
**informal**
16:3,12
**information**
16:10,15
**inpatient**
7:4 8:6,7,22
12:8 31:2
35:15 41:15,23
49:16 50:18
51:2 52:20
**instruct**
53:22
**insulting**
53:5

**intensity**
52:20
**interaction**
19:18,25 20:2,13
40:24
**interested**
61:13
**interviewing**
23:12 51:9
**investigation**
25:7,10
**involved**
11:12 15:23
47:17,21,23
**isnt**
24:23 45:14
57:21
**issue**
20:6,14 21:21
41:13 44:16,20
**issues**
9:12,14 11:2,10
11:15,25 12:1
20:8 21:13,15
24:4 34:3,11
36:24,25 41:21
54:25
**issuing**
26:18
**iterations**
35:18 40:15
**ive**
12:15 19:2

**J**

**jackie**
39:10
**jennifer**
30:16
**jim**
3:5 5:11
**job**
22:23 23:8
29:17 49:22
**joe**
54:6
**john**

13:18,18 20:17
22:2,18 23:6
23:12,14,18
24:11,17 25:11
25:24 27:1,9
27:12 28:18
29:22 30:11,15
31:8,19,24
32:15,22 33:4
33:11,14 34:15
46:10
**johnson**
2:13,22 5:18,18
10:10 17:19
18:2 30:13
31:3,10 32:18
32:25 33:5,17
33:20 35:8,22
39:1,11 40:1
41:9 42:23
43:13 44:7
45:21 46:1
47:2,12,18,25
48:6 49:6,11
50:1,12,15,23
51:14,17,23
52:3,11,16
53:3,8,18,22
55:7,15 56:15
56:19,21 57:13
57:18,23 58:1
59:2,7,11
**june**
42:12 61:16

_____
**K**
_____

**kafantaris**
3:5 5:11
**kalijarvi**
2:3
**katie**
47:7
**kcnlaw**
2:9
**keep**
28:3 36:14
42:15

**kent**
18:19
**kind**
17:4 19:5,14
52:22
**kinds**
41:18
**know**
11:13,25 12:18
12:24 14:5,6
14:18 15:13
16:22,24 17:1
17:2,7 20:23
21:8,14 22:20
23:4,13 24:3,9
24:11,13,14,16
24:21 26:6,10
28:19 29:10
30:6 32:20
34:15,21,24
37:4,8 40:19
44:1,2,2 45:2,6
46:7,25 47:9
47:11,17 49:4
49:25 50:5,8
55:18 56:5
57:5,24
**knowing**
41:15
**knowledge**
21:12
**known**
12:4,11,15
**konicki**
7:17 21:2 54:14
**konickis**
38:20
**kristi**
13:17 47:14,15
48:13

_____
**L**
_____

**l**
2:6
**late**
26:16
**law**

2:4
**lawful**
5:25
**lead**
15:13
**leadership**
36:13,25
**leave**
11:21 17:25
18:4 34:25
41:22
**leaving**
15:19 16:18,23
33:23
**left**
20:12,22 32:16
50:8 54:12
**legal**
6:15
**leligdon**
1:4 3:4 5:3,17
6:6 12:5 18:23
21:7,10,12
23:11,16 24:12
25:12 26:11
27:4 31:21
32:8 33:9
34:24 37:11
44:15 54:1,4,7
55:13 58:15
**leligdons**
9:9 14:4 45:24
**level**
7:11 34:18
37:15,22 38:9
38:11 44:22
**likelihood**
41:1
**limit**
19:17
**linda**
1:13 5:3,24 6:8
59:15 60:3,15
61:6
**line**
26:14 37:17
43:17 44:8

**lisa**
2:13,22 5:18
**listen**
21:23
**litigation**
44:9 53:11,15
**little**
41:3
**living**
30:3,4
**long**
7:6 12:4 21:18
25:11 48:13
49:17
**longer**
20:13 26:19
37:21 38:13
42:5
**look**
30:16 41:13
44:5
**looked**
27:18
**looking**
28:8
**loose**
11:8
**lot**
23:24

_____
**M**
_____

**m**
1:13,22 5:3,11
5:24 6:8 57:11
59:15,16 60:3
60:15 61:6
**maintaining**
9:5
**manage**
22:23 29:18
35:21
**managed**
10:15
**management**
8:1 9:12 23:9
37:15,23 38:9
38:12,17,18

44:22 54:15
**manager**
7:4,10 12:23
13:2 15:4 23:1
**managing**
11:2 38:15
**manner**
20:20 29:12
**march**
61:20
**marshall**
39:4,5
**matter**
5:3 6:16
**maximize**
41:1
**mccaffrey**
13:18
**mcdonald**
1:7 5:4
**mckinney**
13:18 20:17
22:2,18 23:6
23:12,14,18
24:11,17 25:24
27:1,9,12
28:18 29:22
30:11,15 31:8
31:19,24 32:15
32:22 33:4,11
33:14 34:15
46:10
**mckinneys**
25:11
**mean**
21:8 22:22 23:6
23:10 29:16
**meaning**
22:6 30:23
43:25
**meaningful**
40:24
**means**
58:21 61:9
**measure**
40:11,13,14
41:12 42:6,10

41:12 42:6,10
42:13
**measures**
36:15,25 41:3
**medicaid**
31:18
**medical**
7:4,10 8:7 18:12
19:8 22:17,23
23:9 25:3,6
29:18 54:3
**medication**
41:18
**medicine**
18:15
**meet**
15:9 20:7 23:15
25:25 40:11
42:10 46:10
54:13
**meeting**
11:9 25:11
26:23 37:5
54:20,24
**member**
29:13 43:5,25
**members**
15:1
**memory**
27:19 58:18
**mental**
35:2,3,17,20
36:1,3,7,11,14
36:18,21 38:6
38:15,21 39:19
47:24
**mentioned**
37:16 54:10
**merit**
1:17 28:21 61:4
**meszaros**
1:17 5:13 61:4
61:19
**met**
24:11 41:5
42:21
**mh**

37:17 43:6
**micromanaging**
13:7
**midlevel**
8:7,16
**mind**
19:7
**minimally**
55:12
**minimum**
32:13
**minutes**
39:21 40:9
42:16,22
**missing**
57:16
**mmhmm**
12:3 14:22 17:6
28:10 37:24
38:3 43:7
**mode**
32:10,12 58:21
**monday**
15:12
**monitor**
35:2,5,20 36:1,3
37:2,17 38:7
39:19,22 44:4
45:12 47:24
**monitored**
17:3
**monitors**
35:3 36:12,15,18
36:21 38:16,18
39:5 43:6,25
45:11
**month**
6:23 17:16
38:19 44:17
**monthly**
36:7
**months**
28:7 49:25 51:1
**moot**
38:1
**moreland**
6:11

**morning**
15:8
**move**
52:2,6,8 53:21
**moved**
42:11,11 51:21
52:7
**multiple**
13:15 35:18
**murray**
7:21

_____
**N**

**n**
4:1
**name**
5:11 6:7 26:13
38:11,14 47:7
48:15
**named**
61:6
**names**
5:14 13:16,19
38:23,24,25
**nasty**
20:11
**naturalistic**
17:4
**nature**
22:1 23:3
**near**
30:6
**necessary**
9:22 38:20
**need**
12:2 16:21 19:7
19:19 40:7
48:17 53:9
**needed**
23:25 27:22
**never**
42:18,19 45:15
45:17
**newman**
2:3
**nicole**
13:17

**nodding**
9:15 10:22
**noncompliance**
26:22 41:18
**normal**
15:24 29:17
**normally**
31:1,5
**northeastern**
18:14
**northern**
1:2 5:7
**northwest**
2:6
**notary**
1:18 60:17,21
61:5
**note**
39:23,25
**notice**
11:4,20 17:11,18
26:22 33:22
40:3
**november**
26:11
**number**
5:2,7 48:20,23
**nurse**
8:18 23:1
**nurses**
9:6

_____
**O**

**objection**
10:10 17:19
18:2 30:13
31:3,10 32:18
32:25 33:5,17
35:8,22 39:1
40:1 41:9
42:23 43:13
44:7 46:1 47:2
47:12,18,25
48:6 49:6,11
50:1,12,15,23
51:14,17,23
52:3,11,16

53:3,8 55:7,15
56:15
**observe**
29:13
**observed**
12:25 13:3
**obviously**
26:12
**occasion**
19:21
**occur**
17:2
**occurred**
32:7
**oclock**
1:21
**october**
20:5 46:9 57:5
57:10 58:6
**office**
2:12 16:20 20:7
61:15
**officer**
39:6
**offices**
1:19
**offs**
34:3
**oh**
56:17
**ohio**
1:2,18,20 2:20
5:7,10 6:9,11
18:14 61:2,5
61:15
**okay**
33:20 37:9,19
40:19,21 45:1
53:21 56:6,19
57:15 58:1
59:2,6,11
**once**
17:15
**ongoing**
17:7
**opinion**
19:9 22:9,16

34:13 44:23
55:13
**opportunity**
40:23 60:5
**opposed**
45:14 55:4
**originally**
40:15
**oryx**
36:15
**outcome**
20:23 24:14
**outgoing**
15:16,18
**overseeing**
8:24
**oversees**
36:21
**oversight**
36:23 39:7

---

**P**

**p**
1:22 2:3 5:11
57:11 59:16
**pace**
52:20
**page**
26:3,7 36:4
37:20 43:11
44:5,11 45:19
45:21 46:15
56:3,18,25
57:4,11,18,24
**pages**
37:6 46:14 57:8
60:5
**panel**
51:9
**paperwork**
13:13 28:25
29:4
**paranoid**
19:4
**park**
42:12
**part**

9:1 19:9 23:4
24:23 29:8,10
29:17 41:7
51:9 57:16,21
**partially**
40:11
**participate**
51:6
**particular**
7:25 9:16 25:16
**parttime**
14:25
**party**
61:12
**pass**
15:20
**passing**
16:15
**patient**
11:4 14:16 16:1
16:22 22:25
29:5 31:16
40:4 51:16,19
52:22 54:23
**patients**
16:5 30:8,18
35:14 40:16,25
41:14,21
**paul**
39:4,4
**paula**
1:4 3:4 5:3,17
6:6 9:8 11:3,14
12:4 13:21
14:4 18:23
19:16 20:14
21:7,10,12
23:2,11,15
24:8,11 25:12
25:25 26:11
27:4,15 31:20
32:8 33:9
34:24 37:10
38:8 44:14,17
44:20,22 45:24
46:9,17 54:1,4
54:7,13,19

55:13 58:15
**people**
15:5 16:2 19:3,4
44:24 49:4
53:2
**percent**
11:22 23:4
**performance**
9:11,18 14:5,7
24:24 36:24
**person**
15:25 16:18
19:18
**personal**
19:12 48:4
**personally**
31:8
**personnel**
8:20
**pharmacists**
9:6
**phone**
40:20 41:6
**phrase**
31:23
**physician**
6:14 7:9
**physicians**
7:14 8:6,18 25:2
**ping**
31:20,23
**place**
31:1 42:9,10
61:11
**placing**
30:17 31:17
**plaintiff**
1:5,14 2:2 5:17
**plan**
19:17,25 54:22
56:13 58:8
**please**
5:14 28:11
39:12 43:8
45:19 46:18
**plural**
45:12

**plus**
11:22
**point**
13:13 38:1
**pointing**
57:19
**policy**
9:25
**pong**
31:20,23
**position**
7:8 52:23
**positive**
20:5
**possible**
34:11 49:4
**postponed**
10:24
**power**
29:5
**practitioner**
8:18
**prepared**
61:8
**presence**
61:8
**present**
3:3
**pressing**
11:10
**presume**
21:14
**pretty**
44:3
**prevention**
41:8 46:25
**previous**
39:3 56:17,25
**private**
34:9,10
**probably**
13:19 21:20
**problems**
10:8 17:9 41:16
**procedure**
1:16
**proceed**

15:14 39:17
48:24 58:23
**process**
15:7 24:24 41:7
43:22
**processes**
37:25 42:9
**produced**
61:8
**professional**
19:8 51:12,18
**program**
8:23 35:21 42:3
47:8 51:22
**prone**
19:6
**protect**
19:15
**providers**
8:7
**prrtp**
51:22
**prtp**
8:9 52:23
**psychiatric**
41:23 42:11
**psychiatrist**
19:4,13 49:13
**psychiatrists**
8:8,9,10
**psychiatry**
7:5,19 8:6,7
10:3,13 36:17
38:18 50:18
51:22
**psychology**
36:17
**public**
1:18 60:17,21
61:5
**purpose**
35:7,11 39:25
41:7
**purposes**
41:25
**pursuant**
1:15

**put**
42:9

**Q**

**qualified**
61:5
**quality**
36:15 41:25
    44:1
**question**
10:16 37:21
    43:23 44:11
    45:5 53:14,17
    53:19
**questioning**
44:8
**questions**
53:12 59:1

**R**

**r**
2:4 61:1
**raise**
21:15
**raising**
20:14
**ran**
13:8 54:22
**range**
50:6
**rating**
24:24
**read**
26:9 38:10
    56:23 59:3,4,8
    59:9 60:4
**reading**
26:5 45:25
    46:22
**ready**
26:6,7 37:8 56:5
    57:6,7
**really**
11:23 12:6 17:3
    41:13,20 53:11
**reason**
26:18

**reassigned**
10:25
**recall**
17:22 22:17
    24:17 26:10
    32:6,8 34:18
    37:10,12 46:11
    46:12 52:19
**receive**
29:18
**received**
22:18
**recess**
39:15 48:21
    55:20,23
**recite**
27:12
**recognize**
56:7
**recommend**
51:10 59:4
**record**
5:1,15 6:6 39:12
    39:14,16 48:19
    48:22 53:10,15
    55:21,24 59:14
**reduced**
61:8
**refer**
31:19
**reference**
31:24
**referring**
43:16 45:16,16
    57:9
**refers**
36:6
**refreshed**
27:19
**registered**
1:17 61:4
**regular**
11:21 58:22
**relapse**
41:18
**related**
53:15,17

**relationship**
8:20 12:20,22
    22:1 48:4
    49:15
**relative**
29:6 61:12
**release**
29:3
**relevance**
53:9,13
**remember**
18:7,10 21:22,25
    23:20,23 26:12
    26:15 27:6,17
    28:5 29:11
    30:19 32:11,12
    32:24 33:2
    46:7 55:1
    56:10 58:14
**remembered**
26:20
**remind**
40:25
**reminding**
40:5
**renner**
2:4 4:3 5:16,16
    6:4,5 10:14
    17:23 18:5
    30:20 31:7,14
    32:21 33:3,8
    33:21 35:12,25
    39:8,18 40:12
    41:24 43:1,20
    44:13 45:22,23
    46:5 47:5,16
    47:20 48:3,9
    48:17,25 49:9
    49:14 50:4,13
    50:20 51:3,15
    51:20 52:1,5
    52:14 53:1,6
    53:16,21,24
    55:10,19 56:1
    56:17,20,24
    57:1 58:5,25
**rep**

**22:25
**repeat**
45:21
**replaced**
38:8
**report**
9:7 16:22 20:3
    20:10,23 21:1
    25:15 26:19
    30:1 33:15
    39:9 54:11
**reported**
38:19 42:14
**reporter**
1:17 5:12 59:8
    61:5
**reporters**
1:19
**reporting**
38:7 44:16,18,18
    61:14
**reports**
8:11 9:20
**representation**
6:16
**representative**
37:14 43:12
**request**
26:4 37:7 43:3
    44:6 45:20
**requested**
54:12
**required**
36:16
**requirement**
35:14 40:15,19
    41:5
**requirements**
52:22
**resident**
50:14,19
**residential**
8:8,9 35:16
**respect**
22:14 25:24
**responded**
29:19 44:3

**responding**
43:24 44:4,16
**response**
22:24
**responsibilities**
14:12 24:5
**responsibility**
9:9 23:11 29:14
    29:24 36:11
**responsible**
8:23 9:5 10:3
    11:2 37:4
    38:15 50:21
**results**
37:3 38:19
**review**
33:14 57:14
**reviewing**
43:5,25
**richard**
2:4 5:16 6:5
**ridiculous**
20:21 53:4
**right**
13:20 15:20,22
    16:20 17:8
    22:10 26:8,25
    28:8 30:1
    36:20 38:11
    43:10 44:14,21
    46:21 50:22
    56:9,11 58:20
    59:3
**risk**
41:14,22
**rmr**
61:19
**robert**
1:7 5:4
**roc**
26:16 27:16
**roche**
30:16
**ross**
39:4
**rotate**
15:4

**rotating**
14:24
**rotation**
50:18
**rotolo**
47:7,23
**roughly**
27:24
**rounds**
13:12 54:23
**routinely**
13:6
**rrenner**
2:9
**rude**
23:5 28:23,23
**rule**
61:14
**rules**
1:15
**rumors**
20:16,16,19
53:25
**run**
13:11

**S**

**s**
1:8 2:12 5:19,21
45:11,12
**sack**
13:17 47:15
**sacks**
48:13
**sara**
49:10
**saying**
19:8 26:14
32:11 42:21
43:4 45:6,10
46:16 55:2
**says**
46:3,8,24
**schedule**
11:9
**scheduled**
41:2

**scheduling**
14:25
**seal**
61:15
**second**
37:13 43:11
**secretary**
1:8 5:4
**see**
27:9 36:6 37:12
38:9 40:6,7
43:6 46:15,19
57:3 58:24
**seen**
40:16,19,20
**select**
31:15
**selfassessment**
24:18,20,22
**sending**
26:10
**sense**
16:14 25:10
**sensitive**
30:21
**sent**
26:12 28:3 56:8
**sentence**
58:20
**september**
46:16
**sequence**
58:3
**seriously**
25:4
**serve**
40:10
**service**
7:5 8:6,8,22,24
12:9 13:9
16:24 35:15
41:15 43:12
49:16 50:18
51:2 52:13
**services**
9:7
**set**

17:13 61:15
**seven**
35:4,17 40:18
41:4
**sevenday**
41:5 47:24
**sharing**
16:20
**sherry**
13:18
**shes**
13:1
**short**
11:4,20 33:22
48:17 55:19
**show**
41:1
**side**
30:7
**sign**
15:24 16:7,10,12
34:3
**signature**
56:8 57:16,21
59:4
**signed**
29:2
**simply**
37:3
**single**
26:14
**singular**
45:13
**sit**
20:12
**situation**
33:24
**social**
9:6,8 10:18,20
10:25 11:11,17
12:8,12,23
13:1,5,15 14:8
14:11,16 15:16
16:4 17:11
20:8 22:3,6,11
23:22 32:1,4,5
32:9,13,16

33:22,23,24
34:5 37:14
39:20,22 40:4
42:14 43:12
54:15,21 56:12
56:14 58:7,9
**socialize**
48:10
**sorry**
33:19 44:25
47:15
**sort**
11:10 17:7
19:18
**speak**
23:21 40:8
**speaking**
20:20
**specifically**
32:6 37:1 46:13
55:1 58:14
**specifics**
20:18
**specified**
61:11
**speers**
39:6
**split**
15:6
**spoke**
23:1 29:12
39:20
**spoken**
28:22
**ss**
61:3
**staff**
7:21 9:19 10:4
14:23 17:17
37:4 42:20
53:2 54:15
**staffed**
11:18
**staffing**
10:3 32:13
34:18
**start**

22:7
**state**
1:18 5:14 6:6
18:19 49:22
61:2,5
**stated**
34:13 41:12
**states**
1:1 2:16,17 5:5
5:6
**status**
16:16
**stay**
41:23
**staying**
15:19
**stenotypy**
61:8
**step**
11:15
**stereotype**
55:14,17,18
**stereotyping**
55:6
**stone**
13:18
**street**
2:6
**student**
12:7,15 47:9,11
52:23,24
**style**
8:1
**subject**
37:17 43:16,17
**subordinates**
8:13
**subsequent**
37:22
**subsequently**
27:18
**substance**
40:9
**substantive**
41:6
**sufficiently**
26:15 27:17

**suggest**
13:24
**suggested**
24:7
**suggests**
38:6
**suicide**
41:7,17,20 46:25
**suite**
1:19 2:5,18
**suited**
52:13
**summit**
61:3
**superior**
1:20 2:19 5:10
**supervise**
8:3,17
**supervision**
13:6 22:15
**supervisor**
7:16,20 9:16,23
12:12 21:2
33:25 34:4
49:16,19 54:14
**supplemental**
56:12 58:7
**supportive**
55:2
**sure**
6:23 7:15 10:16
12:10 14:14
24:21 25:9
28:5 39:10
49:18
**suspenses**
36:25
**swear**
5:22
**sworn**
6:1 60:17 61:6

**T**

**t**
61:1,1
**take**
25:4 48:17

55:19
**taken**
1:16 25:13
39:15 48:21
55:23 61:11
**talk**
13:24 17:16
20:22 24:8
**talked**
54:3,6
**talking**
14:18,19,21
16:13 24:22
42:15 43:18
45:3,10,11,13
**tape**
48:20,23
**teaching**
52:23,24
**team**
9:1 11:15 14:12
15:7,10,11,17
15:17 17:12
31:16 54:25
**teams**
14:19,24 15:1,6
18:9
**telephone**
19:19 40:17
**tell**
24:1 58:15 59:7
**telling**
13:12 32:8
**template**
39:23
**ten**
8:12,13 16:5
**terms**
55:3
**testify**
61:6
**testimony**
27:18,20,25
54:10 60:7
61:7,10
**thats**
10:16 13:25

15:14,24 19:8
26:23 30:24
33:20 37:15
46:3,7,24 53:4
53:18 56:8,24
57:21
**theres**
9:24 13:20
17:12 32:5,9
36:3 39:22
44:22 45:12
57:8,16,20
58:10,13
**theyre**
11:13 15:18,18
15:18,19 16:19
16:23 19:5
36:23,23 37:1
38:19 40:6
43:16,18 45:10
45:11,13 48:8
**thing**
15:3,24 17:7,13
22:8 24:6
27:10 43:19
**things**
11:24 15:10
19:2,3 24:7
41:19 45:10
**think**
7:14,14 19:2
22:11 23:2
25:3,6,11
28:23 30:19
34:6,9 39:5
40:23 43:16,18
46:12 53:12,18
53:19
**thinking**
12:6 30:17
31:17 52:18
**thinks**
21:14
**thought**
15:3 20:9 32:12
**threatened**
18:23 21:6

**threatening**
21:10
**three**
11:19 32:1
46:14 56:14
57:8 58:8
**thursday**
1:20 18:6
**tie**
11:8
**time**
5:15 15:5,6,13
16:2 17:17,24
17:24 21:17,18
22:17 26:18
30:8,8,21 32:6
34:9,10,19,25
39:14,17 48:13
48:20,23 50:6
50:21 51:21
55:22,25 61:11
**times**
14:15 18:24
32:3
**title**
7:18
**today**
15:11 27:11,19
46:19
**told**
23:20 25:24
27:1,11,13,21
32:1 42:20
44:11,21
**top**
43:4
**track**
36:14
**trade**
14:11
**trained**
47:11 50:14
**training**
19:13 50:22
51:4
**transcript**
59:3,5,10,12

60:4,7
**transcription**
61:9,9
**transfer**
52:24
**transitions**
17:9
**treatment**
9:1
**tried**
21:15
**trouble**
58:2
**true**
45:24 46:6 58:6
60:7 61:9
**truth**
61:7,7,7
**try**
40:25
**turn**
26:3 36:4 37:6
43:2 44:11
45:19 46:14
**two**
11:21 15:6,12
17:18 27:15
32:3,4,13 37:6
50:18 51:12
56:14 57:8
58:8
**typical**
11:17

**U**

**u**
1:8 2:12 5:19,21
**ultimately**
38:21
**unable**
58:22
**undersigned**
1:16
**understand**
43:22
**understood**
24:6

unfairly
20:15
unit
31:2 32:10
  42:11 52:20
united
1:1 2:16,17 5:4
  5:6
universities
18:14
university
18:19
unnecessary
38:2
unpredictable
19:5
unreasonable
13:7
upper
37:22 38:8,11
  44:22
urgent
30:21
usdoj
2:22,23
use
28:11 38:4 43:8
usually
11:12

_____

**V**

va
6:14 7:3,6 9:25
  29:18 33:12
vacancies
10:9,13
various
8:25 9:7 36:14
  41:18
verbally
16:1 28:1,2
verify
60:3
versus
5:4
veteran
16:16,17 34:11

39:21 42:15,21
veterans
1:9 5:5 14:9
  16:11 31:1
  34:3 42:1
video
59:12
videographer
3:5 5:1,12,22
  39:13,16 48:19
  48:22 55:21,24
  59:13
videotape
5:2
videotaped
1:13
vincent
39:4
violence
19:6
visit
30:8,22 35:17
volunteers
11:13
vs
1:6

_____

**W**

wade
42:12
waive
59:3,11
waiver
31:18
want
20:5 26:9,10
  33:24 45:4
  46:17 53:2
  56:21 57:14
  58:4
wanted
23:20 29:4
ward
8:21 9:19 10:15
  10:19,21 11:18
  14:9 15:19,19
  16:19 22:3

23:1 24:5 32:5
  32:9,17 33:23
  34:4,19,21
  54:16,23 55:4
  56:13 58:22
warrant
25:9
washington
2:7
wasnt
15:5 20:22
  21:24 26:21
  30:25 41:11,20
  50:25
way
15:15 17:5 19:5
  24:2 36:22
wedding
48:13
weddings
48:12
week
17:15
weekend
8:8
weeks
15:13 17:15
went
24:9,13 30:16,18
  32:15
west
2:19 30:6 49:10
weve
24:3,6
whats
8:20 15:7 22:4
  22:13,13 48:15
whereof
61:15
whos
9:5 11:2 19:20
wiley
13:17
william
39:6
willing
21:12,23

witness
1:14 5:23,25
  10:12 17:21
  18:4 25:21
  26:4 30:15
  31:5,12 32:20
  33:2,7,19
  35:10,24 37:7
  39:3 40:3
  41:11 42:25
  43:3,15 44:6
  44:10 45:20
  46:3 47:4,14
  47:19 48:2,8
  49:8,13 50:3
  50:17,25 51:18
  51:25 52:12,18
  53:4 55:9,16
  56:22,25 57:15
  57:20 58:2
  59:6,9 61:6,8
  61:15
woman
55:17
women
55:14
wonder
57:23
wont
16:25
word
28:11 43:8
words
38:4
work
8:21 12:2,23
  13:2 15:23
  20:8 37:14,15
  37:23 38:9,12
  42:6,8 45:14
  49:15 53:7
  54:15 56:13
  58:8
worked
7:6 51:1
worker
10:18,20 11:17

14:16 15:16
  16:4 22:3,6,11
  32:5,9 33:22
  33:23,25 34:5
  39:20,23 40:4
workers
9:6,8 10:25
  11:11 12:8,12
  13:5,15 14:8
  14:11 17:11
  23:22 32:1,4
  32:14,16 42:14
  54:21 56:14
  58:9
working
12:7 31:16
workload
32:3
worry
11:24
worst
22:12
wouldnt
20:18 21:14
  23:25 25:1
  29:6
write
25:15,22 27:16
  30:1
writing
27:25
written
16:2 44:24 45:4
  58:17,24
wrote
20:3,10 28:2
  54:11

_____

**X**

x
4:1

_____

**Y**

yeah
16:6 44:19,21
  56:17 57:2
year

7:10 18:16
**years**
 12:10,18,19 13:5
  14:23 21:19
  27:15 35:19
  42:4 49:25
  54:12
**youd**
 59:8
**youll**
 26:21
**youre**
 10:17 14:14,18
  19:8 26:6
  27:10 36:9
  37:8 38:7 45:3
  45:6 50:5 56:5
  57:5,9,19
**youve**
 10:8 12:11
  42:18 53:12

———— **Z** ————

———— **0** ————
**03**
 55:25
**09**
 59:14,16

———— **1** ————
**1**
 1:7 5:2,8 48:20
  57:11
**105**
 1:19
**10701**
 6:8
**11**
 39:14,21 40:9
  42:16,22 61:20
**14**
 40:16,20,22 41:4
**14cv02810dcn**
 1:7 5:8
**15**
 7:14,14

**19**
 26:11
**1900**
 1:19 5:9
**1901**
 2:6
**1934**
 26:3
**1965**
 57:25 58:1
**1966**
 57:20
**1968**
 56:20
**1969**
 56:4 57:2,12
**1977**
 45:19,22
**1980**
 46:14
**1986**
 18:17,20
**1997**
 6:23

———— **2** ————
**2**
 1:21 5:11 48:23
**2000**
 7:7
**20036**
 2:7
**2011**
 42:12,13 54:18
**2012**
 37:11
**2013**
 26:11 57:5,10
  58:6
**2014**
 28:5 34:16
**2015**
 46:16
**2016**
 1:21 5:10 60:8
  61:16
**2019**

61:20
**202**
 2:8
**2065**
 36:4 43:2
**2066**
 44:5,12
**2067**
 37:6 43:11
  44:21
**216**
 2:21
**22**
 39:17
**22nd**
 61:16
**25**
 57:5,10
**26**
 1:21 5:10,11
  60:8
**266**
 44:11
**26th**
 1:21
**28**
 61:14

———— **3** ————
**3**
 39:14,17 48:20
  48:23 55:22
**30**
 46:16
**34**
 48:20
**37**
 48:23
**37250**
 6:11

———— **4** ————
**4**
 4:3 34:16 55:25
  59:14,16
**40**
 55:14,17

**400**
 2:18
**44022**
 6:12
**44106**
 6:9
**44113**
 2:20
**4668696**
 2:8
**47**
 55:22

———— **5** ————
**50**
 11:22
**52**
 57:11

———— **6** ————
**61**
 60:4
**610**
 2:5
**6223679**
 2:21

———— **7** ————
**7**
 40:21

———— **8** ————
**801**
 2:19

———— **9** ————